No. _____

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

IN RE IVAN ABNER CANTU,

MOVANT.

## OPPOSED MOTION FOR ORDER AUTHORIZING THE DISTRICT COURT TO CONSIDER SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244

**GENA BUNN**
**Texas Bar No. 00790323**
**Gena Bunn, PLLC**
**P.O. Box 6150**
**Longview, Texas 75608**
**gbunn@genabunnlaw.com**
**(903) 804-4003**

**ATTORNEY FOR PETITIONER**

*EXECUTION DATE: FEBRUARY 28, 2023*

# CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

*Movant*
    Ivan Abner Cantu

*Counsel for Movant*
    Gena Bunn

*Respondent*
    Bobby Lumpkin
    Texas Department of Criminal Justice, Correctional Institutions Division

*Counsel for Respondent*
    Travis Bragg
    Office of the Attorney General of Texas

*/s/ Gena Bunn*
Gena Bunn
Counsel for Movant

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................ii

TABLE OF CONTENTS............................................................ iii

TABLE OF CONTENTS TO APPENDIX**Error!       Bookmark       not defined.**

I.    Introduction. ...................................................... 1

II.   Statement regarding other pending litigation. ......................5

III.  Statement of the case........................................6

A.    The Dallas Police Department conducted a blinkered investigation
      focused exclusively on Mr. Cantu despite information, including a
      statement from Mr. Cantu, that the homicides were related to Mr.
      Mosqueda's substantial drug dealing.................................6

B.    Mr. Cantu's trial was marred by false testimony from the
      prosecution's star witnesses and the absence of DPD testimony
      explaining that Mr. Cantu could not have left the clothing stained
      with the victims' blood in plain view for DPD to find. ...........13

1.    Amy Boettcher testified falsely in conformity with the DPD
      erroneous beliefs about the evidence. ............................13

a.    Ms. Boettcher lied about Mr. Mosqueda's Rolex Watch. ............17

b.    Amy Boettcher testified falsely about the provenance of her
      engagement ring. ................................................22

c.    The sworn statement of a DPD Officer who inspected Mr. Cantu's
      apartment after he departed for Arkansas on November 4, 2000,
      contradicts Amy Boettcher's testimony that Mr. Cantu left clothing
      stained with victims' blood in their kitchen trashcan. ..........24

d.    Scientific evidence refutes Ms. Boettcher's account: the victims
      were still alive at the time she alleged she visited the crime scene........30

2.    Jeff Boettcher fabricated evidence against Mr. Cantu and has
      recently recanted his testimony. Jeff Boettcher, the prosecution's

other star witness, recanted his testimony in 2022 because he "lied" and gave damning testimony about alleged events that "never happened." .................................................................................. 33

3.    Additional new evidence further discredits the prosecution's case. ...... 36

a.    The jeans recovered from the trashcan could not have been worn by Mr. Cantu. ................................................................................ 36

b.    Ms. Boettcher left the murder weapon—loaded with a magazine that had been handled by Mr. Cantu—where it would be discovered and turned in to DPD................................................................................ 37

c.    The State's evidence and jury argument that victims were beaten and tortured was false............................................................................. 38

C. The prosecution presented evidence through Carlos Gonzalez refuting Mr. Cantu's account of threats related to Mr. Mosqueda's drug debt............... 40

D. One of Mr. Mosqueda's drug suppliers was Mateo "Matt" Gonzalez from the Valley. Mr. Gonzalez matched Mr. Cantu's description of the "pizza man," ran drugs from the Valley to Dallas, and drove a Lincoln. ....................... 43

IV.    Mr. Cantu meets the requirements of 28 U.S.C. § 2244 to receive authorization to proceed on his second or successive habeas application in the district court. ........................................................ 48

A.    Mr. Cantu has not previously presented his claims in federal court. ....................................................................................... 49

B.    Mr. Cantu can make a prima facie showing under § 2244(b)(2)(B) that his claims were not previously discoverable through the exercise of due diligence. ....................... 49

C.    Mr. Cantu can make a prima facie showing of innocence under § 2244(b)(2)(B)........................................................................ 52

V.    Conclusion and prayer for relief. ................................................... 55

CERTIFICATE OF COMPLIANCE ........................................................ 57

CERTIFICATE OF CONFERENCE......................................................... 57

CERTIFICATE OF SERVICE ................................................................57

# TABLE OF CONTENTS TO APPENDIX

DOCUMENT                                                          PAGE RANGE

PROPOSED SECOND OR SUCCESSIVE PEITTION ..........................................5

    EXHIBIT 1 ........................................................................92
    DPD Interview of Gladys and Gilbert Tamez

    EXHIBIT 2 ........................................................................94
    DPD Interview of Sylvia Cantu

    EXHIBIT 3 ........................................................................98
    DPD Police Report Regarding Rolex6

    EXHIBIT 4 ......................................................................100
    Investigative Notes of DA Investigator Dale Lundberg

    EXHIBIT 5 ......................................................................103
    Electronic Mail from Mark Kitchen to Dale Lundberg

    EXHIBIT 6 ......................................................................105
    Declaration of Dr. Judy Melinek, M.D.

    EXHIBIT 7 ......................................................................113
    Declaration of Dr. Priya Banerjee, M.D.

    EXHIBIT 8 ......................................................................118
    DPD Police Report Regarding Frank Perez

    EXHIBIT 9 ......................................................................120
    Declaration of Thomas Houran

    EXHIBIT 10 ....................................................................122
    Declaration of Steve Oliver Mayr

    EXHIBIT 11 ....................................................................124
    Affidavit of Susan Eichenberg

EXHIBIT 12 ........................................................................126
Arrest Warrant Dated November 9, 2000

EXHIBIT 13 ........................................................................128
Affidavit of William Brad Bobbitt

EXHIBIT 14 ........................................................................130
Video Interview of Jeff Boettcher

EXHIBIT 15 ........................................................................132
Declaration of Jason L. Harrelson

EXHIBIT 16 ........................................................................134
Mateo Gonzalez Hidalgo County Court Record

EXHIBIT 17 ........................................................................137
Vehicle Title Record

EXHIBIT 18 ........................................................................142
Declaration of Stewart Fillmore

EXHIBIT 19 ........................................................................144
Declaration of Ryan Patton

EXHIBIT 20 ........................................................................147
Electronic Mail from Tawny Svihovec to Gregg Willis

EXHIBIT 21 ........................................................................149
DPD Interview of Tawny Svihovec

EXHIBIT 22 (7)....................................................................159
Amy Boettcher Statement #1

EXHIBIT 23 (2)....................................................................173
Amy Boettcher Statement #2

EXHIBIT 24 (3)....................................................................179
Amy Boettcher Statement #3

EXHIBIT 25 (8)......................................................................192
Amy Boettcher Statement #4

EXHIBIT 26 ...........................................................................197
Affidavit of Abner Cantu

PRIOR FEDERAL COURT PLEADINGS AND ORDERS

PETITION FOR WRIT OF HABEAS CORPUS ........................199
January 18, 2007

MEMORANDUM OF LAW.......................................................207
January 18, 2007

SUPPLEMENTAL MEMORANDUM OF LAW .....................296
December 22,2008

MEMORANDUM OPINION ....................................................307
March 17, 2009

ORDER & JUDGMENT ...........................................................329
March 17, 2009

FIFTH CIRCUIT OPINION.......................................................330
January 26, 2011

SUPREME COURT OPINION GVR .......................................347
March 26, 2012

FIFTH CIRCUIT OPINION/ORDER .......................................349
June 1, 2012

MEMORANDUM OPINION AND ORDER OF DISMISSAL.................352
June 15, 2016

FIFTH CIRCUIT ORDER DENYING COA..............................370
November 7, 2016

SUPREME COURT ORDER DENYING CERTIORARI ........................376
June 19, 2017

# I.    Introduction.

Substantial new evidence never considered by Mr. Cantu's jury or any reviewing court thoroughly impeaches the State's star witnesses, provides a credible non-inculpatory account of the physical evidence, and validates Mr. Cantu's account of event leading up to the murders indicating that the crime was related to the one of the victim's substantial drug business.

As the Texas Court of Criminal Appeals ("TCCA") found, the testimony of Mr. Cantu's then-girlfriend, Amy Boettcher – an admitted daily drug abuser who feared going to prison herself – was enough to "wholly incriminate[] [Mr. Cantu] in the murders and robbery" at issue.   Ms. Boettcher's testimony was supported by her brother, Jeff Boettcher, who was a drug addict at the time and who testified to his willingness to do anything to protect his sister because they "were in it together." 34 RR 41; 60.  Absent the largely unimpeached testimony of the Boettchers, it is unlikely that Mr. Cantu would have been convicted for capital murder in the deaths of James Mosqueda and Amy Kitchen.

New evidence reveals Ms. Boettcher's repeated false statements to the jury. For example, Mr. Mosqueda's Rolex watch—which his family initially told the police was missing and which Amy Boettcher testified she saw Mr. Cantu wear and dispose of on the night of the murders—was never stolen.  The watch was found in Mr. Mosqueda's home and the police returned it to his family shortly after the

murders. Amy Boettcher testified that, on the night of the murders, Mr. Cantu proposed to her with a diamond engagement ring that she later learned was stolen from Amy Kitchen's body after the murders. However, witnesses have since come forward stating that Mr. Cantu and Amy Boettcher announced their engagement and showed off Amy Boettcher's engagement ring a week before the murders.

Amy Boettcher testified that Mr. Cantu placed bloody jeans and socks in their kitchen trashcan on the night of November 3, 2000, before they left for Arkansas the following day. The jeans and socks were later seized during a search of Mr. Cantu's apartment on November 7, 2000. However, one of the police officers who performed a wellness check at Mr. Cantu's apartment on the evening of November 4, shortly after the bodies were discovered, has since stated that the jeans—which were at least two sizes too large for Mr. Cantu—and socks were not in that trashcan at that time, indicating that someone else had placed the items in the trashcan after Mr. Cantu left for Arkansas. This is further corroborated by telephone records showing that a long-distance telephone call was placed from Mr. Cantu's apartment at 8:53 p.m. on November 4, while Mr. Cantu was hundreds of miles away in Arkansas. This evidence indicated that someone else was in Mr. Cantu's apartment long after he and Amy Boettcher had left the state, and after the police who performed the wellness check were there.

Amy Boettcher testified that Mr. Cantu committed the murders in a 48-minute window between 11:30 p.m., November 3 and 12:18 a.m., November 4. But forensic pathologists have since concluded that the murders could not have occurred prior to midnight (12 a.m. on November 4) and were more likely to have occurred between 6:30 a.m. and 10:30 a.m. on the morning of November 4. Police reports—which were not presented to the jury—indicate that Frank Perez, a man who had been living with James Mosqueda and Amy Kitchen for about three weeks at the time of the murders, was heard to say after the discovery of the bodies on November 4: "They weren't killed last night, they were killed today."

Jeff Boettcher, Amy's brother, testified at trial that, prior to the murders, Mr. Cantu told him he planned to kill James Mosqueda and that Mr. Cantu had tried to recruit him to "clean up" afterward. However, Mr. Boettcher has since disavowed his trial testimony, insisting this conversation "never happened" and he "lied." Mr. Boettcher himself admits that he was was not a credible witness due to his history of drug abuse.

Additionally, Ivan Cantu has always maintained that, on the evening of November 2, 2000—two days before authorities discovered that James Mosqueda, a drug dealer who dealt in large quantities, and his fiancé Amy Kitchen had been shot to death in their home—one of Mr. Mosqueda's drug suppliers came to Mr. Cantu's apartment and threatened both Mr. Cantu and Mr. Mosqueda. Mr. Cantu

said the man, who was unknown to him, was named "Matt," he was from the Valley, he was in the drug business with Mr. Mosqueda, and he drove a boxy Lincoln Town Car.

Mr. Cantu relayed his account to friends, family, and the police before he was arrested. At trial, the prosecution presented testimony—including from one of Mr. Mosqueda's partners in the drug trade—disparaging the story as improbably inconsistent with Mr. Mosqueda's character, and then argued to the jury "[i]t's nothing but a bunch of lies. Why do you have to lie if you don't have anything to cover up?" 41 RR 16–17.

The Dallas Police Department ("DPD") received an anonymous tip in the immediate aftermath of the murders connecting them to Mr. Mosqueda's drug business; but this *Brady* evidence was not revealed to Mr. Cantu's counsel until three days into the merits phase of trial. The lead DPD detective acknowledged, under the trial court's incredulous questioning, that DPD made no effort to investigate the connection between Mr. Mosqueda's drug trafficking and his death. Likewise, Mr. Cantu's trial counsel failed to conduct any independent investigation into the case.

New evidence confirms Matt's existence. Matt lived in the Valley. He owned a boxy Lincoln Town Car. He matched the physical description given by Mr. Cantu. He dealt in large quantities of drugs, including in the Dallas area. More than one witness confirms that Matt from the Valley with a Lincoln Town Car supplied large

amounts of drugs *to Mr. Mosqueda*. Finally, Mr. Mosqueda's partner in the drug trade—the prosecution witness who ridiculed Mr. Cantu's account as "absurd" and "nonsense"—*knew* Matt from the Valley.

The totality of the newly discovered evidence eviscerates the prosecution's case and substantiates Mr. Cantu's account of events, thus undermining confidence in the judgment for which Mr. Cantu faces imminent execution. Any reasonable juror surveying the current evidentiary landscape would harbor a reasonable doubt. Mr. Cantu respectfully moves this Court for authorization to file his successive petition for habeas corpus relief.

## II.    Statement regarding other pending litigation.

Mr. Cantu has filed two successive habeas applications in the state courts. The first was dismissed. *Ex parte Cantu*, No. WR-63,624-02 (Tex. Crim. App. Aug. 23, 2023).  Based on evidence supporting the claims that application first disclosed by the Collin County District Attorney's Office ("CCDAO") after the application was filed, Mr. Cantu filed a suggestion to reconsider the dismissal on the Court's own motion. That motion remains pending before the Texas Court of Criminal Appeals. Mr. Cantu also filed a second subsequent application for writ of habeas corpus in the convicting court and the Court of Criminal Appeals on February 20, 2024, and that application remains pending.

Mr. Cantu files this motion now to comply with the time requirements in Fifth Circuit Rule 8.10.

## III. Statement of the case.

### A. The Dallas Police Department conducted a blinkered investigation focused exclusively on Mr. Cantu despite information, including a statement from Mr. Cantu, that the homicides were related to Mr. Mosqueda's substantial drug dealing.

On the afternoon of November 4, 2000, the bodies of James Mosqueda and his fiancé Amy Kitchen were found in the master bedroom of their home in North Dallas; both had suffered multiple gunshot wounds. 31 RR 111-16. There were no signs of forced entry, and no weapon was found at the scene, but police did find shell casings from a .380-calber handgun and spent projectiles from a small to medium caliber gun. 32 RR 59-62. Police were told that Ms. Kitchen's one-and-one-half-carat diamond and platinum engagement ring, Mr. Mosqueda's Rolex watch, and Mr. Mosqueda's black Corvette were missing; and while Ms. Kitchen's Mercedes was in the garage, her keys were missing. 33 RR 55-58.

Lead Dallas Police Department ("DPD") Detective Anthony Winn learned that Mr. Mosqueda was a well-known drug dealer who sold in large quantities:

> Q. Based on the totality of your investigation, including the crime scene, your interviews with family and friends and suspects and other police officers, have you pretty much formed the conclusion that Mr. Mosqueda was a drug dealer?

A. Yes, sir.

* * *

Q. Now, you have learned, through the course of your investigation, that [Anthony] Fonseca, [Carlos] Gonzalez and [James] Mosqueda were all distribution partners in narcotics, correct?

A. Yes, sir.

Q. Okay. And we're not talking nickel-dime stuff, we're talking major quantities, correct?

A. Yes, sir.

34 RR 128; 131; *see id*. at 133 (Mr. Mosqueda was involved in the "large-scale distribution of marijuana"); *id*. at 144 (Mr. Mosqueda only sold usually "large quantities" of drugs).

On October 5, 2001, the third day of trial, the prosecution revealed for the first time that on November 5, 2000 – the day after the murders were discovered – DPD Detective Laboda received a tip that Mr. Mosqueda was murdered by a drug dealer named "Mario Rojas" to whom he owed money. 33 RR 186; 197. The prosecution acknowledged that the tip sheet "appears to be covered by *Brady*" and "assum[ed] that's exculpatory, if it's supposed to be somebody else doing the killing," but excused their failure to turn it over by stating "we had never seen before until [sic] he got this from the officer." 33 RR 186.

DPD also learned on November 5, 2000, that one of Mr. Mosqueda's distribution partners in the narcotics business, Anthony Fonseca, had his door kicked in about ten days before Mr. Mosqueda was murdered. Exhibit 1 (Interview Mr. Mosqueda's sister and brother-in-law). Mr. Mosqueda's sister was concerned about Mr. Fonseca's safety. *Id*.

With respect to the tip, Detective Winn verified with the DPD narcotics division that Rojas was a "major drug dealer" but inexplicably terminated his investigation there:

Winn:         Detective Laboda did absolutely nothing. He just took the message, did the investigative note, and then gave it to me. He done (sic) absolutely nothing on it.

The Court:    And you didn't do anything, either?

Winn:         That was all that was done, yes sir.

The Court:    So he didn't do anything and you didn't do anything?

Winn:         Well, I notified narcotics division, but other than that, that's all I did, yes sir.

The Court:    So you notified them, and what did they do?

Winn:         They did not do anything because at the time, I don't remember when this came in, but they just supplied me with [sic] intelligent information. That's all.

33 RR 200-201.

DPD knew that Mr. Mosqueda was dealing with large quantities of drugs and, presumably, large amounts of cash. Yet, DPD did not attempt to learn whether Mr.

Mosqueda's drug operation was run out of the home where he was murdered. 34 RR 134-35. DPD never attempted to analyze Mr. Mosqueda's finances or whether his lifestyle could have been supported by legitimate business dealings. 34 RR 135.

Despite Mr. Mosqueda's drug connections, the recent attack on one of his narcotics distribution partners, and a tip identifying a potentially murderous drug dealer by name received the day after the crime was discovered, DPD never investigated the possibility that Mr. Mosqueda's murder was related to his indisputably substantial drug dealing business. Instead, the DPD conducted a blinkered investigation focused exclusively on Mr. Mosqueda's cousin, Ivan Cantu.

 When Mr. Mosqueda's and Ms. Kitchen's bodies were found, Mr. Cantu and his girlfriend Amy Boettcher were hundreds of miles away on a pre-planned road trip to the home of Ms. Boettcher's parents in Franklin, Arkansas, where Amy planned to introduce her fiancé to her parents.  35 RR 112-113; 36 RR 25.

By early evening on November 4, Ivan Cantu's mother, Sylvia Cantu, along with several other family members, had arrived at the scene of her nephew's murder; she requested that police take her to the nearby apartment shared by Mr. Cantu and Ms. Boettcher because she was concerned about Mr. Cantu's welfare.  32 RR 76, 81.  Officers took Mrs. Cantu to the apartment and, despite the lack of a search warrant, used the manager's key to gain entry at 8:25 p.m. 32 RR 109, 78, 82.  They spent about ten minutes inside the small, one-bedroom apartment, ostensibly looking

for some evidence that Mr. Cantu or Ms. Boettcher had been harmed. 3 RR 46-48. Then, as officers were leaving the apartment, they observed a small hole near the door which they thought was a bullet hole; however, they failed to mention this observation in their investigation report. 32 RR 87, 89, 112.

At about 3 a.m. on November 5, police found Mr. Mosqueda's Corvette in the parking lot of the Cantu/Boettcher apartment complex. 33 RR 60. Significantly, police who searched the apartment just hours earlier had not observed the Corvette at that location, though it was found in close proximity to the apartment. 32 RR 89.

In the meantime, Mr. Cantu, still in Arkansas with Ms. Boettcher, had been contacted by his mother and told about the double homicide. 44 RR 145-146. While in Arkansas, Mr. Cantu made and received several telephone calls to and from various family members and acquaintances, including Carlos Gonzalez and Anthony Fonseca, two long-time associates of Mr. Mosqueda who were both drug dealers in their own right. 43 RR 131.

At some point on November 6, Mr. Cantu called Mr. Gonzalez and, unbeknownst to Mr. Cantu, Mr. Gonzalez invited Dallas Police Detective Anthony Winn to listen to that conversation. 33 RR 65-68. During this call, Mr. Cantu told Mr. Gonzalez that a man dressed as a pizza delivery man had threatened Mr. Cantu with a gun in his apartment on November 2, 2000:

> a guy in a Domino's pizza uniform that knocked on his door....When Mr. Cantu said he opened the door, the guy forced his way in, and he

10

had a handgun. He said that the guy put the gun to his head and was telling him that he had fronted his cousin, Mr. Mosqueda, $300,000 in cocaine. He said that Mr. Mosqueda had only paid him $50,000 and he still [sic] owe him $250,000 dollars.

33 RR 70. Mr. Cantu said the man, whose name was "Matt," got upset during the confrontation and "fired one round into the wall inside his apartment *Id.* at 71. As Mr. Cantu's mother reported to DPD on November 6, 2000, "Matt" drove a black Lincoln. Exhibit 8 (DPD Interview of Sylvia Cantu).

Mr. Cantu further explained that he went to Mr. Mosqueda's house on the evening of November 3 to alert Mr. Mosqueda to this threat; Mr. Mosqueda then requested that Mr. Cantu take Mr. Mosqueda's car and leave Mr. Cantu's Honda out front so it would appear that someone was visiting Mr. Mosqueda at home. 33 RR 72. Mr. Cantu had also been in contact with police during this time and had agreed to return to Dallas and talk to them.

During a search of the Cantu/Boettcher apartment on November 7, police found a box of .380 bullets and some keys, including the key to Amy Kitchen's Mercedes and a key that unlocked the door from the garage to the Mosqueda/Kitchen home; police also found a pair of jeans, some white socks, and a latex glove in the kitchen trashcan.[1] 33 RR 100, 102. Subsequent DNA testing indicated that the jeans and socks had Mr. Mosqueda's and Ms. Kitchen's blood on them. 37 RR 185, 186.

---

[1] The detective in charge of the collection of physical evidence testified that the glove was not "removed and processed" because there was nothing about it to "pique [his] interest as far as

Also on November 7, Mr. Cantu and Ms. Boettcher drove back to Dallas from Arkansas. 36 RR 138. At Ms. Boettcher's urging, they went to the apartment of Tawny Svihovec, Mr. Cantu's ex-girlfriend, where they stayed the night. 35 RR 180. The following day, November 8, Mr. Cantu left to go meet with police while Ms. Svihovec went to work; Ms. Boettcher was at Ms. Svihovec's apartment alone for most of the day. 35 RR 181-182. Shortly before noon, Mr. Cantu called Ms. Boettcher and informed her that he had been arrested. 33 RR 104; 35 RR 23-24, 183. Ms. Boettcher immediately called her parents in Arkansas; as her stepfather recalled her saying, "I'm scared to death they are going to kill me. Get me out of here." 36 RR 139. Ms. Boettcher flew back to Arkansas later that day. 35 RR 184. Once back in Arkansas, Ms. Boettcher gave a series of statements to law enforcement (orchestrated by her stepfather) implicating Mr. Cantu and ultimately agreed to testify against him. 33 RR 113; 35 RR 197; 36 RR 6-19.

Police found the murder weapon – a .380 pistol – at Ms. Svihovec's apartment on November 11. 33 RR 107-108, 148. The weapon was matched to projectiles recovered from the decedents' bodies as well as the projectile recovered from the

---

trace evidence goes." 32 RR 46. Had the glove been worn by the assailant in the murder—in which there was a significant amount of blood spatter—both the victim's and the assailant's DNA would have been on the glove. The detective could only have deemed the glove of no value because he believed it was put there by the police working the scene.

wall of the Cantu/Boettcher apartment. 34 RR 172-174. Mr. Cantu's left thumbprint was matched to a latent print recovered from the removable clip, but not the weapon itself. 34 RR 150.

Police never recovered Mr. Mosqueda's Rolex watch or Ms. Kitchen's diamond-and-platinum engagement ring.

## B. Mr. Cantu's trial was marred by false testimony from the prosecution's star witnesses and the absence of DPD testimony explaining that Mr. Cantu could not have left the clothing stained with the victims' blood in plain view for DPD to find.

### 1. Amy Boettcher testified falsely in conformity with the DPD erroneous beliefs about the evidence.

Mr. Cantu's girlfriend, Amy Boettcher, was the indisputable star prosecution witness at trial. As the State argued to the jury, "you can convict him based on her testimony alone," 41 RR 22, and as The Texas Court of Criminal Appeals found, "Amy Boettcher's testimony about the offense wholly incriminated appellant in the murders and robbery." *Cantu v. State*, supra, at *4. According to Ms. Boettcher's testimony, the chronology of the events surrounding the murders was as follows:

- Mr. Cantu telephoned Mr. Mosqueda at 11:20 p.m. on November 3 and arranged to go to his house to talk to him. 3 RR 121.

- Mr. Cantu told Ms. Boettcher that he was going to kill Mr. Mosqueda and Ms. Kitchen, but she did not believe him. 35 RR 121.

- Ms. Boettcher testified that Mr. Cantu returned in Ms. Kitchen's Mercedes at 12:18 a.m., his face swollen,[2] he had blood on his jeans and in his hair, and was wearing a different shirt and shoes. 35 RR 123-124, 126; 36 RR 57-58. Ms. Boettcher testified that she didn't see anything in Mr. Cantu's hands when he left, but he had a gun when he returned. 35 RR 122-125, 136. According to Ms. Boettcher, he also had Mr. Mosqueda's and Ms. Kitchen's identification cards and a set of keys. 35 RR 125. While Mr. Cantu showered, Ms. Boettcher threw Mr. Cantu's jeans in the kitchen trashcan.[3] 35 RR 125-126, 131-132.

- Ms. Boettcher testified that she and Mr. Cantu returned to the Mosqueda/Kitchen house to retrieve some of Mr. Cantu's belongings; they also searched for money and drugs but found nothing. 35 RR 129, 139, 141. Ms. Boettcher testified that she saw Mr. Mosqueda's and Ms. Kitchen's dead bodies. 36 RR 21-22. When they left, Mr. Cantu had a white trash bag with the shirt and boots he had been wearing earlier and another pair of jeans. 35 RR 143-144.

- Ms. Boettcher testified that they returned to their apartment, Mr. Cantu driving Mr. Mosqueda's Corvette and Ms. Boettcher driving Mr. Cantu's car. 35 RR 144-145. Mr. Cantu then asked her to marry him and offered her a diamond and platinum engagement ring; she accepted his proposal and put on the ring. 35 RR 146. Mr. Cantu put on a necklace, a bracelet,[4] and a watch. 35 RR 146-147. They then drove Mr. Mosqueda's Corvette to downtown Dallas where they partied into the early morning hours. 35 RR 127, 149-157. Ms. Boettcher testified that Mr. Cantu threw the Rolex watch out the window of the car as they

---

[2] Notably, the State called several witnesses at trial who claimed they saw Mr. Cantu at parties in the hours after he supposedly killed Mr. Mosqueda and Ms. Kitchen, but none of them described Mr. Cantu's face being swollen or bruised.

[3] In prior statements, Ms. Boettcher had claimed that Mr. Cantu was wearing latex or surgical gloves when he returned from the Mosqueda/Kitchen home that night. However, at trial, she testified that she did not recall seeing the gloves before, that she was not sure whether Mr. Cantu was wearing gloves that night, and that she did not know who put the gloves in the trashcan. 35 RR 132-133.

[4] Ms. Boettcher's stepfather later gave police a gold bracelet that he had found in his home in the room where Ms. Boettcher and Mr. Cantu stayed during their visit. 36 RR 147-150. Mr. Mosqueda's sister testified that the bracelet had belonged to Mr. Mosqueda. 34 RR 267.

drove down the tollway on the way to the club; he threw away the trash bag containing the clothing and the boots in a dumpster near the club. 35 RR 149-150, 158.

- Ms. Boettcher testified that after partying, they returned to their apartment and then left in Mr. Cantu's car at about midday on November 4 for their pre-planned trip to visit Ms. Boettcher's mother and stepfather in Arkansas. 35 RR 157-160, 112-113.

- During their three-day stay in Arkansas, Ms. Boettcher did not tell her mother or stepfather (who was a retired law enforcement officer) or anyone else about the murders and made no effort to call the police even though there were several times she was not with Mr. Cantu. 35 RR 162-167; 36 RR 19, 25-27, 79-81.

- Ms. Boettcher testified that, on November 7, she accompanied Mr. Cantu back to Dallas. 35 RR 168. On the drive back to Dallas, Mr. Cantu discarded the shoes he and Ms. Boettcher had worn in the Mosqueda/Kitchen home; he also demanded that she return the ring to him so that he could get it sized, and she never saw it again. 35 RR 170-172. In Dallas, Mr. Cantu and Ms. Boettcher stayed at the home of Tawny Svihovec, a former girlfriend of Mr. Cantu's. 35 RR 168, 172. Ms. Boettcher testified that she saw Mr. Cantu discard Mr. Mosqueda's and Ms. Kitchen's identification cards and some jewelry near Ms. Svihovec's apartment. 35 RR 172, 180.

- Ms. Boettcher testified that on the morning of November 8, Ms. Svihovec left for work, Mr. Cantu left to meet Detective Winn, and she was alone in the apartment. 35 RR 181. Later that afternoon, Mr. Cantu called her and told her that he had been arrested and that he had left money under the couch cushion. 35 RR 183. Ms. Boettcher used the money to purchase a plane ticket back to Arkansas. 35 RR 184-185.

- Once she was back in Arkansas, Ms. Boettcher told her mother and stepfather that Mr. Cantu had murdered Mr. Mosqueda and Ms. Kitchen; her stepfather contacted law enforcement. 35 RR 196-198.

Ms. Boettcher also testified that on November 2, the evening before the murders, Mr. Cantu fired a shot at her in their apartment during an argument. 35 RR 187-190. It was this shot, according to Ms. Boettcher, that left a bullet in their apartment wall. 35 RR 193-194.

Ms. Boettcher was never charged in connection with the murders, despite her admitted presence at the scene shortly after the crime. 36 RR 19-20, 31. As she later admitted: "I thought I was going to prison." Duff, M. (Host), Episode 15: The State's Star Witness, 58:26-58:41, *Cousins By Blood* (2020-present), https://cousinsbybloodpodcast.com/. She denied at trial that she received any deal for her testimony; but after she testified at Mr. Cantu's trial, the State never sought revocation of her probation in connection with a previous driving-while-intoxicated conviction (though she was obviously in violation), and she was allowed to relocate to Arkansas without any further reporting requirements. 36 RR 19-20, 29-44, 69-71, 94-95. Further, though the record reveals that the State initially planned to subject Ms. Boettcher to a polygraph examination and had made arrangements to do so, they ultimately declined to conduct the examination, giving as an excuse some vague assertion that her menstrual cycle could possibly affect the examination's validity. 36 RR 146, 173. A few days before trial, prosecutors met with Ms. Boettcher for about five hours to prepare her to testify. 36 RR 6, 47.

Ms. Boettcher's testimony was riddled with falsehoods, some of which matched the mistaken beliefs of law enforcement officers and all of which helped the prosecution make their case.

### a. Ms. Boettcher lied about Mr. Mosqueda's Rolex Watch.

Among Ms. Boettcher's demonstrably false claims was her testimony about Mr. Mosqueda's Rolex watch. After James Mosqueda's and Amy Kitchen's bodies were discovered, Mr. Mosqueda's family reported to DPD that Mr. Mosqueda's Rolex watch, a family heirloom, was missing from the home. Thus, DPD believed that the murderer had taken the watch:

COMPLAINANT: **MOSQUEDA, JAMES**                          SERVICE #: 863688-J
                                                          FOR DET. : **WINN**

#### INVESTIGATIVE INFORMATION

SUBMITTING OFFICER:   **CARNEY**    DATE: 11/6/00
INFO OBTAINED VIA: **PHONE**
OBTAINED ON DATE:    **11/6/00**   AT TIME:  **7:00 P.M.**

TOPIC: **COMPLAINANT'S MISSING PROPERTY**

NARRATIVE:

Det. Perez contacted the complainant's mother, Gladys Mosqueda. She gave the following descriptions of complainant's missing property:

1.  Rolex men's gold watch. This watch was engraved in the back with " Lico with Love, Carol" . This watch is 13 yrs. old and belonged to complainant's uncle, Lico, at one time. The watch has diamonds on the inside dial and also on the outside of the watch.

2.  men's billfold, black, $700.00 in cash

3.  necklace

4.  ring value $8,000.00

Exhibit 3 (Excerpt of Dallas Police Department Offense Report).

When the DPD illegally searched Mr. Cantu's residence on November 7, 2000, they expected to find Mr. Mosqueda's gold Rolex watch, but it was not there. 33 RR 123; 160. Consistent with DPD's erroneous belief that watch was stolen, and the fact that it was not found at Mr. Cantu's residence, Amy Boettcher subsequently swore in multiple statements—the first of which was taken on November 10, 2000— that Mr. Cantu had stolen and, improbably, thrown away a Rolex watch:



Exhibit 23 (Amy Boettcher's November 10, 2000, statement to Arkansas Police (AB #2)).

> And A Necklace. We left in the Corvette And After we went through the Tollway, Ivan threw a watch out the window. Ivan said I don't want this shitty "Rolex". Ivan

Exhibit 24 (Amy Boettcher's November 22, 2000, statement to Anthony Winn (AB #3)).

The prosecution told the jury in opening statements that Mr. Cantu had stolen the watch and then put it on back at his apartment. 31 RR 13. Amy Boettcher then testified at trial that she saw Mr. Cantu dispose of the Rolex watch on the night of the murders:

A.     And he said that he didn't want the shitty Rolex and threw it out the window.

Q.     And which watch had that been?

A.     The one he put on at the apartment.

Q.     And he just threw that out the window?

A.     Yes.

Q.     Where were you when he threw it out the window?

A.     Probably not even a full block from the tollway.

35 RR 149-50.

Mr. Mosqueda's watch was never stolen. In 2019, Mr. Cantu's father, Abner Cantu, discovered that the Mosqueda family had the Rolex watch all along. According to Abner Cantu, Amy Kitchen's brother had taken the watch from the scene after the bodies were discovered and then returned it to police; the police later returned the watch to James Mosqueda's mother "shortly after the murders." *See* Exhibit 26 (Affidavit of Abner Cantu). As described in the above initial police report, the allegedly stolen watch had diamonds inside the dial as well as outside and was inscribed on the back to Lico from Carol. Exhibit 3. This is the same watch the police returned to Mr. Mosqueda's mother shortly after the murders:



Oct 2, 2019 1:13:46 PM
1933 North Town East Boulevard
Mesquite
Dallas County
Texas

Oct 2, 2019 1:13:40 PM
1933 North Town East Boulevard
Mesquite
Dallas County
Texas

And, as Mr. Cantu learned last year, the CCDAO's internal investigation confirmed that Mr. Mosqueda had only one Rolex watch and it was never stolen. In October 2019, the CCDAO Investigator Dale Lundberg interviewed Mark Kitchen, Amy Kitchen's brother. Exhibit 4 (Lundberg Notes). Mr. Kitchen found the watch at the victims' home one or two weeks after the murders, Exhibit 4, and turned it over to Detective Winn. *See* Exhibit 5 (Electronic Mail Message from Mark Kitchen to Dale Lundberg). Mr. Kitchen's timeline aligns with an offense report dated November 25, 2000, when Detective Winn met Mr. Kitchen at the victims' home.

Gladys Mosqueda, Mr. Mosqueda's mother, told CCDAO investigator Lundberg in 2019 that a DPD officer gave her the family's Rolex watch shortly after the murders. Exhibit 4 (Lundberg Notes). She told Lundberg that she was given the watch at a building on Main Street in downtown Dallas, which was at that time the location of Dallas Police headquarters. *Id*. However, Lundberg was unable to locate any reference to the Rolex watch in Dallas Police Property Room records. *Id*. Ms. Mosqueda also told Lundberg that her son only had one Rolex watch. *Id*.

CCDAO investigator Lundberg also questioned Detective Winn about the Rolex watch in October 2019. *Id*. Winn claimed that he did not recall[5] giving the

---

[5] Even during Mr. Cantu's trial 2001, Detective Winn professed his inability to recall the details of his investigation in this case. His memory lapses were particularly acute when being cross-examined by the defense, so much so that the trial court's joke about Winn's bad memory drew laughter from the courtroom. 33 RR 168.

watch to Mr. Mosqueda's mother or anyone else. *Id*. He further speculated that if the watch had been found, he would never have given it to anyone because he would have considered it evidence. *Id.* But according to Mr. Kitchen, Detective Winn was aware *before Mr. Cantu's trial* that Mr. Mosqueda's Rolex watch had been located.

Notably, neither Mark Kitchen nor Gladys Mosqueda testified at Mr. Cantu's trial. But these statements are obviously in conflict with Detective Winn's account. The victims' families have no reason to collude in a false account of the evidence to assist Mr. Cantu and their account is confirmed by the Mosquedas' possession of the Rolex watch allegedly discarded by Mr. Cantu on a Dallas freeway. Detective Winn, on the other hand, repeatedly testified to his lack of memory and, significantly, also testified "I don't know what *Brady* is." 33 RR 189.

Amy Boettcher's testimony conformed to law enforcement's mistaken initial beliefs about the crime. Had Ms. Boettcher actually witnessed the events to which she testified, she would not have made the same mistake as the police.

### b. Amy Boettcher testified falsely about the provenance of her engagement ring.

Amy Boettcher testified at trial that, on the night of the murders, Mr. Cantu proposed to her with a diamond engagement ring that she later learned he had stolen from Amy Kitchen's body after the murders. 35 RR 146; 150-51 (State's Direct of Amy). DPD never recovered Ms. Kitchen's diamond-and-platinum engagement ring. Ms. Boettcher's stepfather testified that, when Ms. Boettcher and Mr. Cantu

arrived in Arkansas on November 4, Ms. Boettcher was wearing an engagement ring, which Mr. Cantu told them he had just bought for her; but Ms. Boettcher's stepfather did not give any description of the ring sufficient to identify it as Ms. Kitchen's. Amy Boettcher claimed that Mr. Cantu had taken the ring back and thrown it away before they returned to Dallas from Arkansas.

However, witnesses have since come forward stating that Mr. Cantu and Amy Boettcher announced their engagement and showed off Amy Boettcher's engagement ring a week before the murders. Thomas Houran recalled that he saw Mr. Cantu and Amy Boettcher on the Sunday before the murders. Mr. Cantu introduced Amy to Houran and told Houran they were engaged; Amy was wearing an engagement ring. *See* Exhibit 9 (Declaration of Thomas Houran). Steve Mayr also recalled seeing the couple the Sunday before the murders, and Amy was wearing an engagement ring. *See* Exhibit 10 (Declaration of Steve Oliver Mayr). Therefore, the ring Ms. Boettcher's stepfather testified he saw was Amy Boettcher's, not Amy Kitchen's, and Amy Boettcher testified falsely when she claimed Mr. Cantu gave her Ms. Kitchen's ring after the murders.

Finally, in a November 14, 2019, interview, Ms. Boettcher made it clear that she did not actually know where the ring came from. Duff, M. (Host), Episode 15, Cousins By Blood (2020-present), https://cousinsbybloodpodcast.com/. Instead, the

DPD told her that the victim's ring was missing and that is why she testified that "learned" that the ring had belonged to the victim. *Id.*

### c. The sworn statement of a DPD Officer who inspected Mr. Cantu's apartment after he departed for Arkansas on November 4, 2000, contradicts Amy Boettcher's testimony that Mr. Cantu left clothing stained with victims' blood in their kitchen trashcan.

On November 7, 2000, while Amy Boettcher and Mr. Cantu were still away on their trip to Arkansas, the police executed a search warrant for Mr. Cantu's apartment. The lead detective described finding the trashcan in plain view with the clothes sitting on the top:

> I began looking through drawers, making my way closer to the refrigerator. As I got closer to the refrigerator, there was a trash can that was placed—that's against the wall. I looked inside that trash can. That's where I saw several clothing (sic) that was blue jeans and some socks with a reddish substance on it that appears to have been blood.

33 RR 90 (Direct Examination of Detective Winn). The State introduced evidence documenting the scene as the police found it:



State's Trial Exhibit 61 (trashcan in Mr. Cantu's apartment on November 7, 2000).

Detective Winn "immediately called Detective Whitsitt over who photographed the

trash can with these items on the inside, and then we retrieved these items from out

of the trash can." *Id*. Detective Whitsitt's photograph of the trashcan was admitted

into evidence at trial:



State's Trial Exhibit 62 (clothes found in Mr. Cantu's trash on November 7, 2000).

Detective Donald A. Whitsitt, with the Physical Evidence Section of the Dallas Police Department ("DPD"), was a 24-year veteran with DPD and specially trained in preserving, documenting, and photographing crime scenes. He testified that his photographs accurately documented the apartment as observed *before* anything was disturbed. 32 RR 24. Detective Whitsitt testified that he photographed Mr. Cantu's trashcan before disturbing any of the contents, "before anybody had touched it." 32 RR 47-48.

Several days later, Amy Boettcher gave her first several statements to law enforcement. In her statements, Ms. Boettcher stated that Mr. Cantu came home shortly after midnight on November 4 with blood on him and wearing latex or rubber gloves and put jeans, socks, and latex gloves in the kitchen trashcan:

> He Return Home at 12:18Am By
> our clock, Ivan had Blood on His
> Jeans His Socks on His Gun
> Gun was Jammed He Statement this
> is my fAVIOVErt Gun He also
> HAD Dr. Gloves on, Ivan was
> wearing James Shoes + Shirt He

Exhibit 22 (Amy Boettcher's November 10, 2000, statement to Izard County Sheriff) (AB #1).

> Ivan was gone + he returned home
> at 12:18 by our clock. He had driven
> Amy's Mercedes back to our house + he
> had blood on his jeans. He was also
> wearing James' shirt + shoes. He was also
> wearing rubber type gloves. Ivan said

\* \* \*

> Ivan put his jeans, socks, the gloves,
> + emptied the bullets from his gun into
> A Kitchen trash can.

Exhibit 23 (Amy Boettcher's November 10, 2000, statement to Arkansas Police).

27

There was blood on his Jeans. He was wearing
laky gloves. There was some blood in his hair.
It looked like the left side if his face was
swollen. Ivan stood in the kitchen and
unloaded his gun. There was blood on the gun.
He ate some mushrooms. Ivan took off his
Jeans and socks. I noticed there was blood
on the socks also. He put the jeas Jeans, socks
and gloves in the kitchen garage garbage.

Exhibit 24 (Amy Boettcher's November 22, 2000, statement to Anthony Winn).



HE HAD BLOOD ON HIS JEANS, HAIR AND SOCKS HE HAD LATEX
GLOVES ON AND THERE WAS BLOOD ON THE GUN. HE WAS WEARING

* * *

HE THRU THE SHELLS FROM GUN INTO THE TRASH CAN IN THE
KITCHEN ALONG WITH JEANS, GLOVES, AND SOCKS. HE PUT A HAND

Exhibit 25 (Amy Boettcher's December 2000, statement to Mr. Kremer).

Amy Boettcher subsequently testified at trial about these same items, though she changed her story in at least three respects. First, Ms. Boettcher testified that she—not Ivan—placed the jeans and socks in the trash can. 35 RR 131-32. Second, she eliminated the latex gloves from the list of items she saw that night, testifying that she had never seen them. Third, Ms. Boettcher testified she did not know how the glove came to be in the trashcan. 35 RR 132-33.

Amy Boettcher and Mr. Cantu left for Arkansas midday on November 4, 2000, and completed the approximately eight-hour drive at 8:30 p.m. 36 RR 123. They did not return from Arkansas until late at night on November 7th.

At approximately 8:25 p.m. on the evening of November 4, 2000—just when Mr. Cantu and Ms. Boettcher were arriving in Arkansas—Dallas police officers entered Mr. Cantu's apartment at the request of his mother, Sylvia Cantu. 32 RR 82. Ms. Cantu was concerned after learning about the deaths of her nephew—Mr. Mosqueda—and his fiancé, that Mr. Cantu might also be in danger. One of the officers who performed the wellness check was Susan Iliff, now Susan Eichenberg. The officers swept the apartment checking "under beds, closets, tubs" looking to make sure nobody was in distress or dead. 32 RR 83-84. The officers' search of the small one-bedroom apartment lasted approximately ten minutes and was sufficiently careful to observe a bullet hole in the wall. Exhibit 11 (Affidavit of Susan Eichenberg). Ms. Eichenberg is "positive" that had the bloody clothing been as depicted in State's Exhibits 61 and 62, *supra*, during the wellness check, she would have seen it:

> To the best of my recollection, the search lasted approximately ten minutes. During that search, I entered the small kitchen. I did not observe any clothing or later discovered evidence in the garbage can. I believe this would have been discovered by myself, Junger [the other police officer] or Sylvia Cantu during the search, leading me to believe the evidence in the trash can was not there at the time of the search. The search was thorough and I am positive this evidence would have

> been seen. Further, my recollection is that the lid was on the trash can
> was closed at the time of the search.

Exhibit 11 (Affidavit of Susan Eichenberg).[6] This new evidence demonstrates that, after Ms. Boettcher and Mr. Cantu left for Arkansas, but before they returned, someone else removed the lid from the kitchen trashcan, deposited the jeans and socks, and left them in plain view for police to recover. The DPD officer's affidavit thus calls into question the provenance of **all** crime-relevant evidence found in Mr. Cantu's apartment.

### d. Scientific evidence refutes Ms. Boettcher's account: the victims were still alive at the time she alleged she visited the crime scene.

Ms. Boettcher testified to a facially implausible timeline of events in which Mr. Cantu committed the murders around midnight on November 3rd, returned in bloody clothes, changed, and then took Ms. Boettcher out for an all-night excursion through the city that included drugging with friends, a visit to the crime scene (shortly after which Ms. Boettcher accepted Mr. Cantu's marriage proposal), and going to a night club. And, with the exception of the alleged visit to the crime scene, several witnesses corroborated the fact that Mr. Cantu and Ms. Boettcher spent the wee hours of November 4th partying and having a good time. According to

---

[6] This information is corroborated by telephone records admitted at trial showing that a long-distance telephone call was placed from Mr. Cantu's apartment at 8:53 p.m. on November 4, while Mr. Cantu and Ms. Boettcher were hundreds of miles away in Arkansas. This evidence indicated that *someone else was in Mr. Cantu's apartment* long after he and Amy Boettcher left the state, and after the police who performed the welfare check were there.

Fernando Longoria, Amy Boettcher was "happy" and there was nothing unusual about her demeanor, even though Mr. Longoria met her after she allegedly went to the crime scene. 35 RR 230; *id*. at 265. Likewise, Harlon Hill testified that Ms. Boettcher was "happy" that night/morning. 35 RR 298.[7]

However, two independent forensic pathologists have reviewed the forensic pathology evidence in this case and conclude that Mr. Mosqueda and Ms. Kitchen were *not* killed around midnight on the night of Friday, November 3rd, as Ms. Boettcher claimed in her trial testimony, but instead died later in the morning of Saturday, November 4th.

The two forensic pathologists – Dr. Judy Melinek, a Clinical Senior Lecturer in the Department of Pathology and Molecular Medicine at Otago University School of Medicine in Wellington, New Zealand, and Dr. Priya Banerjee, a Clinical Assistant Professor in the Department of Pathology and Laboratory Medicine at Brown University in Providence, Rhode Island – were initially engaged and independently interviewed by investigator Matt Duff for the "Cousins by Blood" podcast. Neither Dr. Melinek nor Dr. Banerjee has ever been retained by counsel

---

[7] Witnesses testified they saw Mr. Cantu driving Mr. Mosqueda's Corvette during this timeframe. But that was not necessarily out of the ordinary and did not indicate that Mr. Cantu had just murdered Mr. Mosqueda. Another witness has since come forward stating that he saw Mr. Cantu driving Mr. Mosqueda's Corvette, apparently with Mr. Mosqueda's permission, about six months before the murders. Exhibit 9.

for Mr. Cantu; however, both agreed to provide declarations summarizing their review of the forensic pathology evidence in this case and their conclusions as to the estimated time of death of the decedents. *See* Exhibit 6 (Declaration of Dr. Judy Melinek, M.D.) and Exhibit 7 (Declaration of Dr. Priya Banerjee, M.D.).

Applying the established timeframes for the onset and progression of rigor mortis and livor mortis to the observations of both conditions recorded by the Collin County Medical Examiner's Office at the scene and at autopsy, Dr. Melinek concluded:

> 18.     *It is my opinion that James Mosqueda and Amy Kitchen died closer in time to when their bodies were found than to when they were last seen alive.*[8] This is evidenced by the […] "warm" scene temperature combined with the apparent observed early onset of rigor in both individuals, with more advanced rigor in James than in Amy, consistent with his heavier weight and the fact that he would have been partially insulated by bedding.  Had they died closer to the time they were last seen alive, I would have expected Amy Kitchen, given the warm ambient temperature, would have been in full rigor and her extremities would have been fully stiff. *I estimate that the two victims were killed more than 8 but less than 12 hours prior to when they were examined by the death scene investigator on November 4, 2000 at 18:30, which means that the time of death was likely in the morning hours of November 4th.*

Exhibit 6 (Declaration of Dr. Judy Melinek, M.D.) at 5-6 (emphasis added).

---

[8] The time at which Mr. Mosqueda and Ms. Kitchen were "last seen alive," as reported by the Collin County Medical Examiner's investigation report, was on Friday, November 3rd at 10:30 p.m., when they ate dinner with Ms. Kitchen's father.

Dr. Banerjee independently reached similar conclusions about the time of death based on the states of rigor mortis documented by the crime scene investigator and the medical examiner at the time of autopsy. As she explains in her declaration:

> 10. Together, the rigor mortis is the more reliably documented postmortem change in these cases to estimate their time of death. *With the essential understanding of the formation and disappearance of rigor mortis, their time of death is estimated to be approximately 12 hours before evaluation at the scene.*

Exhibit 7 (Declaration of Dr. Priya Banerjee, M.D.) at 2-3 (emphasis added).

Notably, a police report – which was not presented to the jury – indicated that Frank Perez, a man who had been living with James Mosqueda and Amy Kitchen for about three weeks at the time of the murders, was heard to state after the discovery of the bodies on November 4, "They weren't killed last night, they were killed today." Exhibit 8 (police report found in Winn Binders – Tab 14).

**2. Jeff Boettcher fabricated evidence against Mr. Cantu and has recently recanted his testimony. Jeff Boettcher, the prosecution's other star witness, recanted his testimony in 2022 because he "lied" and gave damning testimony about alleged events that "never happened."**

Jeff Boettcher, Amy's brother, testified at Mr. Cantu's 2001 trial that when he moved to Texas in August of 2000, he lived with Mr. Cantu and Amy Boettcher at the home of someone who went by the name Bobbitt. 34 RR 10. During this time, Mr. Boettcher said he was around Mr. Cantu "almost every day." *Id.* at 15. He

testified that Mr. Cantu carried a black gun with a chrome handle every day; he identified the gun in evidence as Mr. Cantu's gun. *Id*. at 16; SX 76B. Mr. Boettcher testified that Mr. Cantu carried it in his jacket pocket for "protection." *Id*. at 16. He testified that the gun contained hollow-tipped bullets, which Mr. Cantu showed him and referred to as "cop killers." *Id*. at 17.

Mr. Boettcher testified that on one occasion in October 2000, he and Mr. Cantu had a conversation during a car ride where Mr. Cantu said it would be easy to kill someone. 34 RR 22. While they were in the car, Mr. Cantu told Mr. Boettcher that he was going to kill James Mosqueda and asked Mr. Boettcher if he would help him clean up the scene afterward. *Id*. at 25. Mr. Boettcher said Mr. Cantu wanted to kill Mr. Mosqueda and steal cocaine, marijuana, and cash. *Id*. at 26. Mr. Boettcher testified that he had another conversation after the murders during which Mr. Cantu allegedly bragged about the crime, telling Mr. Boettcher to "check out the paper." *Id*. at 30.

Thus, Jeff Boettcher's testimony provided the State with motive (and the requisite capital aggravator of robbery); planning; a link to the murder weapon and ammunition; a confession; and remorselessness. When asked whether he was on drugs on the day of that conversation, Jeff testified that he was sober because he was preparing for an upcoming drug test.

However, in early 2022, Jeff Boettcher contacted the CCDAO seeking to recant his trial testimony. Representatives from the DA's office traveled to Minnesota to interview Mr. Boettcher. Under intense questioning, during which the CCDAO sought to minimize the role Mr. Boettcher's testimony might have played in securing Mr. Cantu's conviction, Mr. Boettcher continued to disavow his trial testimony, insisting that he was not a credible witness due to his history of drug abuse. *See* Exhibit 14 (Video Interview of Jeff Boettcher) (available at: http://tinyurl.com/3t6nf8tf).

In the interview, Mr. Boettcher said that he was on drugs at the time of the offense and when he testified. Exhibit 14 at 13:36 ("Q: [Were you on drugs] at the time you testified or the time that everything happened?... A: I'm saying both. I was a drug addict then and when I testified."). According to him, the conversation between him and Mr. Cantu where Mr. Cantu asked him to clean up at the murder "**never happened**." *Id*. at 14:31. When Jeff testified at trial, he did not believe the conversation had happened. *Id.* at 14:49 ("Q: Did you believe that it happened when you testified? A: No. That's why I don't know why I said that."). During the interview, he repeatedly told the CCDAO representatives that he did not believe Mr. Cantu asked him to clean up. *Id.* at 17:39 ("He didn't say that to me. That he wanted me to be the clean up man. No, he didn't say that to me.").

35

Jeff Boettcher has recanted his testimony. He now says that he testified untruthfully about his drug use and that his alleged conversation with Mr. Cantu never happened. In the State's 2022 interview with Jeff Boettcher, he stated, "**I lied**," *Id*. at 14:15, and "I'm recanting my story." *Id.* at 22:00. In the last minutes of the 45-minute interview, Mr. Boettcher says, "I don't think I was reliable ... my statement shouldn't count. It shouldn't be in there." *Id.* at 47:35.

As noted above, Jeff Boettcher—who only met Mr. Cantu for the first time in late August of 2000—testified that Mr. Cantu carried a gun every day. Mr. Cantu's roommate at the time, however, confirms that this testimony was false. William Bobbitt was Mr. Cantu's roommate for two months in the summer of 2000 and was living with Mr. Cantu when Jeff Boettcher arrived in Texas. Mr. Bobbitt has sworn under oath that he "never saw Ivan with a gun or thought he owned a gun." Exhibit 13 to Application (Bobbitt Affidavit). Mr. Bobbitt's affidavit corroborates Mr. Boettcher's recent admission that his trial testimony was a fabrication.

### 3. Additional new evidence further discredits the prosecution's case.

In addition to evidence undermining the State's two star witnesses, new factual developments cast further doubt on the integrity of the prosecution's presentation to Mr. Cantu's jury.

#### a. The jeans recovered from the trashcan could not have been worn by Mr. Cantu.

Amy Boettcher testified that the jeans recovered from the trashcan were worn by Mr. Cantu on the night of murders. These jeans were sized 34/32. 33 RR 92.

At the time of the crime, Mr. Cantu was 5'7" and weighed 140 pounds. Exhibit 12 (arrest warrant found in Winn Binders – Tab 8). William Bobbitt was Mr. Cantu's roommate just months before the crime. 34 RR 8-9 (When Jeff Boettcher met him on August 23, 2000, Mr. Cantu was living with Mr. Bobbitt). In a 2019 affidavit, Mr. Bobbitt states at the time he wore 32/20 jeans. Exhibit 13 (Bobbitt Affidavit). He tried to put on a pair of Mr. Cantu's jeans but they were too small and he could not fit into them. *Id*. Mr. Cantu had a thinner waist and was a few inches shorter than Mr. Bobbitt. Mr. Bobbitt estimates that Mr. Cantu's jeans were size 30/30 or 30/28 and that Mr. Cantu did not wear baggy jeans.

> **b. Ms. Boettcher left the murder weapon—loaded with a magazine that had been handled by Mr. Cantu—where it would be discovered and turned in to DPD.**

Tawny Svihovec, Mr. Cantu's ex-girlfriend, at whose apartment police found the murder weapon, came forward less than a month ago and advised the CCDAO that she was "99.9 percent" certain that it was Amy Boettcher, not Ivan Cantu, who left the gun in her apartment. Exhibit 20 (Electronic Mail from Tawny Svihovec to Greg Willis). Ms. Svihobec told police prior to trial that Mr. Cantu had left her apartment on the morning of November 8, leaving Ms. Boettcher alone in the

apartment for hours before Mr. Cantu was arrested. Exhibit 21 (DPD Interview of Tawny Svihovec).

Moreover, Ms. Boettcher testified that—before leaving to the airport to flee the State after Mr. Cantu was arrested—she looked rummaged under the cushions of the couch where the gun was later found and saw only money and drugs (which she took). 35 RR 183-84. She later called Ms. Svihovec and told her to look for anything that might have been left behind. Amy Boettcher had the opportunity to plant the weapon in Ms. Svihovec's apartment for her to find, and told her to look for it.

### c. The State's evidence and jury argument that victims were beaten and tortured was false.

State's witness Paulette Sutton testified at trial, based on her examination of *photos* of the crime scene (she did not actually view the crime scene), that Amy Kitchen had been kicked or punched in the face with enough force to spray a large amount of blood over the wall behind the bed. 37 RR 212-215. The State relied on Ms. Sutton's testimony to argue at closing:

> We know that he hit or kicked one of the victims. He wanted to torture them before he killed them, and I think it's a reasonable inference from the evidence that it was Amy Kitchen that he hit or kicked before he finally killed her.

> * * * *

> [Ms. Sutton] sat and told you when that person is getting hit or kicked, they were back against the headboard probably in a kneeling position. It was probably Amy Kitchen trying to get away from this Defendant. He was standing between her and the door. She just saw him kill her

fiancé. They only thing she can do is back away as far as she can. She's against the headboard. He shoots her, she starts bleeding, he hits her or kicks her. We know she probably went in the kneeling position because she's got no blood on the back of her legs, no blood on her socks. [Ms. Sutton] sat and said that would be consistent with somebody kneeling, with her kneeling back by the headboard.

41 RR 18-19.

However, a crime scene reconstruction expert and two pathologists have since concluded that the physical evidence does not support Ms. Sutton's conclusions.

Ms. Sutton's testimony has recently been criticized by Chris Robinson (www.chrisrobinsonforensics.com), a ballistics and shooting reconstruction expert formerly with the Georgia Bureau of Investigation and the Atlanta Police Crime Lab:

Now the critical thing for me is now there are no wounds to their bodies besides the gunshot wounds. So there is no kicking here, sir. There's no punching and there's no beating. What you see on that wall right there behind the head of James Mosqueda here is impact spatter and projected bloodstains out of the wound…. So the bullets do not exit, so all the pressure that's built up has to come back out of the wound, so that's projected bloodstains you see up on the wall. There's no beatings, and there's no kickings. So when this trial occurred, I'm not sure who this expert was. She didn't sound like she was too keen to me. Because there was no damage to these bodies. None was noted except for the wounds that they were shot with.

Duff, M. (Host), Episode 36, *Cousins By Blood* (2020-present), https://cousinsbybloodpodcast.com/.

Likewise, forensic pathologists Dr. Melinek and Dr. Banerjee have reviewed the forensic pathology evidence in this case and have concluded that Ms. Sutton's

testimony was not consistent with the physical evidence. As both Dr. Melinek and Dr. Banerjee note in their declarations, neither Ms. Kitchen nor Mr. Mosqueda suffered any injuries unrelated to the gunshot wounds. Exhibit 6, Exhibit 7. Dr. Melinek unequivocally concludes: "Neither Mr. Mosqueda nor Ms. Kitchen sustained blunt force traumatic injuries consistent with being beaten or kicked in the face." Exhibit 6.

The conclusions of these experts provide further evidence that the State's expert testimony and argument were false.

### C. The prosecution presented evidence through Carlos Gonzalez refuting Mr. Cantu's account of threats related to Mr. Mosqueda's drug debt.

As described, *supra*, Mr. Cantu consistently reported to friends, family, and the police that he had been threatened by a man named Matt to whom Mr. Mosqueda had become deeply indebted in his drug dealing business. "Matt" was dressed in a Domino's Pizza shirt. 33 RR 70. To refute Mr. Cantu's account, the prosecution called one of Mr. Mosqueda's longtime friends, 36 RR 183, Carlos Gonzalez who testified that Mr. Cantu's account was a far-fetched tale to cover up his guilt.

Mr. Gonzalez called Mr. Cantu shortly after the murders and, unbeknownst to Mr. Cantu, put him on a speakerphone so that Detective Winn and others present could hear Mr. Cantu's account. 36 RR 271. The prosecution used its direct examination of Mr. Gonzalez to denigrate Mr. Cantu's account:

Q.     Now, there's a pizza man story, too, right? Do you know about the pizza man?

A.     John Travolta, Steven Seagal, Pizza Man?

Q.     No, no. The Domino's pizza man.

A.     Yeah.

* * *

Q.     Do you believe those amounts? That stuff make any sense to you when you heard that's story?

A.     When he told me 250,000?

Q.     Yes.

A.     I started laughing.

Q.     Well, why?

A.     Why?

Q.     Yeah.

A.     It's just absurd, you know.

* * *

Q.     (BY MR. SCHULTZ) Did you believe that story about the pizza man and all? When you were hearing it, did you believe it?

A.     No.

Q.     Well, that meant your friend of all those years was just lying to you?

A.     Exactly.

Q.     Well, did you know that at the time?

A.     Yes, sir. When I heard the story, then I knew.

Q.     When you heard what story?

A.     When I heard the Domino's pizza story.

Q.     You knew what?

A.     I knew what I knew, that story wasn't for real.

Q.     Is it because of the amount or just the absolute–

A.     Just – just the nonsense of it.

                          * * *

Q.     Understanding you've already said that you thought his stories were nonsense, is that just – is that because you thought he was insane at the time or just coming up with nonsense stories?

A.     I think he was just trying to come up with a story that somebody would buy.

36 RR 245; 250-51; 254-55.

After the State rested, the defense rested without presenting any witnesses. 38 RR 3-4.

The prosecution's closing argument relied on Mr. Gonzalez and the demonstrably untruthful Ms. Boettcher to refute Mr. Cantu's account:

42

You've got the Defendant lying. He's telling this pizza man story, that some pizza man came. and he shot a hole in the wall and that's the pizza man that's after James. Well, you know that's a lie. You know it's a lie because Amy Boettcher told you it was a lie. She said, no, it was the Defendant. It was Ivan Cantu that shot at me. Ballistics tell you that's right because that bullet that was taken out of the wall matches that gun. Even Carlos said, when he I started talking about that pizza guy story, I knew he was lying. It's nothing but a bunch of lies. Why do you have to lie if you don't have anything to cover up?

41 RR 16–17.

### D. One of Mr. Mosqueda's drug suppliers was Mateo "Matt" Gonzalez from the Valley. Mr. Gonzalez matched Mr. Cantu's description of the "pizza man," ran drugs from the Valley to Dallas, and drove a Lincoln.

New evidence has emerged supporting Mr. Cantu's account of being threatened by one of Mr. Mosqueda's drug suppliers. Mr. Mosqueda was supplied large quantities of drugs form a dealer named "Matt" who lived in the Valley. Matt matched Mr. Cantu's description of the man who threatened him and he drove a Lincoln. Finally, prosecution witness Carlos Gonzalez *knew* Matt the drug dealer and that he drove a Lincoln.

Jason Harrelson "worked for James Mosqueda off and on for approximately 3 years, from 1994 to 1997" in "his tanning salons; 10-Minute Tan, located in Dallas." Exhibit 15 (Declaration of Jason L. Harrelson). While "working there, [Mr. Harrelson] was aware of an acquaintance of James, who [he] knew as Matt." *Id*. Mr. Harrelson described Matt as "a Hispanic male" who was in his "mid to late 30's back in 1996, 1997." *Id*. "Matt would visit James occasionally at the tanning salon," Mr. Harrelson estimated that "in the 3 years [he] worked there, [Matt] came by 6 to 8

times." *Id*. Mr. Harrelson has positively identified the following person as the "Matt" he knew:



According to Harrelson: "This is the man I knew as Matt. Based on this picture, I am positive that was Matt. The man that would call and visit James at the tanning salon." *Id*.

The man in the above photo is Mateo "Matt" Gonzalez who was born in October of 1959 and died in 2022. Matt has a criminal record for possessing large quantities of marijuana. Exhibit 16 (Mateo Gonzalez Hidalgo County Court Record). He owned a 1989 Lincoln Town Car. Exhibit 17 (Vehicle Title Record).

June Rose was Matt's ex-wife, their common law marriage lasted about ten years, from 1996 to 2006 or 2007, when Matt went to prison for selling drugs. Exhibit 18 (Declaration of Stewart Fillmore). Ms. Rose confirms that "Matt knew James Mosqueda since the late 1980's or the early 1990s. They were close friends in those early years." *Id*. Ms. Rose confirms that "Matt had sold marijuana to James Mosqueda," but she was not aware of the dates of those occasions.

Another witness describes Matt as James's "big supplier" who brought 18 wheelers from the Valley with drugs in the tire.[9]

Finally, Carlos Gonzalez, who disparaged Mr. Cantu's account at trial, *knew* Matt Gonzalez and that he drove a Lincoln. Ryan Patton grew up with Carlos Gonzalez, Anthony Fonseca, and James Mosqueda. Exhibit 19 (Declaration of Ryan Patton). When Mr. Patton "managed the Goodyear tire shop, Carlos brought multiple of his vehicles into the shop and [Mr. Patton] put rims and tires on them." *Id*. Mr. Patton remembers Carlos coming to the shop near the time of 9/11, which would have been immediately before Mr. Cantu's trial:

> In 2001, Carlos told me he had some guys from in the Valley, which I knew as the Rio Grande Valley, who wanted some rims and tires on their vehicles. They wanted to come up to Dallas and have my Goodyear shop put them on because I could give them a discount. I had

---

[9] This witness has expressed apprehension about their safety and is unwilling to appear publicly. Mr. Cantu will produce materials documenting the witness's statement when granted leave to file the materials under seal. For purposes of this application, however, undersigned counsel has a good faith basis for alleging that the witness will confirm the above-stated facts.

to special order these rims and so I needed to get them by the date these guys were coming up.

Around the date of 9-11-2001, Carlos's friends from the Valley came into my shop. From what I can recall, it was about 4 or 5 guys from the Valley in their group. I knew it was right around 9-11-2001, because I remember 9/11 happening within days of these guys coming in.

*Id*. Mr. Patton said that one of the men "really stood out, and stuck in [his] memory because of how he looked, how he was how he was dressed, and his vehicle. He had shoulder length black hair pulled back in a ponytail, but sometimes he would let it down and it reminded me of Antonio Banderas." *Id*. Mr. Patton said "[t]he hair and the trench coat, made him memorable to me, as well as his vehicle," "[h]e drove a black box style Lincoln, late 80's to early 90s style." *Id*.

Mr. Patton's memory of the man matched Mr. Cantu's: "Ivan's description was a medium build, Hispanic male, with long shoulder length hair, who was said to be from the Valley. That sounded like the guy I saw back in 2001 with Carlos Gonzalez, driving the same kind of black box style Lincoln." *Id*. Mr. Patton viewed a sketch of Matt Gonzalez with long hair and a representative picture of a Lincoln:

46




*Id*. Based on the above, Mr. Patton is "95% certain that was the man I saw in my tire shop in 2001. I am 100% certain that this kind of black box style Lincoln is what the man from the Valley was driving." *Id*. Mr. Patton "saw him in September of 2001 with Carlos Gonzalez." *Id*.

Prior to November 2, 2000, Mr. Cantu did not know Matt Gonzalez, or that one of James Mosqueda's big drug suppliers was a man named "Matt from the Valley." He did not know what Matt looked like or that he drove a Lincoln. Yet, Ivan gave an accurate physical description, the correct name, and correctly identified the type of car he owned. This evidence corroborates Mr. Cantu's account and demonstrates that Carlos Gonzalez—Mr. Mosqueda's partner in the drug trade— knew that Mr. Cantu was describing one his friends from the Valley.

**IV. Mr. Cantu meets the requirements of 28 U.S.C. § 2244 to receive authorization to proceed on his second or successive habeas application in the district court.**

When a petitioner seeks authorization to proceed on a second or successive habeas application, this Court performs an initial gatekeeping assessment. Under 28 U.S.C. § 2244(b)(3)(C), this Court "may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection." At this stage, the petitioner is not required to prove that he satisfies the criteria of § 2244(b), nor that he is entitled to relief on the merits of the proposed claim. Those are questions for the district court in the first instance if the petition is authorized to proceed. *In re Will*, 970 F.3d 536, 541 (5th Cir. 2020). Instead, the petitioner must establish "'simply a sufficient showing of possible merit to warrant a fuller exploration by the district court'" and that "'in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirement for the filing of a second or successive petition[.]'" *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003) (quoting *Bennett v. United States*, 119 F.3d 468, 469–70 (7th Cir. 1997)).

Under § 2244(b)(2)(B),

> To receive authorization to file a successive habeas petition with the district court, [the petitioner] must make a prima facie showing that: (1) his … claims [were] not presented in a prior application; (2) the factual predicate for the … claims "could not have been discovered previously

through the exercise of due diligence"; and (3) he can establish by "clear and convincing evidence that, but for [the Brady] error, no reasonable factfinder would have found" him guilty.

*In re Will*, 970 F.3d at 541 (quoting 28 U.S.C. § 2244(b)(2)(B)). Because Mr. Cantu's second petition "deserves fuller review by the district court," *id.*, he respectfully moves this Court to remand his petition for further consideration.

### A. Mr. Cantu has not previously presented his claims in federal court.

The initial question is whether Mr. Cantu presented the claims at issue in his prior federal application. 28 U.S.C. § 2244(b)(1). None of the *Brady*[10] and false testimony allegations have been raised in a prior application. Therefore, Mr. Cantu has met his burden under § 2244(b)(1).

### B. Mr. Cantu can make a prima facie showing under § 2244(b)(2)(B) that his claims were not previously discoverable through the exercise of due diligence.

Mr. Cantu raise two claims in his attached petition:

I.  The testimony of the State's star witnesses, Amy Boettcher and Jeff Boettcher, and Carlos Gonzalez was materially false in violation of the Due Process Clause of the Fourteenth Amendment.

II. The State suppressed evidence impeaching its star witness, Amy Boettcher, in violation of *Brady v. Maryland* and the Due Process Clause.

---

[10] *Brady v. Maryland*, 373 U.S. 83 (1963).

The evidence supporting Mr. Cantu's claims was not previously discoverable. First, as described above, the lead DPD detective investigating this case suppressed evidence demonstrating that Ms. Boettcher lied in her sworn statements and from the stand. Mr. Kitchens discovered Mr. Mosqueda's watch shortly after the murders and gave it to Detective Winn. By then, Mr. Boettcher had already repeatedly sworn she saw Mr. Cantu wear and then discard Mr. Mosqueda's watch. Instead of logging the watch into evidence, Winn returned it to Mr. Mosqueda's mother. Though his report documented the meeting with Mr. Kitchen, he failed to document recovering the watch and thus Mr. Cantu had no way of knowing it had been recovered. He only discovered the deceits of Detective Winn and Ms. Boettcher many years later.

Likewise, the DPD Officers knew that the bloody clothing was not in the apartment after Mr. Cantu and Ms. Boettcher left for Arkansas, but that information was never turned over to Mr. Cantu.

As this Court has held when assessing diligence with respect to motions for authorization, petitioners "need not assume the prosecution may be withholding information in order to exercise diligence": "The Supreme Court has stated that its 'decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed.'" *In re Will*, 970 F.3d at 542 (quoting *Banks v. Dretke*, 540 U.S. 668, 695 (2004). "While this Supreme Court precedent was not interpreting AEDPA,

its due-diligence analysis demonstrates that trial counsel may rely, absent notice to the contrary, on representations by the prosecutor, as [Mr. Cantu's counsel reasonably did here." *Id*. at 543.

Mr. Cantu filed a pre-trial *Brady* motion and the prosecution assured the trial court and defense counsel that it would be diligent in its Brady obligations: "We don't hide behind the file. We will—we started contacting the police agencies and say, if you have any information not disclosed to us that's exculpatory and mitigating, we need to know about it, We're not playing that kind of hide-the-ball game with anybody." 2 RR 33.

Additionally, the CCDAO disclosed Mr. Boettcher's recantation to Mr. Cantu years after Mr. Cantu's prior federal habeas proceedings.

Lastly, evidence validating Mr. Cantu's account of "Matt" the drug dealer from the Valley who was supplying Mr. Mosqueda's substantial drug trade emerged due to a podcast that, as it turns out, is subscribed to by people who knew Mr. Mosqueda and people in his orbit. By soliciting tips from its listeners, the podcast heard from people who knew Mr. Mosqueda, or even people who knew people who knew Mr. Mosqueda. The crowd-sourced podcast investigation is not something that habeas counsel for death-sentenced prisoners could reasonably be expected to perform. But, without it, Mr. Cantu would not have learned about Matt Gonzalez and his connections to Mr. Mosqueda and Carlos Gonzalez.

Mr. Cantu has made a prima facie showing that his claim were not available to him through the exercise of due diligence, he asks that this Court remand his case for further proceedings.

### C. Mr. Cantu can make a prima facie showing of innocence under § 2244(b)(2)(B).

Finally, Mr. Cantu can make a prima facie showing that "by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found" him guilty. *Id.* "This standard has been described as 'a strict form of 'innocence,' . . . roughly equivalent to the Supreme Court's definition of 'innocence' or 'manifest miscarriage of justice' in *Sawyer v. Whitley.*" *Johnson*, 442 F.3d at 911 (quoting 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure § 28.3e, at 1459–60 (5th ed. 2005) (citing *Sawyer v. Whitley,* 505 U.S. 333 (1992))).

At this stage, however, this Court does not need to determine whether Mr. Cantu is actually innocent; instead, this Court need determine only whether there is possible merit to his claim that the withheld evidence meets this subsection. *Will*, 970 F.3d at 544. "[T]he controlling standard is not whether the newly discovered evidence proves innocence beyond all doubt," the "standard is one of reasonable doubt—whether [the petitioner] has made a prima facie showing, by clear and convincing evidence, that no reasonable factfinder would find him guilty." *Id*. at 547.

Thus, this Court "objectively review[s] the evidence as a whole to determine whether it's reasonably likely that the withheld evidence would have changed the outcome." *Id.* at 544. This assessment requires a comparison of the new evidence to existing evidentiary landscape to determine "the likely impact of the *Brady* material on reasonable jurors." *Id.* at 543. Like *Schlup v. Delo*, 513 U.S. 298 (1995), gateway inquiries, here the Court reviews "evidence the trial jury did not have before it," thus "the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *House v. Bell*, 547 U.S. 518, 538–39 (2006). And, if "new evidence so requires, this may include consideration of 'the credibility of the witnesses presented at trial.'" *Id*. at 538–39 (quoting *Schlup*, 513 U.S. at 330).

Because the case against Mr. Cantu looks significantly different than it did the last time this Court reviewed his case, "it is reasonably likely that, after hearing the new evidence alongside the old evidence, every reasonable juror would have some level of reasonable doubt." *In re Will*, 970 F.3d at 547.

When affirming Mr. Cantu's case on direct appeal, five members of the TCCA were willing to assume that much of the physical evidence in this case was illegally obtained but held that violation to be harmless because "Amy Boettcher's testimony about the offense wholly incriminated appellant in the murders and robbery" and "both Amy and Jeff Boettcher testified about appellant's express desire to kill the

victims." *Cantu v. State*, 2004 WL 3093156, at *4 (Tex. Crim. App. June 30, 2004). The three dissenting judges would have reversed Mr. Cantu's conviction. *Id*. at *5–*6.

It is now beyond dispute that Amy and Jeff Boettcher lied under oath and were fundamentally incredible witnesses. Jeff Boettcher admitted that the events to which he testified—and that the TCCS relied on to affirm Mr. Cantu's conviction—"never happened." Without the Boettchers the prosecution's case unravels.

The State may point to the physical evidence but, even if the illegally seized items are properly considered at this stage:

- Mr. Cantu has produced evidence that the crime-relevant items were placed in his apartment after he and Ms. Boettcher left town to visit her parents.

- Ms. Svihovec now says she is 99% sure that Amy Boettcher left the murder weapon in Ms. Svihovec's apartment.

Not only has the case unraveled, but new evidence now confirms Mr. Cantu's account indicating that the murders were related to Mr. Mosqueda's drug distribution business—a theory that was inexplicably disregarded by DPD despite evidence supporting it.

Although § 2244(b)(2)(B)(ii) is a high standard to meet, it is certainly not impossible. This Court found the petitioner in *In re Will* to have met this demanding standard. There, among other inculpatory evidence, Mr. Will: (1) confessed to the

crime; (2) was found in possession of the gun used to kill the victim; (3) attempted to conceal that he had fired a gun; and (4) tested positive for gunshot residue. 970 F.3d at 549 (Ho., J., dissenting). In contrast, the new evidence was that the man Mr. Will asserted was actually responsible for the crime, Michael Rosario, tried to get a different inmate to kill Mr. Will prior to his trial and also told an officer that he was involved in the offense in question, although he did not specify how. *Id.* at 546. If a petitioner who has confessed to the offense meets this exacting standard on such new evidence, certainly Mr. Cantu, who has always maintained his innocence, does based on the new evidence discrediting the prosecution's case and validating his account of the events leading to the crime.

## V.    Conclusion and prayer for relief.

For these reasons, Mr. Cantu requests that this Court enter an order authorizing his claims to proceed in district court.

Respectfully submitted,


_/s/_ Gena Bunn
GENA BUNN
Texas Bar No. 00790323

Gena Bunn, PLLC
P.O. Box 6150
Longview, Texas 75608
gbunn@genabunnlaw.com
(903) 804-4003

ATTORNEY FOR PETIONER

## CERTIFICATE OF COMPLIANCE

I certify that (1) this Motion was prepared in 14-point Times New Roman font using Microsoft Word software, (2) this Motion is 12,372 words, excluding the parts of the Motion exempted by the rules of court, and (3) this Motion has been scanned for viruses and the Motion is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

*/s/ Gena Bunn*
Gena Bunn


## CERTIFICATE OF CONFERENCE

I certify that I conferred with Travis Bragg, counsel for Respondent, and the Respondent opposes this motion.

*/s/ Gena Bunn*
Gena Bunn


## CERTIFICATE OF SERVICE

I certify that on February 28, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. I have also sent a copy via email to counsel for the Director, Tomee Heining.

*/s/ Gena Bunn*
Gena Bunn