# **<u>APPENDIX</u>**

## <u>TABLE OF CONTENTS TO APPENDIX</u>

DOCUMENT                                                         PAGE RANGE

PROPOSED SECOND OR SUCCESSIVE PEITTION ............................................

    EXHIBIT 1 ................................................................................
    DPD Interview of Gladys and Gilbert Tamez

    EXHIBIT 2 ................................................................................
    DPD Interview of Sylvia Cantu

    EXHIBIT 3 ................................................................................
    DPD Police Report Regarding Rolex6

    EXHIBIT 4 ................................................................................
    Investigative Notes of DA Investigator Dale Lundberg

    EXHIBIT 5 ................................................................................
    Electronic Mail from Mark Kitchen to Dale Lundberg

    EXHIBIT 6 ................................................................................
    Declaration of Dr. Judy Melinek, M.D.

    EXHIBIT 7 ................................................................................
    Declaration of Dr. Priya Banerjee, M.D.

    EXHIBIT 8 ................................................................................
    DPD Police Report Regarding Frank Perez

    EXHIBIT 9 ................................................................................
    Declaration of Thomas Houran

    EXHIBIT 10 ..............................................................................
    Declaration of Steve Oliver Mayr

    EXHIBIT 11 ..............................................................................
    Affidavit of Susan Eichenberg

EXHIBIT 12 ...................................................................................................
Arrest Warrant Dated November 9, 2000

EXHIBIT 13 ...................................................................................................
Affidavit of William Brad Bobbitt

EXHIBIT 14 ...................................................................................................
Video Interview of Jeff Boettcher

EXHIBIT 15 ...................................................................................................
Declaration of Jason L. Harrelson

EXHIBIT 16 ...................................................................................................
Mateo Gonzalez Hidalgo County Court Record

EXHIBIT 17 ...................................................................................................
Vehicle Title Record

EXHIBIT 18 ...................................................................................................
Declaration of Stewart Fillmore

EXHIBIT 19 ...................................................................................................
Declaration of Ryan Patton

EXHIBIT 20 ...................................................................................................
Electronic Mail from Tawny Svihovec to Gregg Willis

EXHIBIT 21 ...................................................................................................
DPD Interview of Tawny Svihovec

EXHIBIT 22 (7)..............................................................................................
Amy Boettcher Statement #1

EXHIBIT 23 (2)..............................................................................................
Amy Boettcher Statement #2

EXHIBIT 24 (3)..............................................................................................
Amy Boettcher Statement #3

EXHIBIT 25 (8)....................................................................................
Amy Boettcher Statement #4

EXHIBIT 26 ........................................................................................
Affidavit of Abner Cantu

PRIOR FEDERAL COURT PLEADINGS AND ORDERS

PETITION FOR WRIT OF HABEAS CORPUS ............................................
January 18, 2007

MEMORANDUM OF LAW..........................................................................
January 18, 2007

SUPPLEMENTAL MEMORANDUM OF LAW ............................................
December 22,2008

MEMORANDUM OPINION ........................................................................
March 17, 2009

ORDER & JUDGMENT ..............................................................................
March 17, 2009

FIFTH CIRCUIT OPINION..........................................................................
January 26, 2011

SUPREME COURT OPINION GVR .............................................................
March 26, 2012

FIFTH CIRCUIT OPINION/ORDER .............................................................
June 1, 2012

MEMORANDUM OPINION AND ORDER OF DISMISSAL.......................
June 15, 2016

FIFTH CIRCUIT ORDER DENYING COA....................................................
November 7, 2016

SUPREME COURT ORDER DENYING CERTIORARI ...............................
June 19, 2017

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **IVAN ABNER CANTU,** | § | |
| | § | |
| Petitioner, | § | **Civil Action No. _____** |
| | § | |
| **v.** | § | |
| | § | |
| **BOBBY LUMPKIN, Director,** | § | |
| **Texas Department** | § | |
| **Of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| Respondent. | § | |

**PROPOSED SUBSEQUENT PETITON FOR WRIT OF HABEAS CORPUS**

**GENA BUNN**
**Texas Bar No. 00790323**

**Gena Bunn, PLLC**
**P.O. Box 6150**
**Longview, Texas 75608**
**gbunn@genabunnlaw.com**
**(903) 804-4003**

**ATTORNEY FOR APPLICANT**

**TABLE OF CONTENTS**

I.     INTRODUCTION .........................................................................1

II.    JURISDICTION .........................................................................6

III.   CLAIMS FOR RELIEF.................................................................6

IV.    PROCEDURAL HISTORY ...........................................................7

V.     STATEMENT OF FACTS .............................................................9

      A.     The DPD conducted a blinkered investigation focused exclusively on Mr. Cantu despite information, including a statement from Mr. Cantu, that the homicides were related to Mr. Mosqueda's substantial drug dealing. ...................................................9

      B.     Mr. Cantu's trial was marred by testimony from the prosecution's star witness Amy Boettcher, who testified falsely in conformity with the DPD's erroneous beliefs about the evidence.............................................................16

            1.     Amy Boettcher lied about Mr. Mosqueda's Rolex watch. .......20

                  a.     The police believed, and Amy Boettcher testified, that Mr. Cantu stole, wore, and then discarded Mr. Mosqueda's Rolex watch.................................................21

                  b.     The police learned, *before trial*, that Mr. Mosqueda's watch was never stolen but was instead recovered in his home and returned to his family ..........23

            2.     Amy Boettcher lied about the engagement ring .......................27

                  a.     The police believed that Mr. Cantu gave Amy Boettcher an engagement ring stolen from the victim .............................................................27

b.    Mr. Cantu and Amy Boettcher announced their engagement and displayed her ring before the murders. ..........................................................29

3.    Amy Boettcher lied about the origin of crime-related items discovered in the kitchen trashcan in the apartment Ms. Boettcher and Mr. Cantu shared ...............................30

a.    The police surmised that Mr. Cantu disposed of items related to the crime—including jeans and socks with blood on them, and a latex glove—in his own kitchen trashcan .......................................30

b.    The sworn statement of a DPD Officer who inspected Mr. Cantu's apartment after he departed for Arkansas on November 4, 2000, contradicts Amy Boettcher's testimony that Mr. Cantu left clothing stained with victims' blood in their kitchen trashcan ..........................................................36

4.    Amy Boettcher's testimony about Mr. Cantu committing the murders and having personally witnessed the crime scene is refuted by scientific evidence establishing that victims were still alive after she allegedly saw their bodies ..............................................................37

C.    Jeff Boettcher, the prosecution's other star witness, recanted his testimony in 2022 because he "lied" and gave damning testimony about alleged events that "never happened." ......................................42

1.    Jeff Boettcher's trial testimony ..................................42

2.    Jeff Boettcher has admitted he testified falsely and recanted his testimony ...............................................44

3.    Jeff Boettcher lied about Mr. Cantu carrying a gun ................45

D.    Another State's witness, Carlos Gonzalez, gave materially false and misleading testimony discrediting Mr. Cantu's description of the drug dealer who threatened him .....................................46

1.      The prosecution presented evidence through Carlos
        Gonzalez refuting Mr. Cantu's account of threats related
        to Mr. Mosqueda's drug debt.....................................................46

2.      One of Mr. Mosqueda's drug suppliers was Mateo "Matt"
        Gonzalez from the Valley. Matt matched Mr. Cantu's
        description of the "pizza man," ran drugs from the Valley
        to Dallas, and drove a Lincoln ................................................49

E.      Additional new evidence further undermines the State's
        evidence..............................................................................................55

1.      The jeans recovered from the trashcan could not have been
        worn by Mr. Cantu...................................................................55

2.      The State's evidence and jury argument that victims were
        beaten and tortured was false..................................................56

3.      Tawny Svihovec believed that it was Amy Boettcher, not
        Ivan Cantu, who left the gun in her apartment. ......................58

CLAIMS FOR RELIEF ...............................................................................59

## CLAIM ONE

I.      The testimony of the State's star witnesses, Amy Boettcher and Jeff
        Boettcher, and Carlos Gonzalez was materially false in violation of the
        Due Process Clause of the Fourteenth Amendment. .....................................59

A.      Mr. Cantu is entitled to a new trial because his conviction was
        based on false and misleading testimony in violation of the Due
        Process Clause.....................................................................................59

1.      The *Napue/Giglio* standard standard. .......................................59

2.      Mr. Cantu satisfies the *Napue/Giglio* standard.........................60

a.      The State knowingly relied on false testimony. ............60

b.      The false testimony was material. ...............................66

CLAIM TWO

II.   The State suppressed evidence impeaching its star witness, Amy
      Boettcher, in violation of *Brady v. Maryland* and the Due Process
      Clause...........................................................................................73

      A.      The governing legal standard....................................................73

      B.      "I don't know what *Brady* means": The police suppressed
              favorable evidence that impeached Amy Boettcher. ................75

      C.      Because   the   jury   could   have   "convict[ed]   [Mr.
              Cantu] based on her testimony alone," 41 RR 22, the
              suppressed evidence proving that Amy Boettcher lied to
              substantiate the prosecution's mistaken assumptions about
              the crime was material ...........................................................77


CONCLUSION AND PRAYER FOR RELIEF.......................................................82

APPENDIX

## PROPOSED SUBSEQUENT APPLICATION
## FOR WRIT OF HABEAS CORPUS

Ivan Abner Cantu submits this Subsequent Petition for Writ of Habeas Corpus pursuant to the Constitution of the United States and 28 U.S.C. § 2254. Mr. Cantu respectfully shows as follows:

## I.    INTRODUCTION

Substantial new evidence never considered by Mr. Cantu's jury or any reviewing court thoroughly impeaches the State's star witnesses and impugns the integrity of the State's forensic evidence at trial. As the Texas Court of Criminal Appeals stated previously when deeming the State's putatively illegal search and seizure of evidence harmless, the testimony of Mr. Cantu's then-girlfriend, Amy Boettcher – an admitted daily drug abuser who feared going to prison herself – was enough to "wholly incriminate[] [Mr. Cantu] in the murders and robbery" at issue.[1] Ms. Boettcher's testimony was supported by her brother, Jeff Boettcher, who was a drug addict at the time and who testified to his willingness to do anything to protect his sister because they "were in it together." 34 RR 41; 60. Absent the largely unimpeached testimony of the Boettchers, it is unlikely that Mr. Cantu would have

---

[1] *Cantu v. State*, No. AP-74,220, 2004 WL 3093156 at *4 (Tex. Crim. App. Jun. 30, 2004) (not designated for publication).

been convicted for capital murder in the deaths of James Mosqueda and Amy
Kitchen.

The new evidence reveals Ms. Boettcher's repeated false statements to the
jury. For example, Mr. Mosqueda's Rolex watch—which his family initially told
the police was missing and which Amy Boettcher testified she saw Mr. Cantu wear
and dispose of on the night of the murders—was never stolen. The watch was found
in Mr. Mosqueda's home and the police returned it to his family shortly after the
murders.

Amy Boettcher testified that, on the night of the murders, Mr. Cantu proposed
to her with a diamond engagement ring that she later learned was stolen from Amy
Kitchen's body after the murders. However, witnesses have since come forward
stating that Mr. Cantu and Amy Boettcher announced their engagement and showed
off Amy Boettcher's engagement ring a week before the murders.

Amy Boettcher testified that Mr. Cantu placed his bloody jeans and socks in
their kitchen trashcan on the night of November 3, 2000, before they left for
Arkansas the following day. The jeans and socks were later seized during a search
of Mr. Cantu's apartment on November 7, 2000. However, one of the police officers
who performed a wellness check at Mr. Cantu's apartment on the evening of
November 4, shortly after the bodies were discovered, has since stated that the
jeans—which were at least two sizes too large for Mr. Cantu—and socks were not

in that trashcan at that time, indicating that someone else had placed the items in the trashcan after Mr. Cantu left for Arkansas.  This is further corroborated by telephone records showing that a long-distance telephone call was placed from Mr. Cantu's apartment at 8:53 p.m. on November 4, while Mr. Cantu was hundreds of miles away in Arkansas.   This evidence indicated that *someone else was in Mr. Cantu's apartment* long after he and Amy Boettcher had left the state, and after the police who performed the wellness check were there.

Amy Boettcher testified that Mr. Cantu committed the murders in a 48-minute window between 11:30 p.m., November 3 and 12:18 a.m., November 4.  But forensic pathologists have since posited, based on the absence of full rigor mortis when the bodies were discovered in the late afternoon of November 4, that the murders could not have occurred prior to midnight (12 a.m. on November 4), and were more likely to have occurred between 6:30 a.m. and 10:30 a.m. on the morning of November 4. Police reports—which were not presented to the jury—indicate that Frank Perez, a man who had been living with James Mosqueda and Amy Kitchen for about three weeks at the time of the murders, was heard to say after the discovery of the bodies on November 4: "They weren't killed last night, they were killed today."

Jeff Boettcher, Amy's brother, testified at trial that, prior to the murders, Mr. Cantu told him he planned to kill James Mosqueda and that Mr. Cantu had tried to recruit him to "clean up" afterward.  However, Mr. Boettcher has since disavowed

3

his trial testimony, insisting that he "lied" and was not a credible witness due to his history of drug abuse.

Additionally, Ivan Cantu has always maintained that, on the evening of November 2, 2000—two days before authorities discovered that James Mosqueda, a drug dealer who dealt in large quantities, and his fiancé Amy Kitchen had been shot to death in their home—one of Mr. Mosqueda's drug suppliers came to Mr. Cantu's apartment and threatened both Mr. Cantu and Mr. Mosqueda. Mr. Cantu said the man, who was unknown to him, was named "Matt," he was from the Valley, he was in the drug business with Mr. Mosqueda, and he drove a boxy Lincoln Town Car.

Mr. Cantu relayed his account to friends, family, and the police before he was arrested. At trial, the prosecution presented testimony—including from one of Mr. Mosqueda's partners in the drug trade—disparaging the story as improbably inconsistent with Mr. Mosqueda's character, and then argued to the jury "[i]t's nothing but a bunch of lies. Why do you have to lie if you don't have anything to cover up?" 41 RR 16–17.

The Dallas Police Department ("DPD") received an anonymous tip in the immediate aftermath of the murders connecting them to Mr. Mosqueda's drug business; this *Brady*[2] evidence was not revealed to Mr. Cantu's counsel until three

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

4

days into the merits phase of trial. The lead DPD detective acknowledged, under the trial court's incredulous questioning, that DPD made no effort to investigate the connection between Mr. Mosqueda's drug trafficking and his death. Likewise, Mr. Cantu's trial counsel failed to conduct any independent investigation into the case.

New evidence confirms Matt's existence. Matt lived in the Valley. He owned a boxy Lincoln Town Car. He matched the physical description given by Mr. Cantu. He dealt in large quantities of drugs, including in the Dallas area. More than one witness confirms that Matt from the Valley with a Lincoln Town Car supplied large amounts of drugs *to Mr. Mosqueda*. Finally, Mr. Mosqueda's partner in the drug trade—the prosecution witness who ridiculed Mr. Cantu's account as "absurd" and "nonsense"—*knew* Matt from the Valley.

Critically, Mr. Cantu's trial preceded the effective date of the Michael Morton Act. The record reveals that the Collin County District Attorney's Office was miserly in its pretrial discovery allowance, disclosing a witness' prior statements only after passing the witness for cross-examination by the defense. It is unclear whether the DA's Office disclosed offense reports prior to trial.

The totality of the newly discovered evidence eviscerates the prosecution's case and substantiates Mr. Cantu's account of events, thus undermining confidence in the judgment for which Mr. Cantu faces imminent execution.

## II.    JURISDICTION

This Court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Ivan Abner Cantu was convicted in the 380th Judicial District Court of Collin County, Texas which is within the Eastern District of Texas.  This Court has subject matter jurisdiction under 28 U.S.C. § 2254.

## III.    CLAIMS FOR RELIEF

The false testimony of witnesses and withholding of evidence by State actors in Mr. Cantu's case give rise to the following claims for relief:

> That Mr. Cantu is entitled to a new trial because his conviction was based on false and misleading testimony in violation of the Due Process Clause of the Fourteenth Amendment
>
> That Mr. Cantu is entitled to a new trial because the State failed to disclose favorable, material evidence in violation of *Brady v. Maryland*[3] and the Due Process Clause of the Fourteenth Amendment
>
> That Mr. Cantu is entitled to a new trial because his trial counsel rendered ineffective assistance in violation of *Strickland v. Washington*[4] and the Sixth Amendment of the United States Constitution.

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

[4] *Strickland v. Washington*, 466 U.S. 668, 685 (1984).

## IV.    PROCEDURAL HISTORY

Ivan Cantu was convicted of capital murder and sentenced to death in October 2001. His conviction and sentence were affirmed on direct appeal. *Cantu v. State*, No. AP-74,220, 2004 WL 3093156 (Tex. Crim. App. Jun. 30, 2004) (not designated for publication). State habeas corpus relief was denied in 2006. *Ex parte Cantu*, No. WR-63624-01, 2006 WL 120829 (Tex. Crim. App. Jan. 18, 2006) (not designated for publication). A federal district court denied federal habeas corpus relief, *Cantu v. Quarterman*, No. 2:06-CV-166, 2009 WL 728577 (E.D. Tex. Mar. 17, 2009), and the Fifth Circuit Court of Appeals affirmed. *Cantu v. Thaler*, 632 F.3d 157 (5th Cir. 2011). However, the United States Supreme Court granted certiorari review, vacated the judgment of the court of appeals, and remanded for reconsideration in light of *Martinez v. Ryan*, 566 U.S. 1 (2012). *Cantu v. Thaler*, 566 U.S. 901 (2012). On remand, the federal district court again denied relief and denied a certificate of appealability. *Cantu v. TDCJ-CID*, No. 2:06-CV-166, 2016 WL 3277246 (E.D. Tex. Jun. 15, 2016). The Fifth Circuit also denied a certificate of appealability. *Cantu v. Davis*, 665 Fed. App'x. 384 (5th Cir. 2016). The United States Supreme Court denied certiorari review. *Cantu v. Davis*, 137 S. Ct. 228 (2017).

Mr. Cantu filed a motion for post-conviction DNA testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure on October 1, 2009. The convicting court denied the motion, and the Court of Criminal Appeals affirmed the denial.

*Cantu v. State*, No. AP-76281, 2010 WL 4010833 (Tex. Crim. App. Oct. 13, 2010). However, while Mr. Cantu's federal habeas corpus proceedings were still pending, the parties agreed to additional DNA testing, and the convicting court signed an agreed order to that end. The court conducted hearings regarding the results of this testing on February 13, 2020, and August 4, 2021, and ultimately concluded that the new DNA evidence would not have made a difference at Mr. Cantu's trial.

On December 16, 2022, the convicting court scheduled Mr. Cantu's execution for April 26, 2023. Mr. Cantu filed his first subsequent application for habeas corpus relief on April 18, 2023, and the trial court subsequently withdrew Mr. Cantu's execution date. The Texas Court of Criminal Appeals dismissed Mr. Cantu's first subsequent application without considering the merits of his claims. *Ex parte Cantu*, No. WR-63,624-02 (Tex. Crim. App. Aug. 23, 2023).  Based on evidence supporting the claims in his first subsequent application first disclosed by the Collin County District Attorney's Office ("CCDAO") after the application was filed, Mr. Cantu filed a suggestion to reconsider the dismissal on the Court's own motion. That motion remains pending before the Texas Court of Criminal Appeals.  Mr. Cantu also filed a second subsequent application for writ of habeas corpus in the convicting court and the Court of Criminal Appeals, and that application remains pending.

## V.    STATEMENT OF FACTS

### A.    The DPD conducted a blinkered investigation focused exclusively on Mr. Cantu despite information, including a statement from Mr. Cantu, that the homicides were related to Mr. Mosqueda's substantial drug dealing.

On the afternoon of November 4, 2000, the bodies of James Mosqueda and his fiancé Amy Kitchen were found in the master bedroom of their home in North Dallas; both had suffered multiple gunshot wounds.  31 RR 111-16.  There were no signs of forced entry, and no weapon was found at the scene, but police did find shell casings from a .380-calber handgun and spent projectiles from a small to medium caliber gun.  32 RR 59-62.  Police were told that Ms. Kitchen's one-and-one-half-carat diamond and platinum engagement ring, Mr. Mosqueda's Rolex watch, and Mr. Mosqueda's black Corvette were missing; and while Ms. Kitchen's Mercedes was in the garage, her keys were missing.  33 RR 55-58.

Lead DPD Detective Anthony Winn learned that Mr. Mosqueda was a well-known drug dealer who sold in large quantities:

> Q.    Based on the totality of your investigation, including the crime scene, your interviews with family and friends and suspects and other police officers, have you pretty much formed the conclusion that Mr. Mosqueda was a drug dealer?
>
> A.    Yes, sir.

* * *

9

Q.     Now, you have learned, through the course of your investigation, that [Anthony] Fonseca, [Carlos] Gonzalez and [James] Mosqueda were all distribution partners in narcotics, correct?

A.     Yes, sir.

Q.     Okay. And we're not talking nickel-dime stuff, we're talking major quantities, correct?

A.     Yes, sir.

\* \* \*

Q.     Okay. Was [Mr. Mosqueda] involved in the large-scale distribution of marijuana as well?

A.     Yes, Sir.

\* \* \*

Q.     Did you ever get any information, Detective Winn, that in the course of your investigation that Mosqueda only sold usually in large quantities and only sold to people that he knew very, very well?

A.     I was aware of the large quantities but not people he knew very, very well.

34 RR 128; 131; 133; 144.

On October 5, 2001, the third day of trial, the prosecution revealed for the first time that on November 5, 2000 – the day after the murders were discovered – DPD Detective Laboda received a tip that Mr. Mosqueda was murdered by a drug dealer named "Mario Rojas" to whom he owed money. 33 RR 186; 197. The prosecution acknowledged that the tip sheet "appears to be covered by *Brady*" and "assum[ed]

10

that's exculpatory, if it's supposed to be somebody else doing the killing," but excused their failure to turn it over by stating "we had never seen before until [sic] he got this from the officer." 33 RR 186.

DPD also learned on November 5, 2000, that one of Mr. Mosqueda's distribution partners in the narcotics business, Anthony Fonseca, had his door kicked in about ten days before Mr. Mosqueda was murdered. Exhibit 1 (Interview Mr. Mosqueda's sister and brother-in-law). Mr. Mosqueda's sister was concerned about Mr. Fonseca's safety. *Id*.

With respect to the tip, Detective Winn verified with the DPD narcotics division that Rojas was a "major drug dealer" but inexplicably terminated his investigation there:

Winn:       Detective Laboda did absolutely nothing. He just took the message, did the investigative note, and then gave it to me. He done (sic) absolutely nothing on it.

The Court:  And you didn't do anything, either?

Winn:       That was all that was done, yes sir.

The Court:  So he didn't do anything and you didn't do anything?

Winn:       Well, I notified narcotics division, but other than that, that's all I did, yes sir.

The Court:  So you notified them, and what did they do?

Winn:       They did not do anything because at the time, I don't remember when this came in, but they just supplied me with [sic] intelligent information. That's all.

11

Case: 24-40110   Document: 3   Page: 21   Date Filed: 02/22/2024
000021

33 RR 200-201.

DPD knew that Mr. Mosqueda was dealing with large quantities of drugs and, presumably, large amounts of cash. Yet, DPD did not attempt to learn whether Mr. Mosqueda's drug operation was run out of the home where he was murdered. 34 RR 134-35. DPD never attempted to analyze Mr. Mosqueda's finances or whether his lifestyle could have been supported by legitimate business dealings. 34 RR 135.

Despite Mr. Mosqueda's drug connections, the recent attack on one of his narcotics distribution partners, and a tip identifying a potentially murderous drug dealer by name received the day after the crime was discovered, DPD never investigated the possibility that Mr. Mosqueda's murder was related to his indisputably substantial drug dealing business. Instead, the DPD conducted a blinkered investigation focused exclusively on Mr. Mosqueda's cousin, Ivan Cantu.

When Mr. Mosqueda's and Ms. Kitchen's bodies were found, Mr. Cantu and his girlfriend Amy Boettcher were hundreds of miles away on a pre-planned road trip to the home of Ms. Boettcher's parents in Franklin, Arkansas, where Amy planned to introduce her fiancé to her parents. 35 RR 112-113; 36 RR 25.

By early evening on November 4, Ivan Cantu's mother, Sylvia Cantu, along with several other family members, had arrived at the scene of her nephew's murder; she requested that police take her to the nearby apartment shared by Mr. Cantu and Ms. Boettcher because she was concerned about Mr. Cantu's welfare. 32 RR 76,

81.   Officers took Mrs. Cantu to the apartment and, despite the lack of a search

warrant, used the manager's key to gain entry at 8:25 p.m.  32 RR 109, 78, 82.  They

spent about ten minutes inside the small, one-bedroom apartment, ostensibly looking

for some evidence that Mr. Cantu or Ms. Boettcher had been harmed.  3 RR 46-48.

Then, as officers were leaving the apartment, they observed a small hole near the

door which they thought was a bullet hole; however, they failed to mention this

observation in their investigation report.  32 RR 87, 89, 112.

At about 3 a.m. on November 5, police found Mr. Mosqueda's Corvette in the

parking lot of the Cantu/Boettcher apartment complex.  33 RR 60.  Significantly,

police who searched the apartment just hours earlier had not observed the Corvette

at that location, though it was found in close proximity to the apartment.  32 RR 89.

In the meantime, Mr. Cantu, still in Arkansas with Ms. Boettcher, had been

contacted by his mother and told about the double homicide.  44 RR 145-146.  While

in Arkansas, Mr. Cantu made and received several telephone calls to and from

various family members and acquaintances, including Carlos Gonzalez and Anthony

Fonseca, two long-time associates of Mr. Mosqueda who were both drug dealers in

their own right.  43 RR 131.

At some point on November 6, Mr. Cantu called Mr. Gonzalez and,

unbeknownst to Mr. Cantu, Mr. Gonzalez invited Dallas Police Detective Anthony

Winn to listen to that conversation.  33 RR 65-68.  During this call, Mr. Cantu told

Mr. Gonzalez that a man dressed as a pizza delivery man had threatened Mr. Cantu

with a gun in his apartment on November 2, 2000:

> a guy in a Domino's pizza uniform that knocked on his door. He said
> that the guy – when he opened the door – I'm sorry. When Mr. Cantu
> said he opened the door, the guy forced his way in, and he had a
> handgun. He said that the guy put the gun to his head and was telling
> him that he had fronted his cousin, Mr. Mosqueda, $300,000 in cocaine.
> He said that Mr. Mosqueda had only paid him $50,000 and he still [sic]
> owe him $250,000 dollars.

33 RR 70. Mr. Cantu said the man, whose name was "Matt," got upset during the

confrontation and "fired one round into the wall inside his apartment *Id*. at 71. As

Mr. Cantu's mother reported to DPD on November 6, 2000, "Matt" drove a black

Lincoln. Exhibit 2 (DPD Interview of Sylvia Cantu).

Mr. Cantu further explained that he went to Mr. Mosqueda's house on the

evening of November 3 to alert Mr. Mosqueda to this threat; Mr. Mosqueda then

requested that Mr. Cantu take Mr. Mosqueda's car and leave Mr. Cantu's Honda out

front so it would appear that someone was visiting Mr. Mosqueda at home.  33 RR

72.  Mr. Cantu had also been in contact with police during this time and had agreed

to return to Dallas and talk to them.

During a search of the Cantu/Boettcher apartment on November 7, police

found a box of .380 bullets and some keys, including the key to Amy Kitchen's

Mercedes and a key that unlocked the door from the garage to the Mosqueda/Kitchen

home; police also found a pair of jeans, some white socks, and a latex glove in the

kitchen trashcan.[5]  33 RR 100, 102.  Subsequent DNA testing indicated that the jeans and socks had Mr. Mosqueda's and Ms. Kitchen's blood on them.  37 RR 185, 186.

Also on November 7, Mr. Cantu and Ms. Boettcher drove back to Dallas from Arkansas.  36 RR 138.  At Ms. Boettcher's urging, they went to the apartment of Tawny Svihovec, Mr. Cantu's ex-girlfriend, where they stayed the night.  35 RR 180.  The following day, November 8, Mr. Cantu left to go meet with police while Ms. Svihovec went to work; Ms. Boettcher was at Ms. Svihovec's apartment alone for most of the day.  35 RR 181-182.  Shortly before noon, Mr. Cantu called Ms. Boettcher and informed her that he had been arrested.  33 RR 104; 35 RR 23-24, 183.  Ms. Boettcher immediately called her parents in Arkansas; as her stepfather recalled her saying, "I'm scared to death they are going to kill me.  Get me out of here."  36 RR 139.  Ms. Boettcher flew back to Arkansas later that day.  35 RR 184. Once back in Arkansas, Ms. Boettcher gave a series of statements to law enforcement (orchestrated by her stepfather) implicating Mr. Cantu and ultimately agreed to testify against him.[6]  33 RR 113; 35 RR 197; 36 RR 6-19.

---

[5] The detective in charge of the collection of physical evidence testified that the glove was not "removed and processed" because there was nothing about it to "pique [his] interest as far as trace evidence goes." 32 RR 46. Had the glove been worn by the assailant in the murder—in which there was a significant amount of blood spatter—both the victim's and the assailant's DNA would have been on the glove. The detective could only have deemed the glove of no value because he believed it was put there by the police working the scene.

[6] Ms. Boettcher gave at least four statements to law enforcement during the weeks following the murders: the first to an Arkansas sheriff on the morning of November 10, the second to an Arkansas

Police found the murder weapon – a .380 pistol – at Ms. Svihovec's apartment on November 11. 33 RR 107-108, 148. The weapon was matched to projectiles recovered from the decedents' bodies as well as the projectile recovered from the wall of the Cantu/Boettcher apartment. 34 RR 172-174. Mr. Cantu's left thumbprint was matched to a latent print recovered from the removable clip, but not the weapon itself. 34 RR 150.

Police never recovered Mr. Mosqueda's Rolex watch or Ms. Kitchen's diamond-and-platinum engagement ring.

**B.    Mr. Cantu's trial was marred by testimony from the prosecution's star witness Amy Boettcher, who testified falsely in conformity with the DPD's erroneous beliefs about the evidence.**

Mr. Cantu's girlfriend, Amy Boettcher, was the indisputable star prosecution witness at trial. As the State argued to the jury, "you can convict him based on her testimony alone," 41 RR 22, and as The Texas Court of Criminal Appeals found, "Amy Boettcher's testimony about the offense wholly incriminated appellant in the murders and robbery." *Cantu v. State*, supra, at *4. According to Ms. Boettcher's testimony, the chronology of the events surrounding the murders was as follows:

- Mr. Cantu telephoned Mr. Mosqueda at 11:20 p.m. on November 3 and arranged to go to his house to talk to him. 3 RR 121.

state trooper on the afternoon of November 10, the third to Dallas Police Detective Winn on November 22, and the fourth to her stepfather Richard Kremer sometime after. 36 RR 6-19.

- Mr. Cantu told Ms. Boettcher that he was going to kill Mr. Mosqueda and Ms. Kitchen, but she did not believe him.  35 RR 121.

- Ms. Boettcher testified that Mr. Cantu returned in Ms. Kitchen's Mercedes at 12:18 a.m., his face swollen,[7] he had blood on his jeans and in his hair, and was wearing a different shirt and shoes.  35 RR 123-124, 126; 36 RR 57-58.  Ms. Boettcher testified that she didn't see anything in Mr. Cantu's hands when he left, but he had a gun when he returned.  35 RR 122-125, 136.  According to Ms. Boettcher, he also had Mr. Mosqueda's and Ms. Kitchen's identification cards and a set of keys.  35 RR 125.  While Mr. Cantu showered, Ms. Boettcher threw Mr. Cantu's jeans in the kitchen trashcan.[8]  35 RR 125-126, 131-132.

- Ms. Boettcher testified that she and Mr. Cantu returned to the Mosqueda/Kitchen house to retrieve some of Mr. Cantu's belongings; they also searched for money and drugs but found nothing.  35 RR 129, 139, 141.  Ms. Boettcher testified that she saw Mr. Mosqueda's and Ms. Kitchen's dead bodies.  36 RR 21-22.  When they left, Mr. Cantu had a white trash bag with the shirt and boots he had been wearing earlier and another pair of jeans.  35 RR 143-144.

- Ms. Boettcher testified that they returned to their apartment, Mr. Cantu driving Mr. Mosqueda's Corvette and Ms. Boettcher driving Mr. Cantu's car.  35 RR 144-145.  Mr. Cantu then asked her to marry him and offered her a diamond and platinum engagement ring; she accepted his proposal and put on the ring.  35 RR 146.  Mr. Cantu put on a

---

[7] Notably, the State called several witnesses at trial who claimed they saw Mr. Cantu at parties in the hours after he supposedly killed Mr. Mosqueda and Ms. Kitchen, but none of them described Mr. Cantu's face being swollen or bruised.  In earlier statements, Ms. Boettcher had claimed that Mr. Cantu told her Mr. Mosqueda hit him with a baseball bat, but there was no mention of a baseball bat in her direct testimony at trial, and no baseball bat was found at either the Mosqueda/Kitchen home or the Cantu-Boettcher apartment or the Svihovec apartment. 36 RR 57-60.

[8] In prior statements, Ms. Boettcher had claimed that Mr. Cantu was wearing latex or surgical gloves when he returned from the Mosqueda/Kitchen home that night.  However, at trial, she testified that she did not recall seeing the gloves before, that she was not sure whether Mr. Cantu was wearing gloves that night, and that she did not know who put the gloves in the trashcan.  35 RR 132-133.

000027

necklace, a bracelet,[9] and a watch.  35 RR 146-147.  They then drove Mr. Mosqueda's Corvette to downtown Dallas where they partied into the early morning hours.  35 RR 127, 149-157.  Ms. Boettcher testified that Mr. Cantu threw the Rolex watch out the window of the car as they drove down the tollway on the way to the club; he threw away the trash bag containing the clothing and the boots in a dumpster near the club.  35 RR 149-150, 158.

- Ms. Boettcher testified that after partying, they returned to their apartment and then left in Mr. Cantu's car at about midday on November 4 for their pre-planned trip to visit Ms. Boettcher's mother and stepfather in Arkansas.  35 RR 157-160, 112-113.

- During their three-day stay in Arkansas, Ms. Boettcher did not tell her mother or stepfather (who was a retired law enforcement officer) or anyone else about the murders and made no effort to call the police even though there were several times she was not with Mr. Cantu.  35 RR 162-167; 36 RR 19, 25-27, 79-81.

- Ms. Boettcher testified that, on November 7, she accompanied Mr. Cantu back to Dallas.  35 RR 168.  On the drive back to Dallas, Mr. Cantu discarded the shoes he and Ms. Boettcher had worn in the Mosqueda/Kitchen home; he also demanded that she return the ring to him so that he could get it sized, and she never saw it again.  35 RR 170-172.  In Dallas, Mr. Cantu and Ms. Boettcher stayed at the home of Tawny Svihovec, a former girlfriend of Mr. Cantu's.  35 RR 168, 172.  Ms. Boettcher testified that she saw Mr. Cantu discard Mr. Mosqueda's and Ms. Kitchen's identification cards and some jewelry near Ms. Svihovec's apartment.  35 RR 172, 180.

- Ms. Boettcher testified that on the morning of November 8, Ms. Svihovec left for work, Mr. Cantu left to meet Detective Winn, and she was alone in the apartment.  35 RR 181.  Later that afternoon, Mr. Cantu called her and told her that he had been arrested and that he had left money under the couch cushion.  35 RR 183. Ms. Boettcher used the money to purchase a plane ticket back to Arkansas.  35 RR 184-185.

---

[9] Ms. Boettcher's stepfather later gave police a gold bracelet that he had found in his home in the room where Ms. Boettcher and Mr. Cantu stayed during their visit.  36 RR 147-150. Mr. Mosqueda's sister testified that the bracelet had belonged to Mr. Mosqueda.  34 RR 267.

- Once she was back in Arkansas, Ms. Boettcher told her mother and stepfather that Mr. Cantu had murdered Mr. Mosqueda and Ms. Kitchen; her stepfather contacted law enforcement. 35 RR 196-198.

Ms. Boettcher also testified that on November 2, the evening before the murders, Mr. Cantu fired a shot at her in their apartment during an argument. 35 RR 187-190. It was this shot, according to Ms. Boettcher, that left a bullet in their apartment wall. 35 RR 193-194. Ms. Boettcher denied that there was anyone dressed as a pizza man at their apartment on November 2. 35 RR 169, 171, 176, 186, 195.

Ms. Boettcher was never charged in connection with the murders, despite her admitted presence at the scene shortly after the crime. 36 RR 19-20, 31. She denied at trial that she had received any deal for her testimony; but after she testified at Mr. Cantu's trial, the State never sought revocation of her probation in connection with a previous driving-while-intoxicated conviction (though she was obviously in violation), and she was allowed to relocate to Arkansas without any further reporting requirements. 36 RR 19-20, 29-44, 69-71, 94-95. Further, though the record reveals that the State initially planned to subject Ms. Boettcher to a polygraph examination and had made arrangements to do so, they ultimately declined to conduct the examination, giving as an excuse some vague assertion that her menstrual cycle could possibly affect the examination's validity. 36 RR 146, 173. A few days before

19

trial, prosecutors met with Ms. Boettcher for about five hours to prepare her to testify.  36 RR 6, 47.

Newly discovered evidence demonstrates, however, that Ms. Boettcher's testimony was riddled with falsehoods, some of which matched the mistaken beliefs of law enforcement officers and all of which helped the prosecution make their case.

### 1.    Amy Boettcher lied about Mr. Mosqueda's Rolex watch.

Among Ms. Boettcher's demonstrably false claims was her testimony about Mr. Mosqueda's Rolex watch.  After James Mosqueda's and Amy Kitchen's bodies were discovered, Mr. Mosqueda's family reported to DPD that Mr. Mosqueda's Rolex watch, a family heirloom, was missing from the home.   Thus, DPD believed that the murderer had taken the watch.   When the DPD illegally searched Mr. Cantu's residence on November 7, 2000, they expected to find Mr. Mosqueda's gold Rolex watch, but it was not there. 33 RR 123; 160.  Consistent with DPD's erroneous belief that watch was stolen, and the fact that it was not found at Mr. Cantu's residence, Amy Boettcher subsequently swore in multiple statements—the first of which was taken on November 10, 2000—that Mr. Cantu had stolen and, improbably, thrown away a Rolex watch.  Ms. Boettcher then testified at trial that she saw Mr. Cantu dispose of the Rolex watch on the night of the murders.  35 RR 149-150.

However, Mr. Mosqueda's watch was never stolen: the Mosqueda family has had the Rolex since Detective Winn returned it to them shortly after the murders, and well before trial. Detective Winn, however, omitted this information from his reports and testimony.

> **a.    The police believed, and Amy Boettcher testified, that Mr. Cantu stole, wore, and then discarded Mr. Mosqueda's Rolex watch.**

After Mr. Mosqueda's and Ms. Kitchen's bodies were discovered, Mr. Mosqueda's family reported to police that his Rolex watch, a family heirloom, was missing from the home.   It was, thus, believed by police that the murderer had taken the watch:

COMPLAINANT: **MOSQUEDA, JAMES**                          SERVICE #: 863688-J
                                                         FOR DET. : **WINN**

### INVESTIGATIVE INFORMATION

SUBMITTING OFFICER:  **CARNEY**   DATE: **11/6/00**
INFO OBTAINED VIA: **PHONE**
OBTAINED ON DATE:   **11/6/00**   AT TIME:  **7:00 P.M.**

> TOPIC: **COMPLAINANT'S MISSING PROPERTY**

NARRATIVE:

Det. Perez contacted the complainant's mother, Gladys Mosqueda.  She gave the following descriptions of complainant's missing property:

1.   Rolex men's gold watch.  This watch was engraved in the back with " Lico with Love, Carol" .  This watch is 13 yrs. old and belonged to complainant's uncle, Lico, at one time.  The watch has diamonds on the inside dial and also on the outside of the watch.

2.   men's billfold, black, $700.00 in cash

3.   necklace

4.   ring value $8,000.00

Exhibit 3 (Excerpt of Dallas Police Department Offense Report).

Consistent with the belief of the Dallas Police Department, Amy Boettcher subsequently swore in multiple statements that Mr. Cantu had stolen and disposed of Mr. Mosqueda's watch:

> *On the way to T, Ivan through out a Rolex watch that belonged to James.*

Exhibit XX (Amy Boettcher's November 10, 2000, statement to Arkansas Police (AB #2)).

> *And a Necklace. We left in the Corvette And After we went through the Tollway, Ivan threw a watch out the window. Ivan said I don't want this shitty "Rolex". Ivan*

Exhibit XX (Amy Boettcher's November 22, 2000, statement to Anthony Winn (AB #3)).

In their opening statements to the jury, the prosecution told the jury that Mr. Cantu had stolen the watch and then put it on back at his apartment. 31 RR 13. Amy Boettcher then testified at trial that she saw Mr. Cantu dispose of the Rolex watch on the night of the murders:

A.    And he said that he didn't want the shitty Rolex and threw it out the window.

Q.    And which watch had that been?

A.    The one he put on at the apartment.

Q.    And he just threw that out the window?

A.    Yes.

Q.    Where were you when he threw it out the window?

A.    Probably not even a full block from the tollway.

35 R 149-50.

> **b.    The police learned, *before trial*, that Mr. Mosqueda's watch was never stolen but was instead recovered in his home and returned to his family.**

In 2019, Mr. Cantu's father, Abner Cantu, discovered that the Mosqueda family had the Rolex watch all along.  According to Abner Cantu, Amy Kitchen's brother had taken the watch from the scene after the bodies were discovered and then returned it to police; the police later returned the watch to James Mosqueda's mother "shortly after the murders."  *See* Exhibit 26 (Affidavit of Abner Cantu).  As described in the above initial police report, the allegedly stolen watch had diamonds inside the dial as well as outside and was inscribed on the back to Lico from Carol. Exhibit 1. This is the same watch the police returned to Mr. Mosqueda's mother shortly after the murders:



Matt Duff took these photographs of the Rolex watch, still in Gladys Mosqueda's possession, on October 2, 2019.

Mr. Cantu first learned that Ms. Boettcher lied about the watch in 2019, but the CCDAO's internal investigation in 2019 confirms that Mr. Mosqueda's Rolex watch was never stolen and that police knew before trial that the watch had been recovered.   In October 2019, the CCDAO Investigator Dale Lundberg interviewed Mark Kitchen, Amy Kitchen's brother. Exhibit 4 (Lundberg Notes). Mr. Kitchen found the watch at the victims' home one or two weeks after the murders, Exhibit 4, and turned it over to Detective Winn.  *See* Exhibit 5 (Electronic Mail Message from Mark Kitchen to Dale Lundberg).  Mr. Kitchen's timeline aligns with an offense report dated November 25, 2000, when Detective Winn met Mr. Kitchen at the victims' home.

Gladys Mosqueda, Mr. Mosqueda's mother, told CCDAO investigator Lundberg in 2019 that a DPD officer gave her the family's Rolex watch shortly after the murders. Exhibit 4 (Lundberg Notes). She told Lundberg that she was given the watch at a building on Main Street in downtown Dallas, which was at that time the location of Dallas Police headquarters.  *Id*.  However, Lundberg was unable to locate any reference to the Rolex watch in Dallas Police Property Room records.  *Id*.  Ms. Mosqueda also told Lundberg that her son only had one Rolex watch.  *Id*.

CCDAO investigator Lundberg also questioned Detective Winn about the Rolex watch in October 2019. *See* Exhibit 4. Winn claimed that he did not recall[10] giving the watch to Mr. Mosqueda's mother or anyone else. *Id*. He further speculated that if the watch had been found, he would never have given it to anyone because he would have considered it evidence. *Id.* But according to Mr. Kitchen, Detective Winn was aware *before Mr. Cantu's trial* that Mr. Mosqueda's Rolex watch had been located.

Therefore, the victims' family members confirm Mr. Cantu's claim that Mr. Mosqueda's Rolex watch has been in their possession since shortly after the murders and through the time of Mr. Cantu's 2001 trial. Notably, neither Mark Kitchen nor Gladys Mosqueda testified at Mr. Cantu's trial. But these statements are obviously in conflict with Detective Winn's account. The victims' families have no reason to collude in a false account of the evidence to assist Mr. Cantu, an account that is confirmed by the Mosquedas' possession of the Rolex watch allegedly discarded by Mr. Cantu on a Dallas freeway. Detective Winn, on the other hand, repeatedly testified to his lack of memory and, significantly, also testified "I don't know what *Brady* is." 33 RR 189.

---

[10] Even during Mr. Cantu's trial 2001, Detective Winn professed his inability to recall the details of his investigation in this case. His memory lapses were particularly acute when being cross-examined by the defense, so much so that the trial court's joke about Winn's bad memory drew laughter from the courtroom. 33 RR 168.

Amy Boettcher's testimony that Ivan Cantu (1) stole Mr. Mosqueda's watch; (2) wore Mr. Mosqueda's watch; and (3) disposed of Mr. Mosqueda's watch was all demonstrably false. Even more troubling, the false testimony conformed to law enforcement's mistaken initial beliefs about the crime. Had Ms. Boettcher actually witnessed the events to which she testified, she would not have made the same mistake as the police.

To the knowledge of undersigned counsel, Mr. Cantu's trial counsel were never informed that Mr. Mosqueda's watch had been recovered by the police and returned to the family. Had they known, the defense could have subjected Ms. Boettcher to a devastating cross-examination about her willingness to lie in her statements and on the stand in support of law enforcement's mistaken beliefs about the case. And that was not the only demonstrably false aspect of Amy Boettcher's testimony.

### 2. Amy Boettcher lied about the engagement ring.

#### a. The police believed that Mr. Cantu gave Amy Boettcher an engagement ring stolen from the victim.

Amy Boettcher testified at trial that, shortly after they returned to their apartment from the crime scene on the night of the murders, Mr. Cantu proposed to her with a diamond engagement ring that she later learned he had stolen from Amy Kitchen's body after the murders:

A.    We went back in. He ate some more mushrooms, offered me some. I said no. He put on a necklace, a bracelet, and then he proposed to me.

Q.    When you say he proposed to you, what did he say?

A.    He said, "Will you marry me?"

Q.    What did he do after he said that?

A.    He put a ring on my finger.

Q.    What kind of ring?

A.    It was like a platinum ring, a diamond ring.

Q.    An engagement ring?

A.    Yes.

\* \* \* \*

Q.    Did you show people the engagement ring?

A.    Yes.

Q.    Did you know whose engagement ring that was at the time?

A.    No.

Q.    Did you later learn that was Amy Kitchen's engagement ring?

A.    Yes.

35 RR 146; 150-51 (State's Direct of Amy).

Police never recovered Ms. Kitchen's diamond-and-platinum engagement ring. Ms. Boettcher's stepfather testified that when Ms. Boettcher and Mr. Cantu arrived in Arkansas on November 4, Ms. Boettcher was wearing an engagement ring,

which Mr. Cantu told them he had just bought for her; but Ms. Boettcher's stepfather did not give any description of the ring sufficient to identify it as Ms. Kitchen's. Amy Boettcher claimed that Mr. Cantu had taken the ring back and thrown it away before they returned to Dallas from Arkansas.

### b. Mr. Cantu and Amy Boettcher announced their engagement and displayed her ring before the murders.

Witnesses have since come forward stating that Mr. Cantu and Amy Boettcher announced their engagement and showed off Amy Boettcher's engagement ring a week before the murders. Thomas Houran recalled that he saw Mr. Cantu and Amy Boettcher on the Sunday before the murders. Mr. Cantu introduced Amy to Houran and told Houran they were engaged; Amy was wearing an engagement ring. *See* Exhibit XX (Declaration of Thomas Houran). Steve Mayr also recalled seeing the couple the Sunday before the murders, and Amy was wearing an engagement ring. *See* Exhibit XX (Declaration of Steve Oliver Mayr).

The ring Ms. Boettcher's stepfather testified he saw was Amy Boettcher's, not Amy Kitchen's, and Amy Boettcher testified falsely when she claimed Mr. Cantu gave her Ms. Kitchen's ring after the murders. Finally, in a November 14, 2019, interview, Ms. Boettcher made it clear that she did not actually know where the ring came from. Duff, M. (Host), Episode 15, Cousins By Blood (2020-present), https://cousinsbybloodpodcast.com/. Instead, the DPD told her that the victim's ring

was missing and that is why she testified that "learned" that the ring had belonged to the victim. *Id.*

      **3.**      **Amy Boettcher lied about the origin of crime-related items discovered in the kitchen trashcan in the apartment Ms. Boettcher and Mr. Cantu shared.**

            **a.**      **The police surmised that Mr. Cantu disposed of items related to the crime—including jeans and socks with blood on them, and a latex glove—in his own kitchen trashcan.**

On November 7, 2000, while Amy Boettcher and Mr. Cantu were still away on their trip to Arkansas, the police executed a search warrant for Mr. Cantu's apartment. The lead detective described finding the trashcan in plain view with the clothes sitting on the top:

> I began looking through drawers, making my way closer to the refrigerator. As I got closer to the refrigerator, there was a trash can that was placed—that's against the wall. I looked inside that trash can. That's where I saw several clothing (sic) that was blue jeans and some socks with a reddish substance on it that appears to have been blood.

33 RR 90 (Direct Examination of Detective Winn). The State introduced evidence documenting the scene as the police found it:



State's Trial Exhibit 61 (trashcan in Mr. Cantu's apartment on November 7, 2000).

Detective Winn "immediately called Detective Whitsitt over who photographed the

trash can with these items on the inside, and then we retrieved these items from out

of the trash can." *Id*.  Detective Whitsitt's photograph of the trashcan was admitted

into evidence at trial:



State's Trial Exhibit 62 (clothes found in Mr. Cantu's trash on November 7, 2000).

Detective Donald A. Whitsitt, with the Physical Evidence Section of the Dallas Police Department ("DPD"), was a 24-year veteran with DPD and specially trained in preserving, documenting, and photographing crime scenes. He testified that his photographs accurately documented the apartment as observed *before* anything was disturbed:

> Q    When you got there, what was your—what were your duties when you got there?

32

A       My duties on this entailed the same as our usual duties; first to photograph the location and any items that we observed. And then to seize those items that Detective Winn directed that he wanted seized.

Q       And did you take photographs in the same procedure that you did at the crime scene?

A       Yes, ma'am, I—

32 RR 24. Detective Whitsitt testified that he photographed Mr. Cantu's trashcan before disturbing any of the contents:

Q.      Okay. Were the jeans—was this photograph here, State's Exhibit 62, taken before anybody had touched it?

A.      Yes, sir.

32 RR 47-48.

Several days later, Amy Boettcher gave her first several statements to law enforcement. In her statements, Ms. Boettcher stated that Mr. Cantu came home shortly after midnight on November 4 with blood on him and wearing latex or rubber gloves and put jeans, socks, and latex gloves in the kitchen trashcan:

He Return Home at 12:18Am By
our clock, Ivan had Blood on His
Jeans His Socks on His Gun
Gun was Jammed He Statement this
is my fAViovert Gun He also
Had Dr. Gloves on. Ivan was
Wearing Jammas Shoes & shirt He

000043

Exhibit 22 (Amy Boettcher's November 10, 2000, statement to Izard County Sheriff)

(AB #1).

> Ivan was gone & he returned home
> at 12:18 by our clock. He had driven
> Amy's Mercedes back to our house & he
> had blood on his jeans. He was also
> wearing James' shirt & shoes. He was also
> wearing rubber type gloves. Ivan said

* * *

> Ivan put his jeans, socks, the gloves,
> & emptied the bullets from [his] gun into
> a kitchen trash can.

Exhibit 23 (Amy Boettcher's November 10, 2000, statement to Arkansas Police).

> There was blood on his jeans. He was wearing
> latex gloves. There was some blood in his hair.
> It looked like the left side if his face was
> swollen. Ivan stood in the kitchen and
> unloaded his gun. There was blood on the gun
> He ate some mushrooms. Ivan took off his
> jeans and socks. I noticed there was blood
> on the socks also. He put the [AB] jeans, socks
> and gloves in the kitchen garbage garbage.

Exhibit 24 (Amy Boettcher's November 22, 2000, statement to Anthony Winn).

> HE HAD BLOOD ON HIS JEANS, HAIR AND SOCKS HE HAD LATEX
> GLOVES ON AND THERE WAS BLOOD ON THE GUN. HE WAS WEARING

\* \* \*

> HE THRU THE SHELLS FROM GUN INTO THE TRASH CAN IN THE
> KITCHEN ALONG WITH JEANS, GLOVES, AND SOCKS. HE PUT A HAND

Exhibit 25 (Amy Boettcher's December 2000, statement to Mr. Kremer).

Amy Boettcher subsequently testified at trial about these same items, though she changed her story in at least three respects.  First, Ms. Boettcher testified that she—not Ivan—placed the jeans and socks in the trash can.  35 RR 131-32.  Second, she eliminated the latex gloves from the list of items she saw that night, testifying that she had never seen them. Third, Ms. Boettcher testified she did not know how the glove came to be in the trashcan. 35 RR 132-33.[11]

---

[11] The veteran Dallas Police Officer who specialized in physical evidence testified that the glove was not "removed and processed" because there was nothing about it to "pique [his] interest as far as trace evidence goes." 32 RR 46. Had the glove been worn by the assailant in the murder—in which there was a significant amount of blood spatter—both the victim's and the assailant's DNA would have been on the glove. The detective could only have deemed the glove of no value because he believed it was put there by the police working the scene.

35

       **b.     The sworn statement of a DPD Officer who inspected Mr. Cantu's apartment after he departed for Arkansas on November 4, 2000, contradicts Amy Boettcher's testimony that Mr. Cantu left clothing stained with victims' blood in their kitchen trashcan.**

Amy Boettcher and Mr. Cantu left for Arkansas midday on November 4, 2000, and completed the approximately eight-hour drive at 8:30 p.m. 36 RR 123. They did not return from Arkansas until late at night on November 7th.

At approximately 8:25 p.m. on the evening of November 4, 2000—just when Mr. Cantu and Ms. Boettcher were arriving in Arkansas—Dallas police officers entered Mr. Cantu's apartment at the request of his mother, Sylvia Cantu. 32 RR 82. Ms. Cantu was concerned after learning about the deaths of her nephew—Mr. Mosqueda—and his fiancé, that Mr. Cantu might also be in danger. One of the officers who performed the wellness check was Susan Iliff, now Susan Eichenberg. The officers swept the apartment checking "under beds, closets, tubs" looking to make sure nobody was in distress or dead. 32 RR 83-84. The officers' search of the small one-bedroom apartment lasted approximately ten minutes and was sufficiently careful to observe a bullet hole in the wall. Exhibit 11 (Affidavit of Susan Eichenberg). Ms. Eichenberg is "positive" that had the bloody clothing been as depicted in State's Exhibits 61 and 62, *supra*, during the wellness check, she would have seen it:

> To the best of my recollection, the search lasted approximately ten
> minutes. During that search, I entered the small kitchen. I did not

36

observe any clothing or later discovered evidence in the garbage can. I believe this would have been discovered by myself, Junger [the other police officer] or Sylvia Cantu during the search, leading me to believe the evidence in the trash can was not there at the time of the search. The search was thorough and I am positive this evidence would have been seen. Further, my recollection is that the lid was on the trash can was closed at the time of the search.

Exhibit 11 (Affidavit of Susan Eichenberg).[12]

This new evidence demonstrates that, after Ms. Boettcher and Mr. Cantu left for Arkansas, but before they returned, someone else removed the lid from the kitchen trashcan, deposited the crime-related items, and left them in plain view. The jeans, socks, and latex glove were not placed in the trashcan until *after* Ms. Boettcher and Mr. Cantu left for Arkansas.

> **4.** **Amy Boettcher's testimony about Mr. Cantu committing the murders and having personally witnessed the crime scene is refuted by scientific evidence establishing that victims were still alive after she allegedly saw their bodies.**

Ms. Boettcher testified to a facially implausible timeline of events in which Mr. Cantu committed the murders around midnight on November, returned in bloody clothes, changed, and then took Ms. Boettcher out for an all-night excursion through the city that included drugging with friends, a visit to the crime scene (shortly after which Ms. Boettcher accepted Mr. Cantu's marriage proposal), and

---

[12] This information is corroborated by telephone records admitted at trial showing that a long-distance telephone call was placed from Mr. Cantu's apartment at 8:53 p.m. on November 4, while Mr. Cantu and Ms. Boettcher were hundreds of miles away in Arkansas. SX 119; 37 RR 57. This evidence indicated that *someone else was in Mr. Cantu's apartment* long after he and Amy Boettcher had left the state, and after the police who performed the wellness check were there.

going to a night club.  And, with the exception of the alleged visit to the crime scene, several witnesses corroborated the fact that Mr. Cantu and Ms. Boettcher spent the wee hours of November 4 partying and having a good time.  According to Fernando Longoria, Amy Boettcher was "happy" and there was nothing unusual about her demeanor, even though Mr. Longoria met her after she allegedly went to the crime scene. 35 RR 230; *id*. at 265 (Ms. Boettcher "seemed happy and having a great time."). Likewise, Harlon Hill testified that Ms. Boettcher was "happy" that night/morning. 35 RR 298.[13]

However, two independent forensic pathologists have reviewed the forensic pathology evidence in this case and conclude that Mr. Mosqueda and Ms. Kitchen were *not* killed around midnight on the night of Friday, November 3rd, as Ms. Boettcher claimed in her trial testimony, but instead died later in the morning of Saturday, November 4th.  The conclusions of these experts provide further evidence that the story Amy Boettcher told the jury was false and very likely fabricated by her out of whole cloth.

The two forensic pathologists – Dr. Judy Melinek, a Clinical Senior Lecturer in the Department of Pathology and Molecular Medicine at Otago University School

---

[13] Witnesses testified they saw Mr. Cantu driving Mr. Mosqueda's Corvette during this timeframe. But that was not necessarily out of the ordinary and did not indicate that Mr. Cantu had just murdered Mr. Mosqueda.  Another witness has since come forward stating that he saw Mr. Cantu driving Mr. Mosqueda's Corvette, apparently with Mr. Mosqueda's permission, about six months before the murders.  Exhibit XX.

of Medicine in Wellington, New Zealand, and Dr. Priya Banerjee, a Clinical Assistant Professor in the Department of Pathology and Laboratory Medicine at Brown University in Providence, Rhode Island – were initially engaged and independently interviewed by investigator Matt Duff for the "Cousins by Blood" podcast. Neither Dr. Melinek nor Dr. Banerjee has ever been retained by counsel for Mr. Cantu; however, both agreed to provide declarations summarizing their review of the forensic pathology evidence in this case and their conclusions as to the estimated time of death of the decedents. *See* Exhibit 6 (Declaration of Dr. Judy Melinek, M.D.) and Exhibit 10 (Declaration of Dr. Priya Banerjee, M.D.).[14]

Both Dr. Melinek and Dr. Banerjee reached conclusions about the time of death from the reported observations of rigor mortis and livor mortis that were made by the Collin County Medical Examiner's Office in its initial investigation at the

---

[14] Both Dr. Melinek and Dr. Banerjee are board-certified anatomic and forensic pathologists who have conducted thousands of autopsies and been qualified as expert witnesses to testify on issues related to time and cause of death. Dr. Melinek has been "qualified as an expert witness in the fields of pathology, forensic pathology, post-mortem toxicology interpretation, trauma interpretation, neuropathology, and cause of death determination over 200 times in California, New York, Florida, Utah, Colorado, Illinois, Missouri, Iowa, and Texas." Exhibit 6 (Declaration of Dr. Judy Melinek, M.D.) at 1. She is board-certified in anatomic, clinical, and forensic pathology, and she "routinely interpret[s] autopsy reports, toxicology reports, medical records, and police reports to determine time of death, mechanisms of injury, and cause of death." *Id.* Similarly, Dr. Banerjee estimates that she has performed more than 3,000 autopsies, including 160 homicides, and has been qualified to testify as an expert witness in forensic pathology in multiple states. Exhibit 7 (Declaration of Dr. Priya Banerjee, M.D.) at 1. Dr. Banerjee is often engaged to provide expert assistance to police and law enforcement agencies. *Id.*

scene when the bodies were found and at autopsy.  As Dr. Melinek explains in her

declaration:

> 8.    Rigor mortis is the post-mortem stiffening of muscles
> caused by the depletion of adenosine triphosphate (ATP) from the
> muscles after blood flow ceases. Rigor mortis appears approximately 2
> hours after death in the small muscles of the face, progresses to the
> limbs over the next few hours, and is evident in all muscle groups
> between 6 to 8 hours after death. Rigor mortis is maximal between 12
> and 24 hours after death, and then dissipates with time. Rigor mortis
> generally disappears by 36 hours after death, depending on the ambient
> temperature. Warmer ambient temperatures lead to a more rapid onset
> and dissipation of rigidity.

> 9.    Livor mortis is the red or purplish-blue discoloration of the
> skin in the dependent portions of the body due to the settling of blood
> within skin blood vessels caused by gravitational pull. Lividity
> develops as spots of discoloration within half an hour to two hours.
> These spots then coalesce to form larger patches, which further
> combine to form a uniform discoloration of the body's dependent parts
> that have not been subject to pressure, which appears from 6 to 12
> hours. The discoloration becomes "fixed" after approximately 8-12
> hours, which is confirmed when applied digital pressure no longer
> displaces the blood in the vessels. Warmer ambient temperatures lead
> to a more rapid onset and fixation of lividity.

Exhibit 6 (Declaration of Dr. Judy Melinek, M.D.) at 3-4.

Applying the established timeframes for the onset and progression of rigor

mortis and livor mortis to the observations of both conditions recorded by the Collin

County Medical Examiner's Office at the scene and at autopsy, Dr. Melinek

concluded:

> 18.    *It is my opinion that James Mosqueda and Amy Kitchen
> died closer in time to when their bodies were found than to when they*

*were last seen alive.*[15] This is evidenced by the [...] "warm" scene temperature combined with the apparent observed early onset of rigor in both individuals, with more advanced rigor in James than in Amy, consistent with his heavier weight and the fact that he would have been partially insulated by bedding. Had they died closer to the time they were last seen alive, I would have expected Amy Kitchen, given the warm ambient temperature, would have been in full rigor and her extremities would have been fully stiff. *I estimate that the two victims were killed more than 8 but less than 12 hours prior to when they were examined by the death scene investigator on November 4, 2000 at 18:30, which means that the time of death was likely in the morning hours of November 4th.*

Exhibit 6 (Declaration of Dr. Judy Melinek, M.D.) at 5-6 (emphasis added).

Dr. Banerjee independently reached similar conclusions about the time of death based on the states of rigor mortis documented by the crime scene investigator and the medical examiner at the time of autopsy. As she explains in her declaration:

> 8.    Rigor mortis is a key postmortem change which aids in estimation of death. The scene investigation is essential in evaluation and documentation of it. Based on the records reviewed, Ms. Kitchen had rigor mortis just starting to appear ("setting in") and later at autopsy it is absent. It is best estimated that her time of death is approximately less [than] 8 to 10 hours before evaluation.

> 9.    Similarly, Mr. Mosqueda had rigor mortis present at the scene investigation and still present at autopsy. So his time of death is also estimated to be approximately less than 12 hours before evaluation at the scene.

---

[15] The time at which Mr. Mosqueda and Ms. Kitchen were "last seen alive," as reported by the Collin County Medical Examiner's investigation report, was on Friday, November 3rd at 10:30 p.m., when they ate dinner with Ms. Kitchen's father.

10.    Together, the rigor mortis is the more reliably documented postmortem change in these cases to estimate their time of death. *With the essential understanding of the formation and disappearance of rigor mortis, their time of death is estimated to be approximately 12 hours before evaluation at the scene.*

Exhibit 7 (Declaration of Dr. Priya Banerjee, M.D.) at 2-3 (emphasis added).

Notably, a police report – which was not presented to the jury – indicated that Frank Perez, a man who had been living with James Mosqueda and Amy Kitchen for about three weeks at the time of the murders, was heard to state after the discovery of the bodies on November 4, "They weren't killed last night, they were killed today." Exhibit 8 (police report found in Winn Binders – Tab 14).

The jury that convicted Mr. Cantu never heard any of this critical evidence, which provided an exculpatory explanation for the physical evidence and demonstrated that Amy Boettcher's testimony was so riddled with blatantly false statements that she could not be believed.

### C.    Jeff Boettcher, the prosecution's other star witness, recanted his testimony in 2022 because he "lied" and gave damning testimony about alleged events that "never happened."

#### 1.    Jeff Boettcher's trial testimony.

Jeff Boettcher testified that when he moved to Texas in August of 2000, he lived with Mr. Cantu and Amy Boettcher at the home of someone who went by the name Bobbitt. 34 RR 10. During this time, Jeff said he was around Mr. Cantu

"almost every day." *Id.* at 15. He said Mr. Cantu carried a black gun with a chrome handle. *Id.* He carried it every day. *Id.* He claimed it was the same gun the State had shown him. *Id.* at 16; *see* State's Exhibit 76B. Jeff testified that Mr. Cantu carried it in his jacket pocket for "protection." *Id*. at 16. Jeff testified that the gun contained hollow-tipped bullets, which Mr. Cantu showed him and referred to as "cop killers." *Id*. at 17.

Jeff testified that on one occasion in October 2000, he and Mr. Cantu had a conversation during a car ride where Mr. Cantu said it would be easy to kill someone. *Id.* at 22. While they were in the car, Mr. Cantu told Jeff that he was going to kill James Mosqueda and asked Jeff if he would help him clean up the scene afterward. *Id*. at 25. Jeff said Mr. Cantu wanted to kill Mr. Mosqueda in order to take cocaine, marijuana, and cash. *Id*. at 26. Mr. Boettcher testified that he had another conversation after the murders during which Mr. Cantu allegedly bragged about the crime, telling Jeff to "check out the paper." *Id*. at 30.

Thus, Jeff Boettcher's testimony provided the State with motive (and the requisite capital aggravator of robbery); planning; a link to the murder weapon and ammunition; a confession; and remorselessness. When asked whether he was on drugs on the day of that conversation, Jeff testified that he was sober because he was preparing for an upcoming drug test. *Id*. at 27.

### 2.    Jeff Boettcher has admitted he testified falsely and recanted his testimony.

In early 2022, Jeff Boettcher began calling the Collin County District Attorney's Office, asking to speak with someone about Mr. Cantu's case. An investigator returned his call on February 7, 2022.  During that call, Jeff Boettcher communicated that "at the time of trial he was a drug addict, strung out and basically 'went along for the free ride.'"  Exhibit XX (February 7, 2022 Collin County District Attorney's Office E-mails).  On March 22, 2022, an assistant district attorney and an investigator from the Collin County District Attorney's Office traveled to Minnesota to interview Mr. Boettcher.

On April 5, 2022, assistant district attorney Amy Murphy informed undersigned counsel of Jeff Boettcher's voicemail and the interview in Minnesota. Included with the letter was a recording of the interview with Jeff Boettcher. Exhibit 14 (Collin County *Brady* disclosure).

In the interview, Mr. Boettcher said that he was on drugs at the time of the offense and when he testified. Exhibit 14 (Collin County *Brady* disclosure) at 13:36 ("Q: [Were you on drugs] at the time you testified or the time that everything happened?... A: I'm saying both. I was a drug addict then and when I testified."). According to him, the conversation between him and Mr. Cantu where Mr. Cantu asked him to clean up at the murder "never happened." *Id*. at 14:31. When Jeff testified at trial, he did not believe the conversation had happened. *Id.* at 14:49 ("Q:

44

Did you believe that it happened when you testified? A: No. That's why I don't know why I said that."). During the interview, he repeatedly told the Collin County District Attorney's Office representatives that he did not believe Mr. Cantu asked him to clean up. *Id.* at 17:39 ("He didn't say that to me. That he wanted me to be the clean up man. No, he didn't say that to me.").

Jeff Boettcher has recanted his testimony. He now says that he testified untruthfully about his drug use and that his alleged conversation with Mr. Cantu never happened. In the State's 2022 interview with Jeff Boettcher, he stated, "I lied," *id.* at 14:15, and "I'm recanting my story." *Id.* at 22:00. In the last minutes of the 45-minute interview, Jeff says, "I don't think I was reliable ... my statement shouldn't count. It shouldn't be in there." *Id.* at 47:35. Furthermore, Jeff had not been contacted by anyone else about his testimony, *see id.* at 21:00-21:16, and has come forward because he now recognizes that at the time of trial, he "was just at a bad time in [his] life."

### 3.    Jeff Boettcher lied about Mr. Cantu carrying a gun.

As noted above, Jeff Boettcher—who only met Mr. Cantu for the first time in late August of 2000—testified that Mr. Cantu carried a gun every day. Mr. Cantu's roommate at the time, however, confirms that this testimony was false. William Bobbitt was Mr. Cantu's roommate for two months in the summer of 2000 and was living with Mr. Cantu when Jeff Boettcher arrived in Texas. Mr. Bobbitt has sworn

under oath that he "never saw Ivan with a gun or thought he owned a gun." Exhibit 13 (Bobbitt Affidavit). Mr. Bobbitt's affidavit corroborates Mr. Boettcher's recent admission that his trial testimony was a fabrication.

> **D. Another State's witness, Carlos Gonzalez, gave materially false and misleading testimony discrediting Mr. Cantu's description of the drug dealer who threatened him.**

>> **1. The prosecution presented evidence through Carlos Gonzalez refuting Mr. Cantu's account of threats related to Mr. Mosqueda's drug debt.**

As described, *supra*, Mr. Cantu consistently reported to friends, family, and the police that he had been threatened by a man named Matt to whom Mr. Mosqueda had become deeply indebted in his drug dealing business. "Matt" was dressed in a Domino's Pizza shirt. 33 RR 70. To refute Mr. Cantu's account, the prosecution called one of Mr. Mosqueda's longtime friends, 36 RR 183, Carlos Gonzalez[16] who testified that Mr. Cantu's account was a far-fetched tale to cover up his guilt.

Mr. Gonzalez called Mr. Cantu shortly after the murders and, unbeknownst to Mr. Cantu, put him on a speakerphone so that Detective Winn and others present could hear Mr. Cantu's account. 36 RR 271. The prosecution used its direct examination of Mr. Gonzalez to denigrate Mr. Cantu's account:

---

[16] Although Detective Winn testified at trial that Mr. Gonzalez was Mr. Mosqueda's "distribution partner[]" dealing in "major quantities" of "narcotics," 34 RR 131, Mr. Gonzalez apparently faced no legal consequences for his activities.

46

Q.    Now, there's a pizza man story, too, right? Do you know about the pizza man?

A.    John Travolta, Steven Seagal, Pizza Man?

Q.    No, no. The Domino's pizza man.

A.    Yeah.

Q.    Do you know that one?

A.    Yeah.

Q.    Did you talk with the defendant about a pizza man causing the trouble?

A.    Yes.

Q.    What's that story?

* * *

Q.    Do you believe those amounts? That stuff make any sense to you when you heard that's story?

A.    When he told me 250,000?

Q.    Yes.

A.    I started laughing.

Q.    Well, why?

A.    Why?

Q.    Yeah.

47

A.    It's just absurd, you know.

\* \* \*

Q.    (BY MR. SCHULTZ) Did you believe that story about the pizza man and all? When you were hearing it, did you believe it?

A.    No.

Q.    Well, that meant your friend of all those years was just lying to you?

A.    Exactly.

Q.    Well, did you know that at the time?

A.    Yes, sir. When I heard the story, then I knew.

Q.    When you heard what story?

A.    When I heard the Domino's pizza story.

Q.    You knew what?

A.    I knew what I knew, that story wasn't for real.

Q.    Is it because of the amount or just the absolute–

A.    Just – just the nonsense of it.

\* \* \*

Q.    Understanding you've already said that you thought his stories were nonsense, is that just – is that because you thought he was insane at the time or just coming up with nonsense stories?

A.    I think he was just trying to come up with a story that somebody would buy.

36 RR 245; 250-51; 254-55.

000058

After the State rested, the defense rested without presenting any witnesses. 38 RR 3-4.

The prosecution's closing argument relied on Mr. Gonzalez and the demonstrably untruthful Ms. Boettcher to refute Mr. Cantu's account:[17]

> You've got the Defendant lying. He's telling this pizza man story, that some pizza man came. and he shot a hole in the wall and that's the pizza man that's after James. Well, you know that's a lie. You know it's a lie because Amy Boettcher told you it was a lie. She said, no, it was the Defendant. It was Ivan Cantu that shot at me. Ballistics tell you that's right because that bullet that was taken out of the wall matches that gun. Even Carlos said, when he I started talking about that pizza guy story, I knew he was lying. It's nothing but a bunch of lies. Why do you have to lie if you don't have anything to cover up?

41 RR 16–17.

> ### 2. One of Mr. Mosqueda's drug suppliers was Mateo "Matt" Gonzalez from the Valley. Matt matched Mr. Cantu's description of the "pizza man," ran drugs from the Valley to Dallas, and drove a Lincoln.

New evidence has emerged supporting Mr. Cantu's account of being threatened by one of Mr. Mosqueda's drug suppliers. Mr. Mosqueda was supplied large quantities of drugs form a dealer named "Matt" who lived in the Valley. Matt matched Mr. Cantu's description of the man who threatened him and he drove a

---

[17] The prosecution also noted that ballistics matched a gun recovered from an apartment where Mr. Cantu and Ms. Boettcher stayed before his arrest. However, Ms. Boettcher—on whom the State had leverage and who demonstrably lied under oath to assist the State—was alone in the apartment throughout the day. 35 RR 181-82. Further, Ms. Boettcher testified that she looked under the cushions of the couch where the gun was later found and saw only money and drugs. 35 RR 183-84.

Lincoln.  Finally, prosecution witness Carlos Gonzalez *knew* Matt the drug dealer
and that he drove a Lincoln.

Jason Harrelson "worked for James Mosqueda off and on for approximately
3 years, from 1994 to 1997" in "his tanning salons; 10-Minute Tan, located in
Dallas." Exhibit 15 (Declaration of Jason L. Harrelson). While "working there, [Mr.
Harrelson] was aware of an acquaintance of James, who [he] knew as Matt." *Id*. Mr.
Harrelson described Matt as "a Hispanic male" who was in his "mid to late 30's back
in 1996, 1997." *Id*.  "Matt would visit James occasionally at the tanning salon," Mr.
Harrelson estimated that "in the 3 years [he] worked there, [Matt] came by 6 to 8
times." *Id*. Mr. Harrelson has positively identified the following person as the "Matt"
he knew:



According to Harrelson: "This is the man I knew as Matt. Based on this picture, I am positive that was Matt. The man that would call and visit James at the tanning salon." *Id*.

The man in the above photo is Mateo "Matt" Gonzalez who was born in October of 1959 and died in 2022. Matt[18] has a criminal record for possessing large

---

[18] Mr. Cantu refers to Matt Gonzalez as "Matt" instead of "Mr. Gonzalez" to avoid confusion with prosecution witness Carlos Gonzalez.

quantities of marijuana. Exhibit 16 (Mateo Gonzalez Hidalgo County Court Record). He owned a 1989 Lincoln Town Car. Exhibit 17 (Vehicle Title Record).

June Rose was Matt's ex-wife, their common law marriage lasted about ten years, from 1996 to 2006 or 2007, when Matt went to prison for selling drugs. Exhibit 18 (Declaration of Stewart Fillmore). Ms. Rose confirms that "Matt knew James Mosqueda since the late 1980's or the early 1990s. They were close friends in those early years." *Id*. Ms. Rose confirms that "Matt had sold marijuana to James Mosqueda," but she was not aware of the dates of those occasions.

Another witness describes Matt as James's "big supplier" who brought 18 wheelers from the Valley with drugs in the tire.[19]

Finally, Carlos Gonzalez, who disparaged Mr. Cantu's account at trial, *knew* Matt Gonzalez and that he drove a Lincoln. Ryan Patton grew up with Carlos Gonzalez, Anthony Fonseca, and James Mosqueda. Exhibit 19 (Declaration of Ryan Patton). When Mr. Patton "managed the Goodyear tire shop, Carlos brought multiple of his vehicles into the shop and [Mr. Patton] put rims and tires on them." *Id*. Mr. Patton remembers Carlos coming to the shop near the time of 9/11, which would have been immediately before Mr. Cantu's trial:

---

[19] This witness has expressed apprehension about their safety and is unwilling to appear publicly. Mr. Cantu will produce materials documenting the witness's statement when granted leave to file the materials under seal. For purposes of this application, however, undersigned counsel has a good faith basis for alleging that the witness will confirm the above-stated facts.

> In 2001, Carlos told me he had some guys from in the Valley, which I knew as the Rio Grande Valley, who wanted some rims and tires on their vehicles. They wanted to come up to Dallas and have my Goodyear shop put them on because I could give them a discount. I had to special order these rims and so I needed to get them by the date these guys were coming up.
>
> Around the date of 9-11-2001, Carlos's friends from the Valley came into my shop. From what I can recall, it was about 4 or 5 guys from the Valley in their group. I knew it was right around 9-11-2001, because I remember 9/11 happening within days of these guys coming in.

*Id*. Mr. Patton said that one of the men "really stood out, and stuck in [his] memory because of how he looked, how he was how he was dressed, and his vehicle. He had shoulder length black hair pulled back in a ponytail, but sometimes he would let it down and it reminded me of Antonio Banderas." *Id*. Mr. Patton said "[t]he hair and the trench coat, made him memorable to me, as well as his vehicle," "[h]e drove a black box style Lincoln, late 80's to early 90s style." *Id*.

Mr. Patton's memory of the man matched Mr. Cantu's: "Ivan's description was a medium build, Hispanic male, with long shoulder length hair, who was said to be from the Valley. That sounded like the guy I saw back in 2001 with Carlos

Gonzalez, driving the same kind of black box style Lincoln." *Id*.  Mr. Patton viewed

a sketch of Matt Gonzalez with long hair and a representative picture of a Lincoln:




*Id*. Based on the above, Mr. Patton is "95% certain that was the man I saw in my tire

shop in 2001.  I am 100% certain that this kind of black box style Lincoln is what

the man from the Valley was driving." *Id*. Mr. Patton "saw him in September of

2001 with Carlos Gonzalez." *Id*.

Prior to November 2, 2000, Mr. Cantu did not know Matt Gonzalez, or that

one of James Mosqueda's big drug suppliers was a man named "Matt from the

Valley." He did not know what Matt looked like or that he drove a Lincoln. Yet,

Ivan gave an accurate physical description, the correct name, and correctly identified

the type of car he owned. This evidence corroborates Mr. Cantu's account and

demonstrates that Carlos Gonzalez—Mr. Mosqueda's partner in the drug trade—

knew that Mr. Cantu was describing one his friends from the Valley.

### E.    Additional new evidence further undermines the State's evidence.

In addition to evidence undermining the State's two star witnesses, new factual developments cast further doubt on the integrity of the prosecution's presentation to Mr. Cantu's jury.

### 1.    The jeans recovered from the trashcan could not have been worn by Mr. Cantu.

Amy Boettcher testified that the jeans recovered from the trashcan were worn by Mr. Cantu on the night of murders.  These jeans were sized 34/32. 33 RR 92.

At the time of the crime, Mr. Cantu was 5'7" and weighed 140 pounds. Exhibit 12 (arrest warrant found in Winn Binders – Tab 8).  William Bobbitt was Mr. Cantu's roommate just months before the crime.   34 RR 8-9 (When Jeff Boettcher met him on August 23, 2000, Mr. Cantu was living with Mr. Bobbitt). In a 2019 affidavit, Mr. Bobbitt states at the time he wore 32/20 jeans.  Exhibit 13 (Bobbitt Affidavit).  He tried to put on a pair of Mr. Cantu's jeans but they were too small and he could not fit into them.  *Id*.  Mr. Cantu had a thinner waist and was a few inches shorter than Mr. Bobbitt.  Mr. Bobbitt estimates that Mr. Cantu's jeans were size 30/30 or 30/28 and that Mr. Cantu did not wear baggy jeans.

## 2.     The State's evidence and jury argument that victims were beaten and tortured was false.

State's witness Paulette Sutton testified at trial, based on her examination of

*photos* of the crime scene (she did not actually view the crime scene), that Amy

Kitchen had been kicked or punched in the face with enough force to spray a large

amount of blood over the wall behind the bed.  37 RR 212-215.  The State relied on

Ms. Sutton's testimony to argue at closing:

> We know that he hit or kicked one of the victims.  He wanted to torture
> them before he killed them, and I think it's a reasonable inference from
> the evidence that it was Amy Kitchen that he hit or kicked before he
> finally killed her.

* * * *

> [Ms. Sutton] sat and told you when that person is getting hit or kicked,
> they were back against the headboard probably in a kneeling position.
> It was probably Amy Kitchen trying to get away from this Defendant.
> He was standing between her and the door.  She just saw him kill her
> fiancé.  They only thing she can do is back away as far as she can.  She's
> against the headboard.  He shoots her, she starts bleeding, he hits her or
> kicks her.  We know she probably went in the kneeling position because
> she's got no blood on the back of her legs, no blood on her socks.  [Ms.
> Sutton] sat and said that would be consistent with somebody kneeling,
> with her kneeling back by the headboard.

41 RR 18-19.

However, a crime scene reconstruction expert and two pathologists have since

concluded that the physical evidence does not support Ms. Sutton's conclusions.

Ms. Sutton's testimony has recently been criticized by Chris Robinson (www.chrisrobinsonforensics.com), a ballistics and shooting reconstruction expert formerly with the Georgia Bureau of Investigation and the Atlanta Police Crime Lab:

> Now the critical thing for me is now there are no wounds to their bodies besides the gunshot wounds. So there is no kicking here, sir. There's no punching and there's no beating. What you see on that wall right there behind the head of James Mosqueda here is impact spatter and projected bloodstains out of the wound…. So the bullets do not exit, so all the pressure that's built up has to come back out of the wound, so that's projected bloodstains you see up on the wall. There's no beatings, and there's no kickings. So when this trial occurred, I'm not sure who this expert was. She didn't sound like she was too keen to me. Because there was no damage to these bodies. None was noted except for the wounds that they were shot with.

Duff, M. (Host), Episode 36, *Cousins By Blood* (2020-present), https://cousinsbybloodpodcast.com/.

Likewise, forensic pathologists Dr. Melinek and Dr. Banerjee have reviewed the forensic pathology evidence in this case and have concluded that Ms. Sutton's testimony was not consistent with the physical evidence. As both Dr. Melinek and Dr. Banerjee note in their declarations, neither Ms. Kitchen nor Mr. Mosqueda suffered any injuries unrelated to the gunshot wounds. Exhibit 6, Exhibit 7. Dr. Melinek unequivocally concludes: "Neither Mr. Mosqueda nor Ms. Kitchen sustained blunt force traumatic injuries consistent with being beaten or kicked in the face." Exhibit 6.

The conclusions of these experts provide further evidence that the State's expert testimony and argument were false.

### 3. Tawny Svihovec believed that it was Amy Boettcher, not Ivan Cantu, who left the gun in her apartment.

Tawny Svihovec, Mr. Cantu's ex-girlfriend, at whose apartment police found the murder weapon, apparently did not believe Mr. Cantu was involved in the murders (and who the State did not call as a witness). *See* Statement of Facts, *supra*, at 11-12. Less than a month ago, Ms. Svihovec advised the Collin County District Attorney's Office that she was "99.9 percent" certain that it was Amy Boettcher, not Ivan Cantu, who left the gun in her apartment. Exhibit 20 (Electronic Mail from Tawny Svihovec to Greg Willis). Ms. Svihobec told police prior to trial that Mr. Cantu had left her apartment on the morning of November 8, leaving Ms. Boettcher alone in the apartment for hours before Mr. Cantu was arrested. Exhibit 21 (DPD Interview of Tawny Svihovec). Thus, Amy Boettcher had the opportunity to plant the weapon in Ms. Svihovec's apartment for her to find and turn over to the police, implicating Mr. Cantu.

## CLAIMS FOR RELIEF

### CLAIM ONE

I.    **The testimony of the State's star witnesses, Amy Boettcher and Jeff Boettcher, and Carlos Gonzalez was materially false in violation of the Due Process Clause of the Fourteenth Amendment**.

All allegations and arguments presented in the Introduction and Statement of Facts are fully incorporated into this Claim by this specific reference.

### A.    Mr. Cantu is entitled to a new trial because his conviction was based on false and misleading testimony.

#### 1.    The *Napue/Giglio* standard.

In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the United States Supreme Court held that a criminal defendant is denied due process when the State knowingly uses false or perjured testimony or allows false testimony to go uncorrected at trial. A petitioner seeking habeas relief based on this type of claim must show (1) the testimony was false, (2) the prosecution knew that the testimony was false, and (3) the testimony was material. *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007); *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001); *see also Townsend v. Burke*, 334 U.S. 736, 740-41 (1948) (finding conviction based on "materially untrue" information violates due process "whether caused by carelessness or design"). False testimony is material if there was any reasonable likelihood that it affected the jury's

verdict. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000).

> **2.     Mr. Cantu satisfies the *Napue/Giglio* standard.**

> **a.     The State knowingly relied on false testimony.**

"Evidence is 'false' if, *inter alia*, it is 'specific misleading evidence important to the prosecution's case in chief.'" *Nobles v. Johnson*, 127 F.3d 491, 496 (5th Cir. 1997) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). "[T]estimony that is untrue is one of many ways jurists define false testimony [and the] Supreme Court has indicated that improper suggestions, insinuations and, especially, assertions of personal knowledge constitute false testimony" *Ex parte Robbins*, 360 S.W.3d 446, 460 (Tex. Crim. App. 2011) (citations and internal quotation marks omitted). "The proper question in a false-testimony claim is whether the particular testimony, taken as a whole, gives the jury a false impression." *Ex parte Weinstein*, 421 S.W.3d 656, 666 (Tex. Crim. App. 2014) (citations and internal quotation marks omitted) (citing *Alcorta v. Texas*, 355 U.S. 28, 31 (1957)).

Amy Boettcher testified falsely in numerous ways that assisted the prosecution. She testified that Mr. Cantu stole, wore, and then discarded Mr. Mosqueda's Rolex watch. This helped the State account for evidence that was reported missing but was never recovered and, more generally, explain why the State was unable to produce the proceeds of the alleged robbery. The fact that the watch

was never even stolen demonstrates that Ms. Boettcher was willing to testify to "facts" the State wished to elicit without regard to the truth.

Similarly, witnesses have come forward who saw Amy with her engagement ring before the murders.  By her own admission, the police told her it was Ms. Kitchen's ring, and not the other way around.

Ms. Boettcher also testified that clothes stained with victims' blood belonged to Mr. Cantu and that she put placed them in the kitchen trashcan on the night of the murders.  Only Ms. Boettcher's testimony tied Mr. Cantu to jeans that were two sizes too large for Mr. Cantu.  One of the Dallas Police officers who searched Mr. Cantu's apartment for signs of foul play long *after* Ms. Boettcher and Mr. Cantu left for Arkansas—but before they returned to Dallas—has sworn that the clothes were not there.  Thus, Ms. Boettcher's testimony was false.

Additionally, several days after the clothes were found in the trashcan with a latex glove, Ms. Boettcher gave a series of statements in which she averred that Mr. Cantu was wearing latex gloves when he came home in the bloody clothes.  In her statements, Ms. Boettcher said that Mr. Cantu put the glove in the trash with the clothes.  However, after spending five hours with the prosecutors on Sunday, October 7, 2000, going over her statements and preparing for her October 9th testimony, *see* 35 RR 74-76, Ms. Boettcher subsequently testified that she had not seen any gloves that night and did not know who put the glove in the trash.  Notably,

61

her story changed only after (1) Detective Whitsitt testified on October 4, 2000, that he did not collect the glove because he did not believe it would have evidentiary value or contain any trace evidence, 32 RR 46; and, (2) Ms. Boettcher spent five hours prepping with the State.  The Dallas Police initially documented that a glove was found with blood-stained clothes connected to the crime, and Ms. Boettcher initially swore Mr. Cantu was wearing surgical gloves on the night of the murder and put one in their trashcan.  But after a Dallas Police Detective—who specialized in physical evidence—testified that he inexplicably failed to perceive any potential for trace evidence on a glove allegedly worn by the killer on the night of the murder, Ms. Boettcher changed her story and testified that she did not see any gloves that night and had no idea who put the glove in the trash.

Whether Ms. Boettcher lied in her statements, testimony, or—most likely—both, she indisputably changed her testimony after going over her statements with the prosecutors.  The State, however, falsely argued to the jury that Ms. Boettcher gave four statements and her testimony was "consistent" with all of them "because she's telling the truth."  41 RR 28 (State's closing argument).

Finally, Ms. Boettcher's testimony about the timing of the murders is contradicted by scientific evidence establishing that the victims were alive for at least six more hours after Ms. Boettcher said that Mr. Cantu came home with blood on his jeans and in his hair.  Notably, people who saw Ms. Boettcher after she had

allegedly been to the crime scene reported that she was "happy" and failed to notice anything strange about her demeanor, even though she testified that she only remained with Mr. Cantu out of fear. The scientific evidence and Ms. Boettcher's happy demeanor undermine her testimony that Mr. Cantu went to Mr. Mosqueda's house at 11:30 p.m. to commit murder and that she saw the crime scene shortly after.

In addition to multiple instances of false testimony, the totality of Ms. Boettcher's false statements demonstrate that she was willing to conform her testimony to the State's theory of the case without regard for the truth. The prosecution's jury argument that Ms. Boettcher's four statements and trial testimony were all consistent, and she was therefore a truth teller, also created a false impression about Ms. Boettcher's credibility.

Other than his sister Amy, Jeff Boettcher was the most consequential State's witness. Mr. Boettcher's testimony about alleged conversations he had with Mr. Cantu provided the State with motive (robbing the victims of money and drugs); planning; testimony linking Mr. Cantu to the murder weapon and the type of ammunition used—indeed, Jeff and Amy were the *only* witnesses who said that Mr. Cantu owned a gun; a post-crime confession; and portrayed Mr. Cantu as a calculating, remorseless killer. Mr. Boettcher who, like Amy, was a daily drug user at the time, testified that he would do anything for his sister, including protect her and help her out, because they "were in it together." 34 RR 41; 60. New evidence

from the Collin County District Attorney's Office confirms that this includes testifying falsely for the State.

In early 2022, Jeff Boettcher contacted the Collin County District Attorney's Office seeking to recant his trial testimony. Representatives from the DA's office traveled to Minnesota to interview Mr. Boettcher. Despite intense questioning, during which the State sought to minimize the role Mr. Boettcher's testimony might have played in securing Mr. Cantu's conviction, Mr. Boettcher disavowed his trial testimony, stating, "I lied." Exhibit 14 at 14:15. Contrary to his trial testimony, Mr. Boettcher was using drugs at the time of the trial. *Id*. at 13:36. Mr. Boettcher told the Collin County DA's staff that the damning pre-crime conversation with Ivan to which he testified "never happened." *id*. at 14:31; *see also id*. at 17:39 ("He didn't say that to me. That he wanted me to be the clean up man. No, he didn't say that to me."). Mr. Boettcher knew his testimony was false at the time of trial, *id*. at 14:49, and is now "recanting [his] story." *Id*. at 22:00.

Additionally, Jeff Boettcher's testimony that he allegedly saw Mr. Cantu regularly carrying a gun that resembled the murder weapon is likewise false, according to Mr. Cantu's roommate at the time, who *never* saw Mr. Cantu with a gun and did not believe he owned one.

Jeff Boettcher's trial testimony falls squarely into the category of false testimony.

64

Carlos Gonzalez's testimony discrediting Mr. Cantu's description of the drug dealer who threatened him was also materially misleading and false. The prosecution presented Carlos Gonzalez in large part to discredit Mr. Cantu's account of being threatened by a drug dealer with whom Mr. Mosqueda was doing business. Carlos described the story as "absurd" but, as Mr. Mosqueda's partner in the drug business, he undoubtedly knew that Matt was supplying drugs to their operation. Indeed, Carlos was not only a partner in the same drug operation doing business with Matt, *Carlos and Matt were friends*. Exhibit 19 (Declaration of Ryan Patton) ("Carlos's friends from the Valley came into my shop"). Moreover, Carlos knew that Matt from the Valley drove a Lincoln town car. *Id*. And Carlos knew that he and his partners were dealing with primarily large quantities of drugs, thus a $250,000 debt was not laughable. 36 RR 250. Carlos even mocked Mr. Cantu's description of a ponytailed Latino man who resembled Steven Segal or John Travolta. 36 RR 245. But the description of his friend Matt checks out, and another witness has likewise compared Matt to a ponytailed Hollywood actor. Exhibit 19 (Declaration of Ryan Patton) ("He had shoulder length black hair pulled back in a [sic] pony tail, but sometimes he would let it down and it reminded me of Antonio Banderas.").

Carlos had every reason to deflect blame from Matt, his friend and business associate of the Mosqueda/Fonseca/(Carlos) Gonzalez drug dealing partnership. He knew that Mr. Cantu's account was not "absurd" or "nonsense." To the contrary,

Carlos must have appreciated that Mr. Cantu had credibly identified his friend Matt as a suspect.

### b.    The false testimony was material.

The false testimony, which both provided false information to the jury and shielded the State's star witness from being utterly discredited, more likely than not "affected the judgment of [Mr. Cantu's] jury." *Barrientes v. Johnson,* 221 F.3d 741, 756 (5th Cir. 2000). False or misleading testimony is deemed material when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Barrientes*, 221 F.3d at 756. "A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (internal quotation marks omitted); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976).

Because Amy Boettcher's credibility was critical to the State's case, the defense labored to impeach her by impugning her character and highlighting the State's leverage over her. The defense elicited testimony that Ms. Boettcher was ingesting cocaine, speed, ecstasy "[a]lmost every day," 35 RR 100, and thus violated her probation on a daily basis:

> Q.    How many times would you say you violated your court-ordered probation in Tarrant County?

66

> **A.**    What do you mean violate them?
>
> Q.    Using dope, driving without a driver's license, all the things that you've testified you've done that are in violation of that judge's order.
>
> A.    Probably quite a few.
>
> Q.    Probably in the hundreds, right?
>
> A.    Probably.

36 RR 44.   Though her probation was never revoked, *id.* at 44-45, Amy later admitted that she feared going to prison for the offense (or for hundreds of probation violations):

> Q.    Did you feel like they were the detectives were trying to like, set you up in any way. Like were they trying to like fuck with you, like –
>
> Q.    [Duff] Like leading you—
>
> Q.    Were they like trying to make you like saying incriminate yourself?
>
> A.    I thought it was going to prison.

Duff, M. (Host), Episode 15: The State's Star Witness, 58:26-58:41, *Cousins By Blood* (2020-present),  https://cousinsbybloodpodcast.com/.

And the jury knew that two days before she testified, Ms. Boettcher engaged in a five-hour prep session with the prosecutors and her own counsel during which, according to Amy's lawyer, they "had an extensive meeting … from two o'clock to seven o'clock. The prosecutors were there. I had a personal meeting with her by

myself. We went over her statements and talked to her about how she would be a party to this or possibly stolen property." 35 RR 73-74; *id.* at 76 ("The district attorneys wanted to go over her testimony, wanted to go over her statements and talk with her.").

And yet there is no doubt that Amy Boettcher's testimony was critical to the State's case.  When affirming Mr. Cantu's case on direct appeal, the Texas high court was willing to assume, without deciding, that much of the physical evidence in this case was illegally obtained but held that violation to be harmless because "*Amy Boettcher's testimony about the offense wholly incriminated appellant in the murders and robbery*, and her version was corroborated by other evidence." *Cantu v. State*, *supra*, at *4 (emphasis added).

This court of criminal appeals aptly characterized Ms. Boettcher's testimony. As described *supra*, Ms. Boettcher told the jury that Mr. Cantu announced his intentions before the crime, committed the murder, and robbed the victims. She connected Mr. Cantu to the gun, the bloodstained clothes, and items allegedly stolen during the crime that were never recovered.  Additionally, she portrayed him as violent and without remorse.

As the State told the jury in closing argument, Ms. Boettcher is "not an accomplice to any offense ... *you can convict him based on her testimony alone*." 41 RR 22 (emphasis added).  The State repeatedly invoked her testimony throughout

closing arguments to tie Mr. Cantu to the crime as well as impeach his version of events. *See, e.g.,* 41 RR 16 ("You've got the Defendant lying. He's telling this pizza man story, that some pizza man came, and he shot a hole in the wall and that's the pizza man that's after James. Well, you know that's a lie. You know it's a lie because Amy Boettcher told you it was a lie. She said, no, it was the Defendant.").

After repeatedly invoking her testimony throughout closing argument, the State told the jury that Ms. Boettcher was a truth-teller based on the (false) assertion that her testimony and four statements were all consistent, and that "[s]he's not bright enough to concoct a story and stick with it." 41 RR 28. One of the prosecutors concluded with a plea to believe Ms. Boettcher:

> She was cooperative. From the moment she felt safe at her parents' house. They called the police, let them know where she was. Any police officer that came to take a statement, she gave them a statement and a lengthy one. She was willing to come testify without any kind of deal, just to say here is what happened. She's telling you the truth. She's not an accomplice, and all the evidence shows, beyond a reasonable doubt, that on or about November 4th of 2000, this Defendant intentionally killed James Mosqueda and Amy Kitchen, and he did it in the course of robbing them. And I ask that you go back there and find him guilty.

41 RR 28-29.

Ms. Boettcher's repeated falsehoods—which conformed to law enforcement theories of the case—were about material facts, such as the provenance of the blood-stained clothes in the apartment she shared with Mr. Cantu. But they also expose her to withering cross-examination that would have eviscerated her credibility. The

jury knew that despite admitting to dozens of probation violations, she suffered no consequences.  Had her testimony been truthful, she would have been guilty of assisting Mr. Cantu and tampering with evidence.  But, despite confessing to a variety of actions that should have generated criminal charges or, at minimum, revocation of her probation, Ms. Boettcher walked away free.  She had an incentive to lie for the State, and now it is clear she did.  There is a reasonable likelihood that Ms. Boettcher's false testimony affected the judgment of the jury.

Jeff Boettcher's testimony was also critical to the State's case, as demonstrated by their emphasis on it in their closing arguments. With the support of Jeff's testimony, the State argued that Mr. Cantu had the murder weapon in his possession before the murders took place. 41 RR 15-16.  The State also relied on Jeff Boettcher's testimony exclusively to establish that Mr. Cantu planned to commit murder weeks in advance:

> You've got Jeff Boettcher's testimony, and Jeff told you he'd been talking about this a week or two before the murder. Hey, Jeff, there's dope over there. There's money over there. You help me clean up. you get some. I'm going to kill my cousin, James. He planned it. He knew he was going to do it.

*Id*. at 17.  Jeff was the only person to testify that Mr. Cantu planned the crime in advance.  The State invoked his testimony to argue that the purpose was to commit robbery—one of the theories of capital murder:

> How do we know it was in the course of committing robbery? Again, he talked to Jeff Boettcher about it. He told Jeff, there's money over

there, there's dope over there, I'm going to kill them, and if you help
me clean up the bodies you get some.

*Id*. at 21.   Moreover, the clear implication of Jeff's testimony was that, after the

murders had occurred, Mr. Cantu confessed to being the perpetrator.

Finally, the misleading and false testimony of Carlos Gonzalez was material.

The only credible alternative theory at trial was that Mr. Mosqueda and Ms. Kitchen

were killed by someone in the drug business. Even in the absence of a single defense

witness, the jury still heard that:

- Mr. Mosqueda and his partners were not nickel-and-dime dope dealers,
  they were trafficking large quantities of drugs;

- Immediately after the murder, the police received an anonymous tip that
  a drug dealer to whom Mosqueda was in debt was responsible for the
  murders;

- No large stash of drugs was recovered from Mr. Mosqueda's home or
  business; and,

- Mr. Cantu was threatened by a drug dealer to whom Mr. Mosqueda
  owed money.

During closing arguments, the defense emphasized both that Mr. Mosqueda was a

major drug trafficker and that the State was "trying to pull the wool over [jury's]

eyes" about his background. 41 RR 34.

Had the jury known that Mr. Cantu had accurately identified one of Mr.

Mosqueda's drug suppliers as the threatening figure coming after them, there is a

71

reasonable likelihood that it could have affected the outcome. Mr. Cantu urges this Court to consider how the evidentiary landscape has shifted in light of the totality of the due process violations at issue, which cumulatively:

- Eviscerate the credibility of Amy and Jeff Boetcher, the prosecution's key witnesses, who both lied at trial;

- Undermine confidence in the DPD's handling of the investigation, in light of Detective Winn's failure to acknowledge the return of the Rolex and DPD's singular focus on Mr. Cantu to the exclusion of other credible leads; and,

- Bolster the credibility of the defensive theory that a drug dealer associate was responsible for the murders.

In short, the evidentiary landscape has dramatically shifted to such an extent that relief is required.

There is a reasonable likelihood that the false testimony of either Boettcher sibling alone affected the judgment of the jury. But this Court should consider the totality of the Boettcher siblings' false testimony as well as the misleading and false testimony of Carlos Gonzalez. As Jeff Boettcher testified, "we're in it together," 34 RR 41; 60, and he did whatever was necessary to help his sister. The question before this Court is not whether there would be sufficient evidence to convict Mr. Cantu without Jeff's testimony and after Amy's credibility is discounted for her demonstrable falsehoods. The question is whether there is a reasonable likelihood that the false testimony by both Jeff and Amy Boettcher, as well as Carlos Gonzalez,

affected the outcome. Mr. Cantu submits that the answer is unquestionably "yes," and thus his conviction must be reversed.

# CLAIM TWO

## II.     The State suppressed evidence impeaching its star witness, Amy Boettcher, in violation of *Brady v. Maryland* and the Due Process Clause.

All allegations and arguments presented in the Introduction, Statement of Facts, and Claim One are fully incorporated into this claim by this specific reference.

### A.     The governing legal standard.

The suppression of favorable and material evidence violates the Due Process Clause of the Fourteenth Amendment. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("*Brady* … held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'") (quoting *Brady*, 373 U.S. at 87).

There are three elements to a *Brady* claim: "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Banks*, 540 U.S. at 691 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)); *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006) (*en banc*) ("(1) the state suppressed evidence; (2) the

73

suppressed evidence is favorable to defendant; and (3) the suppressed evidence is material.").

The applicant has the burden of establishing each element of a *Brady* claim. *Harm*, 183 S.W.3d at 406.

Both the questions of whether the evidence is favorable to the accused and whether it is material are determined based on what effective defense counsel could have done with the evidence. *See Kyles v. Whitley*, 514 U.S. 419, 441 (1995) (holding suppressed evidence was material because "disclosure … to competent counsel would have made a different result reasonably probable."); *United States v. Bagley*, 473 U.S. 667, 676 (1985) (*Brady* "evidence is 'evidence favorable to an accused,' … so that, if disclosed and used effectively, it may make the difference between conviction and acquittal") (quoting *Brady*, 373 U.S. at 87). Favorable evidence is evidence which is exculpatory, mitigating or impeaching toward any aspect of the State's case. *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Brady*, 373 U.S. at 87; *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992).

Materiality "turns on the cumulative effect of all … evidence suppressed by the government." *Kyles*, 514 U.S. at 421; *id*. at 436 ("materiality … of suppressed evidence considered collectively, not item by item").

The standard is satisfied when the cumulative effect of the suppressed evidence "raises a reasonable probability that its disclosure would have produced a

different result." *Id.* at 421-22.  To satisfy the materiality standard, the applicant "need not show that he more likely than not would have been acquitted had the new evidence been admitted." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (internal quotation marks and citation omitted).  Conversely, the applicant "can prevail even if … the undisclosed information may not have affected the jury's verdict." *Id.* at 392 n.6.  Even if the jury, fully aware of all the withheld evidence, "*could* have voted to convict [Applicant]," a new trial is required when a reviewing court lacks "confidence that it *would* have done so."  *Id.* at 394 (citing *Smith*, 565 U.S. at 76) (emphasis in original).

Finally, "materiality … is not a sufficiency of evidence test.  A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35.

**B.    "I don't know what *Brady* means"[20]: The police suppressed favorable evidence that impeached Amy Boettcher.**

As described in detail, *supra*, the police initially believed that Mr. Mosqueda's distinctive Rolex watch had been stolen during the murder.  Subsequently, Amy Boettcher swore in her statements to police, and testified at trial, that Mr. Cantu had stolen, wore, and eventually discarded Mr. Mosqueda's Rolex.

---

[20]  33 RR 189 (Detective Anthony Winn, the lead detective in this case, testifying at trial).

The police, however, were mistaken: the watch was never stolen.  Mr. Mosqueda's watch was located in his home by one of Amy Kitchen's relatives, who turned it in to the police, who returned the watch to Mr. Mosqueda's family.  As the above pictures and Abner Cantu confirm, this was Mr. Mosqueda's watch.  Thus, the police—an arm of the State for *Brady* purposes—possessed the allegedly stolen watch and then disposed of the evidence.  Yet this fact was never disclosed to the defense.  Mr. Cantu first learned in 2019 that the watch had been recovered by the police and returned to Mr. Mosqueda's family.  Exhibit 4.  The evidence was thus suppressed by the State.

The watch is indisputably favorable evidence because it demonstrates that Amy Boettcher's testimony that Mr. Cantu stole, wore, and then discarded the watch was a complete fabrication.  But it was not a random fabrication.  Ms. Boettcher lied under oath to substantiate law enforcement's erroneous belief about the crime.  This evidence is favorable to Mr. Cantu because it impeaches the credibility of a witness who had a good reason to lie on behalf of the State: she was guilty of numerous probation violations, as well as—at minimum—tampering with the evidence in a capital murder case.

**C.** **Because the jury could have "convict[ed] [Mr. Cantu] based on her testimony alone," 41 RR 22, the suppressed evidence proving that Amy Boettcher lied to substantiate the prosecution's mistaken assumptions about the crime was material.**

Evidence is material and a new trial is required if "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Kyles*, 514 U.S. at 441. As described above, Ms. Boettcher was unquestionably the star witness for the prosecution. This Court found that "Amy Boettcher's testimony about the offense *wholly* incriminated appellant in the murders and robbery…." *Cantu v. State*, supra, at *4 (emphasis added). Her direct examination exceeded 120 pages, 35 RR 80-207; and she was subjected to the defense's lengthiest cross-examination. 36 RR 6-99. In their closing arguments, the prosecutors told the jury that Amy Boettcher was a truth teller on whose testimony *alone* they could convict Mr. Canto of capital murder. Ms. Boettcher was undeniably the cornerstone of the prosecution's case.

Armed with the fact Ms. Boettcher had fabricated testimony to substantiate the State's mistaken assumptions about the crime, competent defense counsel could have eviscerated her credibility. As defense counsel noted during cross-examination, Ms. Boettcher had an urgent motive to lie for the State: her freedom hung in the balance. Her willingness to tell an outright lie under oath could have been used to question her uncorroborated testimony that:

- Mr. Cantu had owned a gun[21] and used it to shoot at Ms. Boettcher;

- Mr. Cantu announced he was going to kill the victims right before going to their home;

- Mr. Cantu returned to the apartment with blood on his clothes and in his hair;

- The blood-stained clothes in their kitchen trashcan were worn by Mr. Cantu (despite being far too large for him);

- Mr. Cantu brought items belonging to the victims, including their driving licenses, back to their apartment and left them there;

- Mr. Cantu confessed to the murders and showed Ms. Boettcher crime scene; and,

- Mr. Cantu stole property from the victims and then disposed of it, such as Mr. Mosqueda's watch and Ms. Kitchen's ring.

Ms. Boettcher was the *only* witness to dispute Mr. Cantu's account of who fired the bullet lodged in their apartment wall: a man who was coming after James Mosqueda and his associates for a six-figure debt incurred in Mr. Mosqueda's drug-dealing business.  Impeaching her testimony would have dramatically shifted the evidentiary landscape.

Revealing Ms. Boettcher's patently false testimony in support of the State would have also dramatically altered the closing arguments of counsel.  The defense could have credibly urged the jury to disregard Ms. Boettcher's testimony—that

---

[21] The only other witness who testified that Mr. Boettcher owned a gun was Amy's brother Jeff Boettcher, and he now admits to fabricating his testimony. *See*, *supra*, Claim One.

"wholly incriminated [Mr. Cantu] in the murders and robbery"—as coming from a witness who *both* was motivated to give the State whatever it needed *and* demonstrably lied under oath to support the State's mistaken beliefs about the case. The State, on the other hand, could not have stood before the jury and argued that Ms. Boettcher was a truth teller and "not bright enough to concoct a story and stick with it." 41 RR 28.  She concocted, and stuck with, her story about Mr. Cantu stealing and discarding a watch that was never stolen.

The materiality of *Brady* evidence and false testimony must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436.  As described above, Ms. Boettcher's story about the watch was not the only whopper she told on the stand. Ms. Boettcher's other lies included:

- Telling the jury that Mr. Cantu proposed to her and gave her an engagement ring on November 4, 2000, even though they had previously announced their engagement and witnesses saw her with a ring before the murders.

- Telling the jury that she put the bloody clothes in the trashcan in the early morning hours of November 4, 2000, even though a Dallas Police Officer was positive that the clothes were not there long after Ms. Boettcher and Mr. Cantu had departed for a trip to Arkansas and they were in plain view when the police searched the apartment on November 7, 2000.

- Telling the jury that the murders happened between 11:30 p.m. on November 3, 2000, and 12:18 a.m. on November 4, 2000; a time of death that is scientifically impossible.

- Telling the jury that Mr. Cantu took her on a pre-wedding proposal tour of the crime scene hours before the murders could have happened.

*See* Claim One, *supra*.  Additionally, it is now plain that Ms. Boettcher was willing to swear to the State's preferred story about the latex glove in the trashcan: first Mr. Cantu was wearing gloves when he came home and put them in the trashcan with the blood-stained clothes, and then she never saw any gloves and had no idea who put the glove in the trashcan.  The State got whatever it needed from Ms. Boettcher.

Mr. Cantu "need not demonstrate that after discounting the [Ms. Boettcher's testimony] in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. 435–36.  "One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 436.

The Supreme Court has found *Brady* violations where the State failed to disclose impeachment evidence that could have been used to impugn the credibility of the State's "key witness," *Giglio v. United States*, 405 U.S. 150, 154–55 (1972), or that could have "significantly weakened" key eyewitness testimony. *Kyles*, 514 U.S. at 441, 453. *See also Banks*, 540 U.S. at 701–02 (holding that a *Brady* violation occurred because the state suppressed impeachment evidence that two "essential" prosecution witnesses had been coached by police and prosecutors before they testified material); *Graves v. Dretke*, 442 F.3d 334, 344 (5th Cir. 2006) ("Because

the state suppressed two statements of ... its most important witness that were inconsistent with [the witness'] trial testimony, and then presented false, misleading testimony at trial that was inconsistent with the suppressed facts, we have no trouble concluding that the suppressed statements are material.").  As in *Giglio*, *Kyles*, *Banks*, and *Graves*, the suppressed evidence exposes the State's key witness as willing to provide demonstrably false testimony to substantiate the State's case.

In light of the collective suppressions and false testimony at trial—including Jeff Boettcher's recent admission that he too lied to the jury—this Court must find that Mr. Cantu was denied Due Process.

## CONCLUSION AND PRAYER

For the reasons stated above, Mr. Cantu prays that this Court grant habeas corpus relief from his capital murder conviction and sentence of death.

Respectfully submitted,


/s/_____
GENA BUNN
Texas Bar No. 00790323

Gena Bunn, PLLC
P.O. Box 6150
Longview, Texas 75608
gbunn@genabunnlaw.com
(903) 804-4003

ATTORNEY FOR PETITIONER,
IVAN CANTU

000092

**EXHIBIT 1**

000093

215

COMPLAINANT: Mosqueda, James

SERVICE #: 863688-J
FOR DET. : Winn

## INVESTIGATIVE INFORMATION

SUBMITTING OFFICER: Sgt. L.A. Lewis     DATE: 11/05/00

INFO OBTAINED VIA: Interview

OBTAINED ON DATE:     11/05/00  AT TIME:   8:30 a.m.

TOPIC: Interview with Gilbert Tamez and Sylvia Cantu

NARRATIVE:

On this date and time I contacted Gladys and Gilbert Tamez (Phone ▇▇▇▇▇▇▇) who are the sister and brother-in-law of the complainant. I spoke mainly with Gilbert to get some information on Ivan Cantu.

Tamez told me that James Mosqueda, Ivan Cantu, Anthony Fonseca, Francisco, and Ray all worked together. Mosqueda owns a business which used to be called Starnet and it is located on the tollway near where he lives. Tamez says this company wrote mortgages for people. Tamez stated that Cantu, Fonseca, Ray, and Francisco worked under Mosqueda as loan writers. Tamez stated he did not associate with this group much and kept his family away. When asked why, he stated that he believed the group were dealing drugs. I asked him how he knew this. He stated that Moqueda's success was too fast and that his (Tamez) sister was into drugs and told him that they were.

Tamez said that his sister told him that she had heard from Fonseca about a week and half ago and that he told her someone had kicked in his front door. Fonseca has not been heard from since. Tamez said that after the police left last night, that Francisco and Ray told Mosqueda's mother that they would be taking over the business. She was upset because this was Jame's business.

I talked to Sylvia Cantu, who is the mother of Ivan Cantu. I asked if she had heard from her son. She said he called her at about 3:30 a.m. this morning from Arkansas where he was visiting his girlfriend, Amy, family. I asked why he called then, she said that she had left messages on his voice mail. She said he was shocked to hear of the complainant's death. Cantu said that Ivan had talked earlier in the week about going to Arkansas. Sylvia Cantu's telephone numbers are ▇▇▇▇▇▇, ▇▇▇ ▇▇▇ ▇▇▇▇

1

Follow up required: Yes          No          Key words:_____

Supervisor Approval: _____     _____
Document2

000094

**EXHIBIT 2**

COMPLAINANT: MOSQUEDA, JAMES

SERVICE #: 863688-J
FOR DET. : WINN

## INVESTIGATIVE INFORMATION

SUBMITTING OFFICER: **CARNEY**     DATE: 11/6/00

INFO OBTAINED VIA: **INTERVIEW**

OBTAINED ON DATE:     **11/6/00**     AT TIME:     **5:30 P.M.**

TOPIC: **SYLVIA MORENO CANTU**

NARRATIVE:

I interviewed Ms. Cantu, at the CAPERS office, at Det. Winn's request.     Ms. Cantu is the mother of Ivan Abner Cantu and the complainant's aunt.  She is divorced from Abner Cantu Sr.

Ms. Cantu stated that her exhusband, Abner, had mentioned to her that the complainant had had a safe installed in his house at the time it was being built.  This safe is located in the master bedroom of the house.   It is located under the bed and is inground and carpeting covers it.   He also stated to Abner that if anything happened to him to look in the safe for information. Ms. Cantu stated that she didn't think Glayds, the complainant's mother, knew this.

Ms. Cantu stated that when the bodies were found, she became worried about Ivan and started calling him at home and on his cell phone. She left a message on his cell phone.   She stated that she went with the police to his apartment to check on his welfare but found that Ivan was not home.   She noticed that there were two beer bottles left on the kitchen counter that had been opened but were still full.   She also noticed a hole by the front door but didn't think anything about it because she figured it might have been left there by previous tenants.  Ivan had moved into this apartment just a few short months ago.

At 3:30 a.m. Sunday morning, Ivan called her.  He stated that he was in Arkansas with his girlfriend, Amy Boettcher. That they had gone to visit her parents.   Ivan told her that he had checked for messages and had gotten hers. Ms. Cantu told Ivan about the complainants deaths.  Ivan then related the following to her:

He told her that the complainant was doing things that were creating problems and trouble for him.  He told her that James was involved with drugs.   That James was not who she thought he was.  He further stated that on Thursday around 7:30 p.m. there was knock on his door and that when he opened the door, there was a man dressed as a Dominos pizza man.   This man then pushed his way inside the apartment and grabbed him and put a gun to his head.   The man told him to shut up and not say anything but to listen to what he had to say.   He asked him if he was working for James in the mortgage

3

Follow up required: Yes          No          Key words: _____

Supervisor Approval: _____          _____
Document2

219

company or if he was going to work for James.    Ivan told him that
he did not work for James nor was he going to work for James.    This
man also asked him if he had any money.    Ivan told him that he
didn't have any money as he could see from the fact that he was
drinking out of plastic cups.    The man then told Ivan not to be
messing with him.    The man then shoots his gun into the apartment
wall.    Ivan further told Ms. Cantu that this man showed him a list
that had the names of family members and that his name was also on
the list.    Ivan described the man as being a cross between John
Travolta and Steven Segal.    He wore his hair sleeked back in a pony
tail and was a tall man.    He had long sideburns and when he left the
apartment, he got into a black Lincoln.

Ivan then calls James to tell him about what had happened and James
tells him not to tell him on the phone and that he is busy and to
call him later.    Ivan calls James again on Friday and James tells
him to meet him later Friday night because he is going to dinner
with his fiancé's parents.    Ivan tried to warn James but that James
wouldn't listen.    Ivan then went over to James' house later that
Friday night.    He stated that James' fiancé was livid when she heard
the conversation.    She told James that she knew something would go
wrong.    Ivan stated that James owed the man $250,000.00.    He stated
that this man was probably " fronting" James the cocaine and that
James was then " fronting" to other people.

Ivan then tells Ms. Cantu that he tells James to leave the house and
go stay at a hotel.    James tells him that he cannot leave because
someone is coming with money for him.    Ivan tells James that he is
leaving town and is going to Arkansas with his girlfriend and visit
her parents.    Ivan tells him that he has to go to Albertsons first.
Ivan tells him to leave his car, Ivan is driving an Accord, in the
driveway and to take Amy's Mercedes to the store.    Ivan drives the
Mercedes leaving the Accord in the driveway of the complainant's
house.    James tells him that he wants them to think that he has
company.    Ivan comes back from the store and is going to leave for
his apartment.    James tells him to take the Corvette and leave the
Accord in the driveway.    Ivan drives the Corvette back to the
apartment and is going to take it to Arkansas.    He then changes his
mind and calls James to tell him that he does not want to be in the
Corvette.    James tells him to go ahead and pick up the Accord but
not to come in the house.    Ivan tells his girlfriend to get in the
Corvette with him and they go pick up the Accord.    James also tells
him to park the Corvette at his apartments and Ivan does.    Ivan
tells Ms. Cantu that they left James' house about 11:00 p.m. Friday
night and left Dallas around 11:30 p.m.    Ivan told her that they
initially had opened two beer bottles, while at his apartment and
that he and his girlfriend were going to drink them as they left for
Arkansas but changed his mind because they didn't want to get
stopped by the police for having open containers in the car.    Ivan
told Ms. Cantú that James begged him to keep the Accord in his
driveway but that he didn't want the Accord left at James' house
because this car belonged to his mother, Ms. Cantú.    Ivan further
tells Ms. Cantú that he parked the Corvette two spaces down from his
apartment. He also stated that the Corvette's regular keys were in

1

LOW UP REQUIRED:      YES          NO          KEY WORDS:_____

220

James' house and that he drove the Corvette with the spare key. He further stated that he had left some CDs in the Corvette because they were originally going to take this car to Arkansas.

Ivan told Ms. Cantú that James was moving about 10 kilos a week of cocaine about $115,000.00. He also stated that his grandfather, who lives in Mesquite, told him to stay away from James. Abner also called Ivan on Wednesday and told him to stay away from James.

Ms. Cantú stated that Ivan has not worked for James for about a year and that James had asked Ivan to come back and work for him in the mortgage business because he was concerned about Ray Sanchez.

Ms. Cantú stated that Ivan stated that he thinks the pizza man and James' knew partner, Francisco, knew or worked together in Corpus Christi. He stated that James and Francisco had worked coke deals about 7 or 8 years ago.

Ms. Cantú stated that Ray Sanchez told her that he was leary of Francisco because he knew nothing about mortgages and that James had him on salary of $1,200.00 a month without any experience and that James had opened up his office and files to Francisco. Ms. Cantú stated that Ray is from Eagle Pass. Ray calls Ms. Cantú and finds it odd that Francisco tells that he is meeting with the family and will be making the funeral arrangements for the family and will be taking care of the financial affairs. Francisco had been staying at the complainant's house and stated to Ray that he had not been there on Friday night because he had been doing laundry. Ray thought it odd because there is a washer and dryer at James' house.

000098

**EXHIBIT 3**

000099

COMPLAINANT: **MOSQUEDA, JAMES**                    SERVICE #: **863688-J**
                                                    FOR DET. : **WINN**

## INVESTIGATIVE INFORMATION

SUBMITTING OFFICER:  **CARNEY**    DATE: **11/6/00**

INFO OBTAINED VIA: **PHONE**

OBTAINED ON DATE:    **11/6/00**   AT TIME:  **7:00 P.M.**


TOPIC: **COMPLAINANT'S MISSING PROPERTY**

NARRATIVE:

Det. Perez contacted the complainant's mother, Gladys Mosqueda.  She gave the following descriptions of complainant's missing property:

1.  Rolex men's gold watch.  This watch was engraved in the back with " Lico with Love, Carol" .  This watch is 13 yrs. old and belonged to complainant's uncle, Lico, at one time.  The watch has diamonds on the inside dial and also on the outside of the watch.

2.  men's billfold, black, $700.00 in cash

3.  necklace

4.  ring value $8,000.00

1

Follow up required: Yes         No          Key words:_____

Supervisor Approval: _____    _____
Document4

000100

**EXHIBIT 4**

**Ivan Cantu 380-80047-01**

**On 10/24/19,** I/O was informed that the attorney representing Ivan Cantu during the post-conviction proceedings, **Gena Bunn** ▮▮▮▮▮▮▮▮ had information related to a gold Rolex watch that was listed as missing after this offense was committed, but was now in possession of the Gladys Mosqueda, the mother of victim James Mosqueda. I/O called Bunn, who said that a private investigator working for her, Matt Duff, had time stamped photos of the watch.

I/O then contacted **Duff** ▮▮▮▮▮▮▮▮ who said that he had spoken with Abner Cantu, the father of Ivan Cantu and brother of Gladys Mosqueda, Sylvia Cantu, the mother of Ivan Cantu, and Erik Cantu, the brother of Ivan Cantu. Abner told Duff that Gladys had possession of the gold Rolex that she told Dallas PD detectives was missing after this offense was committed. Abner said that Gladys told him that Dallas Police Detectives gave her the watch some time after the offense was committed. Abner provided a notarized statement to Duff, which Duff emailed to I/O. Duff also emailed time stamped location stamped photos of the watch that were emailed to him by Erik Cantu. Duff also gave I/O the phone numbers for Erik and Sylvia Cantu. I/o then called them and arranged an interview at their home on 10/25/19.

**On 10/25/19,** I/O and Investigator D. Hartschuh, met with

**Sylvia Cantu** ▮▮▮▮▮▮▮▮▮▮▮▮

**Erik Cantu** ▮▮▮▮▮▮▮▮▮▮

**At their home at** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

During the interview, which was audio recorded by Inv. Hartschuh, Sylvia and Erik wrote statements detailing a meeting they had with Gladys on 10/2/2019, at ▮▮▮▮▮▮▮▮▮▮
During this meeting Gladys showed them a gold Rolex watch with "to Lico only you for all time love Carol" inscribed on the back. Sylvia said that Gladys told her that she was given the watch after the offense occurred, at the Dallas Police Property room. Erik had emailed photos of the watch he took during the meeting to Matt Duff. See file for copies of the recording and statements.

I/O then reviewed the Dallas Police PES supplements, Investigative Notes and Property Logs related to this case that were in the case file. The only mention of the gold Rolex, was in an investigative note from 11/6/2000, describing a conversation Detective Armando Perez had with Gladys, where Gladys told him the gold Rolex with "Lico" inscribed on the back was missing.

I/O then spoke with Dallas Police Property **Room Clerk, Joanne Wilson.** Wilson reviewed the property log files for this offense and **could not find an entry for a watch.** She also checked for a Rolex, or any property being returned to anyone named Gladys Mosqueda. She found none.

A Clear search and DL search was run on Gladys. A search warrant was typed up for a listed address on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ because that is her listed address on her DL and Sylvia said that she thought the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ address was vacant.

Investigator Perez, who is a Spanish speaker, called Gladys at ▮▮▮▮▮▮▮▮, which is the number that provided by Sylvia, to set up an interview with I/O. There was no answer and no returned call.

On 10/29/19, I/O spoke with Abner Cantu, who said that his sister, Gladys, does not live on ▮▮▮▮▮▮ but does live at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Abner also that Gladys does not keep the watch at home, but in a safety deposit box in a bank. He does not know which bank but will try to find out. He also said that he has regular communication with Gladys and will try to set up a meeting with her for I/O on 10/30/19.

I/O asked Investigator Gibbs to look up possible work locations for Gladys. Gibbs said that Gladys does not show any employment history.

I/O attempted to contact Dallas PD Detective Winn, who was the lead detective on this case, and left messages for him, but so far this has met with negative results.

On 10/29/2019, Detective Winn contacted I/O by phone. Detective Winn, who now works for the Dallas County DA Office, informed I/O that he does not remember giving a Rolex from this offense to Gladys Mosqueda, or anyone else. Winn added that if the watch had been found, he would never have given it to anyone because it would have been evidence.

On 10/30/2019, I/O went to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I/O spoke with Gladys Mosqueda about the Rolex watch. Mosqueda said that she has the watch at bank. Mosqueda told I/O that a uniformed Dallas Officer gave her the watch at a building on Main St. in Downtown Dallas. (at that time, Dallas PD HQ, was at 2014 W. Main St.) I/O informed her that he had spoken to Winn, and checked police records, and that it is unlikely that this happened. Mosqueda maintained her story. I/O asked her to give an affidavit regarding how she got the watch and she refused. When asked if the complainant had other Rolex watches that she knew of, Mosqueda said he only had the one.

While talking to Mosqueda, a woman identifying herself as Mosqueda's sister,

Elaine Aguilar ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

called and told I/O that she remembered that Mark Kitchen, the brother of victim Amy Kitchen, found the watch and gave it to Mosqueda.


10/31/2019, I/O spoke with Mark Kitchen on the phone. Mark Kitchen is the brother of victim Amy Kitchen. **Mark Kitchen said that remembers finding a gold watch, possibly a Rolex, wedged behind a dresser at the crime scene. He found this watch one or two weeks after the murder as he was cleaning the crime scene.  Kitchen said that he gave the watch to two Dallas Police Detectives.** Kitchen described them as follows:

A short white male that later died in a wrong way car accident. This detective had an Italian sounding name. I/O believes this to be Detective William Corallo. The other detective was a tall slender black male. I/O believes that this detective is Anthony Winn. Kitchen said that he will send an email to I/O describing this event.

Mark Kitchen ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

000103

**EXHIBIT 5**

## Amy Murphy

| | |
|---|---|
| **From:** | Dale Lundberg |
| **Sent:** | Monday, November 4, 2019 6:53 AM |
| **To:** | Amy Murphy |
| **Subject:** | FW: IVAN CANTU // watch |

**From:** MARK KITCHEN █████████████████
**Sent:** Saturday, November 2, 2019 9:06 PM
**To:** Dale Lundberg <█████████████████
**Subject:** IVAN CANTU // watch

***** WARNING: External Email. Do not click links or open attachments that are unsafe. *****

Good evening,

The following information is to the very best of my recollection.

While cleaning the room where the murders took place, I found a watch under the bedroom furniture dresser. It was lodged between the bottom underside of the lowest drawer bottom panel of the dresser frame work and a supporting bracket for the front dresser facia.

The watch was a gold Rolex. I was very surprised to discover this watch where it was. I felt like it was somehow overlooked during the initial crime scene investigation and thought that it would be important for the detectives working the case to know about it.

The watch I found was given to Detective Anthony (Wynn - I believe this is his last name) and Detective Carillo (not certain I spelled this correctly). These are the two detectives that were working this investigation.

Please let me know if there is anything further needed.

Mark Kitchen
███████████████

1

000105

# EXHIBIT 6

000106

**DECLARATION OF JUDY MELINEK, M.D.**

1.      My name is Judy Melinek, M.D..  I am a forensic pathologist who works as an independent consultant in both criminal and civil matters. My education is notable for my undergraduate degree from Harvard University (magna cum laude), a medical degree with honors from the University of California Los Angeles School of Medicine, and pathology residency at UCLA Medical Center. I trained in forensic pathology at the Office of the Chief Medical Examiner in New York City from 2001-2003. During that time it was part of my duties to identify the human remains from the World Trade Center terrorist attacks of 9/11/2001. I was an Assistant Medical Examiner at the Office of the Chief Medical Examiner in San Francisco for nine years. I worked as a contract pathologist for the Alameda County Sheriff Coroner's Office from May 2013 until June 2020, and for three months operated as interim chief forensic pathologist in response to the emergence of SARS-CoV2 and the COVID-19 pandemic. I am currently practicing forensic pathology and performing coronial and forensic autopsies in Wellington, New Zealand, where I instruct medical students as a Clinical Senior Lecturer in the Department of Pathology and Molecular Medicine at Otago University School of Medicine. I am the sole forensic pathologist for a jurisdiction of approximately half a million people.

2.      I have published in the medical literature on the topics of pathology, forensic pathology, surgical complications, transplantation surgery, toxicology, and immunology. I have been qualified as an expert witness in the fields of pathology, forensic pathology, post-mortem toxicology interpretation, trauma interpretation, neuropathology, and cause of death determination over 200 times in California, New York, Florida, Utah, Colorado, Illinois, Missouri, Iowa, and Texas. I am currently licensed to practice medicine in California and am vocationally registered to practice forensic pathology in New Zealand. I am board certified in anatomic, clinical, and forensic pathology, and I routinely interpret autopsy reports, toxicology reports, medical records, and police reports to determine time of death, mechanisms of injury, and cause of death, and to evaluate the contributory effects of natural disease or intoxicants.

1

3.      I have investigated many gunshot wound homicides in my career. I have been

qualified in court to opine on mechanism of injury and manner of death based on my own

and others' autopsy reports, photographs, and scene reports. I have taught forensic

pathology to undergraduates, medical students, and resident doctors at New York

University, Stanford University, and the University of California San Francisco Medical

Center, and have been an invited lecturer at the University of California College of the

Law San Francisco, the University of California Davis, and at Barts & The London

School of Medicine.

4.      In October 2019, I was contacted by Matt Duff, a private criminal investigator

who told me he was conducting an investigation into the case of Ivan Cantu, a Texas

death row inmate, for a podcast series called "Cousins by Blood."  My understanding is

that Mr. Duff was conducting an independent investigation of the Cantu case on his own

initiative and that he was not affiliated with either the prosecution or the defense.

5.      Mr. Duff provided me with the following materials related to the Cantu case to

review:

- Dallas Police Department police reports and reports from the Southwestern Institute of Forensic Sciences at Dallas

- The autopsy report of James Edwin Mosqueda, Collin County Medical Examiner's Office, Case No. CC-1162-00, dated November 5, 2000;

- The autopsy report of Amy Michelle Kitchen, Collin County Medical Examiner's Office, Case No. CC-1163-00, dated November 5, 2000;

- Handwritten investigation report by field agent B Atkinson of the Collin County Medical Examiner's Office, Case No. 1162-00;

- Handwritten investigation report by field agent B Atkinson of the Collin County Medical Examiner's Office, Case No. 1163-00; and

- Crime-scene photographs from Case Nos. 1162-00 and 1163-00

- Temperature data for the outside ambient temperatures during the dates and times of the incident

6.      After I reviewed these materials, I was interviewed by Mr. Duff and excerpts from our audio-recorded interview were used in the "Cousins by Blood" podcast.

7.      I have recently been contacted by a member of Ivan Cantu's defense team and asked to re-review the materials set out in paragraph 5, along with color autopsy photographs and trial exhibits for both James Edwin Mosqueda and Amy Michelle Kitchen as well as the trial testimony on October 11, 2001 (pages 1-232), for the specific purpose of providing this declaration.  I have been asked to assess whether the physical findings reported in the Collin County Medical Examiner's Office's investigation report and autopsy report support a conclusion that Mr. Mosqueda and Ms. Kitchen were killed between 11:30 pm. on November 3, 2000, and 12:30 a.m. on November 4, 2000; and whether either of the decedents sustained any injuries consistent with blunt force trauma from being beaten or kicked in the face.

**Establishing the Post-Mortem Interval**

**Rigor mortis and its relationship to time of death**

8.      Rigor mortis is the post-mortem stiffening of muscles caused by the depletion of adenosine triphosphate (ATP) from the muscles after blood flow ceases. Rigor mortis appears approximately 2 hours after death in the small muscles of the face, progresses to the limbs over the next few hours, and is evident in all muscle groups between 6 to 8 hours after death.  Rigor mortis is maximal between 12 and 24 hours after death, and then dissipates with time.  Rigor mortis generally disappears by 36 hours after death, depending on the ambient temperature. Warmer ambient temperatures lead to a more rapid onset and dissipation of rigidity.

**Livor mortis and its relationship to time of death**

9.      Livor mortis is the red or purplish-blue discoloration of the skin in the dependent portions of the body due to the settling of blood within skin blood vessels caused by gravitational pull. Lividity develops as spots of discoloration within half an hour to two hours. These spots then coalesce to form larger patches, which further combine to form a

uniform discoloration of the body's dependent parts that have not been subject to pressure, which appears from 6 to 12 hours. The discoloration becomes "fixed" after approximately 8-12 hours, which is confirmed when applied digital pressure no longer displaces the blood in the vessels. Warmer ambient temperatures lead to a more rapid onset and fixation of lividity.

**Gastric content and relationship to time of death**

10.    Gastric content usually empties approximately 4 hours after a meal, though it may be delayed if a meal is particularly large, and if the decedent drank alcohol. It can also be delayed by pre-existing medical conditions that cause gastroparesis, like diabetes mellitus.

**Relevant dates and times to observed findings of rigor mortis and livor mortis**

11.    According to the Investigation Report of the Collin County Medical Examiner's Office, James Mosqueda and Amy Kitchen were last known to be alive on Friday, November 3, 2000 at 10:30 p.m.  Their deceased bodies were found during a wellness check the next day, Saturday, November 4, 2000, at 4:27 p.m., i.e., approximately 18 hours later.

12.    The autopsy of James Mosqueda was performed on Sunday, November 5, 2000, at 8:15 a.m.

13.    The autopsy of Amy Kitchen was performed on Sunday, November 5, 2000, at 2:30 p.m.

**James Mosqueda: observations of rigor mortis, livor mortis, and gastric content**

14.    According to the investigative report for James Mosqueda, dated November 4, 2000, at 6:30 p.m. rigor mortis was observed in Mr. Mosqueda's jaw, arms, and legs at the time of that report. Livor mortis was observed in his back and the posterior of his arms and legs, consistent with the position in which he was found, lying on his back. The scene temperature was noted to be "warm."

000110

15.     According to the autopsy report dated Nov. 5, 2000, at 8:15 a.m. James Mosqueda weighed 200 pounds, was clad in a T-shirt and boxer shorts, and  was described as having lividity which was "fixed over the back and normal in color. Rigidity is absent in the neck, but marked throughout the remainder of the body." His gastric content consisted of "1100 mL of partially digested food and chyme" and is not described further.

**Amy Kitchen: observations of rigor mortis, livor mortis, and gastric content**

16.     According to the investigation report pertaining to Amy Kitchen (dated November 4, 2000, at 6:30 p.m.), rigor mortis was "setting in" in the jaw, but the legs and extremities were "moveable" at the time of that report.  The report indicates that livor mortis was observed in the abdomen, legs, and arms, consistent with the body in the prone position in which it was found. The scene temperature was noted to be "warm."

17.     According to the autopsy report dated November 5, 2000, at 2:30 p.m. Amy Kitchen weighed 139 pounds and was clad in T shirt, shorts, bra, panties and socks. Her lividity was "fixed over the front of the body and normal in color. Rigidity is absent in the neck, moderate in the arms and marked in the jaw and legs." Her gastric content consisted of 350 ml of "chyme" and is not further described.

**Analysis of Post-Mortem Interval**

18.     It is my opinion that James Mosqueda and Amy Kitchen died closer in time to when their bodies were found than to when they were last seen alive. This is evidenced by the the "warm" scene temperature combined with the apparent observed early onset of rigor in both individuals, with more advanced rigor in James than in Amy, consistent with his heavier weight and the fact that he would have been partially insulated by bedding. Had they died closer to the time they were last seen alive, I would have expected that Amy Kitchen, given the warm ambient temperature, would have been in full rigor and that her extremities would have been fully stiff. I estimate that the two victims were likely killed more than 8 but less than 12 hours prior to when they were examined by the

000111

death scene investigator on November 4, 2000 at 18:30, which means that the time of death was likely in the morning hours of November 4th.

19.     It is notable that while James had a full stomach with over 1 liter of gastric content, Amy's gastric content was minimal, suggesting that he had eaten a large meal within approximately 4 hours of death, but she had not. The medical examiner should have been asked at trial if he remembered the type of food in James' stomach, since if the foods did not match the decedent's last witnessed evening meal, that might have also helped to narrow down the post-mortem interval to the following morning.

**Analysis of Injuries**

20.     According to the autopsy report and autopsy photographs for James Mosqueda, he sustained two gunshot wounds, one to the right side of his head and the other to the left neck. The autopsy report documents a 5/8 by 1/4 inch contusion to the superior left shoulder, but no injuries consistent with blunt force trauma consistent with a beating or kick to the face. The skin over the shoulder contusion was intact and this would not have generated blood stain evidence on the wall or bedding. Only the gunshot wounds appear to breach the skin to be a source of blood stain evidence. There were no blunt force defensive injuries to his extremities.

21.     According to the autopsy report and autopsy photographs of Amy Kitchen, she sustained four gunshot wounds:  to the top of the head, left scapular area, center back, and posterior left arm.  The fourth bullet passed through Ms. Kitchen's arm and re-entered her left breast. The autopsy report documents no injuries consistent with blunt force trauma such as beating or kicking to the face. Only the gunshot wounds appear to breach the skin to be a source of blood stain evidence. There were no blunt force defensive injuries to her extremities.

22.     Neither Mr. Mosqueda nor Ms. Kitchen sustained blunt force traumatic injuries consistent with being beaten or kicked in the face.

I declare under 28 U.S.C 1746 and the Texas Civil Practice and Remedies Code under penalty of perjury and under the laws of the United States of America and Texas, that the foregoing is true and correct.

Executed on the 17th day of April, 2022, in Houston, Texas.

Judy Melinek MD

000113

**EXHIBIT 7**

000114

# DECLARATION OF DR. PRIYA BANERJEE, M.D.

1.      My name is Dr. Priya Banerjee.  I am a board-certified anatomic and forensic pathologist with experience handling a wide variety of cases involving all manners of death.  Since 2012, I have served as a clinical assistant professor in the Department of Pathology and Laboratory Medicine at Brown University in Providence, Rhode Island. In addition, I am president and founder of Anchor Forensic Pathology, LLC, through which I offer private autopsies, second autopsy review, legal consulting, and other forensic pathology services. My expertise includes cause and manner of death, injury/wound interpretation, forensic toxicology, gunshot and stab wounds, and crime scene analysis.

2.      I received my Bachelor of Science degree in cell, molecular biology, and genetics *magna cum laude* from the University of Maryland, College Park in 2000. I received my Doctor of Medicine degree from the University of Pennsylvania School of Medicine in 2004.  I then served my residency in anatomical and clinical pathology at the Johns Hopkins Hospital in Baltimore, Maryland, and served as a fellow in forensic pathology with the Office of Chief Medical Examiner for the State of Maryland.

3.      Over the course of my career, I have performed over 3,000 autopsies, including more than 160 homicides.  My expertise is often requested by police and other law enforcement agencies.  I have qualified in multiple states as an expert witness in the fields of forensic pathology, postmortem toxicology interpretation, trauma interpretation, and cause and manner of death determination. I have also published in multiple peer-reviewed journals on postmortem diagnoses such as infection, tumor diagnosis, and toxicology.

4.      In April or May 2022, I was contacted by Matt Duff, a private criminal investigator who told me he was conducting an investigation into the case of Ivan Cantu, a Texas death row inmate, for a podcast series called "Cousins by Blood." My understanding is that Mr. Duff was conducting an independent investigation of the Cantu case on his own initiative and that he was not affiliated with either the

1

prosecution or the defense. I provided my professional opinion without any
compensation.

5.  Mr. Duff provided me with the following materials related to the Cantu
case to review:

- the autopsy report of James Edwin Mosqueda, Collin County Medical
  Examiner's Office, Case No. CC-1162-00, dated November 5, 2000;

- the autopsy report of Amy Michelle Kitchen, Collin County Medical
  Examiner's Office, Case No. CC-1163-00, dated November 5, 2000;

- the handwritten investigation report by field agent B Atkinson of the
  Collin County Medical Examiner's Office, Case No. 1162-00;

- the handwritten investigation report by field agent B Atkinson of the
  Collin County Medical Examiner's Office, Case No. 1163-00; and

- color and black-and-white crime-scene and autopsy photographs from
  Case Nos. 1162-00 and 1163-00.

6.  After I reviewed these materials, I was interviewed by Mr. Duff and
excerpts from our audio-recorded interview were used in the "Cousins by Blood"
podcast.

7.  I have recently been contacted by a member of Ivan Cantu's defense
team and asked to review the materials set out in paragraph 5 for the specific
purpose of providing this declaration. I have been asked to address two specific
questions: (1) whether the degree of rigor mortis and livor mortis reported in the
Collin County Medical Examiner's Office's investigation report and autopsy report
support a conclusion that Mr. Mosqueda and Ms. Kitchen were killed between 11:30
pm. on November 3, 2000, and 12:30 a.m. on November 4, 2000; and (2) whether
either of the decedents sustained any injuries consistent with blunt force trauma
from being beaten or kicked in the face.

2

8.    Rigor mortis is a key postmortem change which aids in estimation in the time of death. The scene investigation is essential in evaluation and documentation of it. Based on the records reviewed, Ms. Kitchen had rigor mortis just starting to appear ("setting in") and later at autopsy it is absent. It is best estimated that her time of death is approximately less 8 to 10 hours before evaluation.

9.    Similarly, Mr. Mosqueda had rigor mortis present at the scene investigation and still present at autopsy. So, his time of death is also estimated to be approximately less than 12 hours before evaluation at the scene.

10.    Together, the rigor mortis is the more reliably documented postmortem change in these cases to estimate their time of death. With the essential understanding of the formation and disappearance of rigor mortis, their time of death is estimated to be approximately 12 hour or less from the time of medical examiner's scene investigation.

11.    According to the autopsy report pertaining to James Mosqueda, he sustained two gunshot wounds, one to the right side of his head and the other to the left neck.

12.    The autopsy report for Mr. Mosqueda documents no injuries consistent with blunt force trauma from beating or kicking. Any blunt force injury sustained before physiologic death would be manifested as abrasions, contusions, lacerations and/or fractures with bleeding in the soft tissues. No such injuries, unrelated to the gunshot wounds, are identified in either individual.

13.    According to the autopsy report pertaining to Amy Kitchen, she sustained four gunshot wounds:  one to the top of the head, a second to the left scapular area, a third to the center of her back, and a fourth to the posterior left arm.  The fourth bullet passed through Ms. Kitchen's arm and then entered her left breast.

14.    The autopsy report for Ms. Kitchen documents no injuries consistent with blunt force trauma such as beating or kicking her in the face.

3

000117

15.     From my own review of the crime scene and autopsy photographs in addition to the above autopsy reports, I conclude that neither Mr. Mosqueda nor Ms. Kitchen sustained blunt force trauma injuries consistent with beating or being kicked in the face.

Signed,

Priya Banerjee, MD

Board Certified Anatomic and Forensic Pathologist

4

000118

**EXHIBIT 8**

000119

COMPLAINANT: **Mosqueda, James**

SERVICE #: **863688-J**
FOR DET. : **A. Winn #5766**

## INVESTIGATIVE INFORMATION

SUBMITTING OFFICER:  **R.E. Loboda #4881**  DATE: **11/05/00**
INFO OBTAINED VIA: **Telephone**
OBTAINED ON DATE:   **11/05/00**  AT TIME:  **4:03pm**


TOPIC: **Telephone call from Mr. Mark Kitchen**

NARRATIVE:

On the listed date and time, the Reporting Detective received a telephone call from **Mr. Mark Kitchen,** who identified himself as the brother of victim **Amy Kitchen.**

**Mr. Kitchen** requested that the following information be passed on to **Det. Winn.**   **Mr. Kitchen** stated that the complainant (**James Mosqueda** had a pager.  He identified the pager number as: ████

Additionally he stated that on the night that the complainant was found, he was at the offense location, along with a friend he identified as **Ms. Cecilia Pecararo,** who was at the location to translate.  He stated that while at the scene he was approached by an individual who identified himself as **Mr. Frank Perez.**  He stated that **Mr. Perez** identified himself as a friend and business associate of the complainant, and also stated that he had been living with both complainants for about three (3) weeks.  He stated that **Mr. Perez** was driving a black Ford Ranger truck, Tx plates #2KHH91.  He stated that **Mr. Perez** gave him his cellular phone number, which he stated was: ████

He stated that while talking to **Mr. Perez,** he told him that he had just had his truck serviced that day (Saturday), at Belargin Ford, where he got his oil changed.  **Mr. Kitchen** stated that **Mr. Perez** told him that his service manager was **Mr. Jim Iowa.**

**Mr. Kitchen** stated that he was talking to **Ms. Pecararo** about **Mr. Perez,** and that she told him that she thought that **Mr. Perez** was acting very strange and suspicious.  **Mr. Kitchen** stated that she told him that while she was at the location **Mr. Perez** was using his sweater to open a door and turn the lights on, as if he didn't want to leave his fingerprints on anything.  Additionally, she told him that **Mr. Perez** said, "They weren't killed last night, they were killed today."  He stated that this statement made **Ms. Pecararo** uneasy.

**Mr. Kitchen** provided the following information for **Ms. Pecararo** in the event that she needs to be contacted.

2

Follow up required: Yes          No          Key words:_____

Supervisor Approval: _____    _____
Document4

000120

**EXHIBIT 9**

# Signed Declaration Of Facts

My name is Thomas Houran.  I am 51 years of age and a resident of Collin County, Texas.

I make the following statement of my own free will to John "Stewart" Fillmore who has identified himself to me as a Private Investigator licensed by the State of Texas (license number 00061254).  No promises or threats have been made to me.  I am of sound mind.  To the absolute best of my memory and knowledge, the following statement is true and correct:

On or around Sunday, October 29, 2000, I was at the apartment of Kyle Every in Dallas, Texas.  I encountered Ivan Abner Cantu, an individual I have known since childhood.  Cantu introduced me to Amy Boettcher.  Cantu told me he and Amy were engaged to be married.  I observed Amy Boettcher to be wearing a small diamond engagement ring.  It was not extravagant. I am not specifically familiar with the detailed characteristics of engagement rings but the ring generally looked consistent with something Ivan Cantu could have afforded.

I recall that Ivan Cantu was wearing a black suit and Amy Boettcher was wearing a party dress.  Ivan appeared to me to be under the influence of drugs but was positive and seemed happy.

Approximately six months prior to the murders of James Mosqueda and Amy Kitchen, I encountered Ivan Cantu at a local bar. He was driving James Mosqueda's Corvette. To the best of my knowledge, Cantu was driving the Corvette with Mosqueda's permission.

During the investigation of the murders of James Mosqueda and Amy Kitchen, I was never contacted by any investigator by the state or the defense.  I provided no depositions or testimony nor was I called to testify at trial.  Had I been contacted I would have been available to testify, and would have testified consistently at trial.

I declare the foregoing is true and correct under the penalty of perjury under the laws of the State of Texas.

Executed in Collin County, State of Texas, on the fourth day of April, 2023

_____                    _____
Thomas Houran                           John "Stewart" Fillmore witness

4/4/2023

000122

**EXHIBIT 10**

# Signed Declaration Of Facts

My name is Steve Oliver Mayr.  I am 50 years of age and a resident of McClennan County, Texas.

I make the following statement of my own free will to John "Stewart" Fillmore who has identified himself to me as a Private Investigator licensed by the State of Texas (license number 00061254).  No promises or threats have been made to me.  I am of sound mind.  To the absolute best of my memory and knowledge, the following statement is true and correct:

On or around Sunday, October 29, 2000 I encountered Ivan Abner Cantu and Amy Boettcher in Dallas, Texas at Laura's Last Chance, a restaurant/bar. I had known Ivan Cantu approximately six months at the time.  Ivan Cantu told me he and Amy Boettcher were engaged to be married.  Amy was wearing an engagement ring.  Both seemed to be happy and in good spirits.  I am certain I never saw Ivan Cantu or Amy Boettcher after they returned to Texas from Arkansas.

During the investigation of the murders of James Mosqueda and Amy Kitchen, I was never contacted by any investigator by the state or the defense.  I provided no depositions or testimony nor was I called to testify at trial.  Had I been contacted I would have been available to testify, and would have testified consistently at trial.

I declare the foregoing is true and correct under the penalty of perjury under the laws of the State of Texas.

Executed in Bell County, State of Texas, on the fourth day of April, 2023

_Steve Oliver Mayr_

Steve Oliver Mayr

NOTARY PUBLIC
STATE OF TEXAS

TAMMY HAYES
Notary ID #134097458
My Commission Expires
December 8, 2026

_Tammy Hayes, 12-8-26_

000124

**EXHIBIT 11**

000125

AFFADAVIT/ Ivan Cantu case

My name is Susan Eichenberg ( at the time of the crime Susan Iliff. I reside at ████████
████████

On 11/04/2000, I responded to a welfare check on 18663 Gibbons, Dallas, Texas (Collin County).
Upon arrival, two deceased persons were discovered upon entering the residence. Subsequent to
securing the crime scene, an individual by the name of Sylvia Cantu expressed concern for the safety of
her son, Ivan Cantu.

Subsequently, as a response to her concerns, myself and Officer Steven Junger responded to the
apartment of her son. Upon obtaining a key from the apartment manager, Steven and I entered the
residence to conduct a welfare check on Ivan Cantu.

Search results were negative for any crime scene activity save and except a bullet hole in the wall by
the front door. To the best of my recollection, the search lasted approximately ten minutes. During that
search, I entered the small kitchen. I did not observe any clothing or later discovered evidence in the
garbage can. I believe this would have been discovered by myself, Junger or Sylvia Cantu during the
search, leading me to believe the evidence in the trash can was not there at the time of the search. The
search was thorough and I am positive this evidence would have been seen. Further, my recollection is
that the lid was on the trash can was closed at the time of the search.

I hereby state that the information above is true, to the best of my knowledge. I also confirm that the
above is accurate and complete, and relevant information has not been omitted.

Signature of the individual *Susan J Eichenberg*

Date 1/29/2020

Appeared before me and signed this document on 29th day of January 2020 2019

State of North Dakota
County of Cass
The foregoing instrument was acknowledged before me
This 29th day of January, 20 20.
By Deshad Mosaei
Notary Public

DESHAD MOSAEI
Notary Public
State of North Dakota
My Commission Expires Sept. 21, 2021

S-17

000126

**EXHIBIT 12**

000127

# Warrant of Arrest & Detention

Collin County, Texas

(1)
[x] **Felony**

[ ] **Misdemeanor**

**Warrant Number (2)**

F00.863688

**Bail Amount $ (3)**
1,000,000

In the name of the State of Texas to any Sheriff or other Peace Officer of the State of Texas — Greetings:

You are hereby commanded to take instanter the body of:

(4) Cantu, Ivan, Abner

hereinafter called the accused, and him safely keep so that he may be dealt with according to law, and to hold the accused to answer to the State of Texas for an offense against the laws of the said State, namely:

(5) Capital Murder  Texas Penal Code Capital Felony

of which (misdemeanor) (felony) offense he is accused by written complaint, made under oath that has been presented to me and that is by this reference incorporated herein for all purposes.

Witness my signature this ___(6) 9___ day of _November_ 20_00_.

Magistrate
Municipal Court
City of Dallas, Texas

## ADMINISTRATIVE DATA
ALL BLANKS MUST BE COMPLETED OR INDICATE "UNKNOWN"

**(8)** State of Texas vs. Cantu, Ivan, Abner

**(9)** Arrest Status  Dallas County Jail

**(10)** Race  L   **(11)** Sex  M   **(12)** D.O.B. ▇   **(13)** Ht.  507   **(14)** Wt.  140   **(15)** Hair Color  Blac   **(16)** Eye Color  brow

**(17)** Residence Address  4753 Old Bent Tree Lane 1004   **(18)** Driver's Lic. # ▇   **(19)** State  Tx

**(20)** Business Address  N/A   **(21)** Business Name  N/A

**(22)** Complainant  Kitchen, Amy

**(23)** Date of Offense  11-04-00   Arrest Warrant Issued To  D.S.O. / D.P.D.

or County Use Only) (24)

POI-01672  REV-02/90

S/N 753-027-209

000128

**EXHIBIT 13**

# Affidavit

My name is William Brad Bobbitt, my date of birth is ████████ and I am over 18 years of age. My address is: ███████████████████████

My phone number is: ████████████

I met Ivan Cantu the summer of 2000. Ivan and I were roommates for about 2 months.

At that time, I wore a 32x30 in jeans. During the time we lived together, I put tried to put on and wear a pair of Ivan's jeans.

Ivan's jeans would not fit me. They were too small and I could not get into his jeans. Ivan had a thinner waist and was a few inches shorter than me.

My best estimate would be that Ivan wore a 30x30 or 30x28. Ivan moved out of my apartment around September of 2000, less than 2 months before the murders.

I never knew Ivan to wear baggy jeans. We both wore normal fitting jeans.

Also, I never saw Ivan with a gun or thought he owned a gun.

I hereby state that the information above is true, to the best of my knowledge. I also confirm that the information here is both accurate and complete, and relevant information has not been omitted.

Signature of Individual

_William B Bobbitt_

Date

_10/30/19_

Appeared before me and signed this document on 30th day of _October_ 2019.

Notary _S. Samani_    My commission date expires _1/18/23_

SALIMAH H SAMANI
Notary Public
STATE OF TEXAS
My Comm. Exp. 01-18-23
Notary ID # 13186169-9

000130

**EXHIBIT 14**

000131

**Hyperlink to video interview of Jeff Boettcher**

000132

**EXHIBIT 15**

My name is Jason L Harrelson, born ▮▮▮▮▮▮

I worked for James Mosqueda off and on for approximately 3 years, from 1994 to 1997. I worked at his tanning salons; 10-Minute Tan, located in Dallas.

While working there, I was aware of an acquaintance of James, who I knew as Matt. I was told he was from the Houston area. I called him Matt Houston, like the 1980's private investigator TV Show.

Matt was a Hispanic male. I would estimate mid to late 30's back in 1996, 1997.
Matt would visit James occasionally at the tanning salon. I would estimate, in the 3 years I worked there, he came by 6 to 8 times. When he would come, from what I remember they would go out to lunch or somewhere else. I did not see what vehicle Matt was driving.

Matt and James would talk in Spanish, I don't speak Spanish so I never knew what they were talking about. He would also call the tanning salon and talk to James in Spanish.

On Wednesday February 14th 2024, private investigator Matt Duff texted me the picture attached below.



This is the man I knew as Matt. Based on this picture, I am positive that was Matt. The man that would call and visit James at the tanning salon.

I declare the forgoing is true and correct under the penalty of perjury under the laws of the State of Texas.

Jason Harrelson
2-17-2024

000134

**EXHIBIT 16**

# REGISTER OF ACTIONS
## CASE NO. CR-2407-97-H

| | | |
|---|---|---|
| The State of Texas vs MATEO SALINAS GONZALEZ | § § § § § § | Case Type: **Adult Felony**<br>Date Filed: **10/08/1997**<br>Location: **389th District Court** |

---

### RELATED CASE INFORMATION

**Related Cases**
  CR-2407-97-H (Related Case)

---

### PARTY INFORMATION

| | | |
|---|---|---|
| Defendant | **GONZALEZ, MATEO SALINAS** | **Attorneys**<br>**JESUS R. CANALES**<br>*Retained*<br>956-546-7766(W) |
| State | **State Of Texas** | |

---

### CHARGE INFORMATION

| Charges: GONZALEZ, MATEO SALINAS | Statute | Level | Date |
|---|---|---|---|
| 1.  POSS MARIJ >50LBS<=2,000LBS | 481.121(b)(5) | Felony 2nd Degree | 09/19/1997 |

---

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

| | |
|---|---|
| 05/06/2004 | **Disposition** (Judicial Officer: Lopez, Letty)<br>  1. POSS MARIJ >50LBS<=2,000LBS<br>    Deferred |
| 05/06/2004 | **Plea** (Judicial Officer: Lopez, Letty)<br>  1. POSS MARIJ >50LBS<=2,000LBS<br>    Guilty |
| 05/06/2004 | **Sentenced - Other** (Judicial Officer: Lopez, Letty)<br>  1. POSS MARIJ >50LBS<=2,000LBS<br>    Converted Disposition:<br>      Sentence Date: May 6 2004 12:00AM Fine: $500.00 Volume/Page: 101; 279<br>      CSCD 2 Years , 0 Months , 0 Days with Community Service of 0 Hours |

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 10/08/1997 | **CASC**<br>  *Def Status: B; Current Bond Amount: 3000;* |
| 10/23/1997 | **Arraignment**  (9:00 AM) (Judicial Officer Lopez, Letty)<br>  *Hearing Type: ARR Hearing Type Description: ARRAIGNMENT* |
| 11/19/1997 | **Pre-Trial Hearing**  (9:00 AM) (Judicial Officer Lopez, Letty)<br>  *Hearing Type: PT Hearing Type Description: PRETRIAL HEARING* |
| 12/01/1997 | **Pre-Trial Hearing**  (9:00 AM) (Judicial Officer Lopez, Letty)<br>  *Hearing Type: PT Hearing Type Description: PRETRIAL HEARING* |
| 12/05/1997 | **Motion To Strike**  (9:00 AM) (Judicial Officer Lopez, Letty)<br>  *Hearing Type: MTS Hearing Type Description: MOTION TO SUPPRESS* |
| 12/12/1997 | **Order Denying Defendant Mot to Strike 2nd Amended Pet Signed** (Judicial Officer: Lopez, Letty ) |
| 12/15/1997 | **Jury Trial**  (9:00 AM) (Judicial Officer Lopez, Letty)<br>  *Hearing Type: JT Hearing Type Description: JURY TRIAL* |
| 01/12/1998 | **Pre-Trial Hearing**  (9:00 AM) (Judicial Officer Lopez, Letty)<br>  *Hearing Type: PT Hearing Type Description: PRETRIAL HEARING* |
| 01/20/1998 | **Jury Trial**  (9:00 AM) (Judicial Officer Lopez, Letty)<br>  *Hearing Type: JT Hearing Type Description: JURY TRIAL* |
| 01/23/1998 | **Jury Trial**  (9:00 AM) (Judicial Officer Lopez, Letty)<br>  *Hearing Type: JT Hearing Type Description: JURY TRIAL* |
| 01/26/1998 | **Jury Trial**  (9:00 AM) (Judicial Officer Lopez, Letty)<br>  *Hearing Type: JT Hearing Type Description: JURY TRIAL*<br>  Result: NISI |
| 12/28/1998 | **Other**<br>  *JUDGMENT NISI FILED* |
| 01/05/1999 | **Judgment NISI, Signed** |
| 01/14/1999 | **Judgment NISI, Signed** |
| 01/14/1999 | **Citation**<br>  *CIT ISSUED TO SURETY* |
| 01/14/1999 | **Citation**<br>  *CIT ISSUED TO DEFT BY C/M. VOL: 44 PAGE: 921* |

| | |
|---|---|
| | 000136/Book 44, Page 921 |
| 12/11/2000 | **Order of Transfer, Signed** |
| | *CASE TRANSFERRED TO THE 389TH DISTRICT COURT* |
| 02/12/2003 | **Order Setting Bond Forfeiture Trial** |
| | *SIGNED AND SET FOR 05/07/03 @ 9:00 A.M. COPY WAS MAILED TO O. CASTANEDA BAIL BONDS AND TO D.A. OCTAVIO CASTANEDA.* |
| 05/06/2003 | **File Sent to District Court** |
| 05/07/2003 | **File Sent to District Clerk** |
| 05/07/2003 | **Court Entry** |
| | *CASE CALLED BY JUDGE HOMER SALINAS: D.A. DAVID REYES PRESENT; CASE RESET TO 10/08/03 @ 9:00 A.M.* |
| 05/07/2003 | **Bond Forfeiture**  (9:00 AM) (Judicial Officer Lopez, Letty) |
| | *Hearing Type: BFT Hearing Type Description: Bond Forfeiture Trial Feb 11 2003 @ 9:00 a.m. Bondsman Octavio Castaneda* |
| 10/08/2003 | **File Sent to District Court** |
| 10/08/2003 | **Order Setting Bond Forfeiture Trial** |
| | *SIGNED AND SET FOR 12/03/03 @ 9:00 A.M. COPY WAS MAILED TO DEFENDANT-SURETY OCTAVIO CASTANEDA AND DEFENDANT-PRINCIPAL MATEO SALINAS GONZALEZ AND GIVEN TO D.A. JEFF GILBERT.* |
| 10/08/2003 | **Bond Forfeiture**  (9:00 AM) (Judicial Officer Lopez, Letty) |
| | *Hearing Type: BFT Hearing Type Description: Bond Forfeiture Trial May 7 2003 @ 9:00 a.m. Bondsman Octavio Castaneda* |
| 10/09/2003 | **File Sent to District Clerk** |
| 12/03/2003 | **Case Passed** |
| | *CONFERENCE WITH D.A. JEFF GILBERT AND BONDSMAN DAVID JONES; CASE RESET TO 03/26/04 @ 9:00 A.M.* |
| 12/03/2003 | **Bond Forfeiture**  (9:00 AM) (Judicial Officer Lopez, Letty) |
| | *Hearing Type: BFT Hearing Type Description: Bond Forfeiture Trial Oct 9 2003 @ 9:00 a.m. Bondsman Octavio Castaneda* |
| 03/25/2004 | **Other** |
| | *TAKEN BY CINDY FROM FORFEITURES* |
| 03/26/2004 | **Court Entry** |
| | *CONFERENCE WITH BONDSMAN DAVE JONES FROM CASTANEDA BAIL BONDS. CASE RESET FOR 04/28/04 @ 9:00 A.M.* |
| 03/26/2004 | **Bond Forfeiture**  (9:00 AM) (Judicial Officer Lopez, Letty) |
| | *Hearing Type: BFT Hearing Type Description: Bond Forfeiture Trial Dec 3 2003 @ 9:00 a.m. Bondsman Octavio Castaneda* |
| 04/02/2004 | **Court Entry** |
| | *WAS FAXED TO ATTY RICK CANALES AND GIVEN TO THE D.A.'S OFFICE TO ADVISE CASE IS SET FOR PRE TRIAL ALONG WITH MOTION TO RECALL JUDGMENT NISI ON 04/21/04 @9:00 A.M.* |
| 04/02/2004 | **Other** |
| | *APPEARANCE OF COUNSEL, FILED.* |
| 04/14/2004 | **Request** |
| | *REQUEST FOR NOTICE OF INTENT TO OFFER EXTRANEOUS CONDUCT UNDER RULE 404(B) AND EVIDENCE OF CONVICTION UNDER RULE 609(F) AND EVIDENCE OF AN EXTRANEOUS CRIME OR BAD ACT UNDER ARTICLE 37.07, FILED* |
| 04/14/2004 | **Motion** |
| | *MOTION FOR DISCOVERY OF EXCULPATORY AND MITIGATING EVIDENCE, FILED* |
| 04/14/2004 | **Motion** |
| | *MOTION TO SUPPRESS STATEMENTS, FILED* |
| 04/14/2004 | **Motion** |
| | *MOTION FOR WITNESS LIST, FILED* |
| 04/14/2004 | **Motion** |
| | *MOTION FOR DISCOVERY, FILED* |
| 04/16/2004 | **Phone Call** |
| | *CONFERENCE HELD WITH ATTY RICK CANALES. STATE PRESENT. PRETRIAL SET FOR 04/21/04 WAS MOVED TO 04/27/04 @ 9:00 A.M. ALONG WITH MOTION TO RECALL JUDGMENT NISI.* |
| 04/27/2004 | **Court Entry** |
| | *DEF. PRESENT WITH ATTY. RICK CANALES DEF. ARRAIGNED SET FOR PT-5.6.04 AND TM- 5.10.04 @ 9:00 A.M.* |
| 04/27/2004 | **Judgment NISI Dismissed** |
| | *CAPIAS RECALLED AT THE DEFENDANTS EXPENSE. ORDER SIGNED BY JUDGE LETTY LOPEZ. COPY OF ORDER WAS FORWARDED TO THE SHERIFF'S OFFICE.* |
| 04/27/2004 | **Pre-Trial Hearing**  (9:00 AM) (Judicial Officer Lopez, Letty) |
| | *Hearing Type: PT Hearing Type Description: PRETRIAL HEARING Apr 2 2004 @9:00 a.m. Along with Mtn To Set Aside Nisi.* |
| 04/28/2004 | **Capias Returned** |
| 05/06/2004 | **Plead Guilty** |
| | *CASE CALLED: DEFENDANT APPEARED WITH ATTY RICK CANALES. STATE PRESENT. DEF. ENTERED A PLEA OF GUILTY TO THE INDICTMENT AND WAS SENTENCED.* |
| 05/06/2004 | **Waiver of Ten Days Notice of Negotiation Conference** |
| 05/06/2004 | **Disposition** |
| | *TERMS OF PLEA AGREEMENT: 2 YRS. PROBATION $500.00 FINE $266.25 COURT COST URINE ANALYSIS $40.00 P.F. $50.00 CRIME STOPPERS FEE AVOID THE USE OF ALCHOL AND DRUGS AVOID BARS AND CANTINAS COMPLETE 15 HR. DRUG PROGRAM NO COMMUNICATION WITH CO-DEFENDANT'S.* |
| 05/06/2004 | **Pre-Trial Hearing**  (9:00 AM) (Judicial Officer Lopez, Letty) |
| | *Hearing Type: PT Hearing Type Description: PRETRIAL HEARING Apr 27 2004 @ 9:00 a.m.* |

---

**FINANCIAL INFORMATION**

| | | | |
|---|---|---|---|
| **Defendant** GONZALEZ, MATEO SALINAS | | | |
| Total Financial Assessment | | | 766.25 |
| Total Payments and Credits | | | 766.25 |
| **Balance Due as of 02/13/2024** | | | **0.00** |
| | | | |
| 05/06/2004 | Transaction Assessment | | 766.25 |
| 05/21/2004 | Payment | Receipt # 532677 | GONZALEZ, MATEO SALINAS | (766.25) |

000137

**EXHIBIT 17**

👤 MR MATEO GONZALEZ (Male)  |  466-17-####  |  10/##/1959

---

👤 **MR MATEO GONZALEZ** (Male)  |  466-17-####  |  10/##/1959

### 🏠 Addresses (30)

PO BOX 185, TILDEN, TX 78072-0185 MCMULLEN (Jan 2018 - Feb 2024)
5407 W MILE 6 RD, MISSION, TX 78574-3822 HIDALGO (Nov 2010 - Feb 2020)
5407 W 6MI RD, MISSION, TX 78574 HIDALGO (Nov 2010 - Nov 2021)
5407 W 6 MI RD, MISSION, TX 78574 HIDALGO (Oct 2012 - Apr 2022)
5407 W 6 MILE, MISSION, TX 78574 HIDALGO (Nov 2010 - Feb 2020)
5407 W 6 MILE RR, MISSION, TX 78574 HIDALGO (Jul 2013 - Jul 2014)
5407 W 6 MILELINE RD, MISSION, TX 78574 HIDALGO (Nov 2009 - Mar 2011)
6407 W 6MI RD, MISSION, TX 78574 HIDALGO (Jun 2016 - Jun 2018)
5407 W 8 MILE RD, MISSION, TX 78574 HIDALGO (Aug 2017 - Aug 2017)
5407 W 6 MILE LN RD, MISSION, TX 78574 HIDALGO (Jun 2013 - Jun 2016)
3804 SILENT OAK DR APT 1501, EULESS, TX 76040-2573 TARRANT (Apr 2005 - May 2007)
3804 SILENT OAK DR APT 15, EULESS, TX 76040-2529 TARRANT (May 2009 - Dec 2009)
12715 N INSPIRATION RD, MISSION, TX 78573-4309 HIDALGO (Jun 2001 - Apr 2009)
12175 N INSPIRATION RD, MISSION, TX 78573-4307 HIDALGO (Dec 2004 - Jul 2005)
9833 WALNUT ST APT Q208, DALLAS, TX 75243-2876 DALLAS (Jun 1994 - Dec 2014)
4203 RIO GRANDE LN, MISSION, TX 78572-9446 HIDALGO (Mar 2000 - May 2004)
3325 E TEXAS ST APT 211, BOSSIER CITY, LA 71111-3219 BOSSIER (Oct 1999 - Jun 2004)
RR 33 BOX 7533, MISSION, TX 78574-9800 HIDALGO (Jun 2001 - Oct 2002)
RR 26 BOX 77AA, MISSION, TX 78574-9826 HIDALGO (Jun 1992 - Jan 2007)
RR 6 BOX 145, MISSION, TX 78574-9486 HIDALGO (Jul 1993 - Nov 2000)
RR 6 BOX 66D, MISSION, TX 78574-9486 HIDALGO (Jan 1988 - Dec 2000)
PO POX 77, MISSION, TX 78572 HIDALGO (Jun 1998 - Jan 1999)
145 RR 6 BOX, MISSION, TX 78572 HIDALGO (May 1992 - Apr 1996)
3626 N HALL ST APT, DALLAS, TX 75219-5105 DALLAS (Oct 1993 - Oct 1993)
6808 EASTRIDGE DR APT, DALLAS, TX 75231-6869 DALLAS (Sep 1993 - Sep 1993)
2801 W MAPLE AVE APT 131, MCALLEN, TX 78501-7316 HIDALGO (Sep 1981 - Jan 1988)
RR 2 BOX 145I, MISSION, TX 78574-9802 HIDALGO (Sep 1981 - Sep 1981)
11 BROADWAY STE 1600, NEW YORK, NY 10004-1303 NEW YORK (Nov 2017 - Feb 2018)
PO BOX 394, KARNES CITY, TX 78118-0394 KARNES (Jun 2015 - Nov 2017)
RR 6 BOX 77A, MISSION, TX 78574-9486 HIDALGO (Oct 1997 - Oct 1997)

### 📞 Phones (6)

(956) 391-5416 ⭐⭐⭐⭐ - Wireless - (Jul 12 - Jul 12)
(361) 354-9018 ⭐⭐⭐⭐ - Mobile
(956) 424-3237 ⭐⭐⭐⭐

### 🗄 Utilities

No Utilities Found

### 🔧 Criminal & Traffic Records (15)

04/20/2014 - DWI 3RD
09/19/1997 - POSS MARIJ >50LBS<=2,000LBS
07/03/1990 - POSS CONT SUB
07/03/1990 - DWI 2ND
07/03/1990 - EVADE ARREST
07/03/1990 - DWLSB
07/03/1990 - FSRA
01/05/1988 - UCW
01/05/1988 - POSS MJ 2
01/05/1988 - DWI
04/20/2014
09/19/1997
12/05/1988 - DWI
09/19/1997 - NOT SPECIFIED
04/20/2014 - NOT SPECIFIED

### 🗄 People at Work

No People at Work Found

### 🚗 Vehicles (12)

2012 Chevrolet Avalanche - 3GNMCFE08CG153446 - FZZ0279 (TX)
2017 Ford Taurus - 1FAHP2D81HG110638 - LKC6413 (TX)
1998 Jeep Grand Cherokee - 1J4GZ58S6WC206089 - CZ3T261 (TX)
2002 Chevrolet Avalanche - 3GNEK13TX2G106313 - CFF2067 (TX)
1998 Ford Windstar - 2FMZA5149WBE00712 - M47CSX (TX)
1986 Honda Accord - 1HGBA7439GA137074 - N43ZTG (TX)

1984 Ford F150   2FTEF14FXECA62322   ZE1458 (TX)
1989 Ford F150 - 1FTEX15N6KKB12594 - 4Z1H57 (TX)
000139
1989 Lincoln Town Car - 1LNBM81FXKY787571 - YJC17R (TX)
1976 CHEVROLET 20/2500 - CCS246S112206 - 2VWX01 (TX)
1989 Ford F250 - 1FTHF26H1KKA65392
1986 Ford F150 - 1FTEF14N1GPB78145

## 📇 Drivers Licenses (7)

######## - TX (10/22/2010 - NA)
######## - TX (12/03/1975 - NA)
######## - TX
######## - TX
######## - TX
######## - TX
######## - TX

## 👤 Aliases (4)

MATEO GONZALEZ (Male)
MATT GONZALES
MATT GONZALEZ
MATIO GONZALEZ

## 👤 Imposters

No Imposters Found

## 🪓 Bankruptcies

No Bankruptcies Found

## 🪓 Liens & Judgments (1)

05/19/1992 - TX

## 🪓 Foreclosures

No Foreclosures Found

## 🏠 Properties (3)

DOFFING #1 E 147.6' OF W 315.20' OF S 147.6' LOT 210 .50 AC NET
GOODWIN #3A S74'-E648.5 BNG AN IRR TRACT LOT 65 0.55AC NET
GOODWIN #3A LT 64 EXC S294'-E648.57' BEING AN IRR TR 5.23AC

## 🪓 Civil Court Records

No Civil Court Records Found

## 🪓 Notice of Defaults

No Notice of Defaults Found

## 🏦 UCC Filings

No UCC Filings Found

## 🏦 Corporate Affiliations

No Corporate Affiliations Found

## 🪓 Sexual Offenses

No Sexual Offenses Found

## 🏛 Possible Student Records

No Possible Student Records Found

## 📇 Voter Registrations (1)

05/19/2001 (Texas)

## 📇 Professional Licenses

No Professional Licenses Found

## Relatives (19)

(1st) JUNE BERTHA ROSE - 08/##/1969 - Wife (54)
(1st) ARNOLDO GONZALEZ - 12/##/1960 - Brother (63)
(1st) ALEJANDRO MATEO GONZALEZ - 03/##/1991 - Son (32)
(1st) AZUCENA SALINAS GONZALES - 11/##/1933 - Parent (90)
(1st) MYRTHALA PATRICIA GONZALEZ - 06/##/1963 - Sister (60)
(1st) JUNE R GONZALEZ
(1st) ARNOLDO GONZALEZ - 12/##/1986 - Son (37)
(1st) BERTHA ALICIA GONZALEZ - 12/##/1981 - Daughter (42)
(1st) MARIA DEL ROBLE GONZALEZ - 03/##/1973 (50)
(1st) ARNULFO PADILLA GONZALEZ - 02/##/1972 - Brother (52)
(1st) DAISY ABAD GONZALEZ - 04/##/1988 - Child (35)
(1st) MACARIO GONZALES - 07/##/1932 - Father (91)
(1st) EDNA G GUERRA - 01/##/1964 (60)
(1st) ARNULFO ALDAY GONZALEZ - 03/##/1970 - Brother (53)
(1st) SUZANNA GONZALEZ - 01/##/1998 - Daughter (26)
(1st) SONIA GONZALEZ OLIVAREZ - 09/##/1962 (61)
(1st) GENARO PADILLA GONZALES - 02/##/1970 - Brother (53)
(1st) ARNULFO CHAVEZ GONZALEZ - 08/##/1948 - Brother (75)
(1st) MYRIAM DENISSE GONZALEZ - 05/##/1991 - Daughter (32)

## Associates (5)

TIMOTHY CLEMENTS CUSHMAN - 05/##/1978
JOHN MICHAEL OLIVAREZ - 11/##/1960
ROSENDO W OLIVAREZ - 08/##/1937
SABRINA JENISE OLIVAREZ - 08/##/1986
JOHN DAVID OLIVAREZ - 01/##/1983

## Neighbors (2)

5407 W 6 MILE, MISSION, TX 78574 HIDALGO
5407 W MILE 6 RD, MISSION, TX 78574-3822 HIDALGO

## Weapon Permits

No Weapon Permits Found

## Controlled Substances

No Controlled Substances Found

## Historical Neighbors (4)

5407 W MILE 6 RD, MISSION, TX 78574-3822 HIDALGO
5407 W 6MI RD, MISSION, TX 78574 HIDALGO
5407 W 6 MILE, MISSION, TX 78574 HIDALGO
5407 W 6 MI RD, MISSION, TX 78574 HIDALGO

## FAA Certifications

No FAA Certifications Found

## Hunting & Fishing Licenses

No Hunting & Fishing Licenses Found

## Firearm & Explosive Permits

No Firearm & Explosive Permits Found

## Aircrafts

No Aircrafts Found

 ## Watercrafts

 ## Emails

000141

No Watercrafts Found                                        No Emails Found

Important: The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State. The criminal record data in this product or service may include records that have been expunged, sealed, or otherwise have become inaccessible to the public since the date on which the data was last updated or collected.

IRBsearch does not constitute a "consumer report" as that term is defined in the federal Fair Credit Reporting Act, 15 USC 1681 et seq. (FCRA). Accordingly, IRBsearch may not be used in whole or in part as a factor in determining eligibility for credit, insurance, employment or another permissible purpose under the FCRA.

000142

**EXHIBIT 18**

000143

# DECLARATION

My name is Stewart Fillmore. I am 60 years of age and I am a resident of Smith County, Texas. I am a retired Special Agent of the Federal Bureau of Investigation (FBI) where I was employed for 29 years. I am currently a licensed Private Investigator working for Gena Bunn, the attorney for Ivan Cantu.

On February 19, 2024, I telephonically spoke with June Rose who identified herself to me as being 54 years old and a resident of Tarrant County, Texas. Rose said she was in a common law marriage with Mateo Gonzalez for about ten years from approximately 1996 to approximately 2006 or 2007. Rose said she had known Mateo Gonzalez (who is now deceased but commonly went by "Matt") since she was about 18 years old. They were friends for many years before we became common law married.

Rose said that Matt knew James Mosqueda since the late 1980's or the early 1990s. They were close friends in those early years.

Rose said she was aware that Matt sold marijuana. She added that Matt had gone to prison for selling marijuana and it caused the break up of their marriage in 2006 or 2007. Rose was unaware of any specifics, but said Matt had sold marijuana to James Mosqueda on a few infrequent occasions. Rose was not aware of the dates of those occasions.

Rose said that if there was ongoing drug dealing between Matt and James Mosqueda, she was unaware of it, but it would likely have been done through intermediaries. Rose said she was unaware of the names of any possible intermediaries.

The above information was given freely and voluntarily by Rose and no threats or promises were made to her. The above information is true and accurate to the best of knowledge.

Stewart Fillmore

000144

**EXHIBIT 19**

**Signed Declarations of Facts**

My name is Ryan Patton, born ▮▮▮▮▮▮

In 2001, I managed a Goodyear tire shop in Dallas, Texas. At the time, Carlos Gonzalez was running a kiosk in the Valley View Mall, selling watches.

I grew up knowing Carlos Gonzalez, Anthony Fonseca and James Mosqueda. We went to schools together.

While I managed the Goodyear tire shop, Carlos brought multiple of his vehicles into the shop and I put rims and tires on them.

In 2001, Carlos told me he had some guys from in the Valley, which I knew as the Rio Grande Valley, who wanted some rims and tires on their vehicles. They wanted to come up to Dallas and have my Goodyear shop put them on because I could give them a discount. I had to special order these rims and so I needed to get them there by the date these guys were coming up.

Around the date of 9-11-2001, Carlos's friends from the Valley came into my shop. From what I can recall, it was about 4 or 5 guys from the Valley in their group. I knew it was right around 9-11-2001, because I remember 9/11 happening within days of these guys coming in.

Carlos told me these guys were in the business of "running girls," which I knew to mean basically pimps. Carlos told me these were serious players, which I knew to mean some kind of high up criminals.

One of the guys really stood out, and stuck in my memory because of how he looked, how he was dressed, and his vehicle. He had shoulder length black hair pulled back in a pony tail, but sometimes he would let it down and it reminded me of Antonio Banderas.

The man with the long hair was wearing a trench coat, which also stood out because it was September, around the end of summer in Texas and this guy was wearing a trench coat. It looked odd, like he was trying to look like a mob boss. The hair and the trench coat, made him memorable to me, as well as his vehicle. He drove a black box style Lincoln, late 80's to early 90s style.

Aside from that, I remember him as having average height, average build. He was Hispanic and I would estimate mid 30's in 2001. We put rims and tires on this guy's Lincoln and the rest of Carlos's friend's vehicles too. I never saw any of those guys from Valley ever again. I don't remember any of their names.

Then, around June of 2021 my then wife (now ex-wife) and I were listening to the Cousins By Blood podcast. We were interested in the podcast because I also went to school with Ivan. But, I just heard bits and pieces of the podcast. I did not listen to all of the podcast like my then wife (now ex-wife) did.

I heard talk about a black box style Lincoln on the podcast, and I told my wife I saw that car in my shop in 2001, it was one of Carlos's friend's vehicle. My wife told me to call the private investigator Matt Duff, who produced the podcast. I called Matt Duff and he interviewed me for the podcast in July of 2021. I told Matt Duff the same story as written above.

I had not heard Ivan's description of the "pizza man" on the podcast. I had just heard about the description of the Lincoln. Matt Duff told me, over the phone during my interview, that my description of the guy I saw at my tire shop was similar to Ivan's description of the "pizza man" that came to his apartment the night before the murders. Ivan's description was a medium build, Hispanic male, with long shoulder length hair, who was said to be from the Valley. That sounded like the guy I saw back in 2001 with Carlos Gonzalez, driving the same kind of black box style Lincoln.

On Wednesday February 14th 2024, private investigator Matt Duff texted me a picture of Mateo Gonzalez, asking if I could ID him as the guy I saw at the tire shop. He also texted a picture of a 1989 Lincoln Town car.



That was the kind of Lincoln the guy from the Valley was driving. But I was not certain about the picture of the guy. On Sunday February 18th 2024, Matt Duff texted me a sketch of Mateo Gonzalez, with long hair.



Based on this sketch, I am 95% certain that was the man I saw in my tire shop in 2001. I am 100% certain that this kind of black box style Lincoln is what the man from the Valley was driving.

Based on all the similarities of the guy in my tire shop and Ivan's details about the guy referred to as the "pizza man," I truly believe that this must be the same individual. And I saw him in September of 2001 with Carlos Gonzalez.

Ryan Patton

2-19-2024

000147

**EXHIBIT 20**

000148

## John Rolater

| | |
|---|---|
| **From:** | Tawny Svihovec ◄ ▇▇▇▇▇▇▇▇▇▇▇ ▸ |
| **Sent:** | Tuesday, January 23, 2024 1:24 PM |
| **To:** | Greg Willis |
| **Cc:** | John Rolater |
| **Subject:** | Please urgently review Ivan Cantu's case |

***** WARNING: External Email. Do not click links or open attachments that are unsafe. *****

Dear DA Willis,

Recent vigorous investigation into IVAN CANTU's case has uncovered serious exculpatory evidence that was suppressed or manipulated at trial by state officials.

Additionally, key state witnesses have recanted their testimony and, in light of these findings, 3 trial jurors have stated that had they known of these wrongdoings at trial, they very possibly would have rendered a different verdict.

With Mr Cantu's death date fast approaching and, thus far, no signal from the courts of a willingness to grant Mr. Cantu an evidentiary hearing on this new evidence, I appeal to you and your Conviction Integrity Unit to open an urgent inquiry into Mr. Cantu's case.

As you yourself have stated, it is the mission of your office "not to convict, but to see that justice is done."

I urge you to:

• scrutinize the new evidence in Ivan's case that exposes fraudulent testimony and wrongdoing by state witnesses and law enforcement; • should this inquiry raise doubts about any form of unfairness done to Mr. Cantu in the course of his trial, courageously state publicly your reservations about the integrity of the conviction; • and recommend that execution be delayed to allow time for an evidentiary hearing on Mr. Cantu's behalf.

Yours, truly  Tawny Svihovec .
With all of the above being said . I was the ex girlfriend where Ivan & Amy came to my place from Arkansas. I was the last person to see & spend any time with Amy botcher Who I am 99.9 percent she was the one who left the murder weapon at my apartment. She was NOT AFRAID OF IVAN , as she continually said on the stand . The jurors NEVER HEARD MY TESTIMONY!!! Because Ivan's CORT appointed attorneys Called Not 1 witness for Ivan's behalf . This was a CRUEL & Calculated trial ! And NO ONE WAS  GIVING IVAN ANY EVIDENCE OF WHAT WAS GOING ON ! The trial the arrests the whole death sentence is WRONG !!! You will be murdering an innocent man !!!! GIVE IVAN A FAIR TRIAL  .

Sent from my iPhone

1

000149

**EXHIBIT 21**

COMPLAINANT: **Mosqueda, James**

SERVICE #: 863688-J
FOR DET. : Winn

# INVESTIGATIVE INFORMATION

SUBMITTING OFFICER: **Brady**    DATE: **11-9-00**

INFO OBTAINED VIA: **Interview**

OBTAINED ON DATE:    **11-9-00**    AT TIME:    **3:30 p.m.**

TOPIC: **Tawny Svihovec**

NARRATIVE:

On November 9, 2000, **Det. Winn #5768** received a call from **David Pire**, Attorney. **Mr. Pire** informed **Det. Winn** that he might know where the weapon used in this offense was located. **Det. Winn** made arrangements to met **Mr. Pire** at ▮▮▮▮▮▮▮▮▮▮

Upon arrival at **Mr. Pire's** office, **Det. Winn** and **Reporting Detective** were introduced to **Tawny Svihovec** and **Cheryl Snyder**, Attorney. **Ms. Svihovec** provided the following personal information:

Tawny Svihovec
W/F/▮
7780▮
Dall▮
Gabl▮
HM#: ▮

Business: Steven Maxx Salon

**Tawny** informed **Detectives** that she is an ex-girlfriend of **Ivan Cantu**. She stated that she has known **Ivan** for about nine years and they lived together for about 4 years. **Tawny** stated that she and **Ivan** broke up about 5 years ago and **Ivan** married someone else. After **Ivan's** marriage broke up, **Tawny** and **Ivan** started dating again and dated for about 8 months until their break-up in August.

**Tawny** stated the last time that she had seen or talked to **Ivan** was at a Halloween party. **Ivan** introduced her to his fiancée, **Amy**. **Tawny** stated that **Ivan** was "IN LOVE"!

**Tawny** stated that on Tuesday night, November 7, 2000, **Ivan** and **Amy** showed up on her doorstep. She stated that **Ivan** asked if they could stay the night because he was afraid to go home. **Ivan** stated that someone dressed in a pizza uniform showed up at his place and threatened to hurt him. He stated that the guy shot a hole in his

Follow up required: Yes    No    Key words:_____

Supervisor Approval: _____    _____

Document2

000151

wall. **Ivan** stated that the guy had a list of names that he stated owed him money. **Ivan** said that the complainant's name was on the list.

**Tawny** stated that **Ivan** also told her that the complainant let him use his corvette but he drove his own car to Arkansas instead. **Ivan** returned to his apartment and when he got back to **Tawny's** apartment he showed her a document that had the Dallas Police Department on it and a list of items that had been taken including a portion of the wall and clothing. **Ivan** told **Tawny** that he believed somebody was messing with him because he thought the document was fake.

**Tawny** stated that **Ivan** called the phone number left at his apartment by the police and spoke with a **Det. Loboda**. **Ivan** refused to meet with the **Detective** but told the **Detective** that he would call back in the morning.

**Tawny** stated that **Ivan** and **Amy** left her apartment about 3:00 a.m. She stated that they returned about 9:00 a.m. and **Ivan** left to met his mother, **Sylvia** and then go met with the **Detectives**. **Amy** fell asleep on her sofa.

**Tawny** stated that later that day, **Ivan** called her and told her that he was being charged with two counts on murder. After **Ivan's** call, **Amy** called her parents in Arkansas and then called the airlines and made a reservation to fly back to Arkansas. **Tawny** drove **Amy** to the airport. They stopped at TFI Friday's a grabbed something to eat on their way to the airport. **Tawny** stated that before **Amy** left, she told **Tawny** to check her apartment and make sure that **Ivan** did not leave anything there.

**Tawny** stated that on her way home, she stopped by **Ivan's** mother's house and picked up **Ivan's** younger brother, **Eric Cantu** because she was afraid to go home alone. **Tawny** stated that when she got back to her apartment she started looking around the area where **Ivan** had placed his bags. When **Tawny** raised the cushion on the love seat, she found a gun and a box of bullets. **Tawny** stated that she did not know what to do. **Eric** told her to call the police. **Tawny** stated that she was afraid so she and **Eric** used a tee shirt of her's, picked up the gun and bullets and placed them in the cabinet under the bar. **Tawny** stated that **Eric** left about 1:30 a.m. and went to a friends.

**Tawny** stated that the next morning she called **Cheryl Snyder**, an attorney friend of hers. **Cheryl Snyder** stated that she is a civil / family attorney, not a criminal attorney. **Cheryl** then contacted **David Pire** for advice. **David Pire** is a friend and a criminal attorney of **Cheryl Snyder**.

**Cheryl's** ▮▮▮▮▮▮▮▮▮ 8222 Douglas Ave., Suite 670, Dallas, TX, 214-▮▮▮▮▮▮▮▮▮▮▮▮

**David P**▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮. **Winn** and informed of the above information.

LOW UP REQUIRED:        YES        NO        KEY WORDS:_____

After being informed of the above information, **Det. Winn** arranged to meet **Tawny, Cheryl, David** and **PES** at **Tawny's** apartment. Upon arrival at the apartment **Detectives** observed a **Colt, MK4IV, Mustang .380 auto, Serial #MS21397** and **a box of Federal .380 auto ammo** on the top shelf of the cabinet under the bar area.

---

**Det. F. Smith #6315** took color photographs of **Tawny's** apartment and collected that above listed items. **Det. Smith** found 6 live rounds in the magazine and one live round in the chamber. He also found four live rounds inside the Federal ammo box. For further details see **Det. Smith's** supplement. **Det. Smith** also took custody of 20, 10 mg, tablets of Diazepam, which were given to **Tawny** by **Amy.**

---

**Det. Winn** took an Affidavit In Any fact from **Tawny** regarding the above mentioned facts and has placed it in Section 12 of this file. **Tawny** was advised to contact **Det. Winn** should she find anything else inside her apartment left by **Suspect Cantu.**

---

863688J.B

---

LOW UP REQUIRED:      YES        NO          KEY WORDS:_____

~009153

# PERSONAL INFORMATION SHEET

NAME: *Tawny Michelle Svihovec*  R/S/DOB W/F/ ███  DATE: 11-9-00

Address: ██████████ City/ST/Zip: *Dallas TX*  Phone #:(███ ███ █████

Employer: *Steven Marx Saloon* Address: *Cort & Ann*  Phone #:(██████████

Place of Birth: *New Mexico*  ID (State & #): ██████  SS███████████

DPD ID #:_____ DSO ID #:_____ Pager #:(____)_____

CHILDREN? Yes ( ) No ( ) If "Yes", School:_____ List children as contact persons below.

PARENTS ALIVE? Yes (✓) No ( ) If "Yes", list parents as contact persons below.

*Emergency Contact:* ████████████████████

Address: *1110 San* ██████████████████████

Employer: ██████████████████████████████████

*Contact Person:*_____ R/S/DOB_____ Relationship:_____

Address:_____ City/ST/Zip:_____ Phone #:(____)_____

Employer:_____ Work Phone#:(____)_____

*Contact Person:*_____ R/S/DOB_____ Relationship:_____

Address:_____ City/ST/Zip:_____ Phone #:(____)_____

*Contact Person:*_____ R/S/DOB_____ Relationship:_____

Address:_____ City/ST/Zip:_____ Phone #:(____)_____

Comments:_____

_____

_____

_____

_____

_____

ATTACH

PHOTO

HERE

Completed By:_____ Badge #:_____

Service #:_____

Dallas P.D. Homicide Unit
Revised 11/22/96

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County, State of Texas, on this day personally appeared

Tawny Michelle Svihovec W/F/ ██████ ████████ ████

Who, after being by me duly sworn, on oath deposes and says:

On Monday Afternoon, Ivan called me on my cell phone. He Asked me had I seen Anything on T.V. or in the papers regarding James and Amy Death. On Tuesday Night Around 11pm there was a knock at my front door. It was Amy and Ivan. They had an overnight bag, and a little makeup bag. Amy told me that they did not feel safe at their Apartment, ~~becames~~ because there was a bullet hole in their Apartment. Ivan said that he had spoken to a detective, and he was going to go talk to him. Amy stayed and Ivan went to their Apartment. When he returned he had A paper. He had A police document listing things the police had taken out of their Apartment. Ivan said it does not look official.

X _Tawny Svihovec_

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 9 DAY OF November A.D. 2000

Notary Public, Dallas County, Texas

000155

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County. State of Texas. on this day personally appeared Tawny Svihovec

Who. after being by me duly sworn. on oath deposes and says:

Ivan called his Mother. Around 3 Am the packed up And they left to go meet Ivan's mother, Around 9am they returned. Amy stayed and slept on the couch, Ivan Left. Then I left to go to work. Around 4pm Amy called me at work And said she was worried, She had talked to Sylvia, And Sylvia was on her way to pick her up, and she wanted me to come home. I called Ivan's cell phone, And his mom Answered and said everything was fine. Around 45 minutes later Ivan and said that he was being booked for two counts of murder. Amy was scared. She called her parents. She booked A flight to Arkansas

Tawny Svihovec

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 9 DAY OF November A.D. 2000

Notary Public. Dallas County. Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony _____

a Notary Public in and for said County. State of Texas. on this day personally appeared

Tawny Svihovec

Who. after being by me duly sworn. on oath deposes and says:

And I took her to the Airport. When I was
coming, I stopped And picked up Ivan's brother
Eric Canto. We came to my house. Amy told me
to make sure And check Ivan did not
leave Anything in my house. When I got
home I lifted the cushion on the love seat
A found Gun, And a box of bullets. Eric told
me to call the police. I was scared. Using
one of my T-shirts Eric moved the weapon
into A cabinet under the bar. Around 1:30 Am
Eric leaves.

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 9 DAY OF November A.D. 2000

Notary Public. Dallas County. Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County. State of Texas. on this day personally appeared
Tawny Svihovec   w/F/39

Who. after being by me duly sworn. on oath deposes and says:

I Am Adding this to my original statement.
There was a bag of drugs left At my apartment.
I don't remember where I found them. I do know
they were Not by the gun. The color of the drugs
was brownish, ~~purple~~, dirty looking. It was rolled
up in a clean sandwich bag. There were Also some
white ~~little~~ pills in the bag. I flushed the bay
down the toilet. AT DFW Airport Amy
gave me some money. She told me to try and
get Ivan out of Jail. I did not count the
money until I returned back to my apartment
It was a thousand dollars. I kept the money
because Ivan owed me $1500.00 dollars, from the

Tawny Svihovec

SUBSCRIBED AND SWORN TO BEFORE ME THIS 9 DAY OF December A.D. ~~#2000~~

Notary Public. Dallas County. Texas

000158

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, *Anthony Wing*

a Notary Public in and for said County. State of Texas. on this day personally appeared
*Tawny Svihovec*

Who. after being by me duly sworn. on oath deposes and says:

Summer of 2000, because we went on a trip. The reason
I did not tell the police the first time was
because I was scared.

*Tawny Svihovec*

SUBSCRIBED AND SWORN TO BEFORE ME THIS 9 DAY OF *December* A.D. ~~19~~ *2000*

Notary Public. Dallas County. Texas

000159

**EXHIBIT 22**

## JOE MARTZ, SHERIFF
## IZARD COUNTY SHERIFF'S DEPARTMENT

### STATEMENT OF YOUR RIGHTS

NAME: __AMY M. BOETTCHER__   DATE: __11/10/2000  10:45AM__

DATE OF BIRTH: __08/23/76__   TIME: __10:45AM__   LOCATION: __IZARD CO. SHERIFF'S DEPT.__

#### BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

DO YOU UNDERSTAND THAT YOU HAVE THE RIGHT TO REMAIN SILENT?

RESPONSE:   YES[ ✓ ]   NO[ ___ ] _____   INITIAL _AB_

DO YOU UNDERSTAND THAT ANYTHING YOU SAY CAN WILL BE USED AGAINST YOU IN COURT?

RESPONSE:   YES[ ✓ ]   NO[ ___ ] _____   INITIAL _AB_

DO YOU UNDERSTAND THAT YOU HAVE THE RIGHT TO TALK TO A LAWYER FOR ADVICE BEFORE WE ASK YOU ANY QUESTIONS AND TO HAVE HIM/HER WITH YOU DURING QUESTIONING?

RESPONSE:   YES[ ✓ ]   NO[ ___ ] _____   INITIAL _AB_

DO YOU UNDERSTAND THAT IF YOU CANNOT AFFORD A LAWYER, ONE WILL BE APPONINTED FOR YOU BEFORE ANY QUESTIONING IF YOU WISH, AT NO COST TO YOU?

RESPONSE:   YES[ ✓ ]   NO[ ___ ] _____   INITIAL _AB_

DO YOU UNDERSTAND THAT IF YOU DECIDE TO ANSWER QUESTIONS NOW WITHOUT A LAWYER PRESENT, YOU WILL STILL HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME?  YOU ALSO HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME AND TALK WITH A LAWYER.?

RESPONSE:   YES[ ✓ ]   NO[ ___ ] _____   INITIAL _AB_

### WAIVER OF RIGHTS

I HAVE READ OR HAD READ TO ME THIS STATEMENT OF MY RIGHTS AND I UNDERSTAND WHAT MY RIGHTS ARE. I AM WILLING TO MAKE A STATEMENT AND ANSWER QUESTIONS.  I DO NOT WANT A LAWYER AT THIS TIME.  I UNDERSTAND AND KNOW WHAT I AM DOING.  NO PROMISES OR THREATS HAVE BEEN MADE TO ME AND NO PRESSURE OR COERCION OF ANY KIND HAS BEEN USED AGAINST ME.

SIGNED: __Amy Boettcher__

WITNESS: __Joe Martz__   LOCATION: __IZARD COUNTY SHERIFF'S DEPT.__

WITNESS: _____

# JOE MARTZ, SHERIFF

# IZARD COUNTY SHERIFF'S DEPARTMENT

### P.O. BOX 370
### MELBOURNE, ARKANSAS 72556
### 870-368-4203

## WITNESS STATEMENT

Page 1 of _____

Case Number: _____

Date: 11/10/2000

Witness Name: Amy Boettcher

Date of Birth: 8-23-76

Home Address: 4753 Old Bent tree Dr. 1004

Home Phone: 870-322-8172

Work Phone: _____

This statement is giving under my own free will, I understand that I'm not implicated or suspect at this time. Thur 2nd of Nov, I was Argueing with Ivan Cantu at my residents in Dallas TX. My live in finance. He got up from the couch went to Bedroom got a gun on fired a shot next to my head my started ringing I dropped to the floor than He put the gun to my head and stated to calm down Because He is not full of shit I tri to leave the Residents And Ivan slamed my head in the door than Ivan hit me across the face. we talked And He said that He's not full of shit if everyone anyone fucks Him over they will be Hurt. I got out of the Apt sat on sidewalk. He came looking

Witness Signature _____

Reporting Officer _____

IZARD COUNTY SHERIFFS DEPARTMENT

WITNESS STATEMENT

CASE NO————

for me. Ask Saying He thought I went to a Neighboers Apt, I stated me that I just needed air. I was affaid for my life the Rest of the Night. He stated I try when went to sleep, I tryed to stay awake Because I Didn't know what was going to happen to me.

Friday NOV, 3rd, Ivan got up And left for must of the Day. Ivan came Home in the evening after His part time job. Ivan went to Grouchy Store my girl friend mel was there when He Return. After She left He made a phone call to james Saying He need to talk to him this was About 11:00 — 11:30 pm. Ivan left our Res Apt Ivan Stated knew I have to go kill James & Amy,

Witness Signature                    Reporting Officer

IZARD COUNTY SHERIFFS DEPARTMENT                    PAGE 3 OF

WITNESS STATEMENT

CASE NO

He Return Home at 12:18 Am By our clock, Ivan had Blood on His Jeans His socks on His Gun Gun was Jammed He statement this is my FAVlovert Gun. He also HAD Dr. Gloves on. Ivan was waveing Jammes Shoes + shirt. He me to go park Jammes Car Right So I DiD. Ivan had Blood in His hair so He showed, I had Jammes wallet + Amy's I.D. He said He HAD to kept them, And 3 sets of keys of Jammes + Amys Put them sum there. Ivan ate sum mushtroms Drug type Ivan said lets go kick it at seven its a night Club He said He had to go there, So we left the Apt and when to a friends House After the friend House Ivan Said we are going Back to.

Witness Signature                    Reporting Officer

IZARD COUNTY SHERIFFS DEPARTMENT

PAGE----4----OF------

WITNESS STATEMENT

CASE NO-------------

James & Amy's House, I said
I not want to go He stated that
Im going so I know He was not
full of Shit. We got to the House
Ivan unlock to Door And said come
in I said NO Ivan said get in Here
so I Did. I He said Help He look for
2 Kilols of Coke again came I said
NO let go please He said you need
to calm Down let know I stated
please Don't yell at me Ivan
said we better Help me knew
so Did Because I Did know if
He would kill me to. Ivan
Said Come and look at this
I Said NO He come on. I Did
not see close up But I kind of
seen. I o must threw-up. Ivan
got Said this is to let you know
Im not full out Shit Ivan got
His cell phone & His Boots By the
kitchen of James & Amy, House,

out of
the Bed
Room

Witness Signature                          Reporting Officer

IZARD COUNTY SHERIFFS DEPARTMENT

PAGE 5 OF

WITNESS STATEMENT

CASE NO------------

AS we were leave Ivan put
the mersadies in the garage + pulled
the Corvette out I was sitting in
the Honda 2 Trucks Drove By at
this time one was white one was
Black after Ivan got in the corvette
we when to to the Apt + Drop off
the Honda. Ivan + I when it to
our Apt HE HAD A white garbage
Bag of Ivan shirt + a pair of
Jeans, Ivan said He HaD to get
to Seven He grab his Drugs +
~~left the Apprt~~ then Ivan said
Will my married me + gave me
a ~~right~~ Ring I said yes, Ivan +
I left Apt got in the corvette +
~~then to Seven get~~ stated Heading
to Seven Ivan said when you
See a Dumpster let me Know
He found one about 1 Block away
from Seven Ivan Throw white
~~garbage Bug away~~ got Back in corvette

Witness Signature                    Reporting Officer

we ~~get~~ there we ~~got~~ when to Seven
we Got

IZARD COUNTY SHERIFFS DEPARTMENT

WITNESS STATEMENT

PAGE 6 OF____

CASE NO._____

There about 3:15am + left about 3:45am when to friend house like 7 Blocks Away we sat there from awhile when to we followed someone to a friend Apt 1 Block of seven sat there for awhile Ivan + Amy left we when to a other friends so Ivan could gave he money it was the same friend house that we were at Before we when to Jarms + Amys so I could look of from the cell and Other things I stated. After we left there we when to a friend of mine in Jeving. sat there until about 10:00 I said we have to get to mey parent Huise we left there when Back to the Apt there we lived Back at our closes Ivan was walk around

Witness Signature

Reporting Officer

IZARD COUNTY SHERIFFS DEPARTMENT

WITNESS STATEMENT

PAGE 7 OF ___

CASE NO. _____

Our Apt loo like was someone was there I said let go my parent are going to worry about us He said -k- hang on I let you Right Now. He thought someone was watching him. Fineally we left about 12:00-12:30 PM Before we walk out the Door He stated get straight into the car, the Hole time we were went together He had to Gun on your away up to my Parents He stated I Better act like nothing is wrong + listen to every thing his sauds, we arrived at my Parents at 8:30pm - 9:00 pm. on Sat Nov 4, We stayed at parent House untill Tue. Nov 4th in the mean time He made phone calls talk about James + Amy. one phone that He made just to Carlos Stated

Witness Signature _____

Reporting Officer _____

IZARD COUNTY SHERIFFS DEPARTMENT

WITNESS STATEMENT

PAGE_____8____OF_____

CASE NO_____

Let get Detective Wind on this.
Ivan told me that Detective Wing
was Dirty. We left my parent Nov 4th
at 12:30pm on away to Texas
Ivan talk to people on His Cell
one phone call stated that He
was going to Mexico. We got to
Texas about 10:00-10:30pm when
to Tawny House. Ivan called
Detective Wind. He said that He and
along Day We will talk today.
Ivan left Tawnys + when to our
Apt Bye His Self. Came Back
Tawnys + Hes Inventory
listed that was at our Apt
call with His Mom + Aunt Penny
I said I thought We were Being
straight with death other. He also
called my frend metal told He
that were Coming over + Ivan
told my to get my thing from Tawnys

Witness Signature

Reporting Officer

IZARD COUNTY SHERIFFS DEPARTMENT

WITNESS STATEMENT

PAGE___9___OF_____

CASE NO_____

And we were leaveing we
left He call His mom + Aunt Penny
to meats us at IHPO we Sat there
& Had coffee + pop Ivan talk to them
we Sat there from awhile His
told His Anut there His was going
to have someone take care of Carlos
when He was talking to the Detectixe
Ivan also Stated that I know
everything after we left IHPO we
got Gas, the IHPO was in Irving
off of MacAruths, After Ivan
got Gas He was on His Cell phone
with His mom + Aunt Penny
His mother said She Dosen't
trust me, His Aunt penny said
Don't let Her talk to her
friend or family Because she
might not talk to them against
She Done toDay was in wed
nov.5 After get Gas we went

Witness Signature

Reporting Officer

IZARD COUNTY SHERIFFS DEPARTMENT

WITNESS STATEMENT

PAGE 10 OF _____

CASE NO _____

to my friend metals in
Irving at there for awhile
we left I told him the I was
tried His said that we would
go to a Hotel at get some
sleep we stopped at one Ivan
said to Stay in the car. Ivan
came Back out I was can we
Please go to Tawnys I fell safe
there so get go there one Apt
Complex a Right next Door he
stopped at a Dumpster & put James
wallet + Amys I.D. & in a Burger
king Bag & Throw it in there
we when to Tawnys at 8:00 AM
to sleep Ivans phone Cell
Rang about 8:30 AM it was Mr wind
He got up got Really to go
talk to him Before Ivan
left he said that the Drugs +
money where under the coachs
cusesion.

Witness Signature _____

Reporting Officer _____

IZARD COUNTY SHERIFFS DEPARTMENT

WITNESS STATEMENT

PAGE 4 OF _____

CASE NO _____

About 4:00pm NOV. 8 I called Ivan cell His mother a had it She said she was coming to get me to talk to the Detective I call Tawny at work Because I was Affaid of His mother Do to other facts I state Tawny come Right home, we sat there from a while — I Also call my parent stateding Affaid + please come + get me. Tawny talk to my parents. Ivans mother call And said that we Tawny + I needed to get a Attny than Ivan called And said that his being charge with Murede told me not to let with his mother + for Tawny to make sure that I was safe. I called Airline got Ticket to go to little Rock

Witness Signature _____

Reporting Officer _____

IZARD COUNTY SHERIFFS DEPARTMENT

WITNESS STATEMENT

PAGE 2 OF

CASE NO

I got a ticket called my parent
Stated the time I was leave IAnd
told tawny not to said anything
to anyBody She&I left her Bhouse
when to friday to talk And to

000173

**EXHIBIT 23**

000174

# ARKANSAS STATE POLICE

ASP-116
(Rev. 7/98)

## Miranda Rights Form

**Name:** *Amy M Boettcher*
(First/MI/Last Name)

**Date:** *11/0/00*
(Month/Day/Year)

**Place:** *Izard Co. S.O.*

**Time:** *2:41* ☐ AM ☒ PM

*4:23 p (MH)*

Before we ask you any questions, you must understand your rights.

1. **Do you understand that you have the right to remain silent?**

   Response: *Yes.    AB    4:24 AB*

2. **Do you understand that anything you say can and will be used against you in court?**

   Response: *Yes.    AB    4:24 AB*

3. **Do you understand that you have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning?**

   Response: *Yes.    AB    4:24 AB*

4. **Do you understand that if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish, at no cost to you?**

   Response: *Yes.    AB    4:24 AB*

5. **Do you understand that if you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time? You also have the right to stop answering at any time until you talk to an attorney.**

   Response: *Yes.    AB    4:24 AB*

## WAIVER OF RIGHTS

I have read this statement of my rights and understand what my rights are. I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

**Signed:** *Amy M Boettcher*
(First/MI/Last Name)

*Amy M Boettcher*
*11/10/00*

**Witness:** *Sgt. Mark A. Holland #576*
(Rank/First/MI/Last Name/Badge#)

**Witness:** _____
(Rank/First/MI/Last Name/Badge#)

Amy M. Boettcher
w/f DOB  8/23/76
He 80  BX 234
Franklin, AR  72536
870. 322. 8172

11/10/00
244P

AB · On  11/2/00 : Ivan + I argued about
something + I questioned him about some
of his dealings. He got real upset + ran
AB  to get his pistol. He come into the
living/dining area + fired a shot over my
head, + then put the gun to my head.
He then told me that this was a
warning to let me know he was serious. He
said that I shouldn't fuck him over or
mess with him. I got up + tried to leave
+ he slammed the door on my hand.

We were supposed to leave the next morning  AB
day (11/3/00) + drive to Arkansas as soon as
Ivan got in from work. When Ivan
got in from working at Soup + Salad, it
was about 1030 - 1100 P.

When Ivan got home, he told me that
he was going to kill James + Amy. He didn't
seem upset or agitated when he told me

- 2 .

this.

He then left & went to the grocery store & returned after about 20 minutes or so.

While Ivan was gone Melanie (LNU) come over & she was there when he came home. We were going to meet Melanie & her husband later at club 7. Melanie left a short time after Ivan returned home.

Ivan called James & told him he need to come talk to him. Ivan got off the phone stated he was going to James' house. I called Melanie while Ivan was gone.

When Ivan left, I wanted to call James & warn him or even run away, but I was afraid to.

Ivan was gone & he returned home at 12:18 by our clock. He had driven Amy's Mercedes back to our house & he had blood on his jeans. He was also wearing James' shirt & shoes. He was also wearing rubber type gloves. Ivan said James had hit him with something, & that it

wasn't pretty. He also told me that Amy had told him what he wanted to know. He then told me to get ready to go to Club T.

Ivan put his jeans, socks, the gloves, + emptied the bullets from his gun into a kitchen trash can.

The gun that Ivan was unloading into the trash can was the same he always carried + also the one he fired at me. I also noticed there was what appeared to be blood in Ivans hair + on the gun.

Ivan had James identification, keys + wallet + Amy's identification with him.

Ivan showered + changed clothes, then ate some mushrooms. When Ivan was in the shower, he told me to go + park the mercedes "correctly", so I went down + parked it more straight then it had been.

We left + went to Smileys house +

apartment, & came back late with
the inventory Sheet. We stayed at
Tanny's & Ivan went to talk to
the police the next morning. AB

Amy M. Boettcher

11-10-2000
5:30 pm.

Wit. Sgt. Mike A. Wolf

000179

**EXHIBIT 24**

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County. State of Texas, on this day personally appeared
Amy Boettcher W/F/8·23·76                              42

Who, after being by me duly sworn, on oath deposes and says:

On Thursday around 11pm, we were sitting on the couch.
Talking and joking. I asked him if he was serious.
I met Ivan August 19, at club "7" of this year. We
Moved in together and stayed at Ivan's and Road
Bobit town house. October 15 we got an apartment
A Pean Ridge. He put the apartment in my names
because he told me he had to act poor, due to
Mortgage scams. Ivan jumped up and said he
was leaving. He went into the bedroom. He then
comes back into the living room. Ivan shot at shot.
I dropped down to my knees. I was on my hands
and knees. I was rocking forward and backwards.
Ivan put the gun to my AB head. He told me

Amy Boettcher

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF November A.D. 2000

Notary Public. Dallas County. Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County. State of Texas. on this day personally appeared
Amy Boettcher

Who. after being by me duly sworn. on oath deposes and says:

that this was to know he was not fucking
around or full of shit. Ivan snorts cocaine, but
I did not see him snort any that night, but
we did have 2 drinks at "Mi Cocina" Resturont.
I did see a "small" bag of cocaine Wednesday in the
drawer in the bathroom. Thursday it was not there
and Ivan told me the maintence man took it.
Ivan put the gun to my head. He brought
a file out, He opened up the files and he
pointed out dollar amounts. He said he gets
everything back on the 16th of November.
I tried to get the key to the apartment
I opened the front door, I had the right

Amy Boettcher

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF November A.D. 2006

Notary Public. Dallas County. Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County. State of Texas. on this day personally appeared
Amy Boettcher                              pg 3

Who. after being by me duly sworn. on oath deposes and says:

key in the lock. He slammed the door on my left hand. After I moved my hand, he shut the door. Ivan then slapped me on the left side of my face. I told Ivan my hand hurts. He did not say anything. Ivan went and layed down on the couch. He told me that I could call the cops, but they were not going to do anything because they worked for him. Friday when I woke up Ivan was at work. We had plans with Melanie and Craig to go to club "7". Ivan came home, and he had groceries with him. Melanie was there. I told Melanie that

*Amy Boettcher*

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF November A.D. 2000

Notary Public. Dallas County. Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County. State of Texas. on this day personally appeared
Amy Boettcher pg 4

Who. after being by me duly sworn. on oath deroses and says:

I hurt my hand when Ivan was closing the door, and hit my hand. AB by accident I told Melanie that we had argued on Thursday. Ivan left, but before he left he called James. Ivan was wearing a stone wash pair of Arizona jeans, a black and white "No Fear" pull over shirt. White socks, and brownish color hilling boots. I AB called my step-father at 11:30 pm an Ivan was not home. I also called Melanie on her cell phone. Around 12:18 am Ivan come home. I know it was 12:18 AM because I saw the time on my VCR clock AB. Ivan had on a different shirt. AB A black button Down shirt AB He also had on a pair of dress shoes black.

_Amy Boettcher_

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF November A.D. 2000

Notary Public. Dallas County. Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County, State of Texas, on this day personally appeared

Amy Boettcher Pg 5

Who, after being by me duly sworn, on oath deposes and says:

There was blood on his Jeans. He was wearing
Inky gloves. There was some blood in his hair.
It looked like the left side if his face was
swollen. I van stood in the kitchen and
unloaded his gun. There was blood on the gun.
He ate some mushrooms. I van took off his
Jeans and socks. I noticed there was blood
on the socks also. He put the jeans, socks
and gloves in the kitchen garbage garbage.
Ivan said that James and Amy are dead,
and Amy told me what I needed to know.
Ivan told me to go outside and park the car
right. I walk out and I saw Amy's Mercedes.

Amy Boettcher

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF November A.D. 2000

Notary Public, Dallas County, Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County. State of Texas, on this day personally appeared
Amy Boettcher DOB

Who. after being by me duly sworn. on oath deposes and says:

parked crooked in front of my Apartment. Ivan
gave me the keys to the car. I ~~started~~ AB
re-parked the car. Ivan changed clothes and
we drove to ~~Kevin's~~ AB Kevin's Apartment. Kevin
gave Ivan about $1600.00 dollars. We left there and
we drove ~~the~~ AB back to James and Amy's house. We
enter through the front. Ivan's Honda was not
parked in front of the house. Ivan had his gun
in his hand, this is the same AB gun Ivan had
Thursday when he shot a hole in the wall at our
Apartment. Ivan said I want you to come see
this. He told me that if I did not help him
I would not be leaving. He told me that this

Amy Boettcher

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF November A.D. 2000

[Notary stamp:]
ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

Notary Public. Dallas County. Texas

000186

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County. State of Texas. on this day personally appeared

Amy Boettcher 197

Who. after being by me duly sworn. on oath deposes and says:

was not his first "Napeo" I took that meaning he
had killed someone. He told me that this is what
happens to people who "Fuck me over", and he wanted
me to see it, so I would know he was not full
of shit. Ivan was looking for his cell phone. Ivan
told me that he was looking for two kiles of
cocaine. Ivan wanted a garbage bag. Ivan told
me that I better fucking help him now. Ivan told
me again that I would not be leaving if I did
not help him. Ivan got really upset, and he said
he should shot them again, because he cannot
find what he wanted. Ivan started going thru
things at the house. He did not make a mess

Amy Boettcher

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF November A.D. 2000

Notary Public. Dallas County. Texas

000187

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County. State of Texas. on this day personally appeared

Amy Boettcher 148

Who. after being by me duly sworn. on oath deposes and says:

I open and closed the cupboards in the Kitchen. Ivan told me to drive the Honda, he parked the Mercedes in the garage, and took the Corvette. We drove back to our apartment. Ivan grabbed his boots that were left in the Kitchen on the carpet. Ivan said there was a cleaning crew and crooked cops working for him. Ivan sat the garbage bags on the ground floor inside the apartment. He proposed to me and gave me a ring. This is the same ring that I later found out, that belonged to Amy Kitchen. Ivan had Amy's Id cards and James wallet. He also had on a watch

*Amy Boettcher*

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF November A.D. 2020

Notary Public. Dallas County. Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, _Anthony Winn_

a Notary Public in and for said County. State of Texas. on this day personally appeared
_Amy Boettcher,_                    ss

Who. after being by me duly sworn. on oath deposes and says:

And a necklace. We left in the Corvette and After we went through the Tollway, Ivan threw a watch out the window. Ivan said I don't want this shitty "Rolex". Ivan kept saying he needed a "Bump" meaning "cocaine". Ivan through the clothes into a dumpster. We went to club "J" it was around 3:15 am. We left at 3:30 am and went to Harlon's house. We sat there for a while. Ivan was asking people if they had any stuff. We left and we drove to an apartment and Ivan scored some "cocaine." We left and drove back to Kevin's.

_Amy Boettcher_

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF _November_ A.D. 2000

Notary Public. Dallas County. Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County, State of Texas, on this day personally appeared

Amy Boettcher          Pg10

who after being duly sworn, on oath deposes and says:

Ivan gave Kevin the $1500.00 back. We left and drove to Irving. We visit Metal. We stayed there until about 10:30 am Saturday morning. I told Ivan let's go, because we needed to go visit my parents. We drove back to Our apartments. We loaded the Honda, and we drove to Arkansas. When Ivan came home in the Mercedes he had a hand full of keys. I showed my parents the ring. Ivan took the ring back when we came to Dallas. I have not seen the ring since. When we came back to Dallas, we went to Tawny's Apartment. Ivan was talking to

Amy Boettcher

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF November A.D. 2000

Notary Public, Dallas County, Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, Anthony Winn

a Notary Public in and for said County. State of Texas. on this day personally appeared

Amy Boettcher                                          1911

Who. after being by me duly sworn. on oath deposes and says

his mother on the cell phone. Ivan went back to the
Apartment When he returned he had mushrooms,
Estasy, a bottle of volvuns, and the Inventory list. His
Aunt told him that the Inventory list is fake
Ivan said that he was to take me to Metals
because he had security cameras, but instead we
met Ivan's mother and Aunt Penny At
the "I-Hop." in Irving old Ivan took me back to Tawny's
I stayed And Ivan left. I called Ivan's cellphone
And his Mom, Answered And she told me that he was stilling
talling to the Detective, And she was coming to
get me, Also I needed A lawyer. Tawny's
drove me to the Airport, and I told her before I
left to look Around.

Amy Boettcher

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF November A.D. 2000

Notary Public. Dallas County. Texas

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, _Anthony Winn_

a Notary Public in and for said County, State of Texas, on this day personally appeared
_Amy Boettcher_ 19/12

Who, after being by me duly sworn, on oath deposes and says:

Ivan said at the house that he should ~~shot~~
shoot them again, because he can not find what
he was looking for.

When Ivan walked out of Jamie's and Amy's
bedroom he said goodnight.

_Amy Boettcher_

ANTHONY WINN
Notary Public, State of Texas
My Commission Expires
06/08/2003

SUBSCRIBED AND SWORN TO BEFORE ME THIS 22 DAY OF _November_ A.D. 2000

Notary Public, Dallas County, Texas

000192

**EXHIBIT 25**



000193

I FIRST MET IVAN CANTU ABOUT AUG. 18 OR 19 2000
WE MET AT CLUB 7 IN DALLAS. I WAS SETING AT A TABLE
WITH MY GIRLFRIEND RAENA. IVAN AND ANOTHER MAN APPROACHED
US. IVAN SAID THIS IS MY TABLE. I ASKED WHAT HIS NAME WAS.
HE SAID IVAN.  I SAID I'M SORRY I DON'T SEE YOUR NAME
ANYWHERE, BUT YOUR MORE THAN HAPPY TO JOIN US. THEY DID.
WE STARTED DATING SHORTLY AFTER, IN SEPT. 2000
--------------------------------------------------------------
WE MOVED IN TOGETHER IN SEPT. 2000 WE BECAME ENGAGED
SHORTLY AFTER THIS. WE LIVED AT HIS MOMS FOR A WHILE
AND THAN GOT OUR OWN APT. OCT. 15, 2000
THE APT. WAS IN MY NAME, BECAUSE HE WAS REFUSED AT ONE
PLACE WE APPLIED. AND SAID HE HAD TO ACT POOR UNTIL
NOV. 15, 2000 HE STATED THIS IS WHEN HE GETS ALL HIS STUFF
BACK. DUE TO MORTGAGE SCAMS IN HIS PAST. I CALLED MY MOM
AND TOLD HER WE WERE  ENGAGED AND WE WOULD COME DOWN IN
NOV. SO THEY  COULD MEET HIM.
--------------------------------------------------------------
PRIOR TO THUR. NOV. 2, 2000 IVAN TREATED ME LIKE A QUEEN
ON THUR. EVENING NOV. 2, 2000 IVAN AND I HAD GONE OUT TO
EAT WITH MEL AND CRAIG. WE GOT HOME ABOUT 11:00 P.M.

WE WERE SITING ON THE COUCH EATING ICE CREAM DRUMSTICKS
I DABBED MY ICE CREAM CONE ON HIS NOSE AND LICKED IT OFF.
I ASKED IF HE WAS SERIOUS ABOUT GETTING MARRIED, AND WAS
HE SERIOUS ABOUT GETTING HIS HOUSE AND STUFF BACK.

 HE KIND OF GOT AN ATTITUDE AND SAID HE WAS LEAVING. I SET
THE ICE CREAM CONE ON HIS LAP. HE GOT UP AND WENT INTO THE
BEDROOM. THINKING HE WAS LEAVING I PICKED UP HIS KEYS AND
WAS TRYING TO REMOVE MY HOUSE KEY. I HAD THE KEY IN THE
DOOR OUTSIDE LOCK. THIS WAS THE ONLY KEY TO THE APT.
NEXT THING I KNEW HE FIRED HIS GUN, SLAMMED MY LEFT HAND
IN THE DOOR, AND SLAPPED ME ACROSS THE LEFT SIDE OF MY
FACE.
HE GRABBED ME PUT HIS GUN TO MY HEAD. LEFT SIDE TEMPLE. I
WAS TERRIFIED.I DROPPED TO MY HANDS AND KNEES ON THE
FLOOR.
 I WAS SCREAMING HE TOLD ME TO SHUT UP, BE QUIET, CALM
DOWN. THAT THIS IS TO SHOW ME THAT I'M NOT FUCKING AROUND
OR FULL OF SHIT. IF I CHEAT ON HIM OR FUCK HIM OVER IN ANY
WAY I WILL BE HURT. HE WENT AND GOT A FILE AND USED HIS
GUN AS A POINTER SHOWING ME DOLLAR FIGURES. ONCE AGAIN
STATING THIS IS TO SHOW YOU I'M NOT FUCKING AROUND. HE
WENT OVER AND LAID ON THE COUCH. HE SAID YOU CAN RUN OR
YOU CAN CALL THE COPS BUT THEY WON'T HELP YOU BECAUSE THEY
WORK FOR HIM THAT HE OWNS DALLAS, HE'S RUNNING THINGS.
 I JUST SAT ON THE FLOOR CRYING UNTIL HE WENT TO SLEEP.
WHEN I GOT OFF THE FLOOR I SAT ON THE OTHER END OF THE
COUCH. IF I GOT UP HE WOULD ASK WHERE I WAS GOING.
--------------------------------------------------------------



000194

FRI. NOV. 3, 2000  I DID'T GET MUCH SLEEP THURSDAY NIGHT
WHEN I DID GET TO SLEEP I WOKE UP FRI. AFTERNOON. IVAN
WAS GONE. IVAN RETURNED HOME. BECAUSE MY HAND WAS HURT
HE HELPED ME TAKE A SHOWER. WASH HAIR AND SHAVE UNDER MY
ARM PIT. MEL ARRIVED JUST AFTER I GOT OUT OF THE SHOWER.
I TOLD IVAN I NEEDED TO GO TO THE STORE TO GET CIGARETTES
HE SAID NO THAT HE HAD TO GO TO THE STORE ANYWAY. MEL SAID
SHE COULD GO, I ASKED IF I COULD GO WITH.  IVAN SAID NO.
MEL WENT TO THE STORE AND GOT CIGARETTES AND DROPPED THEM
OFF AND LEFT. I THINK MEL WAS STILL THERE WHEN HE CALLED
JAMES. THIS WAS ABOUT 10:30 - 11:00 P.M. ALL I HEARD OF
THE CONVERSATION WAS HE NEEDED TO STOP OVER AND SEE THEM.
I BELIEVE THIS CALL WAS TO JAMES. IVAN LEFT THE HOUSE
ABOUT 11:20 OR SO. AS HE WAS LEAVING HE SAID HE WAS GOING
TO KILL JAMES AND AMY. HE TOLD ME TO GET AHOLD OF A FRIEND
METAL, SO HE AND IVAN COULD MEET. IVAN KNEW EVERY TIME I
USED THE PHONE, WHO I WAS CALLING, AND WHAT WAS SAID. I
WANTED TO CALL JAMES, I DIDN'T KNOW JAMES PHONE NUMBER.
I ALSO DIDN'T KNOW IF HE WAS TESTING ME LIKE HE DID IN THE
PAST. OR IF HE WAS SERIOUS. I THOUGHT HE MIGHT BE SETTING
OUTSIDE WATCHING TO SEE IF I WAS GOING TO RUN. I WAS
AFRAID TO DO ANYTHING ONLY WHAT HE TOLD ME TO DO.
 I CALLED MY STEP DAD SHORTY AFTER. THAT WAS ABOUT 11:30 I
TOLD HIM IVAN WASN'T HOME. AND WE WERN'T SURE WHAT TIME WE
WERE LEAVING TO ARKANAS. I TOLD HIM I DIDN'T KNOW IF IVAN
WANTED TO LEAVE WHEN HE GOT HOME, OR AT 4:00 A.M. AS
PLANNED. I CALLED MEL AT 12:00 MIDNIGHT AND TOLD HER IVAN
WAS RUNNING ERRANDS DID SHE TALK CRAIG INTO MEETING AT
CLUB 7 ?  SHE SAID TO CALL WHEN IVAN GOT BACK.
IVAN RETURNED HOME AT 12:18 A.M. BY THE V C R CLOCK I
LOOKED WHEN HE ARRIVED.
 HE HAD BLOOD ON HIS JEANS, HAIR AND SOCKS HE HAD LATEX
GLOVES ON AND THERE WAS BLOOD ON THE GUN. HE WAS WEARING
BLACK DRESS SHOES.  ALSO HE HAD ON A  DIFFERENT SHIRT. HE
LEFT THE HOUSE WEARING JEANS, BLACK AND WHITE STRIPPED
SHORT SLEEVE PULL OVER SHIRT. OVER THE LEFT BREAST IT SAID
NO FEAR. HE WAS WEARING HIS HIKING BOOTS.  ON HIS RETURN
HE WAS WEARING A BLACK BUTTON UP SHIRT. THE SIDE OF HIS
FACE LOOKED SWOLLEN.
 HE WENT TO THE KITCHEN UNLOADED HIS GUN, SAID HE WAS MAD
BECAUSE HIS GUN WAS JAMMED. THIS IS HIS FAVORITE FUCKING
GUN. THIS IS WHAT HAPPENS WHEN PEOPLE FUCK HIM OVER, STEEL
FROM HIM, HE'S NOT FUCKING AROUND. AND A LOT OF RAMBLING
THAT I'M NOT SURE OF. HE ALSO STATED HE'S TIRED OF LIVING
POOR, ITS TIME HE START WALKING ON MARBLE FLOORS AGAIN.
 HE THRU THE SHELLS FROM GUN INTO THE TRASH CAN IN THE
KITCHEN ALONG WITH JEANS, GLOVES, AND SOCKS. HE PUT A HAND
FULL OF KEYS INTO A DRAWER NEXT TO THE REFRIGERATOR. ATE
SOME MUSHROOMS ALSO SAID HE HAS TO GO TO 7 TONIGHT, LETS
GO KICK IT AT 7 AND THAT JAMES HIT HIM WITH A BASEBALL
BAT, IT WASN'T PRETTY.  HE WENT AND TOOK A SHOWER. I CAN'T
REMEMBER EVERYTHING HE SAID I WAS TOO SCARRED.

SAT. NOV. 4, 2000 AS HE WAS HE WAS GETTING INTO THE SHOWER
HE TOLD ME GO OUT AND PARK AMY'S KITRCHENS CAR PROPERLY. I
DID. IT WAS PARKED CROOKED I SIMPLY BACKED IT UP AND
PULLED IT STRIGHT.  HE GOT DRESSED HE WAS WEARING THE SAME
SHIRT AS WHEN HE CAME HOME. WE LEFT AND WENT TO KEVINS
[ SMILYS ] IVAN DROVE AMY KITCHENS CAR. KEVIN GAVE IVAN
SOME MONEY $1500.00  IVAN ASKED KEVIN TO GO OUT ON HIS
BALCONY AND CHECK OUT THE CAR HE BOUGHT FOR ME. WE LEFT
HERE AROUND 2:00 OR LATER. IVAN SAID HE HAD TO BACK TO
JAMES HOUSE TO GET HIS CELL PHONE. I ASKED HE TAKE ME HOME
BECAUSE I DIDN'T WANT TO GO THERE. HE SAID I'M GOING
BECAUSE HE WANTS ME TO SEE WHAT HAPPENS TO PEOPLE WHEN
THEY FUCK HIM OVER. I KEPT SAYING NO I DON'T WANT TO GO
THAT I BELIEVED WHAT HE DID. WHEN WE GOT THERE HE UNLOCKED
THE FRONT DOOR, I ASKED IF I COULD PLEASE WAIT OUTSIDE
I TOLD HIM I WAS AFRAID I DIDN'T WANT TO GO IN. WE WENT IN
I STOOD BY THE FRONT DOOR. IVAN SAID TO COME IN HERE AND
LOOK AT WHAT HE DID. HE HAD HIS GUN IN HIS HAND. I WAS
AFRAID HE WAS GOING TO KILL ME. I MOVED IN BY THE LOVE
SEAT, I PEAKED AROUND THE DOOR TO THE BEDROOM I SAW BLOOD
ON THE WALL, JAMES WAS ON THE BED ON HIS BACK. I SAW AMY'S
HEAD. I COVERED MY MOUTH AND TOLD IVAN I WAS GOING TO
THROW UP. IVAN WENT IN AND TURNED ON THE BATHROOM LIGHT.
THE HALLWAY BATHROOM. I LEANED OVER THE TOILET IT WAS DRY
HEAVES. IVAN WAS IN THE BEDROOM LOOKING THRU THINGS. I
TOLD HIM LETS GO. HE SAID DON'T WORRY NO ONES COMING HERE.
NO ONES HERE BUT US. HE CAME OUT OF THE BEDROOM WITH HIS
GUN IN HIS HAND AND SAID,I SHOULD SHOOT THEM AGAIN BECAUSE
I CAN'T FIND WHAT I WANT. YOU HAD BETTER START HELPING ME,
OR YOU AREN'T LEAVING THE HOUSE. HE SAID HE WAS LOOKING
FOR 2 KILOS OF COKE AND MONEY. HE WANTED A GARBAGE BAG
HE TOOK A GARABGE BAG INTO THE BEDROOM. WHILE HE WAS IN
THERE I JUST OPENED AND CLOSED CABINETS IN THE KITCHEN
I DIDN'T REALY LOOK. HE CAME OUT OF THE BEDROOM AND INTO
THE OFFICE. HE GRABBED SOME FILES AND SAID THESE ARE SOME
I NEED. HE LOOKED AT THEM AND THAN PUT THEM AWAY. I OPENED
ONE DRAWER. WE BOTH WENT INTO THE SPARE BEDROOM WHERE THE
TANNING BED IS. HE STATED THAT THIS IS HIS TANNING BED.
IVAN LEFT THE CLOSET LIGHT ON IN THE OFFICE. HE WENT BACK
TO THEIR BEDROOM SHUT OUT THE LIGHT AND SAID GOOD NIGHT
TO THEM. HE PICKED UP THE GARBAGE BAG, CELL PHONE HE TOLD
ME TO GRAB HIS BOOTS. THEY WERE ON THE CARPET BY THE
BOARDER OF THE KITCHEN TILE. HE SAID DON'T WORRY HE HAS A
CLEAN UP CREW. AND DIRTY COPS. THIS IS ALL I SAW HIM TAKE.
HE ALSO SAID GOODBYE TO THE DOG. WE LEFT THE HOUSE I GOT
IN THE HONDA. IVAN PULLED AMY K. CAR INTO THE GARAGE. AND
PULLED THE CORVETTE OUT. A BLACK AND ALSO A WHITE TRUCK
WENT BY AND PULLED OVER A SHORT DISTANCE DOWN THE ROAD.
IVAN SAID WHEN WE GOT HOME THAT THIS WAS THE CLEAN UP
CREW.

000196

PAGE TWO SAT. NOV. 4, 2000
IVAN PUT THE TRASH BAG IN THE VETTE HE DROVE THE CORVETTE
I DROVE THE HONDA HOME. WHEN WE ARRIVED HOME IVAN TOOK THE
TRASH BAG, AND A C/D CHANGER THAT CAME OUT OF AMY K. CAR
TRUNK. ALSO A BLACK PAIR OF SLIPPERS  HE BROUGHT THEM INTO
THE HOUSE. HE PUT ON A WATCH, A NECKLACE, TOOK OUT JAME'S
WALLET AND AMY'S I D HE SAID HE HAD TO KEEP THESE. HE PUT
AN ENGAGEMENT RING ON MY FINGER.
HE SAID HE WANTED TO SURPRISE ME THAT HE HAD IT CUSTOM
MADE. IT WAS TOO BIG. I DIDN'T ARGUE TAKING IT.
IVAN GRABBED THE TRASH BAG FROM JAMES HOUSE I SAW IN IT
IVANS NO FEAR SHIRT, AND A PAIR OF JEANS. IVANS WERE STILL
IN OUR KITCHEN TRASH CAN. WE GOT IN THE CORVETTE AND LEFT
FOR CLUB 7
 WE ENTERED THE TOLL WAY OFF FRANKFORD TOWARDS DALLAS.
JUST AFTER WE ENTERED THE TOLL WAY IVAN TOOK OFF THE WATCH
AND SAID I DON'T WANT THIS SHITTY ROLLEX AND THRU IT OUT
THE WINDOW. WE DROVE TO 7 HE SAID TO WATCH FOR A DUMPSTER
ABOUT A BLOCK FROM 7 AND A BLOCK OVER HE THRU THE TRASH
BAG IN A DUMPSTER. WE WENT TO 7 IT WAS AROUND 3:00 A.M.
OR SO WHEN WE ARRIVED. EVERYONE HE INTRODUCED ME TO HE
TOLD ME TO SHOW THE RING. HE TOLD ME TO TELL PEOPLE WE
WERE AT MI CASINO WHEN HE ASKED ME AND GAVE ME THE RING.
I DID WHAT HE SAID. HE STAYED RIGHT BY MY SIDE WHILE WE
WERE AT 7 HE EVEN FOLLOWED ME TO THE BATHROOM. WE LEFT
ABOUT 3:30 - 3:40 A.M. AND DROVE AROUND AS EXPLAINED TO
OFFICER WINN. WE LEFT FOR MY PARENTS HOUSE AROUND 12: NOON
TO 12:30 P.M.


*As Taken by Richard Kremes*

*Amy Boettcher*

000197

# Exhibit 26

000198

# Affidavit

My name is <u>Abner Cantu</u>, my date of birth is ████████████ d I am over 18 years of age.

My phone number is: ███████████

██████████████████████████ of Capitol Murder in 2001. Ivan was convicted of killing his cousin James Mosqueda and James's fiancé Amy Kitchen.

I took these front and back pictures of this Rolex watch on August 7, 2019.

My sister gave the Rolex to her son James. The Rolex previously belonged to my brother Lico. On the back of the Rolex inscribed is "To Lico... Love, Carol." I certify this was my brother Lico's Rolex. This is the Rolex that the victim James Mosqueda had and Ivan was convicted of stealing.

My sister said that after the murders Amy Kitchen's brother had taken it from the crime scene and then returned to the police. My sister told me the police gave her back this Rolex shortly after the murders. I do not know how long after the murders.

This watch was never stolen by Ivan.



LICO'S ROLEX WATCH (FRONT & BACK)

I hereby state that the information above is true, to the best of my knowledge. I also confirm that the information here is both accurate and complete, and relevant information has not been omitted.

_Abner Cantu_    9-22-19
Signature of Individual                     Date

MICHAEL PICAZO
Notary Public, State of Texas
Comm. Expires 12-21-2019
Notary ID 130474262

Appeared before me and signed this document on 22nd day of September      2019.

Notary _Michael Picazo_      My commission date expires _12/21/2019_

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

FILED - CLERK
U.S. DISTRICT COURT

2007 JAN 18 PM 1:59

TX EASTERN-MARSHALL

## PETITION FOR A WRIT OF HABEAS CORPUS BY A
## PERSON IN STATE CUSTODY

ORIGINAL

Ivan Abner Cantu
_____
PETITIONER (Full name of Petitioner)

v.
_____

Nathaniel Quarterman
_____
RESPONDENT (Name of TDCJ Director, Warden, Jailor, or
authorized person having custody of petitioner)

Polunsky Unit         BY_____
_____
CURRENT PLACE OF CONFINEMENT

999399
_____
PRISONER ID NUMBER

2:06cv166
_____
CASE NUMBER (Supplied by the Clerk of the District Court)

## INSTRUCTIONS - READ CAREFULLY

1. The petition must be legibly handwritten or typewritten and signed by the petitioner, under penalty of perjury. Any false statement of an important fact may lead to prosecution for perjury. Answer all questions in the proper space on the form.

2. Additional pages are not allowed except in answer to questions 11 and 20. Do not cite legal authorities. Any additional arguments or facts you want to present must be in a separate memorandum.

3. When the Clerk of Court receives the $5.00 filing fee, the Clerk will file your petition if it is in proper order.

4. If you do not have the necessary filing fee, you may ask permission to proceed *in forma pauperis*. To proceed *in forma pauperis*, (1) you must sign the declaration provided with this petition to show that you cannot prepay the fees and costs, and (2) if you are confined in TDCJ-ID, you must send in a certified *In Forma Pauperis* Data Sheet from the institution in which you are confined. If you are in an institution other than TDJC-ID, you must send in a certificate completed by an authorized officer at your institution certifying the amount of money you have on deposit at that institution. If you have access or have had access to enough funds to pay the filing fee, then you must pay the filing fee.

5. Only judgments entered by one court may be challenged in a single petition. If you want to challenge judgments entered by different courts, either in the same state or in different states, you must file separate petitions as to each court.

6. Include all your grounds for relief and all facts that support each ground for relief in this petition.

7. When you have finished filling out the petition, mail the original and two copies to the Clerk of the United States District Court for the federal district within which the State court was held which convicted and sentenced you, or to the federal district in which you are in custody. A "VENUE LIST," which lists U.S. District Courts in Texas, their divisions, and the addresses for the clerk's office for each division, is posted in your unit law library. You may use this list to decide where to mail you petition.

8. Petitions that do not meet these instructions may be returned to you.

## PETITION

What are you challenging? (Check only one)

☒ A judgment of conviction or sentence, probation or deferred-adjudication probation (Answer Questions 1-4, 5-12 & 20-23)

☐ A parole revocation proceeding (Answer Questions 1-4, 13-14 & 20-23)

☐ A disciplinary proceeding (Answer Questions 1-4, 15-19 & 20-23)

All petitioners must answer questions 1-4:

1. Name and location of the court (district and county) which entered the conviction and sentence that you are presently serving or that is under attack:

380th Judicial District Court of Collin County, Texas

2. Date of judgment of conviction: August 21, 2001

3. Length of sentence: Death Penalty

4. Nature of offence and docket number (if known):

Capital Murder under Tex. Pen. Code 19.03(a)(2) and (7)(A)  Docket No. 380-80047-01

Judgment of Conviction or Sentence, probation or Deferred-Adjudication Probation:

5. What was your plea? (check one)  ☒ Not Guilty  ☐ Guilty  ☐ Nolo Contendere

6. Kind of trial: (Check one)  ☒ Jury  ☐ Judge Only

7. Did you testify at the trial?  ☐ Yes  ☒ No

8. Did you appeal the judgment of conviction?  ☒ Yes  ☐ No

9. If you did appeal, in what appellate court did you file your direct appeal? Court of Criminal Appeals, Austin, Texas

Case Number (if known) 74,220

What was the result of your direct appeal (affirmed, modified, or reversed): Affirmed

What was the date of that decision?  June 30, 2004

If you filed a petition for discretionary review after the decision of the court of appeals, answer the following:

Result:

Date of result:  Cause Number (if known:)

If you filed a petition for *writ of certiorari* with the United States Supreme Court, answer the following:

Result:

Date of result:

10. Other than a direct appeal, have you filed any petitions, applications, or motions from this judgment in any court, state or federal? This includes any state application for writ of habeas corpus that you may have filed

☒ Yes  ☐ No

11 If your answer to 10 is "Yes," give the following information:

Name of court: Court of Criminal Appeals, 380th Judicial District Court, Collin County

Nature of proceeding: Ex Parte Ivan Abner Cantu

Cause number (if known): W 380-80047-01 (HCI)

Date (month, day and year) you filed the petition, application, or motion as shown by a file-stamped date from the court

May 24, 2004

Grounds raised: Ineffective Assistance of Counsel; Due Process; Eighth Amendment; Sixth Amendment

Date of final decision: January 18, 2006

Name of court that issued the final decision: Court of Criminal Appeals

As to any second petition, application, or motion, give the same information:

Name of court:

Nature of proceeding:

Cause number (if known):

Date (month, day, and year) you filed the petition, application or motion as shown by a file-stamped date from the court

Grounds raised:

Date of final decision:

Name of court that issued the final decision:

*If you have filed more than two petitions application or motions, please attach an additional sheet of paper and give the same information about each petition, application, or motion*

12 Do you have any future sentence to serve after you finish serving the sentence you are attacking in this petition:

☐ Yes     ☒ No

(a)    If your answer is "yes," give the name and location of the court that imposed the sentence to be served in the future:

(b)    Give the date and length of the sentence to be served in the future:

(c)    Have you filed, or do you intend to file, any petition attacking the judgment for the sentence you must serve in the future?

☐ Yes     ☐ No

**Parole Revocation:**

13. Date and location of your parole revocation: _____

14. Have you filed any petitions, application, or motions in any state or federal court challenging your parole revocation?

    ☐ Yes      ☐ No

    If your answer is "yes," complete Question 11 above regarding your parole revocation

**Disciplinary Proceedings:**

15. For your original conviction, was there a finding that you used or exhibited a deadly weapon?

    ☐ Yes      ☐ No

16. Are you eligible for mandatory supervised release?

    ☐ Yes      ☐ No

17. Name and location of prison or TDCJ Unit that found you guilty of the disciplinary violation:

_____

    Disciplinary case number: _____

18. Date you were found guilty of the disciplinary violation: _____

    Did you lose previously earned good-time credits? ☐ Yes    ☐ No

    Identify all punishment imposed, including the length of any punishment if applicable, any changes in custody status, and the number of earned good-time credits lost:

    ┌─────────────────────────────────────────┐
    │                                         │
    │                                         │
    │                                         │
    └─────────────────────────────────────────┘

19. Did you appeal the finding of guilty through the prison or TDCJ grievance procedure?

    ☐ Yes      ☐ No

    If your answer to Question 19 is "yes," answer the following:

    **Step 1** Result:

_____

        Date of Result: _____

    **Step 2** Result:

_____

        Date of Result: _____

**All applicants must answer the remaining questions:**

20. State clearly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting them.

**CAUTION:**
<u>Exhaustion of State Remedies:</u> You must ordinarily present your arguments to the highest state court as to each ground before you can proceed in federal court
<u>Subsequent Petitions:</u> If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date

Following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement is a separate ground for possible relief. You may raise any grounds, even if not listed below, if you have exhausted your state court remedies. However, you should raise in this petition all available grounds (relating to this conviction) on which you base your belief that you are being held unlawfully

**<u>DO NOT JUST CHECK ONE OR MORE OF THE LISTED GROUNDS.</u>** Instead, you must also STATE the SUPPORTING FACTS for ANY ground you rely upon as the basis for your petition

(A)     Conviction obtained by a plea of guilty which was unlawfully induced, or not made voluntarily, or made without an understanding of the nature of the charge and the consequences of the plea.

(B)     Conviction obtained by the use of a coerced confession.

(C)     Conviction obtained by the use of evidence gained from an unconstitutional search and seizure.

(D)     Conviction obtained by the use of evidence obtained from an unlawful arrest.

(E)     Conviction obtained by a violation of the privilege against self-incrimination.

(F)     Conviction obtained by the prosecution's failure to tell the defendant about evidence favorable to the defendant

(G)     Conviction obtained by the action of a grand or petit jury which was unconstitutionally selected and impaneled

(H)     Conviction obtained by a violation of the protection against double jeopardy.

(I)     Denial of effective assistance of counsel

(J)     Denial of the right to appeal.

(K)     Violation of my right to due process in a disciplinary action taken by prison officials

A.  **GROUND ONE:** Cantu was denied his Sixth Amendment constitutional right to ineffective assistance of counsel

Supporting FACTS (tell your story <u>briefly</u> without citing cases or law):

B.  **GROUND TWO:** The evidence at trial was legally insufficient to support Cantu's sentence of death

Supporting FACTS (tell your story <u>briefly</u> without citing cases or law):

C. **GROUND THREE:** Cantu was denied his constitutional rights against cruel and unusual punishment and to due process of law

Supporting FACTS (tell your story <u>briefly</u> without citing cases or law):

because the trial court refused to instruct the jury that they could consider that Cantu was subject to a forty year minimum sentence for parole eligibility.

D. **GROUND FOUR:** Cantu was deprived his constitutional rights because the court's instruction concerning mitigation did not

Supporting FACTS (tell your story <u>briefly</u> without citing cases or law):

require the state to prove the absence of sufficient mitigation circumstances beyond a reasonable doubt

21. Have you previously filed a federal habeas petition attacking the same conviction, parole revocation, or disciplinary proceeding that you are attacking in this petition?

☐ Yes     ☒ No

If your answer is "yes," give the date on which <u>each</u> petition was filed, the federal court in which it was filed, and whether the petition was (a) dismissed without prejudice or (b) denied.

22. Are any of the grounds listed in paragraph 20 above presented for the first time in this petition?

☒ Yes     ☒ No

If your answer is "yes," state <u>briefly</u> what grounds are presented for the first time and give your reasons for not presenting them to any other court, either state or federal.

Grounds 8-12 are raised for the first time and were not presented to the State courts because of ineffective assistance of state habeas counsel.

**E. Ground Five:** CANTU WAS DENIED HIS CONSTITUTIONAL RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW DUE TO THE REQUIREMENTS THAT IT TAKE AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT NEGATIVE ISSUES.

**F. Ground Six:** TEXAS CODE CRIM PROC. ART. 37.071 AND ART. 44.251 VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION BECAUSE THEY FAIL TO PROVIDE MEANINGFUL REVIEW OF PUNISHMENT ISSUES.

**G. Ground Seven.** THE SEARCH OF THE APARTMENT IN WHICH MR. CANTU RESIDED VIOLATED HIS FOURTH AMENDMENT RIGHTS

**H. Ground Eight.** TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE CANTU'S CLAIMS OF ACTUAL INNOCENCE

**I. Ground Nine.** CANTU'S APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE AN ISSUE ON APPEAL RELATED TO THE TRIAL COURT'S ERROR IN NOT GIVING A REASONABLE DOUBT INSTRUCTION FOR EXTRANEOUS OFFENSES

**J. Ground Ten.** MR. CANTU WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT AT ALL STAGES OF HIS TRIAL.

**K. Ground Eleven.** MR. CANTU'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO EXTRANEOUS VICTIM IMPACT TESTIMONY.

**L. Ground Twelve.** THE STATE'S USE OF A PREEMPTORY CHALLENGE TO DISQUALIFY AN HISPANIC JUROR WAS IMPROPER UNDER *BATSON V. KENTUCKY*

**M. Ground Thirteen.** THE INVESTIGATION CONCERNING CANTU'S ACTUAL INNOCENCE CONTINUES AND, ON THAT BASIS, CANTU PRESERVES THIS CLAIM.

23. Do you have any habeas corpus proceedings or appeals now pending in any court, either state or federal, relating to the judgment or proceeding under attack?

　　　☐ Yes　　　　　☒ No

If "yes," identify each type of proceeding that is pending (i.e., direct appeal, art. 11.07 application, or federal habeas petition), the court in which each proceeding is pending, and the date each proceeding was filed.

Wherefore, petitioner prays that the Court grant him the relief to which he may be entitled to.

_____
Signature of Attorney (if any)

F. Clinton Broden
2707 Hibernia St.
Dallas, Texas   75204

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on:

_____

Executed on: January 17, 2007

_____
Signature of Petitioner (required)

Petitioner's current address:　3872 FM 350 South; Livingston, TX 77351

U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JAN 1 8 2007

DAVID J. MALAND, CLERK
BY
DEPUTY_____

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| IVAN A. CANTU, | ) CIVIL ACTION NO. |
| | ) |
| **Petitioner,** | ) <u>2:06 CV 166</u> |
| | ) |
| v. | ) |
| | ) |
| NATHANIEL QUARTERMAN, Director | ) |
| Texas Department of Criminal | ) |
| Justice, Institutional Division, | ) |
| | ) |
| **Respondent.** | ) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF MOVANT'S PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. §2254

**Broden & Mickelsen**

**F. Clinton Broden III**
**2707 Hibernia Street**
**Dallas, TX 75204**
**(214) 720-9552**
**(214) 720-9594 (Facsimile)**

**Gersten Savage LLP**

**Adam D. Mitzner**
**600 Lexington Avenue**
**New York, New York 10022**
**(212) 972-5200**
**(212) 980-5192 (Facsimile)**

# TABLE OF CONTENTS

Page No.

TABLE OF CONTENTS ....................................................................... ii

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT .............................................................. 1

STATEMENT OF FACTS ..................................................................... 3

    A. Guilt/Innocence .......................................................................... 3

        1. The Crime Scene ................................................................. 3

        2. The Testimony of Amy Boettcher ..................................... 3

        3. The Search of Cantu's Home ............................................. 6

        4. Other Physical Evidence .................................................... 7

        5. The Cantu Phone Call ........................................................ 8

    B. The Penalty Phase ..................................................................... 8

ARGUMENT ..................................................................................... 10

I. CANTU WAS DENIED HIS SIXTH AMENDMENT
CONSTITUTIONAL RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL ............................................................. 12

    A.    Cantu's Trial Counsel's Failure to have Cantu Examined by
        a Mental Health Professional was Well Below Reasonable
        Norms ............................................................................. 13

    B.    There was a Reasonable Probability of a Different Outcome
        at Trial Had Counsel Not Been Deficient ........................ 16

    C.    Application ...................................................................... 12

II. THE EVIDENCE AT TRIAL WAS LEGALLY INSUFFICIENT TO
SUPPORT CANTU'S SENTENCE OF DEATH.....................................18

    A. The Evidence Does Not Support the Jury's Finding that Cantu
    Posed a Future Danger to Society....................................................18

    B. The Evidence Does Not Support the Jury's Finding that there did
    not Exist Mitigating Circumstances Warranting a Sentence of Life
    Imprisonment.................................................................................21

III. CANTU WAS DENIED HIS CONSTITUTIONAL RIGHTS AGAINST
CRUEL AND UNUSUAL PUNISHMENT AND TO DUE PROCESS
OF LAW BECAUSE THE TRIAL COURT REFUSED TO INSTRUCT
THE JURY THAT THEY COULD CONSIDER THAT CANTU WAS
SUBJECT TO A FORTY YEAR MINIMUM SENTENCE FOR PAROLE
ELIGIBILITY....................................................................................23

IV. CANTU WAS DEPRIVED HIS CONSTITUTIONAL RIGHTS
BECAUSE THE COURT'S INSTRUCTION CONCERNING
MITIGATION DID NOT REQUIRE THE STATE TO PROVE THE
ABSENCE OF SUFFICIENT MITIGATION CIRCUMSTANCES
BEYOND A REASONABLE DOUBT....................................................27

V. CANTU WAS DENIED HIS CONSTITUTIONAL RIGHTS AGAINST
CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW
DUE TO THE REQUIREMENTS THAT IT TAKE AT LEAST TEN "NO"
VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE
PUNISHMENT NEGATIVE ISSUES......................................................30

    A. The 12/10 Rule Creates Unconstitutional Juror Confusion........31

    B. The 12/10 Rule Unconstitutionally Allows Jurors to Believe that
    their Individual Vote is Meaningless.................................................32

VI. TEXAS CODE CRIM. PROC. ART. 37.071 AND ART. 44.251
VIOALTE THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE
U.S. CONSTITUTION BECAUSE THEY FAIL TO PROVIDE
MEANINGFUL REVIEW OF PUNISHMENT ISSUES..........................34

VII. THE SEARCH OF THE APARTMENT IN WHICH MR. CANTU
RESIDED VIOLATED HIS FOURTH AMENDMENT RIGHTS............36

VIII. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
INVESTIGATE CANTU'S CLAIMS OF ACTUAL INNOCENCE..........38

IX. CANTU'S APPELLATE COUNSEL WAS INEFFECTIVE FOR
FAILING TO RAISE AN ISSUE ON APPEAL RELATED TO THE
TRIAL COURT'S ERROR IN NOT GIVING A REASONABLE DOUBT
INSTRUCTION FOR EXTRANEOUS OFFENSES...............................39

X. MR. CANTU WAS DENIED HIS CONSTITUTIONAL RIGHT TO
BE PRESENT AT ALL STAGES OF HIS TRIAL...............................41

XI. MR. CANTU'S TRIAL COUNSEL WAS INEFFECTIVE FOR
FAILING TO OBJECT TO EXTRANEOUS VICTIM IMPACT
TESTIMONY...................................................................................43

XII. THE STATE'S USE OF A PREEMPTORY CHALLENGE TO
DISQUALIFY AN HISPANIC JUROR WAS IMPROPER UNDER
BATSON V. KENTUCKY.................................................................45

XIII. THE INVESTIGATION CONCERNING CANTU'S ACTUAL
INNOCENCE CONTINUES, AND, ON THAT BASIS, CANTU
PRESERVES THIS CLAIM.............................................................50

CONCLUSION...............................................................................51

CERTIFICATE OF SERVICE..........................................................52

# TABLE OF AUTHORITIES

## CASE LAW

Apprendi v. New Jersey, 530 U.S. 466 (2000) ...........................27, 28, 29

Batson v. Kentucky, 476 U.S. 79 (1986).........................................45

Beazley v. Johnson, 242 F.3d 248 (5th Cir.) cert. denied,
534 U.S. 945 (2001)..............................................................34

Boyd v. State, 811 S.W.2d 105 (Tex. Crim. App.),
cert. denied, 402 U.S. 971 (1991)...............................................25

Brasfield v. United States, 272 U.S. 448 (1926)................................31

Brown v. Texas, 522 U.S. 940 (1997) ......................................25, 26

Cantu v. State, 939 S.W.2d 627 (Tex. Crim. App.),
cert. denied, 522 U.S. 994 (1997)..............................................43

Carlson v. Ferguson, 9 F. Supp. 2d 654 (S.D. W. Va. 1997)....................37

Clemons v. Mississippi, 494 U.S. 778 (1990)..................................34

Duhamel v. Collins, 955 F.2d 962 (5th Cir. 1992)..........................39, 45

Furman v. Georgia, 408 U.S. 233 (1972).......................................34

Halley v. State, 173 S.W, 3d 510 (Tex. Crim. App. 2005.......................43

Herrera v. Collins, 506 U.S. 390 (1993)........................................50

Jackson v. Virginia, 443 U.S. 307 (1979)......................................18

Jacobs v. Scott, 31 F.3d 1319 (5th Cir. 1994), cert. denied,
513 U.S. 1067 (1995).............................................................30

Jaffe v. Redmond, 518 U.S. 1 (1996)...........................................15

Janecka v. Cockrell, 301 F. 3d 316 (5th Cir. 2002), cert. denied,
123 S. Ct. 1264 (2003)........................................................37

Jones v. United States, 526 U.S. 227 (1999).................................27

Kubat v. Theirot, 867 F.2d 351 (7th Cir.), cert. denied,
493 U.S. 874 (1989).............................................................33

Lowenfeld v. Phelps, 484 U.S. 231 (1988)..................................31

Martinez v. Johnson, 255 F.3d 229 (5th Cir. 2001)...........18, 38, 39, 41, 45

Miller v. Johnson, 200 F.3d 274 (5th Cir. 2000)............................23

Mills v. Maryland, 486 U.S. 367 (1988)..........................30, 32, 33

Mitchell v. Esparza, 540 U.S. 12 (2003)......................................10

Parker v. Dugger, 498 U.S. 308 (1991)......................................34

Penry v. Lynaugh, 492 U.S. 302 (1989).....................................34

Ring v. Arizona, 536 U.S. 584 (2002)..........................................28

Smith v. State, 898 S.W.2d 838 (Tex. Crim. App.),
cert. denied, 516 U.S. 843 (1995).............................................25

Simmons v. South Carolina, 512 U.S. 154 (1994)...............24, 25, 26

State v. Huziar, 12 S.W.3d 479 (Tex. Crim. App. 2000)....................39

State v. Williams, 392 S. 2d 619, 631 (La. 1980)..........................32

Stone v. Powell, 428 U.S. 465 (1976).....................................36, 37

Strickland v. Washington, 466 U.S. 668 (1984).............................12

Taylor v. Illinois, 484 U.S. 400 (1988)............................................42

United States v. Cronic, 466 U.S. 648, (1984)...................................13

United States v. Gagnon, 470 U.S. 522 (1985)...................................41

United States v. Garza Lopez, 410 F.3d 268 (5th Cir.),
cert. denied. 298 S. Ct. 298 (2005).............................................27

Vela v. Estelle, 708 F.2d 954 (5th Cir. 1983)....................................13

Wiggins v. Smith, 539 U.S. 510 (2003)..............................11, 13, 17

Williams v. Taylor, 529 U.S. 362 (2000)....................................10, 36

Willingham v. State, 897 S.W.2d 351 (Tex. Crim. App. 1994),
cert. denied, 516 U.S. 946 (1995)..............................................25

## STATUTES

Tex. Code Crim. Proc. Art. 37.071, § 2(d)(2)........................30, 34, 39

Tex. Code. Crim. Proc. Art. 44.251..............................................34

28 U.S.C. § 2254(d).................................................................37

Tex. Crim. Code § 19.03(a)(7)...................................................43

## OTHER

Randy Hertz & James S. Leibman, *Federal Habeas Corpus Practice &
Procedure*, §27.1 at 1242 (4th ed. 1998)......................................31

Petitioner Ivan Abner Cantu, by his attorneys, Broden & Mickelson and Gersten Savage LLP, hereby submits this Memorandum of Law in support of his Writ of Habeas Corpus pursuant to 28 U.S.C. §2254.

## PRELIMINARY STATEMENT

James Mosqueda and Amy Kitchen were murdered in their home on November 4, 2000. (31 R.R. 111-116.[1]) Mosqueda was a well-known drug dealer who sold in large quantities. (34 R.R. 127, 36 R.R. 182.) He further associated with several other well-known drug dealers. (43 R.R. 131; 36 R.R. 193; 34 R.R. 119-121.) Despite Mosqueda's drug connections, his cousin, Ivan Cantu, was charged with the murders.

Cantu was convicted on October 16, 2001 (41 R.R. 61), and he was sentenced to death October 26, 2001. (48 R.R. 8.) Cantu's direct appeal was denied on June 30, 2004, and his State Writ of Habeas Corpus was denied on January 18, 2006.

Cantu now brings this Federal Writ of Habeas Corpus seeking to address several errors that deprived him of numerous of his constitutional rights. These issues run the gamut from the ineffectiveness of his trial

---

[1] References to the Record shall be designated as "___ R.R. ___" indicating the volume followed by the page number.

1

counsel for not investigating important grounds for mitigating the death penalty sentence to certain constitutional violations that deprived Cantu of a fair trial.

# STATEMENT OF FACTS

The following statement of facts is derived from the record in this matter.

## A. Guilt/Innocence

### 1. The Crime Scene

On the afternoon of November 4, 2000, Mosqueda and Kitchen were Found murdered in their home. The crime scene indicated that Mosqueda and Kitchen had been shot while in their nightclothes in their bedrooms. There were no signs of forced entry and no gun was found at the scene. (32 R.R. 59-62.)

### 2. The Testimony of Amy Boettcher

Amy Boettcher was Ivan Cantu's girlfriend at the time of the murders. (35 R.R. 87.) At trial, Boettcher provided the major account of Cantu's whereabouts and conduct around the time of the murders.

At the time of the murder, Boettcher was twenty-five years old. (35 R.R. 80.) She had already lived with many men, and was an admitted drug user, testifying that she preferred ecstasy, speed and cocaine. (35 R.R. 87-95, 111; 34 R.R. 99-100.) She was on probation and had not been gainfully employed in some time, preferring to spend her time sleeping all day and partying all night, and relied on Cantu to pay for this lifestyle. (36 R.R. 65-

3

66.) By contrast, at the time of the murders, Cantu had been successful in several legitimate businesses. (37R.R.18-19.)

According to Boettcher's testimony, the chronology of the events surrounding the murders was as follows:

- Cantu called Mosqueda at 11:20 p.m. on November 3, and asked to go see him. (34 R.R. 121.)

- Cantu told Boettcher that he was going to kill Mosqueda and Kitchen. (43 R.R. 121.)

- Boettcher testified that Cantu had his gun with him when he left (34 R.R. 124, 125), and when he returned, his face was swollen, and there was blood on his jeans and he had a different shirt on. (36 R.R.57, 58.)

- Boettcher claimed that Cantu then took her back to the crime scene to look for cocaine. (35 R.R. 129.)

- After seeing the dead bodies, Boettcher claimed that she and Cantu went clubbing until the early hours of the morning. (34 R.R. 120.)

- Approximately mid-morning on November 4, Cantu and Boettcher drove to Arkansas to visit with her parents. (35 R.R. 153-58.)

- Boettcher did not tell her mother or stepfather (who was a retired police officer) or anyone else about the murders, and made no effort

to call the police during their two day stay in Arkansas, despite the fact that there were several times she was not with Cantu. (36 R.R. 19, 26, 27, 79-81.)

- Boettcher claimed that on the evening before the murders, Cantu fired a shot at her in their apartment. (35 R.R. 188.)

- On November 7, Boettcher accompanied Cantu back to Dallas. (35 R.R. 168.) On the way back from Arkansas, Cantu and Boettcher stopped at the home of Tawny Svihovec, a former girlfriend of Cantu. (35 R.R. 172.)

- On November 8, 2000, Boettcher received a telephone call from Cantu telling her that he had been arrested. (34 R.R. 183.) Boettcher claimed that Cantu told her that he had left her money under a couch cushion. (35 R.R. 184-85.)

- Boettcher further claimed that with this found money, she purchased a plane ticket to return to Arkansas. (34 R.R. 184.)

- Once she was back in Arkansas, Boettcher agreed to cooperate with the authorities. (36 R.R. 19, 26, 27.)

As a result of Boettcher's cooperation, she was not charged in connection with the murders, despite her claimed presence at the scene shortly after the crime. (36 R.R. 19-20, 31.) Moreover, although her

continued drug use violated a condition of her parole in connection with a previous conviction for drunk driving (36 R.R. 32, 44), the authorities made no effort to revoke her probation. (36 R.R. 44.) To the contrary, the case's lead detective arranged for her to complete her probation in Arkansas, and told Boettcher that if she had any problems with her probation officer, she should contact him. (36 R.R. 69-71, 94.)

### 3. The Search of Cantu's Home

On the evening that the bodies were discovered (November 4), Sylvia Cantu, Cantu's mother and Mosqueda's aunt, allegedly requested that officers take her to the Cantu/Boettcher home. (32 R.R. 76, 81.) Officers Junger and Illif took Ms. Cantu to the residence. (32 R.R. 76, 81.)

Officer Junger did not have a search warrant to enter the home. (32 R.R. 109.) Nonetheless, he used the manager's key to gain entry at 8:25 p.m. (32 R.R. 78, 82), and spent approximately ten minutes alone inside the small one-bedroom apartment, ostensibly looking for some evidence that Cantu or Boettcher had been harmed. (3 R.R. 46-48.) Ms. Cantu was not permitted inside the home during this search. (32. R.R. 100.)

Officer Junger testified that when he was leaving the apartment, he noticed a small hole by the door, which he said he thought was a bullet hole.

(32 R.R. 87, 112.) Junger did not mention this bullet-hole in his report. (32 R.R. 89.)

On November 7, 2000, Detective Anthony Winn obtained a search warrant for the Cantu/Boettcher residence. On his direct appeal, Cantu argued that this search was illegal.

During this search, the following items were seized: a pair of jeans, white socks, one box of 380 bullets and assorted keys, including a sliver and gold Mercedes key that started Kitchen's Mercedes and another key that unlocked the door from the garage to the Mosqueda/Kitchen's house. (SX 105; SX-1.) Later forensic tests indicated that the jeans and socks had the decedents' blood on them. (37 R.R. 185, 186.)

### 4. **Other Physical Evidence**

In the course of their investigation, the police uncovered the murder weapon at the home of Svihovec. (33 R.R. 148.) Cantu's fingerprints were on the removable clip, but not the weapon itself. (34 R.R. 150.)

After executing a second search warrant, police determined that the bullet hole in the Cantu/Boettcher home, which Boettcher claims occurred when Cantu shot at her two days before the murders, contained a bullet fired from the murder weapon. (34 R.R. 172-174.) Mosqueda's Corvette was also located parked nearby the Cantu/Boettcher residence. (33 R.R. 154.)

### 5. **The Cantu Phone Call**

On November 5, 2000, Cantu called Carlos Gonzales, a mutual acquaintance of Cantu and Mosqueda. (33 R.R. 60.) Unbeknownst to Cantu, Gonzales invited Detective Winn to listen to that conversation. (33 R.R. 62.)

During this call, Cantu told Gonzales that a man dressed as a pizza deliveryman had threatened Cantu on November 2. (3 R.R. 97.) The man told Cantu that Mosquada owed him money for drugs and that when he left he shot into the wall. (3R.R. 97.) Cantu further explained that he went to Mosqueda's house on November 3 to alert Mosqueda to this threat, and, at that time, Mosqueda requested that Cantu take his car and leave Cantu's Honda so that it would appeared that someone was visiting Mosqueda at home. (33 R.R. 67-68.)

### B. **Penalty Phase**

After Cantu was found guilty of the murders, the case proceeded to the penalty phase. Cantu's prior criminal record consisted mostly of charges for reckless driving, intoxication and one deferred adjudication for possession of cocaine. (42 R.R. 17, 25, 42 R.R. 105.) The state's other punishment evidence largely concerned Cantu's alleged violence toward his two wives, and an argument he had with his mother. A topless dancer named Michelle Gonzales claimed that she had seen bruises on Cantu's second

wife, Jennifer. (42 R.R. 79, 84.) That account was disputed by Cantu's mother. (44 R.R. 142.) Another witness, Patrick Swann, testified that he saw Cantu screaming at his mother (43 R.R. 4-14), although Mr. Swann further admitted that he was a wife-abuser himself. (43 R.R. 18.) Cantu's first wife, Michelle Traister, testified that there had been violence in her marriage to Cantu (43 R.R. 109-133), but acknowledged that there was also considerable drug use, which fueled Cantu's anger.

Cantu's trial counsel, however, had failed to uncover and therefore failed to introduce, significant evidence demonstrating Cantu's various mental defects that would have certainly been weighed by the jury as important evidence of mitigation. This evidence is set forth more fully below.

## ARGUMENT

Under AEDPA, a federal court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the petitioner shows that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(1); Williams v. Taylor, 529 U.S. 362, 402-13 (2000). A state court's decision is "contrary to" clearly established federal law if (1) the state court "applies a rule that contradicts the governing law" announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts. Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003)(internal quotation marks omitted). A state court's application of clearly established federal law is "unreasonable" within the meaning of AEDPA when the state court identifies the correct governing legal principle from Supreme Court precedent, but applies that principle to the case in an

objectively unreasonable manner. <u>Wiggins v. Smith</u>, 539 U.S. 510, 520

(2003).

# I.

## CANTU WAS DENIED HIS SIXTH AMENDMENT CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

Cantu's trial counsel failed to investigate or put on any evidence regarding his mental health problems. Specifically, trial counsel failed to have Cantu diagnosed by a mental health expert for the purpose of introducing evidence concerning Cantu's mental defects, dysfunctional childhood or drug use, in the event that Cantu was found guilty of the crime. Such an investigation was necessary to proffer evidence of mitigation at the sentencing phase. This failure by trial counsel denied Cantu of his constitutional right under the Sixth Amendment to effective trial counsel.

It is axiomatic that defendants enjoy a constitutional right to effective counsel. For counsel to be deemed ineffective such that the accused's constitutional right has been violated, the accused must show that his counsel fell below an objective standard of reasonableness and that there was a "reasonable probability" that the results of the trial would have differed but for counsel's deficient performance. Strickland v. Washington, 466 U.S. 668, 687-688 (1984). Both of the prongs of the Strickland test have been met here.

**A.    Cantu's Trial Counsel's Failure to Have Cantu
       Examined By a Mental Health Professional
       Was Well Below Reasonable Norms**

During the sentencing phase, trial counsel failed to either look for or
introduce evidence of mitigation on the ground of Cantu's mental condition.
This failure rendered trial counsel ineffective and deprived Cantu his rights
under the Sixth Amendment.

As a general matter, courts reviewing the effectiveness of counsel will
consider trial counsel's performance as a whole, although an isolated error
may by itself render counsel's performance constitutionally deficient. United
States v. Cronic, 466 U.S. 648, 657, n. 20 (1984); Vela v. Estelle, 708 F.2d
954, 965 (5th Cir. 1983), cert denied, 464 U.S. 1053 (1984).

In this case, trial counsel failed to make an independent investigation
of the facts regarding mitigation because he failed to investigate the possible
psychiatric causes that led to the crime. The duty to conduct such an
investigation is central to counsel's obligations to provide effective
assistance. See Wiggins v. Smith, 539 U.S. 510 (2003).

The record below makes clear that trial counsel failed to conduct any
investigation into the mental disorders that would have led the jury to
impose a lesser sentence than death. During the State Writ process, Cantu's
Habeas counsel conducted such an investigation by retaining Dr. Daneen

13

Milam, PhD, a psychologist and the director of the McCullough Assessment Center. Dr. Milam examined Cantu and prepared a written report of her findings. (A true and correct copy of that report is attached hereto as Exhibit A.)

Dr. Milam's examination of Cantu revealed that Cantu suffers from a bi-polar disorder. (Id. paras 6, 7, 14.) In addition, Dr. Milam opined that Cantu's history of drug abuse, including ecstasy, mushrooms, speed and cocaine, required trial counsel to conduct a drug assessment and prepare a social history. (Id., paras 8, 12.) Had such an evaluation been performed, Dr. Milam believed that this would have enabled trial counsel to place Cantu's actions in context so that the jury could better understand what might have motivated him to commit this crime. (Id., para 15.)

There can be little doubt that trial counsel's failure to even investigate the possible mental defects that could have existed and therefore contributed to Cantu's commission of this crime was inexcusable. Trial counsel must have known that in the event that Cantu was found guilty, the issue of his psychiatric health would be central to any claim of mitigation at sentencing. Failing to investigate a possible defense to the death sentence on this ground is clear ineffective assistance.

14

During the State Writ process, Cantu's trial counsel submitted an affidavit stating that he relied exclusively on statements made by Cantu and Cantu's mother to assess Cantu's psychiatric disorders. (Attachment B, at 8.) Trial counsel further substituted his own layperson's assessment of this complicated mental disorder for that of a trained professional, and determined that because Cantu could recall facts, was not incoherent, and offered other forms of assistance, that he did not suffer from a psychiatric disorder and, therefore, that no further inquiry was necessary. Id.

Trial counsel further claimed that he chose not to have a psychiatrist evaluate Cantu for fear that such an opinion would be adverse to Cantu. Id. However, this rationale is highly questionable given that any psychiatric evaluation would be cloaked under the attorney-client privilege (as well as doctor-patient privilege). Jaffe v. Redmond, 518 U.S. 1 (1996). As a result, the possible adverse impact of such an evaluation, which trial counsel claims was the reason that he chose not to have Cantu examined, was completely unfounded.

Indeed, it is the very purpose of the attorney-client privilege to allow an attorney to conduct a full investigation without fear of adverse facts being introduced at trial. Trial counsel's decision to forgo a psychiatric examination for fear that such an examination would result in an adverse

opinion is no different than failing to ask your client the facts behind his defense for fear that he will admit his guilt.

**B.   There was a Reasonable Probability of a Different Outcome at Trial Had Counsel Not Been Deficient**

After the jury found Cantu guilty of the double-murders, they had to consider whether to impose the death sentence. Unfortunately, as a result of counsel's failure to reasonably discharge his duties, the jury was not provided with evidence concerning Cantu's bi-polar disorder, his dysfunctional childhood, or his drug abuse.

Had the jury heard the findings of Dr. Milam, they would have assuredly concluded that Cantu's conduct was motivated by a severe mental disorder. As Dr. Milam explained in her submission accompanying the State Habeas Writ (and would have explained to a jury), bi-polar disorder is a medical condition "caused by a difference in how a person's brain and nervous system regulates basic behavior patterns. It is not a choice, but is instead, a breakdown of the inhibitory system." (Exhibit A, para 6.)

Such evidence could not have helped but to have had an impact on the jury. Faced with the prospect of sentencing to death a young man who committed this murder due to a mental defect, as opposed to a venal choice, the jury would likely have shown leniency.

16

The Court of Criminal Appeals rejected Cantu's State habeas Writ on this ground, claiming that trial counsel's strategy was sound. However, this ruling is contrary to well-established federal law. In <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), the Court found that the issue was not whether counsel's strategy decision was sound, but rather whether counsel had conducted a sufficient investigation to make such a strategy decision. <u>Id</u>. at 539. Here there can be no doubt that counsel did not perform an adequate investigation to make the strategic decision not to put on psychiatric mitigation evidence because counsel never had Cantu examined by a psychiatrist in the first place. As a result, there can be little doubt that counsel was ineffective in this regard.

## II.

## THE EVIDENCE AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT CANTU'S SENTENCE OF DEATH

The United States Court of Appeals for the Fifth Circuit will conduct a sufficiency review to determine the sufficiency of evidence related to the jury's determination of Texas's special issues. Martinez v. Johnson, 255 F.3d 229, 241 (5th Cir. 2001), cert. denied, 535 U.S. 1091. In doing so, it applies the standard announced by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307 (1979). Johnson, 255 F.3d at 241 In this case, the evidence (or lack thereof) which allegedly supports the jury's findings of future dangerousness and/or lack of mitigation fails to meet this basic standard.

### A.    The Evidence Does Not Support the Jury's Finding that Cantu Posed a Future Danger to Society

The State failed to put on sufficient evidence to support the jury's finding that Cantu posed a future danger to society. This was a crime involving Cantu's family members. Although the nature of the crime was horrific, there was nothing in Cantu's background to indicate that he would be a future danger to society.

The State's evidence concerning punishment was woefully inadequate to support the death penalty. Cantu's prior criminal record consisted mostly

18

of charges for reckless driving, intoxication and one deferred adjudication for possession of cocaine. (42 R.R. 17, 25, 42 R.R. 105.) Cantu's probation officer admitted that Cantu had successfully completed his supervision and his felony was dismissed. (42 R.R. 105-108.) Cantu had also successfully completed a drug program, and had converted to Christianity. (44 R.R. 101.)

In addition, the jury heard evidence that Cantu has had no disciplinary infractions while he has been in custody. (44 R.R. 61; 45 R.R.160.) The two officers who had been involved in Cantu's prior arrests both testified that Cantu exhibited no aggressive behavior during those arrests. (42 R.R. 37, 45-46.)

Finally, Cantu relied on two experts. Dr. Mark Cunningham, a forensic psychologist, explained to the jury that future dangerousness was an assessment of the risk of violence while mitigation explained what forces shape a defendant's choices. (45 R.R. 72.) In this regard, Dr. Cunningham explained that capital offenders are less likely to engage in serious acts of violence than the rest of the prison population. (45 R.R. 112.) He further explained that in Cantu's case, the risk of further violence would be decreased in prison because the factors that put Cantu at risk to commit such violence (drugs, unstructured environment) would no longer be a factor. (45 R.R. 160-161.)

The defense also offered the testimony of Walter Quijano, Ph.D., a clinical psychologist who is very familiar with the Texas Prison system. Dr. Quijano testified that a family murder – like the one here – is not likely to be repeated because the dynamics that lead up to it are no longer present in prison. (46 R.R. 219.)

By contrast, the State's evidence of "future dangerousness" was sparse, indeed. The State relied largely on the evidence from dubious sources to further the claim that Cantu had been abusive to his wives. For example, a topless dancer named Michelle Gonzales claimed that she had seen bruises on Cantu's second wife, Jennifer. (42 R.R. 79, 84.) That account was disputed by Cantu's mother. (44 R.R. 142.) Another witness, Patrick Swann, testified that he saw Cantu screaming at his mother (43 R.R. 4-14), although Mr. Swann further admitted that he was a wife-abuser himself. (43 R.R. 18.) Cantu's first wife, Michelle Traister, testified that there had been violence in her marriage to Cantu (43 R.R. 109-133), but acknowledged that there was also considerable drug use, which fueled Cantu's anger.

The crime at issue involved family members, and was brought about by drug abuse. The other instances of alleged violent conduct were, if believed, all directed toward family members and, likewise, all had drug use

as a triggering factor. As a result, the evidence was insufficient to support the jury's conclusion of future dangerousness.

In sum, there was no credible evidence that Cantu would be a continuing threat to society. It is a travesty of justice to put to death a man who had never been arrested for a crime of violence and only other interaction with the criminal justice system were relatively minor infractions involving drugs, on the theory that he was a continuing threat to society.

**B.      The Evidence does not Support the Jury's Finding that There Did Not Exist Mitigating Circumstances Warranting a Sentence of Life Imprisonment**

In a similar fashion, the trial record does not support the jury's finding that there were not sufficient mitigating circumstances to warrant life imprisonment as an alternative to the death sentence. The jury was provided with significant evidence of Cantu's rehabilitative ways while in prison, including his religious studies.

Most notably, Cantu's mother testified that Cantu had a difficult childhood, marked by their family moving often and Cantu having to attend many different schools. (44 R.R. 17, 31.) Cantu was eight when his parents divorced (44 R.R. 33), and began abusing drugs at an early age. (44 R.R. 47.)

Ms. Cantu explained that in September 2000, she had concerns that Cantu was suicidal, and he was taken to Parkland Psychiatric Services. (44 R.R. 91-92.) She did not believe that her son was guilty of the murders. (44 R.R. 142, 148.)

In sum, there was simply not sufficient evidence to justify a finding that there was not sufficient mitigating evidence to justify a life sentence.

# III

## CANTU WAS DENIED HIS CONSTITUTIONAL RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND TO DUE PROCESS OF LAW BECAUSE THE TRIAL COURT REFUSED TO INSTRUCT THE JURY THAT THEY COULD CONSIDER THAT CANTU WAS SUBJECT TO A FORTY YEAR MINIMUM SENTENCE FOR PAROLE ELIGIBILITY[2]

The Court's jury charge at the punishment phase contained the

following instruction:

> Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

> You are instructed not to consider or discuss the possible actions of the Board of Pardons and Paroles or the Governor, nor how long a defendant would be required to serve on a sentence of life imprisonment, nor how the parole laws would be applied to this defendant. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are of no concern to the judge or jury.

---

[2] Cantu acknowledges that the United States Court of Appeals for the Fifth Circuit has held that the Texas jury instruction regarding the irrelevance of parole eligibility is constitutional. See Miller v. Johnson, 200 F.3d 274, 290 (5th Cir. 2000). Cantu, nevertheless, submits this argument in order to preserve it for higher court review.

By contrast to the trial court's instruction that the jury should not consider parole eligibility when determining Cantu's future dangerousness to society, the Constitution requires that the jury consider such "truthful information." As the United States Supreme Court unequivocally declared in Simmons v. South Carolina, 512 U.S. 154 (1994):

> [I]f the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society. Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.

Id. at 168-69.

In Texas, the State necessarily relies on the justification of "future dangerousness" in every death penalty case. See Texas Code Crim. Pro. 37.071, § 2(b)(1). As a result, it was constitutionally required that Cantu be able to allow the jury to actually consider that he would not be eligible for parole for at least forty years. Simmons, 512 at 168-69.

The fact that the trial court referenced Cantu's ineligibility for parole and then instructed that the jury could not consider that fact actually exacerbated the problem. Id. at 170-171. For due process to have been satisfied, Cantu must have been afforded the right to answer the State's

24

future dangerousness allegations with information regarding his parole ineligibility. Id.

Courts in Texas have interpreted the Supreme Court's directive to be inapplicable on the theory that "future dangerousness" applies to the population both in and out of prison. Smith v. State, 898 S.W.2d 838, 846 (Tex. Crim. App.), cert. denied, 516 U.S. 843 (1995); Boyd v. State, 811 S.W.2d 105, 118, n.12 (Tex. Crim. App.), cert. denied, 402 U.S. 971 (1991). On this basis, the Texas Court of Criminal Appeals has traditionally determined that juries need not be told about minimum parole eligibility because the defendant continues to be a threat to his fellow inmates even in the absence of parole. See, e.g, Willingham v. State, 897 S.W.2d 351, 359 (Tex. Crim. App. 1994), cert. denied, 516 U.S. 946 (1995).

The troubling aspect of the Texas law was addressed by the Supreme Court in a written opinion by Justice Stevens in Brown v. Texas, 522 U.S. 940 (1997). Although respecting the Court's denial of a petition for writ of certiorari Justice Stevens, joined by Justices Souter, Ginsberg and Breyer, noted the "obvious tension" between the Texas rule prohibiting the introduction of parole ineligibility information and the Court's basic holding in Simmons. Justice Stevens went on to state:

> The situation in Texas is especially troubling. In Texas, the jury determines the sentence to be imposed after conviction in a significant

number of non-capital felony cases. In those noncapital cases, Texas law *requires* that the jury be given an instruction explaining when the defendant will become eligible for parole. [footnote omitted]. Thus, the Texas Legislature has recognized that, without such an instruction, Texas jurors may not fully understand the range of sentencing options available to them. Perversely, however, in capital cases, Texas law *prohibits* the judge from letting the jury know when the defendant will become eligible for parole if he is not sentenced to death. The Texas rule unquestionably tips the scales in favor of a death sentence that a fully informed jury might not impose.

Id.

As Justice Stevens and his colleagues opined in <u>Brown v. Texas</u>, it is impossible to reconcile the Texas rule prohibiting the consideration of parole ineligibility and the constitution dictates in <u>Simmons v. South Carolina</u>. The trial court's refusal to allow the jury to consider Cantu's parole ineligibility for forty years denied Cantu his rights under the United States Constitution – specifically, the rights to an impartial jury, against cruel and unusual punishment and to due process of law, guaranteed by the Sixth, Eighth and Fourteen Amendments.

## IV.

## CANTU WAS DEPRIVED HIS CONSTITUTIONAL RIGHTS BECAUSE THE COURT'S INSTRUCTION CONCERNING MITIGATION DID NOT REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATION CIRCUMSTANCES BEYOND A REASONABLE DOUBT[3]

The trial court followed the current "mitigation" special issue in Texas, and instructed the jury as follows:

> Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(RC VII-1455.) This jury charge did not impose any burden of proof on either the State or the defense.

In Apprendi v. New Jersey, 530 U.S. 466 (2000) and Jones v. United States, 526 U.S. 227 (1999), the United States Supreme Court held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged

---

[3] Cantu acknowledges that the United States Court of Appeals for the Fifth Circuit has upheld the constitutionality of the Texas jury instruction regarding the failure to prove the second special instruction beyond a reasonable doubt See United States v. Garza Lopez, 410 F.3d 268, 276 (5th Cir.), cert. denied. 298 S.Ct. 298 (2005). Cantu nevertheless, submits this argument in order to preserve it for higher court review.

in the indictment, submitted to a jury, and proven beyond a reasonable doubt." Jones, 526 at 243, n. 6. In other words, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." Apprendi, 530 U.S. at 482-483. The Court went on to hold that a "sentencing factor" that served to increase a sentence beyond the maximum sentence otherwise statutorily authorized (in Apprendi that being a hate-crime), "is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense." Id. at 494, n. 19.

More recently, in Ring v. Arizona, 536 U.S. 584 (2002), the Supreme Court held that the Constitution prohibited Arizona's scheme in which trial judges determined whether aggravating factors existed which justified imposition of the death penalty. The Court concluded that "because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury." Id. at 605.

In this case, the jury's guilty verdict cannot result in the imposition of the death penalty unless both special issues are answered. The first – that

there was a probability that Cantu would commit criminal acts of violence that would constitute a continuing threat to society – requires the jury to answer in the affirmative beyond reasonable doubt. However, the second special issue – whether "taking into consideration all of the evidence . . . do you find that there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?" – contains no reasonable doubt requirement.   Despite   the   fact that it is worded in the negative, the special instruction is nevertheless the "functional equivalent of an element of a greater offense," Apprendi, 530 U.S. at 494 n. 19, because it serves to increase the offense from one punishable by life without parole to a capital offense punishable by death. As a constitutional matter, therefore, under Apprendi and its progeny, the jury is required to make this finding by beyond a reasonable doubt.

## V.

## CANTU WAS DENIED HIS CONSTITUTIONAL RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW DUE TO THE REQUIREMENTS THAT IT TAKE AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT NEGATIVE ISSUES[4]

Under Texas law, for the death penalty to be imposed, two special issues must be decided by the jury. The first concerns the future dangerousness of the defendant, and all twelve jurors must vote affirmatively for the death penalty to be imposed. The second concerns whether mitigation requires the imposition of a life sentence, and that requires only that ten jurors vote negatively. See Tex. Code Crim. Proc. Art. 37.071, § 2(d)(2) (hereinafter referred to as the "12/10 Rule"). In this case, the trial court instructed the jury according to Texas law. (CR.I-254-255.)

The Texas 12/10 Rule is constitutionally deficient for two reasons. First, it generates considerable juror confusion. Second, it violates the Eighth Amendment principle in Mills v. Maryland, 486 U.S. 367 (1988), by leaving reasonable jurors to believe that their individual vote in favor of returning a

---

[4] Cantu acknowledges that the United States Court of Appeals for the Fifth Circuit has held that the Texas jury instruction regarding the 12/10 Rule is constitutional. See Jacobs v. Scott, 31 F.3d 1319, 1328 (5th Cir. 1994), cert. denied, 513 U.S. 1067 (1995). Cantu nevertheless submits this argument in order to preserve it for higher court review.

life sentence based on mitigating factors is meaningless unless they are joined by nine other jurors on this same mitigating factor.

## A. The 12/10 Rule Creates Unconstitutional Juror Confusion

The 12/10 Rule generates the considerable likelihood that jurors who would otherwise hold out against voting for the death sentence, instead adopt a "majority rules" approach and change their vote to conform to the will of the majority.  The United States Supreme Court has repeatedly criticized any form of minority juror coercion. See, e.g., Lowenfeld v. Phelps, 484 U.S. 231, 239-240 (1988); Brasfield v. United States, 272 U.S. 448, 450 (1926). As the Court held in Lowenfeld v. Phelps, "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear 'in some degree, serious although not measurable, an improper influence on the jury." Lowenfeld, 484 U.S. at 239, citing Brasfield, 272 U.S. at 450.

The 12/10 Rule is akin to an impermissible "dynamite charge" which has been recognized as a possible Eighth Amendment violation in the capital sentencing context. See Lowenfeld, 484 U.S. at 240-41. In addition, the 12/10 Rule injects arbitrariness into the sentencing process, by causing each juror to question the importance of his or her vote, leaving the juror free to speculate as to what the outcome would be in the event that there was no

31

unanimity, including the possibility that individual jurors would surmise that their disagreement would result in a new sentencing hearing or new trial. Such uncertainty – especially when it surrounds the imposition of a death sentence – is constitutionally improper. See State v. Williams, 392 So.2d 619, 631 (La. 1980)(on rehearing) (Louisiana Supreme Court holding that such uncertainty amongst jurors was a constitutional violation.)

### B. The 12/10 Rule Unconstitutionally Allows Jurors to Believe that their Individual Vote is Meaningless

The 12/10 Rule also violates the Eighth Amendment because it leaves reasonable jurors to believe that their individual vote in favor of returning a life sentence based on a particular mitigating factor is meaningless. In this way, a reasonable juror could well believe that there must be a meeting of the minds between his or her fellow jurors as to whether a mitigating factor sufficient to impose a life sentence is present.

Under Mills v. Maryland, 486 U.S. 367 (1988), it is unconstitutional to effectuate a scheme in which jurors believe that their vote is meaningless unless joined by others. "Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk." Id. at 400.

The 12/10 Rule clearly violates the rule of <u>Mills</u>. In <u>Kubat v. Theiriot</u>, 867 F.2d 351 (7th Cir.), <u>cert. denied</u>, 493 U.S. 874 (1989), in reviewing a scheme virtually identical to the 12/10 Rule in Texas, the Seventh Circuit held.

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death . . . [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

<u>Kubat</u>, 867 F.2d at 373.

Moreover, it is possible that jurors concluded that even if a majority of them believed that mitigating factors existed so that the death penalty should not be imposed, that unless ten of them agreed on the <u>specific</u> mitigating factor, there was not sufficient mitigation to avert a capital penalty. This, too, is unconstitutional under <u>Mills</u>.

In sum, Texas' 12/10 Rule is unconstitutional. The trial court's use of that rule requires that Cantu be given a new trial.

## VI

## TEXAS CODE CRIM PROC. ART. 37.071 AND ART. 44.251 VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION BECAUSE THEY FAIL TO PROVIDE MEANINGFUL REVIEW OF PUNISHMENT ISSUES[5]

The Texas courts did not review the legal sufficiency of the jury's determination concerning whether sufficient mitigation existed against the imposition of the death penalty (special issue no. 2.) (Order of Court of Appeals Attached as Exhibit C.) As a matter of constitutional right, Cantu was entitled to a meaningful appellate review of his death penalty sentence. Parker v. Dugger, 498 U.S. 308 (1991); Penry v. Lynaugh, 492 U.S. 302 (1989).

There can be little doubt that meaningful review and the reweighing of evidence when appropriate is necessary to give meaning to an accused's constitutional rights. Indeed, as the Supreme Court held in Clemons v. Mississippi, 494 U.S. 778 (1990), failure to perform an appellate review is tantamount to an automatic affirmance. Similarly, in Furman v. Georgia, 408 U.S. 233 (1972), the Court held that decisions that give rise to the death penalty must be subject to appellate review.

---

[5] Cantu acknowledges that the United States Court of Appeals for the Fifth Circuit has held that the Texas Code Articles 37.071 and 44.251 are constitutional. See Beazley v. Johnson, 242 F.3d 248 (5th Cir.) cert. denied, 534 U.S. 945 (2001). Cantu nevertheless submits this argument in order to preserve it for higher court review.

Under the Texas scheme, however, there was no review whatsoever of
the jury's finding that mitigation sufficient to spare Cantu the death penalty
was not present. As a result, the death sentence imposed here is not
constitutionally sustainable.

## VII

## THE SEARCH OF THE APARTMENT IN WHICH MR. CANTU RESIDED VIOLATED HIS FOURTH AMENDMENT RIGHTS

As noted above, a great deal of the evidence against Mr. Cantu was gathered as a result of the search of the apartment he was living in with Amy Kitchen. Mr. Cantu argued on direct appeal that the search violated his rights under the Fourth Amendment. A majority of the Court of Criminal Appeals assumed arguendo that, in fact, the search was constitutionally deficient but concluded that this was harmless. See Attachment C. Notably, three judges dissented and found that the illegally seized evidence contributed to the verdict. Id. ("Such testimony [identified by the majority in its harmless error analysis] might be sufficient to support the conviction without illegal evidence, but I do not see how it could remove every reasonable doubt that the illegal DNA evidence even contributed to the verdicts." (emphasis in original)). As such, three of the nine Court of Criminal Appeals judges thought Mr. Cantu's conviction should have been reversed.

The Court of Criminal Appeals' decision on this issue is "contrary to, or involved an unreasonable application of, clearly established Federal law" as that term was explained by the United States Supreme Court in Williams v. Taylor, 529 U.S. 362 (1999). Mr. Cantu further submits that the

36

roadblock erected in <u>Stone v. Powell</u>, 428 U.S. 465 (1976), should not apply to this claim. Indeed, commentators have noted that it is arguable that <u>Stone</u> "does not apply to capital cases." See, e.g., Randy Hertz & James S. Leibman, *Federal Habeas Corpus Practice & Procedure*, §27.1 at 1242 (4th ed. 1998). Likewise, one court has held that, by failing to exclude Fourth Amendment claims from its standard of review, the revised 28 U.S.C. § 2254(d) has effectively abolished the distinction drawn by *Stone* between Fourth Amendment claims and other claims and requires federal courts to employ a uniform standard for assessing all claims raised under 28 U.S.C. § 2254. <u>Carlson v. Ferguson</u>, 9 F. Supp. 2d 654 (S.D. W. Va. 1997).[6]

---

[6] Unfortunately, pending review by a higher court, Mr. Cantu must acknowledge the inapplicability of the <u>Stone</u> roadblock is currently foreclosed by the Fifth Circuit's decision in <u>Janecka v. Cockrell</u>, 301 F. 3d 316 (5th Cir. 2002), <u>cert. denied</u>, 123 S. Ct. 1264 (2003) given that the Fifth Circuit applied the Stone roadblock in that case despite the fact that it was both a capital case and governed by the ADEPA cases

## VIII.

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE CANTU'S CLAIMS OF ACTUAL INNOCENCE[7]

Cantu's trial counsel failed to conduct even a minimal investigation into the possibility that Cantu was innocent of the charges. Trial counsel failed to retain a private investigator, or interview potential witnesses who could exculpate Cantu.

Federal Habeas counsel, with the assistance of a private investigator, is currently seeking to do what trial counsel did not – seek out evidence of Cantu's actual innocence. When such evidence becomes available, Cantu will submit it to the Court in order to demonstrate that there was a reasonable probability of a different outcome had trial counsel not been deficient.

---

[7] In the event this Court was to agree that Cantu's ineffective assistance of counsel was partially defaulted, Cantu asserts that he is excused based upon the deficient performance of his habeas counsel. While Cantu acknowledges that the United States Court of Appeals has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. See, e.g. Martinez v. Johnson, 255 F.3d 229, 245 (5th Cir. 1999). Cantu nevertheless, submits this argument in order to preserve it for higher court review.

## IX.

## CANTU'S APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE AN ISSUE ON APPEAL RELATED TO THE TRIAL COURT'S ERROR IN NOT GIVING A REASONABLE DOUBT INSTRUCTION FOR EXTRANEOUS OFFENSES[8]

At the punishment phase of the trial, Cantu's trial lawyer requested that, pursuant to Tex. Code Crim. P. 37.07, the trial court instruct the jury that it must believe that the extraneous offenses introduced against Cantu at the punishment hearing occurred beyond a reasonable doubt before it could consider them in its deliberations. (47 R.R. 29-30). The trial court denied this request. (47 R.R. 30). Without question, this was error. State v. Huziar, 12 S.W.3d 479 (Tex. Crim. App. 2000). Likewise, on appeal this error could have resulted in Cantu receiving a new punishment hearing. Id.

It is axiomatic that an appellate attorney provides ineffective assistance of counsel on appeal by failing to raise a claim that "would have had a reasonable probability of success on appeal." Duhamel v. Collins, 955 F.2d 962 (5th Cir. 1992). Here, it is inexplicable why Cantu's appellate counsel did not raise a claim regarding the trial court's failure to follow

---

[8] Mr. Cantu must again acknowledge that this ground for relief was not raised in his State Habeas Writ. In the event this Court believes that this claim has been either completely or partially defaulted, Mr. Cantu would submit that he is excused based upon the deficient performance of his habeas counsel. Mr. Cantu acknowledges that the United States Court of Appeals has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. See, e.g. Martinez, 255 F.3d at 245. Mr. Cantu, nevertheless, submits this argument in order to preserve it for higher court review.

binding case law exactly on point. Given these clear facts, Cantu received

ineffective assistance from his appellate counsel.

## X.

# MR. CANTU WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT AT ALL STAGES OF HIS TRIAL[2]

At one point in the trial, there was a hearing conducted outside the presence of the jury. During the hearing, the lead detective in this case, Anthony Winn, was questioned regarding claims that another person, Mario Rojas, committed the murders of Mr. Mosqueda and Ms. Kitchen. This was the first time that the defense had learned of this alternative suspect who the police long knew about through an anonymous tip. Despite the importance of this information, however, Mr. Cantu was not present during the questioning of the detective. Moreover, when the trial court noticed Mr. Cantu's absence, Mr. Cantu's trial counsel inexplicably "waive[d] Ivan's appearance" despite the fact that there is no evidence that he had Mr. Cantu's permission to do so. (33 R.R. 182-202.)

The right to be present at all trial proceedings is grounded in the Sixth Amendment and the due process clause of the United States Constitution. See United States v. Gagnon, 470 U.S. 522 (1985). Moreover, this right is

---

[9] Mr. Cantu must again acknowledge that this ground for relief was not raised in his State Habeas Writ. In the event this Court believes that this claim has been either completely or partially defaulted, Mr. Cantu would submit that he is excused based upon the deficient performance of his habeas counsel. Mr. Cantu acknowledges that the United States Court of Appeals has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. See, e.g. Martinez, 255 F.3d at 245. Mr. Cantu, nevertheless, submits this argument in order to preserve it for higher court review.

one of those "basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the defendant." <u>Taylor v. Illinois</u>, 484 U.S. 400, 417-18 (1988). Nevertheless, this is exactly what Mr. Cantu's trial counsel did in this case.

In sum, Mr. Cantu's trial was rendered constitutionally defective when he was denied his Sixth Amendment and due process rights to be present at a hearing, conducted during the middle of trial, in which it was learned for the first time that the police had been informed of an alternative suspect in the murders for which Mr. Cantu was standing trial. As such, Mr. Cantu would be entitled to habeas relief and a new trial.

## XI.

## MR. CANTU'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO EXTRANEOUS VICTIM IMPACT TESTIMONY[10]

Mr. Cantu was indicted separately for the murder of James Mosqueda and Amy Kitchen. The state elected to try the cases separately and the instant case was based upon the killing of James Mosqueda. (Indictment of Ivan Cantu attached as Exhibit D.) While it is true that the state alleged the killing of Amy Kitchen in the instant indictment as one of the "methods" of committing capital murder under Tex. Crim. Code § 19.03(a)(7), there should be no dispute that the complainant in the case was only James Mosqueda.

Texas law is very clear that, while the state, in capital cases, may introduce victim impact evidence related to the complainant, victim impact testimony related to the victim of an extraneous offense is generally *inadmissible.* *See* Halley v. State, 173 S.W, 3d 510 (Tex. Crim. App. 2005); Cantu v. State, 939 S.W.2d 627 (Tex. Crim. App.), *cert denied*, 522 U.S. 994 (1997). In this case, however, the state introduced victim impact

---

[10] Mr. Cantu must again acknowledge that this ground for relief was not raised in his State Habeas Writ. In the event this Court believes that this claim has been either completely or partially defaulted, Mr. Cantu would submit that he is excused based upon the deficient performance of his habeas counsel. Mr. Cantu acknowledges that the United States Court of Appeals has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. *See, e g*, Martinez, 255 F.3d at 245. Mr. Cantu, nevertheless, submits this argument in order to preserve it for higher court review.

evidence regarding Amy Kitchen as well as James Mosqueda. Indeed, the last witness the state called during the punishment phase was Bernadine Kitchen, Amy Kitchen's mother, who testified regarding her relationship with Amy and Amy's relationship with her niece. ((47 R.R. 16-19.) In addition, Bernadine Kitchen testified as to Amy's career plans, and the effect Amy's death has had upon her, Amy's brother, Amy's niece and Amy's father. (47 R.R. 16-19.) For example, when talking about the impact Amy's death had on Amy's father, Bernadine Kitchen testified that he told her "I wish I could just go to sleep and never wake up. I miss her so bad. I just want to be with her in heaven." (47 R.R. 19.) Bernadine Kitchen ended her testimony stating "I just can't seem to imagine to want to go on without her." (47 R.R. 19.)

Given the well established case law on this point, there could have been no reason for Mr. Cantu's trial counsel not to object to Bernadine Kitchen's testimony. His failure to do so rises to the level of ineffective assistance of counsel under *Strickland* and should provide Mr. Cantu with a new punishment hearing with competent counsel.

## XII.

## THE STATE'S USE OF A PREEMPTORY CHALLENGE TO DISQUALIFY AN HISPANIC JUROR WAS IMPROPER UNDER *BATSON V. KENTUCKY*[11]

In <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), the United States Supreme Court held that the Equal Protection Clause prohibits a prosecutor to challenge potential jurors solely on their race. During Cantu's trial, prosecutors peremptorily challenged juror Hilda Lauriello on the grounds that she, like Cantu, was Hispanic. (11 R.R. 67.) Cantu's counsel objected to this preemptory challenge as a violation of <u>Batson</u>, but the trial Court overruled that objection. (11 R.R. 97.) The trial court's determination was in error and permitting the prosecutor to exclude juror Lauriello deprived Cantu of his rights under the Equal Protection Clause.

As with all Equal Protection challenges, Cantu bears the burden of showing that the prosecutor's preemptory of juror Lauriello was as a result of racial discrimination. <u>Batson</u>, 476 U.S. at 93. Once the defendant makes

---

[11] Cantu acknowledges that this ground was not raised in either his direct appeal or his State Habeas Writ. In the event this Court believes that this claim has been either completely or partially defaulted, Cantu asserts that he is excused based upon the deficient performance of his direct appeal and/or habeas counsel. Cantu has a right to effective direct appeal counsel. *See* <u>Duhamel</u>, 955 F.2d at 962. As to state habeas counsel, Cantu acknowledges that the United States Court of Appeals has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. <u>See, e.g, Martinez v. Johnson</u>, 255 F.3d 229, 245 (5th Cir. 1999). Cantu raises the latter argument in order to preserve it for higher court review.

45

this requisite showing, the burden shifts back to the State to explain adequately the racial exclusion. Id. "Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections . . . The prosecutor must therefore articulate a neutral explanation related to the particular case to be tried." Id. at 98.

In this case, Cantu made the requisite showing that juror Lauriello was struck based on her Hispanic heritage, and the Court shifted the burden to the State to show a neutral basis for its preemptory challenge. (11 R.R. 69.) In response, the State failed to provide an adequate racially neutral motivation, but instead resorted to the type of "good faith denials" that have been held to be deficient. Batson, 476 U.S. at 98.

For example, the State claimed that the juror "seemed to be hostile to me in her answers," by virtue of the fact that juror Lauriello told the prosecutor that he was being "callous" and "insensitive" in his treatment of fellow jurors. (11 R.R. 70.) However, when asked if juror Lauriello's alleged feelings about the prosecutor would interfere with her ability to be an impartial juror, Lauriello responded (according to the prosecutor as this was not a transcribed conversation), "I don't think so," or "I can't see that happening." (11 R.R. 70-71.) Rather than believe juror Lauriello would be

impartial, the State saw that response as further indicating that she was tainted. (Id.)

Importantly, the main basis for the State's challenge was due to the State's own provocation of this potential juror. (11 R.R. 83.) In addition, the State's discharge of juror Lauriello based on her statement that she "didn't think" her feelings toward the prosecutor would render her unable to be impartial was directly different conclusions than the prosecutors drew when white jurors answered in similar fashion. For example, Juror No. 1, Mr. Calhoun, also told prosecutors that he "thought he could" be impartial, or a similarly equivocal statement as offered by juror Lauriello, but prosecutors did not object to his presence on the jury. (11 R.R. 84.)[12]

Perhaps most troubling of all, the trial Court's ruling manifested a misunderstanding of the nature of a challenge under Batson. The trial court's entire ruling on this complicated issue was as follows:

> I tell you what. I observed the witness myself. And I found her to be attractive and articulate and really a person of nondescript ethnicity. If she had Hispanic on her questionnaire, she – if I had guessed, I could have guessed her to be any number of things, some sort of Mediterranean or perhaps ordinary American lineage.
>
> I note, too, that she appears to have been born in New York. And so if I were going to speculate, I would speculate that she was more apt to be Puerto Rican than Mexican. And so, and I assume that

---

[12] Although the prosecutor denied that Juror Calhoun provided an equivalent response, he claimed that he could not recall what Calhoun answered. (11 R.R. 84-85.)

the -- that the defendant is of Mexican decent, although I don't know that either.

MR. GOELLER [Trial Counsel]: We'll just say Hispanic, Your Honor, slash Latino.

THE COURT:     But I don't know that her ethnicity, if we were going to say that, would be identical to his. But be that as it may, if you can lump everyone into Hispanic, then he's a Hispanic and, I suppose, so is the juror. At any rate, I'll find that based upon all the evidence before me that the State's strike was not based on ethnicity or race."(11 R.R. 97.)

The trial court's ruling indicates numerous violations of Cantu's Equal Protection rights. First, the trial court clearly assumed that it would be permissible to use a preemptory on juror Lauriello if the prosecutor believed she was Puerto Rican and the defendant was Mexican. The law, however, is to the contrary. Batson is unequivocal in its reach that any racial motive in selecting a jury violates the constitution. Batson, 476 U.S. at 88 ("the Constitution prohibits all forms of  racial discrimination in selection of jurors").

Second, the trial court's ruling was based on his assumption that the prosecutor did not know that juror Lauriello was Hispanic – a fact not supported by the record. The prosecutor never claimed when justifying the preemptory strike that he didn't know that juror Lauriello was Hispanic. (11 R.R. 85-97.) Nevertheless, the trial judge's decision places considerable weight on the fact that juror Lauriello was not, in the trial court's mind,

identifiably Hispanic—"I found her to be a ... a person of nondescript ethnicity of some sort of Mediterranean or perhaps ordinary American lineage." (11 R.R. 97.)

Third, and even more problematic, the trial court's conclusion on this ground seemed to be based on racial stereotypes. The only support in the record for the conclusion that juror Lauriello was of "nondescript ethnicity" or "some sort of Mediterranean or perhaps ordinarily American Heritage" (11 R.R. 97) was the fact that the trial court "found her to be attractive and articulate" (11 R.R. 97) – as if attractive, articulate people could not be Hispanic. The trial judge's bias in this regard was further highlighted by, not only his speculation that the "attractive and articulate" juror was non-Hispanic, but that the defendant was likely "Mexican" (11 R.R. 97) – another fact that was not in the record.

For all of these reasons, the disqualification of juror Lauriello by use of the State's preemptory challenge violated Cantu's constitutional right under the Equal Protection Clause of the Fourteenth Amendment.

# XIII.

## THE INVESTIGATION CONCERNING CANTU'S ACTUAL INNOCENCE CONTINUES AND, ON THAT BASIS, CANTU PRESERVES THIS CLAIM

Pursuant to the United States Supreme Court's pronouncement in Herrera v. Collins, 506 U.S. 390 (1993), proof of actual innocence constitutes another ground for vacatur of Cantu's conviction. At this time, counsel continue their investigation in an effort to obtain evidence of Cantu's actual innocence. Cantu hereby raises this ground for habeas relief so that it is not waived. Immediately upon obtaining information concerning his actual innocence, Cantu will supplement the brief on this issue.

## CONCLUSION

For the foregoing reasons, petitioner Ivan Abner Cantu respectfully requests that his judgment of conviction and/or sentence of death be vacated and that he be granted a new trial. In the alternative, Cantu requests a new sentencing hearing.

Dated: January 17, 2007

**BRODEN & MICKELSEN**

F. Clinton Broden
2707 Hibernia Street
Dallas, TX 75204
(214) 720-9552
(214) 720-9594 (Facsimile)

**GERSTEN SAVAGE LLP**
Adam D. Mitzner
600 Lexington Avenue
New York, New York 10022
(212) 752-9700
(212) 980-5192 (Fax)

## CERTIFICATE OF SERVICE

I, F. Clinton Broden, certify that on January 17, 2007, I caused the foregoing document to be served via U.S. mail, first class, postage prepaid, on the Texas Attorney General's Office, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

F Clinton Broden

# AFFIDAVIT

1. My name is Daneen A. Milam, I am over 21 years of age and am competent in all respects to make this affidavit. I am a licensed psychologist and certified as a Health Service Provider in the state of Texas. I am board certified in clinical neurpsychology by the American Board of Professional Neurpsychology. I practice clinical neuropsychology in San Antonio, Texas and have been the director of an assessment center for more than fifteen years. I have served on the editorial board of Archives of Clinical Neuropsychology, the official scholarly journal of the National Academy of Neuropsychology for the past five years. Much of my present clinical practice is in the area of forensic neuropsychology and I have conducted more than 20 examinations of criminal defendants.

2. I have reviewed the summation statements from the trial of the State of Texas vs. Ivan Abner Cantu, the Social History produced by Shelli S. Schade, LMSW, DAPA, the medical records from Parkland Hospital, the medical records from Parkland Hospital, Texas Department of Corrections records, and a case summary from the Texas Department of Criminal Justice. I have read in its entirety the correspondence of Ivan Cantu to his attorney, his mother, and his grievance to the State Bar of Texas. I have reviewed Ivan's questions and objections regarding the quality of his representation during both the guilt/innocence portion of his trial and the mitigation stage.

3. There are multiple, overlapping indicators that would have led a a neuropsychologist or similar specialist, when presented with this information, to suspect that Mr. Cantu may suffer from organic brain damage or a severe mood altering disorder.

4. First, Ivan's father, Abner Cantu has a long history of alcohol and cocaine addiction. In a review of Ms. Schade's social history, there is a significant history of substance abuse and

*Exhibit A*

98

violent behaviors that were noted in several paternal family members. Ivan's grandfather committed murder and Ivan's uncle committed suicide. In reviewing Ivan's father's family, there was clearly a long history of depression, and Abner was later diagnosed with Bi-Polar disorder. Research indicates that 60% of all adults diagnosed with Bi-Polar Disorder suffer from alcoholism and drug abuse, with stimulants causing escalation of Bi-Polar symptoms.

5. Secondly, Ivan's mother, Sylvia and his brother, Erik have both been diagnosed with Bi-Polar Disorder. One aunt has had a series of manic moods that are consistent with a Bi-Polar diagnosis but has never officially received treatment. Ivan's maternal grandfather had a violent temper that was "inherited" by Sylvia. Physical and substance abuse have been noted across three generations of the family.

6. Thirdly, Ivan exhibited many of the symptoms that are common to Bi-Polar Disorder. He exhibited rapid mood swings, grandiose thinking patterns and violent nightmares. One of the side effects of Bi-Polar disorder is difficulty working through logical problems and errors in comprehension. His pattern of leaving school, walking off of jobs, going AWOL from the Navy, and his inability to learn from failed personal relationships are all commonly seen patterns of behavior of a Bi-Polar diagnosis. A Bi-Polar disorder is caused by a difference in how a person's brain and nervous system regulates basic behavior patterns. It is not a choice, but is instead, a breakdown of the inhibitory system. Bi-Polar is a regulatory error that is caused by a complicated mix of environmental factors, genetic potential, and differences in brain structure.

7. In reviewing Ivan's records, his suicidal gestures, grandiose thinking, poor insight, and substance abuse, illuminate a pattern of manic highs and depressive lows. In addition, in each instance where Ivan was using a stimulant, he became abusive in his personal relationships. Friends noted that he was disoriented, irritable and paranoid. Bi-Polar individuals

000268

respond to stimulants with defiance, moodiness, and may become violent. Taken together, with his dysfunctional childhood and family history of Bi-Polar, Mr. Cantu's behavior strongly suggest symptoms suggestive of Bi-Polar from an early age. Had he been evaluated prior to the punishment phase of his capital murder trial, and had a mental health professional been provided with the information above, I believe that any reasonably competent psychiatric professional would have recognized the need to subject Ivan Cantu to a complete Neuropsychological evaluation to rule out an organic cause of his behavior pattern.

8. I was retained by Mr. Cantu's habeas counsel to assist with the clinical aspects of Mr. Cantu's case. I traveled to the Polanski Unit in Livingston in May of 2004 to examine and evaluate Mr. Cantu. I spent approximately 11 hours examining and testing Mr. Cantu in a small room on Death Row. We were alone in the room; two guards watched the assessment through a glass window. His handcuffs were removed during this period but his leg irons remained in place.

9. First, I conducted a clinical interview with Mr. Cantu. I then performed a mental status examination to check his orientation to time, place, and person. After determining he was both willing and capable of being assessed, I spent approximately ten hours conducting formal neuropsychological testing which included a formal measure of intellectual potential, a memory measure, portions of the Halstead-Reitan Neuropsychological Battery for Adults, and several other psychological and neuropsychological tests. Mr. Cantu was also evaluated, formally and informally for malingering. These tests are all accepted and recognized as reliable within the neuropsychological community.

10. During Mr. Cantu's evaluation he consistently exhibited pressured speech, an exaggerated sense of self confidence, (noting that when he was released he planned to attend Harvard University), and tended to place himself in a leadership role in

each and every job he has held since high school. His response
pattern was one of impulsivity and poor planning on structured
tasks. His response style was consistently one of distractibility,
and an inflexible thought process that is consistent with
obsessive-compulsive behavior patterns. His motor skills were
moderately poor but very fast. He exhibited constructional
dyspraxia but his error pattern was consistent with a regulating
difficulty rather than an organic dysfunction. Comparing across
all instruments, Mr. Cantu exhibited a range of difficulty with
measures of central nervous system integrity; attentional deficits,
impulsivity, organizational deficits, constructional dyspraxia,
along with the partial loss of the ability to inhibit responses. He
has moderate memory and attention deficits. The overall results
indicate a consistent pattern of poor regulation of thoughts,
feelings and abilities which is consistent with a diagnosis of Bi-
Polar disorder.

11. Bi-Polar Disorder is a medical problem that is not the result of
lack of will power, oppositional or defiant behavior or poor
parenting, although neglectful and abusive parents will worsen
the course of a Bi-Polar disorder. The effects of Mr. Cantu's
inherited disorder were no doubt aggravated by the chaotic,
traumatic home environment in which he spent his formative
years. Children who suffer from Bi-Polar disorder require
intensive limit setting and a stable environment. It appears
extremely unlikely that any adult in Mr. Cantu's household
could provide this kind of structure and discipline. Mr. Cantu
was placed in charge of his three year old brother when he was
ten years old. His mother was working two jobs and rarely
home. The records provided by Ms. Schade, after interviewing
many family members, indicate that Mr. Cantu spent the earliest
years of his life in a home environment marked by poverty,
alcoholism, and drug abuse, physical abuse and neglect, mental
illness and death of more than one close family member. His
uncle committed suicide in front of the family at a Thanksgiving
gathering.

12. It is significant that on August 29, 2000, sixty five days before
the murder of his cousin, Mr. Cantu was taken to Parkland
Hospital for suicidal gestures. This indicates a severe mood
disorder that generally requires intensive medication and/or
therapy. He was released the same day he was admitted and an
opportunity to remediate his Bi-Polar disorder was missed. By
Labor Day weekend he had moved into a manic phase, met Amy
Boettcher, married her within a few weeks, and began to abuse
Crank, Ecstasy, and Speed. Clearly these drugs interact with a
Bi-Polar disorder to cause difficult and unpredictable behavior,
irritability, agitation, and cause biological and chemical
malfunctions to escalate. It is a common side effect that as self
medication escalates, the roller coaster ride of ups and downs
alienate the people capable of providing a support system.
People with Bi-Polar disorder rarely realize how impaired they
are and blame others for their problems, isolating them even
more.

13. During my interview with Mr. Cantu, he advised me in no
uncertain terms that he had not committed the offense for which
he is now on death row. However, I have been asked by counsel
for Mr. Cantu to address the mitigation special issue at the
punishment phase of his trial. My observations are intended
solely and strictly to assist in the evaluation of counsel's
performance at the punishment phase of Mr. Cantu's trial and
are not to be interpreted to be an admission, either implicit or
explicit, of any criminal liability on Mr. Cantu's part
whatsoever.

14. There is a lot of evidence that Bi-Polar Disorder is a deficit in
mechanisms of programming and reprogramming neurons. Life
stresses, difficult relationships, drug use, disruption in sleep
cycles all seem to bring on the symptoms and begin a rapid
cycling episode. Children of parents diagnosed with Bi-Polar
disorder are at high risk for developing Bi-Polar disorder and
the risk is several times that of the general population. Some
estimate the risk to be as high as 1:4 for developing some kind of
mood disorder. None of this is a choice of the individual. Mr.

Cantu did not choose to be born into a dysfunctional family. He did not choose to develop a Bi-Polar disorder. He did not choose to be misdiagnosed and receive medication that would escalate the symptoms rather than help his disorder. More than 60% of all individuals who develop Bi-Polar disorder suffer from alcoholism and substance abuse. His choice to use drugs was mediated by this fact.

15. It is my opinion that, without a through evaluation and differential diagnosis, the presentation of the defense case at the punishment phase of Mr. Cantu's trial was inadequate and failed to inform the jury of many important and relevant aspects of his psychological functioning. Without access to this information the jury would not be able to make a fair and balanced assessment of his personal moral culpability.

Further affiant sayeth not.

_____
Daneen A. Milam, Ph.D., ABPN

SUBSCRIBED AND SWORN TO BY DANEEN A. MILAM BEFORE ME, THE UNDERSIGNED AUTHORITY, ON THIS 24TH DAY OF MAY, 2004, TO CERTIFY WHICH, WITNESS BY HAND AND OFFICIAL SEAL OF OFFICE.

_____
Notary Public, State of Texas

DONNA GAYLE BASSE
NOTARY PUBLIC
State of Texas
Comm. Exp. 05-12-2006

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

AUSTIN, TEXAS

AND

THE 380TH JUDICIAL DISTRICT COURT

COLLIN COUNTY, TEXAS

| | | |
|---|---|---|
| EX PARTE | § | |
| | § | |
| | § | NO. W-380-80047-01 (HCI) |
| | § | |
| IVAN ABNER CANTU | § | |

## *AFFIDAVIT OF J. MATTHEW GOELLER*

Comes now J. Matthew Goeller, and submits the following affidavit as ordered by the 380th

District Court, said Court having denied and overruled Affiant's Objection previously filed on

September 21, 2004   This affidavit is given in response to the Court's Order of September 21,

2004, and April 20, 2005, regarding the following:

*1) WHETHER APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL*

*BECAUSE HIS TRIAL ATTORNEYS-- FAILED TO UNCOVER AND--INTRODUCE INTO*

*EVIDENCE EXPERT TESTIMONY DEMONSTRATING THAT APPLICANT HAD A*

*A. DYSFUNCTIONAL CHILDHOOD,*

*B. ABUSED DRUGS,*

*C. AND SUFFERS FROM A BIPOLAR DISORDER,*

FILED

2005 OCT 12  AM 9: 39

Page 1 of 13

HANS BIBLE
DISTRICT CLERK
COLLIN COUNTY, TEXAS
BY_____ DEPUTY

*Exhibit B*

151

*2) WHETHER THE AFFIDAVIT OF DR. DANEEN MILAM CORRECTLY IDENTIFIES*

*DEFICIENCIES IN THE PERFORMANCE OF TRIAL COUNSEL;*

*3) COUNSEL'S SENTENCING TRIAL STRATEGIES IN PRESENTING APPLICANT'S*

*DEFENSE TO A COLLIN COUNTY JURY;*

*4) ANY OTHER INFORMATION COUNSEL DEEMS RELEVANT TO RESPOND TO*

*APPLICANT'S ALLEGATIONS, INCLUDING THE EXTENT TO WHICH APPLICANT*

*PARTICIPATED IN DICTATING A COURSE OF ACTION.*

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared J. MATTHEW GOELLER, who after being duly sworn deposed and stated:

"My name is J. MATTHEW GOELLER, I am an attorney licensed to practice in the State of Texas. My bar number is 08059260. My address is 400 Chisholm Place, Suite 400, Plano, Texas 75075. I have been licensed to practice law since November 1984. I have been board-certified in criminal law since 1990.

On December 5, 2000, I was appointed as lead trial counsel for IVAN A. CANTU, in the above-referenced cause number. Mr. Don N. High was appointed as my co-counsel on January 2001. Mr. CANTU was charged with the offense of Capital Murder. Mr. Cantu's case was pending in the 380th Judicial District Court of Collin County, Texas. The case number is 380-80047-01.

Don High and I worked very closely together in all aspects of our defense of Mr. Cantu. Therefore, we have worked together in the preparation of our affidavits.

### Review of File

Mr. Cantu was accused of murdering his cousin, Mr. James Mosqueda, and Mr.

Mosqueda's girlfriend, Miss Amy Kitchen. At the outset, I reviewed the offense report, crime scene report, detective's summary, autopsy and all other documents relevant to the charges against Mr. Cantu. My review revealed that on November 4, 2000, the decedents were found murdered in their home at 18663 Gibbons, Dallas, Texas by George Snowden, a firefighter who was asked to perform a "safety check" at the behest of Amy's mother. The couple was last seen the previous evening by Amy's father, Mr. Jerry Kitchen, when they went out for dinner with him at the El Rancho Restaurant in Oak Cliff. He left them for his home in Arlington at approximately 10:30 p.m. while James and Amy drove up the tollway to their home in North Dallas in James's black Corvette.

Both Mr. Kitchen and his ex-wife, Ms. Bernadine Kitchen, made several attempts to contact the couple on Saturday, November 4, but were unsuccessful. Ms. Kitchen was to go shopping with Amy on Saturday. After trying to contact Amy all day, Ms. Kitchen went to the house at around 4:00 p.m.; when no one answered the door, she went to the fire station and asked for a safety check.

Upon realizing he was entering a crime scene, Lt. Snowden called the police. The call was answered by Officers Frank Della (who arrived at the scene first) and Barry Maxwell of the Dallas Police Department, who arrived at the house around 5:45. These officers made a search of the premises and secured the area until detectives arrived an hour later. The decedents had apparently been shot while in their night clothes in their bedroom. James was lying in the middle of the bed while Amy's body was on the floor next to the bed. There were no signs of forced entry or a struggle, and no gun was found at the scene.

Officer Steve Junger arrived at 6:30 p.m. to assist in securing the crime scene. At approximately 8:00 p.m., Officer Junger and his partner, Officer Illiff, accompanied Applicant's mother Sylvia Cantu, to an apartment at 4753 Old Bent Tree No. 1004, which was occupied by Applicant and his fiancee, Amy Boetcher, to perform an "emergency search" of the apartment. There was no search warrant. No owner of the apartment was home at the time. Junger entered by using a manager's key at 8:25 p.m. Junger searched the apartment for about ten minutes out of the presence of Ms. Cantu. Upon exiting the apartment, Officer Junger noticed a small hole by the door which he later testified appeared to be a bullet hole. However Junger did not

mention the supposed bullet hole in his report. Later, when Junger was contacted by his sergeant, he was asked whether he saw a black Corvette in the parking lot. At that time, Junger informed the sergeant of the bullet hole in the wall.

On November 4, 2000, applicant and his fiancee, Amy Boetcher, drove to Arkansas to meet her parents. This trip had been planned for some time. They stayed with her parents until November 7th, when they returned to Dallas.

While Applicant and Boetcher were in Arkansas, it was determined that James's black corvette and wallet were missing, along with Amy Kitchen's engagement ring. The Corvette was later recovered in the parking lot of the Pear Ridge Apartments on November 5, 2000. Detective Anthony Winn, the lead detective, testified that he had been invited to listen to a telephone conversation between Applicant and Carlos Gonzales, a friend of Applicant's. According to Winn, Applicant called from Arkansas to tell his friend that he had been threatened by a man dressed as a pizza delivery man on November 2nd. The man told him that James owed him a lot of money for drugs. Applicant went to James's house on Friday, the 3rd to discuss it. James asked him to leave his Honda in front of the house and take his Corvette because he feared this man and wanted it to look as if someone were visiting their home.

On November 7, 2001, Detective Winn obtained a search warrant authorizing what Applicant contends was an illegal search of Applicant's apartment. As a result of this search, the following items were confiscated from Applicant's apartment: a pair of jeans, white socks, one box of 380 bullets, and assorted keys, including a silver and a gold Mercedes key. The key started Amy's Mercedes, and one key unlocked the door from the garage to the decedents house. The jeans and the socks were later shown to have the decedents' blood on them.

Applicant and Boetcher returned to Dallas on November 7th. Applicant was arrested November 8th, and Amy Boetcher flew back to her parent's home in Arkansas.

Amy Boetcher is a girl that has lived with many men from an early age and at the time of the murder was Applicant's fiancee. She enjoyed doing drugs, mostly ecstasy, speed and cocaine, paid for by Applicant. She was not interested in employment. Amy Boetcher and Applicant lived together at the Pear Ridge Apartments, where Amy's name was on the lease, but Applicant paid the bills and had the only key. She enjoyed her lifestyle where she slept all day,

partied all night and paid for nothing. Applicant has been successful in several legitimate businesses and was employed at the time

According to Amy Boetcher, Applicant called James at 11:20 p.m. and asked to go see him. Applicant supposedly told Boetcher that he was going to kill James and Amy. He came home about an hour later with his face swollen, blood on his jeans, and wearing different shoes and shirt. He told her that James had hit him with a baseball bat. He had his gun with him. Applicant and Boetcher returned to the crime scene together and looked for some cocaine. Afterwards she and Applicant went clubbing through the early hours of the morning, because she wanted to go to Club Seven. While in Arkansas, with her parents, Amy made no attempt to call the police or even tell her parents about the murders (her stepfather is a retired police officer). When she and applicant returned on November 7, they went to Tawny Svihovec's apartment. The gun alleged to be the murder weapon was found in the home of Tawny Svihovec. Applicant's fingerprint was found on a removable clip, not the handle of the gun.

After his arrest, Applicant spoke with Detective Winn and later called Amy Boetcher to tell her about it. He had left some money for her under a couch cushion. She took some of the money and flew back home to Arkansas. At no time from November 4 until November 8 did Boetcher notify the authorities.

When she returned to Arkansas, Amy Boetcher did not tell her parents about Applicant's arrest until the next morning. While in Arkansas, Boetcher gave no less than four different accounts to law enforcement officials, including her stepfather and Officer Winn: She wrote a statement to an Arkansas Sheriff Joe Martz, around November 10, 2000; She made a statement to an Arkansas state trooper; her third statement was to Detective Winn on November 22, 2000; and her fourth statement was to her stepfather, Richard Kremer, after her Statement to Winn. Amy was coached by her stepfather to included the phrase "I'm not implicated. I'm not a suspect in anything." Boetcher was not investigated for her role in this incident. Amy was on probation for a DWI from 1999 until 2002. Her continual drug use would be a violation of that probation. She has never been served with a Motion to Revoke her probation. Detective Winn arranged for her to complete her probation in Arkansas, and told her that if she had any problems to have her probation officer contact him.

Page 5 of 13

155

Amy Boetcher returned to Dallas to pick up her belongings and did so on the same day that Winn executed the second search warrant to remove the bullet from Applicant's apartment James Mosqueda was a known drug dealer who sold large quantities. His friend, Carlos Gonzales, and Anthony Fonseca were also dealers. Chris Head and Anthony Fonseca were currently in the narcotics business. During his investigation, Detective Winn received an anonymous tip that Mosqueda owed Rojas a lot of money for drugs

After I became familiar with the factual allegations against Mr. Cantu, Mr. High and I discussed our initial opinions regarding our defense of the case. We interviewed Ivan Cantu on several occasions, both together, and separately, in order to get his input regarding the facts and to apprize him of the information we had obtained. Initially, Cantu had lied to us about the facts of the case and his involvement, taking the position that he knew nothing about the murders. Cantu thereafter changed his recollection of his involvement in the murders. Cantu refused to participate in any psychological mitigation strategies--Cantu wished to focus on the guilt/innocense stage, despite overwhelming evidence of his guilt in the murder of Mosqueda and Kitchen. Throughout my representation, Cantu displayed animosity toward myself and Mr. High because of strategy designed to defeat the "future dangerousness" special issue in the punishment phase of the trial. Cantu, despite his ultimate recognition of the evidence against him, continuously advanced his demand that "we try this case to obtain a not guilty." Cantu repeatedly questioned our punishment phase preparation, stating several times that our punishment phase strategy was premised on "losing" the guilt-innocense phase of the trial

Since the courts order has limited this affidavit in scope, I will limit any further comments regarding our trial strategy to the *punishment phase* only. Based upon our knowledge of the case up to that point, Mr. High and I agreed that our best strategy regarding punishment involved four main points:

1. Ivan Cantu's dysfunctional childhood and family,

2. Ivan Cantu's misuse of drugs and alcohol, some of which was supplied by the decedent Mosqueda.

3. Ivan Cantu's lack of future dangerousness when drugs and alcohol were removed from his access, i.e., a plea for a life sentence.

Page 6 of 13

156

4. The advent of Ivan Cantu's recent spiritual conversion experience, making him a "born again Christian", thereby reducing his likelihood for future violence, and *filling the void* brought about for the now-missing drugs and alcohol.

This strategy remained consistent throughout the trial and on into the punishment phase, despite Cantu's demand that our efforts concentrate on guilt/innocense, and not mitigation in the punishment phase.

### Motions filed

As part of our defense of Mr. Cantu, Don and I filed twenty-four (24) motions. These are all available for review in the clerk's file. The court reporter's record contains the hearing, and subsequent ruling on each of these motions. Of particular note is the motion to appoint a Mitigation Specialist in the case, specifically Mr. Vince Gonzales of Lubbock, Texas.

### Strategy during Jury Selection

Jury Selection began August 20, 2001. Throughout jury selection, our criteria for jurors remained consistent: we were looking for jurors who would strongly scrutinize the punishment phase issues mentioned above. Additionally, based upon Mr. Cantu's good behavior during his incarceration in Collin county, and his recent conversion to being a "born again Christian", we were looking for jurors who could consider the fact that our client was not a future danger as long as he was locked up--away from drugs and alcohol--those things which had made him dangerous at the time of the commission of the offense.

### Evidence on Mitigation

From our initial discussions regarding our strategy in Mr. Cantu's case, Don and I, along with our mitigation specialist, Vince Gonzales, discussed the issue of mitigation evidence. Early on, we asked Mr. Cantu to provide us an account of his life prior to being arrested for the current offense. We specifically asked Mr. Cantu to provide information regarding his childhood, any abuse he suffered (at the hands of anyone, including his parents), any traumatic injuries he had suffered, and anything else he could think of that would assist us in convincing a jury to spare his life should the trial reach that final question. We also addressed these same questions to his

157

mother, Ms. Sylvia Cantu. We asked both of them to provide the names and addresses of any witnesses we could interview on these topics. Any information that they provided was given to Vince Gonzales who did extensive interviews with these people to develop a detailed mitigation plan. As a result of our mitigation evidence not being very extensive, Mr. Cantu's behavior while in jail, and his success in the business world, ultimately became much more important to us.

### Bi-Polar Disorder

At my initial meeting with Mr. Cantu, and throughout all subsequent dealings I had with him, I found him to be able to intelligently discuss the allegations made against him. He readily discussed trial strategy with us, especially when he disagreed with a proposed course of action. Mr. Cantu understood the factual allegations against him as well as the day-to-day courtroom proceedings. He communicated with us intelligently throughout our representation of him. Never was he incoherent, or "in another time, place, or space". Mr. Cantu was able to recall the facts regarding his involvement with the deceased, as well as other individuals who gave testimony in the trial. Mr. Cantu was able to comprehend the factual allegations against him (both regarding the guilt/innocence and punishment allegations) and offer assistance in his defense.

Throughout the trial, Mr. Cantu paid attention and continually proposed questions he wanted us to ask each witness. These questions were generally relevant and had the potential to elicit a helpful answer.

From the beginning, Vince Gonzales, Mr. High and I discussed the ramifications of having a psychiatrist evaluate Ivan Cantu. We knew that under *Lagrone v. State*, 942 SW2d 602, the trial court may order a defendant to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, or plans to introduce, its own future dangerousness expert testimony. Of great concern in deciding whether or not to subject Cantu to a State-sponsored psychiatric examination was the fact that Cantu was manipulative and had lied on several occasions to his own counsel. Cantu's participation in his defense consisted of (1) an initial denial of any knowledge or complicity in the murders; (2) a subsequent statement involving a conspiracy between friends and a pizza-delivery man who killed Mosqueda and

Page 8 of 13

158

Kitchen; (3) his admission that he had indeed killed Mosqueda for "ripping him off" on a drug deal, and Kitchen just happened to be at the Mosqueda home, and that "I didn't want to leave any witnesses"; (4) that despite his previous statements and admission to counsel, he desired to advance an insanity defense that involved a conspiracy between Mosqueda, Kitchen, and Boetcher to "brain-wash" him with the drug 'Rohypnol" that ultimately caused him to commit the murders. When Cantu was admonished that counsel would not be involved in nor sponsor perjured testimony, Cantu replied that "Your (counsel's) job is to get me home, period." Based on the foregoing, we obviously had concern about Cantu being evaluated by a State psychiatric expert, as such would have likely lead to findings of manipulation, a commonly-sought State theme in the punishment phase. We ultimately decided not to have Ivan Cantu evaluated because (1) Cantu did not wish to participate in psychiatric-based mitigation evidence; (2) we did not believe Cantu would receive a favorable report, based on the fact that Cantu had admitted that to us that he killed Mosqueda and Kitchen because Mosqueda had not paid Cantu for Cantu having supplied Mosqueda with a 2.5 kilos of cocaine that was subsequently sold by Mosqueda for several thousands of dollars (and, thus, the murders were motivated by revenge, per Cantu); (3) the State's evidence regarding Cantu's prior violent acts against women, coupled with the particularly gruesome nature of the execution-style of the instant murders, concerned myself, Mr. High, and Mr. Gonzales of the probability that a state-sponsored psychiatric evaluation would indicate Cantu displays a sociopathic personality. We were of the opinion that any such evidence would substantially lower our already slim chance for a life sentence, considering the fact that Cantu was indicted for the murder of two people who were at home in their own bed. Although Daneen Milam, Ph.D., states in her affidavit that the failure of the defense to obtain a psychiatric evaluation was ineffective assistance of counsel, she fails to recognize that Cantu himself objected to any strategy that involved psychiatric-based mitigation evidence (if any such evidence did exist), and, further, failed to recognize the substantial sociopathic-type punishment evidence in possession of the State.

Everything we had observed about Ivan Cantu (from our personal interaction, to discussions with family members and friends, to our review of all of the relevant documents regarding his life history) led us to believe that a psychological evaluation would reveal him to be

a sociopath and accordingly, a future danger.

Furthermore, we had no evidence to support the theory that Mr. Cantu was suffering from any kind of mental deficiency, and in particular a bi-polar disorder. (Pursuant to previous mental health proceedings, in my seventeen years as a practicing attorney, I have represented many individuals afflicted with this disorder, and am well acquainted with its effects and symptoms) On the contrary, Mr. Cantu's behavior during our interaction with him showed him to be of average, to above average intelligence. This conclusion was supported by Mr. Cantu's self-penned legal documents as well as his letters to us and other individuals. This was further supported by evidence revealed in childhood and adult records that Sylvia Cantu provided to us, and in the Collin County jail records.

To be more specific, our evaluation of Ivan Cantu's mental capacity was based on our considerable face-to-face interaction with him, as well as our review of all the relevant documents in his case. Furthermore, our interviews with knowledgeable witnesses supported the conclusion that Ivan Cantu was not afflicted with a Bipolar Disorder. His family members were questioned by Mr. Gonzales, Mr. High, and myself, and none of them ever stated (or even remotely suggested) that Mr. Cantu's mental capacity was significantly diminished. None of these individuals ever mentioned a Bi-Polar or Schizophrenic Disorder.

Mr. High and I elected not the have Mr. Cantu evaluated by a psychologist for a number of reasons. Foremost in our minds was that Mr. Cantu would most likely be determined to be a sociopath. Based upon all the facts in our possession, our assessment of Mr. Cantu was that he is controlling and manipulative. Mr. Cantu will purposely behave in whatever manner he believes will accomplish his objective.

We certainly saw nothing in Mr. Cantu's interactions with us that would indicate he was bipolar or suffered from schizophrenia. We did not witness any tremendous mood swings or changes in his personality. We *did witness* actions by Mr. Cantu indicating he was quite intelligent and fairly stable. For example, during jury selection, Mr. Cantu would laugh and joke with us, and draw pictures of the prosecutors, and tease with us about the good food he was getting in the jail. He would interact with us about his spiritual development, and the assistance he felt he was providing the other inmates. It is important to note that our social history revealed

that Ivan Cantu was an above-average student, who gained considerable financial success as a
mortgage broker prior to the commission of these murders. Cantu stated that part of his financial
success in the mortgage business was his ability to "scrub" poor credit histories, such
"scrubbing" having involving a complicated scheme involving kickbacks to personnel working
for credit-reporting agencies.

### Testimony of Dr. Mark Cunningham

On the 24th of June 2001, I contacted Dr. Mark Cunningham to inquire about his opinion
on the issue of Ivan Cantu's future dangerousness (or lack thereof). I met with Dr. Cunningham
and provided him an overview of Mr. Cantu's case. I explained the details of the allegations
against him. I also detailed the potential punishment evidence against Mr. Cantu, as well as all
pertinent documents we had gathered for our social history. At a later date, we provided Dr.
Cunningham with the Collin County jail records regarding Mr. Cantu.

Dr. Cunningham and I discussed the fact that Ivan had been incarcerated for almost a
year. We explained that our review of the relevant records demonstrated that as long as Mr.
Cantu was in custody, and away from drugs and alcohol, he was not dangerous.

Dr. Cunningham indicated that, if our evaluation of Ivan Cantu's behavior while in
custody was accurate, he had numerous studies to support the theory that Ivan Cantu was not a
future danger as long as he was incarcerated. Dr. Cunningham took the records and began his
review. I specifically asked Dr. Cunningham to evaluate these records with an eye for any
information he felt was relevant and helpful to us in mitigation.

After reviewing the records, Dr. Cunningham concurred in our evaluation and we agreed
he should testify on behalf of Ivan Cantu. Dr. Cunningham prepared a visual demonstration and
this, along with his oral testimony, was presented to the jury.

Dr. Cunningham was not asked to perform a psychological assessment of bi-polar
disorder or any mental retardation of Ivan Cantu for the same reasons as I have stated earlier.
(We did not suspect this disorder, we certainly *had not observed any evidence of it*, and only felt
that any evaluation done would only hurt, and not help Ivan's chances) When Dr. Cunningham
left our initial meeting, he had in his possession several of the documents Dr. Daneen Milam
cites to support her conclusion that Ivan Cantu is afflicted with the Bi-Polar Disorder. Dr.

Cunningham never mentioned these documents to us as indicators of *any* diminished mental capacity of Ivan Cantu. Several other documents we reviewed, and provided to Dr Cunningham indicate that Mr. Cantu was an "excellent student" in his jail education classes and suffered from no mental illness

### Testimony of Dr. Walter Quijano

In an effort to depict the true nature of prison life, Mr High and I asked Dr Walter Quijano to comment on a videotape of a Texas prison unit. Since our central punishment strategy was to show that Mr. Cantu was not a future danger as long as he was incarcerated, we felt it was imperative to show the jury exactly what prison life is like. Mr. High and I had discussed the fact that the State would most likely attempt to minimize the severity of the conditions and/or limitations imposed on inmates inside a prison. We wanted to be in a position during closing argument to emphasize the true characteristics of the penitentiary

We viewed the tape, and decided it would be useful piece of evidence for the jury. We successfully petitioned the Court to allow Dr. Quijano to "narrate" the tape as it was played so tne jurors could understand what they were seeing

### Testimony of Reverend Maury Davis

During the course of our preparation, and specifically after learning of Mr. Cantu's conversion to Christianity, we learned of a previously-convicted murdered who is now an Assembly of God minister. Maury Davis was convicted in 1981 for the murder of a female real estate agent in Dallas, Texas. He served ten (10) years on his sentence in TDC. While in prison, he, like Ivan, converted to Christianity, and began studying and later teaching other prisoners about the Bible. At one point, his prison ministry numbered over five (500) hundred inmates. He was later paroled, and took a job at the Calvary Temple Church in Irving under the *supervision of Pastor J. Don George*

Mr. Davis began as a janitor there at the church, was given an opportunity to teach some and rapidly progressed to Sunday School teacher and later served as a adjunct minister. He was so gifted and capable in the pulpit that he was later called to a full time ministry at a church in Nashville, Tennessee. (This former murderer now pastors a congregation of 5000 people)

162

Pastor Davis was contacted about Ivan, and came to Texas to meet with him, to pray with him, and later testify for him in the punishment phase of his trial. One of Pastor Davis' most salient points was (and a mitigation theme for a life sentence, rather than a death) "How can you give up on a man and kill him when God has not finished his work with him?"

Part of the defense strategy in calling Rev. Davis was to thwart the State's intention of calling Dr. James P. Grigson as a rebuttal witness--Dr. Grigson had testified for the State in the early 1980's that Maury Davis was a "future danger". Because Maury Davis is now a nationally-recognized pastor, and heads the one of the largest church congregations in Nashville, TN, the State declined to call Dr. Grigson at trial.

Considering the nature of the crime, the State's punishment evidence, and Cantu's history of manipulation and violence, I am of the opinion that the defense punishment strategy of attempting to prevail on the future dangerousness issue, involving the testimony of Dr. Cunningham, Dr. Quijano, and the Rev. Maury Davis, was effective assistance of counsel. Further, affiant sayeth not.



J. MATTHEW GOELLER

SUBSCRIBED AND SWORN BEFORE ME on the 11 day of October, 2005.

Notary Public in and for the State of Texas

SHAREN ARRIAZOLA
MY COMMISSION EXPIRES
November 28, 2005

Page 13 of 13

163

✉ Send this document to a colleague                    Close This Window

IN THE COURT OF CRIMINAL APPEALS

OF TEXAS

## NO. 74,220

## IVAN ABNER CANTU, Appellant

### V.

## THE STATE OF TEXAS

ON DIRECT APPEAL

# FROM COLLIN COUNTY

KELLER, P.J., *delivered the opinion of the Court in which* MEYERS, KEASLER, HERVEY *and* COCHRAN, JJ., *joined.* WOMACK, J., *filed a dissenting opinion in which* PRICE *and* JOHNSON, JJ., *joined.* HOLCOMB, J., *concurred in the result.*

### O P I N I O N

Appellant was convicted in October 2001 of capital murder.[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death.[2] Direct appeal to this Court is automatic.[3] Appellant raises thirteen points of error. We shall affirm.

## I. SUFFICIENCY OF THE EVIDENCE

### A. Guilt

#### 1. *Legal*

In point of error six, appellant claims the evidence is legally insufficient to support his conviction for capital murder. He argues that "apart from the evidence resulting from the unlawful search of [his] apartment, the only convincing evidence in the record that connects him to the murders is the testimony of Amy Boettcher." He maintains that, because Boettcher was an accomplice, her testimony must be corroborated under Article 38.14. He says that the only evidence that corroborates her testimony was illegally obtained and therefore cannot be considered.[4]

An accomplice participates with a defendant before, during, or after the commission of a crime.[5] The participation must involve an affirmative act that promoted the commission of the offense with which the accused is charged.[6] One is not an accomplice for failing to disclose a crime or even concealing it.[7]

Appellant and Boettcher shared an apartment not far from the victims, James Mosqueda and Amy Kitchens. Mosqueda was appellant's cousin. On the night of the offense, appellant told Boettcher he was going to Mosqueda and Kitchens' house to kill them, but Boettcher did not believe him. Appellant spoke with Mosqueda on the phone before leaving at about 11:30 p.m. While appellant was gone, Boettcher talked on the phone with her stepfather, whom she and appellant were going to visit in Arkansas the next day. When appellant returned around 12:20 a.m., his face was swollen and he had what looked like blood on his jeans and in his hair. He told Boettcher that "it wasn't pretty" and began unloading his gun, complaining that it had jammed on him. He had the victims'

identification and car keys. Boettcher testified that she threw appellant's bloody jeans in the kitchen trash can. After he cleaned up, appellant made Boettcher return with him to the victims' house to see what he had done. They drove Kitchens' Mercedes. Boettcher testified that she could see the victims' bodies through the doorway to the master bedroom. They parked the Mercedes in the garage and left in Mosqueda's Corvette. Appellant gave Boettcher a diamond engagement ring that had belonged to Kitchens. Boettcher did not attempt to elude appellant or turn him in after learning of the murders. She testified that she was terrified of appellant and thought he might kill her. Appellant had shot at Boettcher with a pistol the night before the murders and slammed the door on her hand as she tried to leave.

There is no evidence that Boettcher intended to promote the offense or assisted in its commission. Viewing the murder scene after the fact, failing to report the offense, assisting appellant in returning Kitchens' car to the scene, and failing to extricate herself from appellant after becoming aware that he had committed the offense are not acts that render Boettcher an accomplice to the offense. Because she was not an accomplice, her testimony needed no corroboration. Point of error six is overruled.

### 2. *Factual*

In his seventh point of error, appellant claims the evidence is factually insufficient to support his conviction for capital murder. Evidence is factually insufficient if, viewing all of the evidence in a neutral light, "the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof."[8] Again, appellant argues that Boettcher was an accomplice, that her testimony was unreliable and requires corroboration, and that there was no other admissible evidence linking appellant to the crime. Appellant does not explain with any more specificity in what way the evidence was factually insufficient.

As discussed above, Boettcher was not an accomplice. Her testimony clearly showed appellant's involvement in the crime. While appellant challenges her credibility, the credibility of a witness is the province of the jury, and the jury's determination in that regard generally should not be disturbed, even in a factual sufficiency review.[9]

Moreover, even without considering the evidence appellant claims was illegally obtained,[10] there was a substantial amount of other evidence of his guilt. The murder weapon was found at the home of one of appellant's friends, with whom appellant and Boettcher had stayed in the days following the offense. Appellant's fingerprints were found on the magazine of the gun, along with Mosqueda's blood on the gun barrel. Appellant's fingerprints were also found on Kitchens' Mercedes. Evidence was presented that appellant showed off the engagement ring he gave to Boettcher to numerous people on the night of the offense, and to Boettcher's family in the days after the offense. Appellant was seen wearing Mosqueda's bracelet in the days after the murders and the bracelet was found at Boettcher's parents' house in the room where Boettcher and appellant stayed following the offense. In addition, Jeff Boettcher testified that appellant told him less than a month before the murders that appellant wanted to kill Mosqueda, and after the offense, appellant called Jeff and told him to check out the newspaper. Finally, records from the toll road reflecting the comings and goings of the Mercedes and Corvette on the night of the offense corroborated Amy Boettcher's version of events.

Appellant does not contend that there is any exculpatory evidence in the trial record that could be weighed against the inculpatory evidence, and we find none. We cannot say that the jury's verdict is so lacking in support or so outweighed by contrary proof as

to be clearly wrong and manifestly unjust. We hold the evidence supporting the conviction to be factually sufficient. Point of error seven is overruled.

## B. Punishment

### 1. Future dangerousness - legal

In his eighth point of error, appellant claims the evidence is legally insufficient to support the jury's finding that appellant would be a continuing threat to society.[11] We consider all of the evidence presented at both phases of trial and ask whether, viewing that evidence in a light most favorable to the verdict, any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society.[12]

The facts of the offense show the depravity of appellant's character. As first cousins, appellant and Mosqueda grew up together. They shared apartments over the years and worked together in various business enterprises. Trusting appellant, Mosqueda allowed him into his house at nearly midnight to "talk." Witnesses testified that appellant was jealous of Mosqueda's material wealth and success in business. Appellant searched the house for drugs and money after the murders, and stole Mosqueda's watch and bracelet and Kitchens' diamond engagement ring. Later that night appellant gave Kitchens' ring to Boettcher as he proposed marriage. Driving Mosqueda's Corvette, the two then went out partying at several places where appellant showed off the ring and announced that they were engaged. Appellant showed no remorse the night of the offense, taking Boettcher back to the scene to show her what he had done, to gather some things that he had left, and to continue looking for drugs and money. When visiting Boettcher's parents in the days following the offense, appellant acted as though nothing was wrong. He made several self-serving phone calls to friends in which he told a story about a man who had appeared at his apartment on the night of the offense and had threatened his and Mosqueda's lives.

In addition to the facts surrounding the double murder, the State also presented evidence of appellant's abusive conduct during his two marriages and toward Boettcher. Boettcher testified that the night before the offense she and appellant had an argument. In his anger, appellant retrieved a pistol and shot it at her head. When Boettcher tried to leave the apartment, appellant slammed the door on her hand and "smacked" her across the face. He then held the gun to her head and told her he was "serious." He also told Boettcher that going to the police would be futile because the police all worked for him and would not help her. Appellant's first wife, Michelle Traister, described episodes in which appellant threw her to the floor, while beating her face and slamming her head repeatedly against concrete and tile surfaces. In one instance, as appellant choked her, he stated that he wanted to kill her. Traister blacked out and when she came to, appellant ripped her clothes off and forced her to have sex with him. In another instance, appellant beat Traister's head and face so severely that she still exhibited bruises days later when she finally returned to work. Several police officers testified about responding to domestic disturbance calls from appellant's second wife, Jennifer. In each case, upon arrival, the police officers witnessed bruises on Jennifer which she said were caused by appellant's beating. Jennifer told one of the officers that appellant had told her he wanted to kill her. A friend of Jennifer's testified that she saw Jennifer's bruises and advised her to leave appellant. There was also testimony about incidents between appellant and his mother in which appellant flew into a violent rage and others had to intervene on behalf of appellant's mother. Finally, there was evidence of appellant's continued drug abuse, reckless driving, convictions for a DWI, a public intoxication, evading arrest, a controlled substance charge, and failed probation.

All of the evidence taken together and viewed in the proper light support the jury's finding beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. Point of error eight is overruled.

### 2. Future dangerousness - factual

In his ninth point of error, appellant claims the evidence is factually insufficient to support the jury's affirmative answer to the future dangerousness issue. This Court does not conduct a factual sufficiency review of the future dangerousness special issue.[13] Point of error nine is overruled.

## 3. Mitigation - legal and factual

In his tenth point of error, appellant claims the evidence is both legally and factually insufficient to support the jury's answer to the mitigation special issue. We do not review

the sufficiency of the evidence to support the jury's answer to the mitigation special issue.[14] Point of error ten is overruled.

## II. GUILT

## A. Motion to suppress

### 1. Search

In points of error one through three, appellant claims the trial court abused its discretion by denying appellant's motion to suppress evidence obtained by allegedly illegal searches of his apartment on November 4, 7, and 29, 2000, in violation of Articles 18.02(10) and 38.23, the Fourth Amendment to the United States Constitution, and Article I § 9 of the Texas Constitution.[15]

Assuming, without deciding, that the searches were illegal, we find the admission of the evidence to be harmless. As a result of these searches, the police recovered the following evidence: (1) a pair of jeans; (2) a pair of socks; (3) a box of .380 bullets; (4) a Dooney & Burke key ring with keys; (5) a set of assorted keys; (6) a silver Mercedes Benz key; (7) a black Mercedes Benz key; and (8) a bullet found in the wall of appellant's apartment. Blood on the jeans and socks was analyzed and determined to match the victims' DNA.

Amy Boettcher's testimony about the offense wholly incriminated appellant in the murders and robbery, and her version was corroborated by other evidence. In addition, as discussed in the section of this opinion relating to the factual sufficiency of the evidence to support guilt, there was a great deal of circumstantial evidence, obtained from sources other than the searches in question, that linked appellant to the crime. Finally, both Amy and Jeff Boettcher testified about appellant's expressed desire to kill the victims.

As for the bullet recovered from the wall in appellant's apartment, the existence of that bullet did nothing to link appellant to the crime. While the recovery of the bullet corroborates Boettcher's testimony that appellant shot at her with a pistol and slammed her hand in the door, other evidence corroborated her version of these events, such as a neighbor who testified to hearing a loud sound like a gun, and a witness who testified about the injuries to Boettcher's hand. We find beyond a reasonable doubt that the evidence did not contribute to appellant's conviction or punishment.[16] Points of error one through three are overruled.

### 2. Arrest

In point of error four, appellant claims his arrest on November 8, 2000, was illegal in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article 1 §§ 9, 10 of the Texas Constitution. He complains that this arrest was a fruit of the illegal searches and that evidence of this arrest should have been suppressed. But appellant entered into an agreement with the State at trial that any statements or other evidence stemming from the allegedly illegal arrest would not be offered into evidence. There is no indication in the record that the agreement was breached and appellant does not claim it was. Point of error four is overruled.

## B. Accomplice witness jury instruction

In his fifth point of error, appellant claims the trial court abused its discretion in denying his request to instruct the jury that appellant's girlfriend, Amy Boettcher, was an accomplice as a matter of law. A prosecution witness who is indicted for the same offense with which the defendant is charged or a lesser-included offense based upon participation

in the commission of the greater offense is an accomplice as a matter of law.[17] If a prosecution witness is an accomplice as a matter of law, the trial court has a duty to instruct the jury accordingly.[18] However, we have already found that Boettcher was not an accomplice as a matter of law. Therefore, the trial court did not abuse its discretion in denying appellant's request for an instruction. Point of error five is overruled.

### III. PUNISHMENT

In point of error eleven, appellant contends that Articles 37.071 and 44.251 are unconstitutional under the Eighth and Fourteenth Amendments by failing to provide meaningful review of the punishment issues. Identical claims have been addressed and rejected.[19] Point of error eleven is overruled.

In his twelfth point of error, appellant argues that Article 37.071 is unconstitutional under the Eighth and Fourteenth Amendments because it fails to adequately define the term "society" in the context of the future dangerousness punishment special issue. This Court has repeatedly held that this term need not be defined, as it is presumed to be understood by the jury without instruction.[20] Point of error twelve is overruled.

Relying on Justice Brennan's dissent in *Gregg v. Georgia*, 428 U.S. 227 (1976), appellant claims in his thirteenth point of error that the Texas death penalty scheme constitutes cruel and unusual punishment in violation of the Eighth Amendment. This Court is not bound by Justice Brennan's dissent. Moreover, we have previously rejected facial challenges to the Texas death penalty scheme under the Eighth Amendment.[21] Point of error thirteen is overruled.

The judgment of the trial court is affirmed.

KELLER, Presiding Judge

Delivered: June 30, 2004

Do not publish

1. Tex. Penal Code § 19.03(a).

2.

Art. 37.071 § 2(g). Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure

3. Art. 37.071 § 2(h)

4

Although appellant cites *Jackson v. Virginia*, 443 U.S. 307 (1979), his argument that the evidence is legally insufficient is based solely on the effect of the statutory accomplice witness rule.

5. *Kutzner v. State*, 994 S.W.2d 180, 187 (Tex. Crim. App. 1999).

6

*Id.*

7

*Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998).

8

*Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

9

*Ortiz v. State*, 93 S.W.3d 79, 88 (Tex. Crim. App. 2002), *cert. denied*, 538 U.S. 998 (2003).

10. We express no opinion about the propriety of considering such evidence in a factual sufficiency review.

11  Art. 37.071 § 2(b).

12

*Manns v. State*, 122 S.W.3d 171, 193 (Tex. Crim. App. 2003).

13. *Allen v. State*, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003).

14

*McFarland v. State*, 928 S.W.2d 482, 499 (Tex. Crim. App. 1996), *cert. denied*, 519 U.S. 1119 (1997); *Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995), *cert. denied*, 519 U.S. 826 (1996).

15

In his points of error, appellant mistakenly refers to the third search as occurring on November 22, but the search warrant for that search is dated November 29, 2000.

16. Tex. R. App. Proc. 44.2(a).

17

*Herron v. State*, 86 S.W.2d 621, 631 (Tex. Crim. App. 2002)(citing *Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App.1991))

18.

*Blake v. State*, 971 S.W.2d 451, 455 (Tex. Crim. App. 1998).

19

*Resendiz v. State*, 112 S.W.3d 541, 549 (Tex. Crim. App. 2003); *Eldridge v. State*, 940 S.W.2d 646, 651-53 (Tex. Crim. App. 1996).

20

*Ladd v. State*, 3 S.W.3d 547, 572-73 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000).

21

*Brooks v. State*, 990 S.W.2d 278, 288 (Tex. Crim. App.), *cert. denied*, 528 U.S. 956 (1999).

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. 74,220

IVAN ABNER CANTU, Appellant

V.

THE STATE OF TEXAS

## APPEAL FROM
## COLLIN COUNTY

*WOMACK, J., filed a dissenting opinion, in which PRICE and JOHNSON, JJ., joined*

Constitutional error requires reversal "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."[1] I do not agree with the court's decision that the error of admitting evidence that was illegally seized was harmless. The error included clothing that contained blood with DNA that matched the victim's DNA. Such evidence probably has more weight than any other that

---

[1] TEX. R. APP. P. 44.2(a).

Cantu (dissent) - 2

courts receive today  (Other incriminating evidence was seized illegally, too )

I am not willing to "find beyond as reasonable doubt," as the <u>court does,</u> that the illegally seized evidence "did not contribute to the appellant's conviction or punishment" because there was (1) "a great deal of circumstantial evidence," (2) testimony from the woman who assisted the appellant after the offense and was given the murder victim's diamond ring, and (3) testimony from that woman's relatives  Such testimony might be sufficient to support the conviction without the illegal evidence, but I do not see how it could remove every reasonable doubt that the illegal DNA evidence even *contributed* to the verdicts

I believe the law requires us to <u>reverse</u> the judgment  I respectfully dissent

En banc
Filed June 30, 2004
Do Not Publish

DDRESS  4753 OLD BENT TREE LANE #1004, DALLAS, TX  75287   CAUSE# 380-80049-01
COLLIN COUNTY JAIL

ESCRIPTION  06/14/73, WM, 5'7, 140, BLK/BRO, TX 01891126   AGENCY/#  DALLAS 863688-J

REST INFORMATION  11/14/00 ON F00-863688

CAPITAL MURDER

### TRUE BILL OF INDICTMENT

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS: The Grand Jury of Collin
county, State of Texas, duly organized at the  January   Term, A.D.,   2001  of the  366   th

rict Court of said county, in said court at said term, do present that

'AN ABNER CANTU, HEREINAFTER CALLED DEFENDANT

or about the  4TH  day of  NOVEMBER   in the year of our Lord Two Thousand, in said county and

—te, did then and there

·tentionally cause the death of an individual, James Mosqueda, by shooting James Mosqueda
h a firearm, and the said defendant was then and there in the course of committing and
ttempting to commit the offense of robbery of James Mosqueda;

...entionally cause the death of an individual, James Mosqueda, by shooting James Mosqueda
ith a firearm, and the said defendant was then and there in the course of committing and
empting to commit the offense of burglary of James Mosqueda;

entionally cause the death of an individual, James Mosqueda, by shooting James Mosqueda
.th a firearm, and did then and there intentionally cause the death of an individual, Amy
'itchen, by shooting Amy Kitchen with a firearm, and both murders were committed during the
ne criminal transaction;

ainst the peace and dignity of the State.

Foreman of the Grand Jury

Exhibit D

201

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IVAN ABNER CANTU, | § | CIVIL ACTION |
| | § | |
| Petitioner, | § | No. 2:06CV166 |
| | § | |
| v. | § | |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Institutional Division, | § | |
| | § | |
| Respondent. | § | |

**SUPPLEMENT TO MEMORANDUM OF LAW
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2254**

The Petitioner, Ivan Abner Cantu, through court-appointed counsel, files this Supplement to Memorandum of Law in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254.

**Mr. Cantu's claim challenging trial counsel's failure to investigate and present evidence of innocence is not procedurally barred and should be considered on the merits.**

On January 17, 2007, Mr. Cantu, through previous court-appointed counsel, filed in this Court his petition for writ of habeas corpus and original memorandum of law in support of that petition. DE[1] 9, 10. In that petition and memorandum, Mr. Cantu argued, inter alia, that his trial attorneys had rendered ineffective assistance by failing to investigate his actual innocence. *See* DE 10 at 38. Now, through newly appointed counsel, Mr. Cantu files this supplement to that memorandum. This claim is not procedurally defaulted, as the Director urges, because a state court remedy remains available. Therefore, the Court should stay and abate these proceedings to allow Mr. Cantu to raise the claim in state court.

---

[1] "DE" refers to the numbered Docket Entries in the instant lawsuit, followed by citation to page numbers, if applicable.

**A.    This claim is unexhausted, but it is not procedurally barred because a state court remedy remains.**

The Director urges that this claim is procedurally defaulted because Mr. Cantu failed to raise the claim in state court and would be unable to do so now.[2]  DE 12 at 29.   Mr. Cantu concedes that his state habeas counsel did not raise this claim in his state habeas corpus application, the first opportunity he would have had to raise such a claim.   But, contrary to the Director's averments, a state court remedy remains.   Therefore, while the claim is unexhausted and, pursuant to interests of comity and federalism that govern federal habeas corpus actions, must be passed upon first by the state courts, the claim is not procedurally defaulted.  *See Rose v. Lundy*, 455 U.S. 509, 518-519 (1982).

The federal habeas corpus statute bars the granting of habeas corpus relief "unless it appears that the applicant has exhausted the remedies available in the courts of the State."   28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275-76 (1971).   But because "[t]his requirement . . . refers only to remedies still available at the time of the federal petition," *Engle v. Isaac*, 456 U.S. 107, 125, n.28 (1982), it is satisfied "if it is clear that [the petitioner's] claims are now procedurally barred under [state] law."   *Castille v. Peoples*, 489 U.S. 346, 351 (1989).   In that case, however, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim."   *Gray v. Netherland*, 518 U.S. 152, 162 (1996).  *See also Coleman v. Thompson*, 501 U.S. 722, 744-751 (1991).   It is on this basis that the Director urges procedural default.

---

[2]   Likely anticipating the Director's argument, previous counsel urged in his original memorandum that the procedural default of this claim be excused based upon the deficient performance of state habeas counsel, conceding, however, that Fifth Circuit precedent does not support the argument.   DE 10 at 38, n.7.

However, "[i]f it appears that the petitioner still may have a right under state law to obtain relief, the federal court will either abate or dismiss the application in order to allow the applicant to present his unexhausted claims in a successive petition to that court." *King v. Dretke*, No. 1:01CV435, 2006 WL 887488, at *6 (E.D.Tex. Mar. 29, 2006) (unpublished order) (citing *Rhines v. Weber*, 544 U.S. 269 (2005)). *See also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.").

Here, Mr. Cantu has the right, under state law, to raise his claim that trial counsel rendered ineffective assistance by failing to investigate and present evidence of his innocence at trial. Specifically, this claim falls within an exception to Texas' statutory prohibition on successive applications.

> If a subsequent applicant for writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains specific facts establishing that:
>
> \*    \*    \*
>
> (2) by a preponderance of the evidence, but for the violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

Tex. Code Crim. Proc. Ann. art. 11.071 §5(a)(2). Significantly, this provision does not require that the claim be based on newly discovered evidence or that the claim could not have been raised in the first application. *See* art. 11.071 §5(a) (containing three sections, each presented in disjunctive, only first of which requires previous unavailability of claim). Furthermore, any ambiguity regarding whether Mr. Cantu's claim falls within the ambit of the exception must be resolved in favor of stay and abeyance.

> In determining whether to stay a federal application and allow an applicant to return to state court[], the federal court does not decide whether the [claim] actually meets the state law standard; instead, it determines only whether it is entirely clear that the Texas courts would find that the [claim] does not meet that standard. Absent such

clarity, the federal court must allow the state court to determine whether the [claim] meets the state law requirement.

*King v. Dretke*, 2006 WL 887488, at *9.   Therefore, unless it is entirely clear to this Court that the state court would not review the merits of Mr. Cantu's unexhausted claim, the claim cannot be dismissed as procedurally barred.

> **B.    The petition should be stayed and held in abeyance to allow Mr. Cantu to present his claim in state court.**

While this unexhausted claim cannot be dismissed with prejudice as procedurally defaulted, the AEDPA clearly precludes this Court from granting relief on an unexhausted claim. 28 U.S.C. § 2254(b)(1)(A).   On the other hand, in light of the AEDPA's one-year statute of limitations, it would be inappropriate to dismiss the petition "without prejudice" to permit exhaustion, which would result in Mr. Cantu's entire petition being time-barred upon return to federal court.   *Cf. Rose v. Lundy*,  455 U.S. at 522 (pre-AEDPA precedent directing federal courts to dismiss without prejudice petitions containing unexhausted claims to allow return to state court); *see Slack v. McDaniel*, 529 U.S. 473, 486 (2000) (noting that dismissal without prejudice under *Lundy* "contemplated that the prisoner could return to federal court after the requisite exhaustion").   Indeed, the Supreme Court has determined that the more appropriate course of action in such a case is for the district court to stay the federal petition and hold it in abeyance while the petitioner returns to state court to exhaust his previously unexhausted claims; once the petitioner exhausts his state remedies, the district court will lift the stay and allow the petitioner to proceed in federal court.   *See Rhines v Weber*, 544 U.S. at 275-276.   Mr. Cantu asks that this Court do the same in his case – stay the petition and hold it in abeyance to permit him to file a successive habeas application in state court.

> **C.    Alternatively, state habeas counsel's ineffectiveness excuses the procedural default.**

But in the event this Court determines that there is no remaining state-court remedy and, therefore, a procedural default arises from Mr. Cantu's failure to raise this claim in his initial state habeas corpus application, Mr. Cantu reurges the argument contained in his original memorandum of law that his state habeas counsel's ineffectiveness constitutes cause sufficient to excuse that default.[3]  *See* DE 10 at 38, n.7.  Where, as here, the allegedly defaulted claim – ineffective assistance of trial counsel – could not have been raised until state habeas corpus proceedings, the Fourteenth Amendment guarantees of due process and equal protection demand that counsel at that stage perform effectively.   And, therefore, counsel's failure to raise the claim gives rise to cause sufficient to excuse the resulting procedural default.

In *Douglas v. California*, 372 U.S. 353 (1963), the Supreme Court held that an indigent criminal defendant has a right to appointed counsel in his first appeal as of right in state court. The Court held in *Evitts v. Lucey*, 469 U.S. 387, 396 (1985), that this right encompasses a right to effective assistance of counsel for all criminal defendants in their first appeal as of right.   The Court based its holding in *Douglas* on that "equality demanded by the Fourteenth Amendment." 372 U.S. at 358.   Recognizing that "[a]bsolute equality is not required," the Court nonetheless held that "where the merits of *the one and only appeal* an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line as been drawn between rich and poor."   372 U.S. at 357 (emphasis in original).

Here, Mr. Cantu's state habeas corpus application was, in fact, "*the one and only appeal*" available to challenge his trial attorneys' performance.   *See Thompson v. State*, 9 S.W.3d 808, 813 n.5 (Tex. Crim. App. 1999).   But court-appointed state habeas counsel Jan Hemphill utterly failed to provide reasonably adequate assistance of counsel during state habeas corpus proceedings.

---

[3]   Mr Cantu acknowledges that Fifth Circuit precedent does not support this argument, but raises it nonetheless for preservation purposes.   *See Martinez v. Johnson*, 255 F.3d 299, 245 (5th Cir. 2001); *Ruiz v. Quarterman*, 460 F.3d 638, 643-644 (5th Cir. 2006).

Ms. Hemphill never met with Mr. Cantu to consult with him regarding what claims may have been available to raise in state collateral review. She failed to respond to Mr. Cantu's repeated requests to communicate with her before the state habeas application was filed. In fact, Ms. Hemphill met with her client only once during state habeas corpus proceedings, and that was to discuss having her removed as counsel (which did not happen). Ultimately, Ms. Hemphill filed a state habeas application without ever having discussed it with her client − and the application only challenged the death sentence. The application omitted several potentially meritorious claims, including the claim that trial counsel rendered ineffective assistance by failing to investigate and present evidence of Mr. Cantu's actual innocence of the crime. This omission amounted to deficient performance; and absent such omission, there is a reasonable likelihood Mr. Cantu would have been granted relief.

Therefore, Mr. Cantu was, in fact, deprived of the effective assistance of counsel in his "one and only appeal" available to challenge trial counsel's performance. Such ineffective assistance should constitute cause sufficient to excuse the procedural default of the underlying claim.

**D.    Rather than investigate potential witnesses and evidence which would have supported Mr. Cantu's innocence or otherwise effectively challenge the State's case, trial counsel conceded Mr. Cantu's guilt before the jury, thereby rendering constitutionally ineffective assistance.**

Mr. Cantu's trial attorneys − Matt Goeller and Don High − rendered constitutionally ineffective assistance by failing to conduct any significant investigation into the facts of the crime for which their client was accused. They failed to discover and/or effectively utilize several critical pieces of evidence that supported Mr. Cantu's unwavering insistence that he had no involvement in the murders of his cousin and his counsel's fiancee. In fact, during closing argument at the guilt-innocence phase of trial, counsel repeatedly conceded Mr. Cantu's culpability for the murders.

As an initial matter, the Director's reliance on a contention in Mr. Goeller's state habeas affidavit that Mr. Cantu in fact admitted his guilt to trial counsel is unsound.  *See* DE 12 at 30-31. First, the affidavit was submitted in response to Mr. Cantu's state habeas claim that counsel rendered ineffective assistance *at the sentencing phase*.  SHCR[4] at 156, 158-159.  Therefore, Mr. Goeller's claim that Mr. Cantu admitted guilt clearly exceeded the scope of the inquiry; the claim was gratuitous and utterly self-serving.   Furthermore, due to state habeas counsel's complete failure to communicate effectively with Mr. Cantu, *see* Section C. *supra*, Mr. Cantu was never advised that trial counsel had even submitted an affidavit, much less that the affidavit contained a claim that he had admitted guilt.  Mr. Cantu did not learn of the affidavit until he received a copy of it attached as an appendix to his federal habeas corpus petition.   Thus, he has never had an opportunity to rebut the claim by trial counsel that he admitted his guilt, a claim that he emphatically denies.   And perhaps most significantly, this portion of Mr. Goeller's affidavit was neither specifically credited nor relied upon by the state habeas judge in its findings of fact and conclusions of law.   SHCR at 187-192.   Under these circumstances, it would be improper for this Court to credit the claim and rely upon it as a basis for denying this claim of ineffective assistance of counsel.

In reviewing claims of ineffective assistance of counsel, courts employ the two-prong inquiry articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).   The first prong requires the defendant to demonstrate that trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.   *Id.* at 688.   To satisfy this prong, known as the deficient-performance prong, the defendant must identify the acts or omissions of counsel alleged to be ineffective and affirmatively prove that they fell below the

---

[4]   "SHCR" refers to the State Habeas Clerk's Record – the documents filed with clerk's office during the course of Mr. Cantu's state habeas corpus proceeding – followed by citation to page numbers.

professional norm of reasonableness. The second prong requires the defendant to demonstrate that he was prejudiced by the deficient performance of his attorney. To establish prejudice, a defendant must prove that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S at 694.

Trial counsel failed in several respects to effectively counter the State's case at the guilt-innocence phase of trial. Trial counsel failed to scrutinize telephone records admitted into evidence at trial showing that a long-distance telephone call was made from Mr. Cantu's apartment at 8:37 p.m. on November 4. *See* SX 119; 37 RR 57. This evidence indicates that someone else had access to Mr. Cantu's apartment long after he and Amy Boettcher had left for Arkansas, supporting the conclusion that Mr. Cantu was framed by the rival drug dealers truly responsible for James Mosqueda's murder.

Likewise, trial counsel failed to cross-examine State's witnesses regarding toll tag records showing that James Mosqueda's Corvette was driven at 11:15 a.m. on November 4, possibly after Mr. Cantu and Amy Boettcher had left for Arkansas. *See* SX 117, 188; 37 RR 41-53; 36 RR 25 (Boettcher's testimony that they left for Arkansas sometime between 11 a.m. and noon on November 4). Amy Boettcher gave no explanation for this toll tag hit in her testimony; according to her testimony, the last time they drove the Corvette was about 6:30 that morning, when they arrived back at the apartment from downtown Dallas. 35 RR 158-159. At the very least, the discrepancy indicates that someone else besides Mr Cantu could have driven the Corvette before it was discovered by law enforcement on November 5 in the parking lot of Mr. Cantu's apartment complex,[5] again supporting the conclusion that Mr. Cantu was set up as the fall guy for a drug-business hit. But trial counsel failed to capitalize on these critical discrepancies in the

---

[5] Significantly, police conducting an emergency search of Mr. Cantu's apartment on the evening of November 4 did not see the victim's Corvette, which according to State's witnesses was found the next day parked in close proximity to Mr. Cantu's apartment.

State's case, discrepancies that would have seriously undermined the physical evidence relied upon by the State to corroborate the testimony of Amy Boettcher, who even the prosecutor described as a "doper" and a "lawbreaker[]" for whom he had no respect. 41 RR 55.

Trial counsel also failed to probe an obvious inconsistency between the testimony of two of the State's expert witnesses: medical examiner Dr. William Rohr and blood-spatter expert Paulette Sutton. Ms Sutton opined, based on her examination of *photos* of the crime scene (she did not actually view the crime scene), that Amy Kitchen had been kicked or punched in the face with enough force to spray a large amount of blood over the wall behind the bed. 37 RR 212-215. But Dr. Rohr, who performed autopsies on the victims' bodies, apparently found no evidence of any injuries to the victims apart from the gunshot wounds (aside from a small contusion on James Mosqueda's right shoulder). *See* SX 157, 158, 159, 160. But trial counsel did not even cross-examine Dr. Rohr, 37 RR 130, and his examination of Ms. Sutton consisted of about a page and a half and did not touch upon her testimony's inconsistency with the autopsy reports. 37 RR 228-229.[6]

Finally, to further aggravate their failure to effectively rebut the State's case, trial counsel stood in front of the jury during final argument at the guilt-innocence phase of trial and repeatedly conceded Mr. Cantu's complicity in the murders, arguing only that he was technically not guilty of capital murder. 41 RR 31 ("I didn't say he was innocent. I said he's not guilty of capital murder"), 33 ("I'm not saying he's innocent. He's not guilty of capital murder."), 43 ("there's

---

[6] Trial counsel also rendered deficient performance by failing to even interview Tawny Svihovec, Mr. Cantu's ex-girlfriend, at whose apartment police found the murder weapon and who apparently did not believe Mr. Cantu was involved in the murders (and who the State did not call as a witness); by failing to question State's witnesses regarding whether Mr. Cantu's face was swollen when they saw him during the early morning hours of November 4 in order to impeach Amy Boettcher's testimony to that effect; by failing to question State's witnesses who testified they saw Amy Boettcher wearing Amy Kitchen's engagement ring (on her left hand) regarding whether they also noticed any injury or swelling to that hand, which Amy Boettcher and other witnesses testified was the result of an assault by Mr. Cantu that took place the night before.

nothing I can tell you that the murder of Amy Kitchens (sic) was not intentional"), 45 ("He's not innocent, but he's not guilty of capital murder"), 46 ("you're not saying he's innocent. You're saying . . . it's not capital murder"). And the State was quick to capitalize on counsel's concessions in its own closing argument. *See* 41 RR 55 ("His own attorney concedes it. I mean, his own attorney argued – it's already made him the killer. . . . You look at the killing that Mr. Goeller has already conceded, and you find some way one of those cases is not intentional.").

It is true that an attorney's concession of his client's guilt at argument without that client's express consent does not automatically render counsel's performance deficient. *Florida v. Nixon*, 543 U.S. 175, 192 (2004). And in certain cases, it can be a valid strategic decision. *Id.* at 190-191. But for a trial strategy to be deemed reasonable, it must be based on a thorough investigation. *Wiggins v. Smith*, 539 U.S. 510, 521-522 (2003). Trial counsel's decision to concede guilt was not based on a truly thorough investigation. In a case such as this, where there is ample evidence to argue in support of your client's innocence, such a concession certainly falls below the bounds of reasonably professional assistance.

Trial counsel's many failures amount to deficient performance, and had trial counsel performed differently, there is a reasonable likelihood that at least one juror would have found a reasonable doubt as to Mr Cantu's guilt and voted "not guilty." Therefore, Mr Cantu is entitled to relief on his claim of ineffective assistance of counsel at the guilt-innocence phase of trial.

## CONCLUSION

For the foregoing reasons, petitioner Ivan Abner Cantu respectfully requests that the Court stay his pending federal habeas corpus petition and hold it in abeyance to permit him to file a successive state habeas corpus application raising his unexhausted claim of ineffective assistance of trial counsel at the guilt-innocence phase. Alternatively, if the Court finds the claim is procedurally defaulted, Mr. Cantu asks that the Court excuse the procedural default based on state habeas counsel's ineffectiveness, conduct an evidentiary hearing on this and other claims

contained in his original petition and memorandum of law, and grant habeas corpus relief regarding his conviction and sentence.

                                          Respectfully submitted,


                                          /s/_____
                                          GENA BUNN
                                          Attorney for Petitioner

                                          **HOLMES & MOORE, P.L.L.C.**
                                          P.O. Box 3267
                                          Longview, Texas 75606
                                          Telephone:      (903) 758-2200
                                          Fax No.          (903) 758-7864

<u>**CERTIFICATE OF SERVICE**</u>

On this 22nd day of December 2008, I do certify that a true and correct copy of the foregoing Supplement to Memorandum of Law in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 was sent via electronic filing to counsel for the Director, Assistant Attorney General Thomas Merrill Jones.

                                          /s/_____
                                          GENA BUNN

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## MARSHALL  DIVISION

| | | |
|---|---|---|
| **IVAN A. CANTU,** | § | |
| Petitioner, | § | |
| **v.** | § | No. 2:06cv166 |
| **NATHANIEL QUARTERMAN, Director,** | § | |
| **Texas Department of Criminal Justice,** | | |
| **Correctional Institutions Division,** | § | |
| Respondent. | § | |

## MEMORANDUM OPINION

Ivan A. Cantu ("Cantu"), an inmate confined to the Texas Department of Criminal Justice, Institutional Division, filed an application for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2241 and 2254.  Cantu challenged his capital murder conviction and death sentence imposed by the 380th Judicial District Court of Collin County, Texas in cause No. 380-80047-01, styled *The State of Texas vs. Ivan Abner Cantu.* For the reasons set forth below the Court finds that the application is not well-taken and it will be denied.

### Background

*Facts*

Cantu lived with Amy Boettcher in an apartment not far from his cousin, James Mosqueda, who lived with Amy Kitchen.  At approximately 11:20 pm on the night of November 3, 2000, Cantu called Mosqueda and asked if he could come to Mosqueda's house and see him.  Cantu told Boettcher that he was going to Mosqueda and Kitchen's house to kill them, but Boettcher did not

believe him.  When he left the apartment, Cantu had his gun with him.  When he returned to the apartment around 12:20 a.m., his face was swollen and he had what looked like blood on his jeans and in his hair.  He told Boettcher that "it wasn't pretty" and began unloading his gun, complaining that it had jammed on him.  He had Mosqueda's and Kitchen's identification and car keys.  Boettcher threw Cantu's bloody jeans in the kitchen trash can.  After Cantu cleaned up, he made Boettcher return with him to the victims' house to see what he had done.  They drove Kitchen's Mercedes.  Boettcher could see the victims' bodies through the doorway to the master bedroom.  While at the house, Cantu gathered things he had left at the house, and searched the house for drugs and/or money.  They parked the Mercedes in the garage and left in Mosqueda's Corvette.  Cantu gave Boettcher a diamond engagement ring that had belonged to Kitchen.

Later that morning, Cantu and Boettcher drove to Arkansas to visit Boettcher's parents for three days.  That evening, Mosqueda's and Kitchen's bodies were discovered.  After speaking with Sylvia Cantu, Cantu's mother, authorities searched Cantu's and Boettcher's apartment.  They later obtained a search warrant and searched it again, finding among other things the bloody jeans, ammunition, and keys to the victims' house and Kitchen's Mercedes.  When Cantu and Boettcher returned from their trip, they stopped at the house of Tawny Svihovic, a former girlfriend of Cantu's.  His gun was later found at that residence.

On November 7, 2000, Cantu was arrested.  Shortly after he spoke to Boettcher by telephone from the police station, she flew back to Arkansas.  The next day, she began cooperating with authorities investigating the killing.

*Procedural history*

Cantu was indicted for capital murder in violation of Tex Penal Code Ann. S 19.03 (a)(9)(A) (Vernon 1994). After a jury trial, he was convicted and on November 6, 2001, he was sentenced to death. His conviction was affirmed on direct appeal, *see Cantu v. State*, No. 74220, 2004 WL 3093156 (Tex. Crim. App. June 30, 2004)(unpublished), and his state petition for post-conviction relief was denied, *see Ex parte Ivan Cantu*, No. WR-63624-01, 2006 WL 120829 (Tex. Crim. App. Jan. 18, 2006) (unpublished). On January 18, 2007, he filed the present application for a writ of *habeas corpus*.

*Claims*

Cantu raised thirteen claims in his petition:

1. He was denied his sixth amendment right to the effective assistance of counsel.

2. The evidence at his trial was legally insufficient to support his sentence of death.

3. He was denied his right to be free from cruel and unusual punishment and his right to the due process of law when the trial court refused to instruct the jury that he would have to serve forty-years in prison before he would be eligible for parole.

4. He was deprived his constitutional rights because the court's instruction concerning mitigation did not require the state to prove the absence of sufficient mitigation beyond a reasonable doubt

5. He was denied his constitutional rights against cruel and unusual punishment and due process of law by the requirement that at least ten jurors must vote "No" in order for the jury to return a negative answer to the punishment mitigation issue.

6. Texas Code Crim. Proc. Art. 37.071 and Art. 44.251 violate the Eighth and Fourteenth Amendments because they fail to provide meaningful review of punishment issues.

7. The search of Cantu's apartment violated his Fourth Amendment rights.

8. Trial counsel was ineffective for failing to investigate Cantu's claims of actual innocence.

9. Appellate counsel was ineffective for failing to raise an issue on appeal related to the trial court's error in not giving a reasonable doubt instruction for extraneous offenses.

10. Cantu was denied his constitutional right to be present at all stages of his trial.

11. Trial counsel was ineffective for failing to object to extraneous victim impact testimony.

12. The state's use of a peremptory challenge to disqualify an Hispanic juror was improper under *Batson v. Kentucky*.

13. Cantu is actually innocent of capital murder.

*Standard of Review*

Because Cantu's application for *habeas corpus* was filed after 1996, the Anti-Terrorism and Effective Death Penalty Act (AEDPA) applies to his claims. Under the AEDPA, a state prisoner seeking to raise claims in a federal petition for *habeas corpus* ordinarily must first present those claims to the state court and exhaust his state remedies. *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163 (2002). If an applicant raises a claim in his federal *habeas corpus* application which was not presented to the state courts, the federal court will attempt to allow the applicant to return to state court and present them to the state court in a successive petition, either by dismissing the entire petition without prejudice, see *Rose v. Lundy*, 455 U.S. 509, 520-22 (1982), or by staying the federal proceedings, s*ee Rhines v. Weber*, 544 U.S. 269, 279 (2005). If the federal court is convinced that the state court would refuse to consider the merits of such a successive petition, however, the federal court will treat the unexhausted claims as if the state court had already refused to hear them on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). The federal court generally does not review procedurally defaulted claims unless the applicant can establish either that he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failing to address the claims on their merits would result in a fundamental miscarriage of justice, because the petitioner is actually innocent of the offense. *See Coleman v.*

4

*Thompson,* 501 U.S. 722, 749-750 (1991); *Finley v. Johnson,* 243 F.3d 215, 220 (5ᵗʰ Cir. 2001). If it is not entirely clear that the state court would refuse to hear a successive petition containing the new claims, however, the federal court will allow the state court the first opportunity to consider them. *See Wilder v. Cockrell,* 274 F.3d 255, 262-63 (5ᵗʰ Cir. 2001).

If the state court denied the claim on its merits, a federal court may only grant relief if the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, *see* 28 U.S.C. § 2254 (d)(1), or the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *see* 28 U.S.C. § 2254 (d)(2). The court reviews questions of law and mixed questions of law and fact under section 2254(d)(1), while it reviews questions of fact under section 2254(d)(2). The state court's findings of fact are presumed to be correct, and the applicant has the burden of rebutting this presumption of correctness by clear and convincing evidence. *Richardson v. Quarterman,* 537 F.3d 466, 472-73 (5ᵗʰ Cir. 2008).

If the state court based its decision on the alternative grounds of procedural default and a rejection of the merits, the general rule in this circuit is that a federal court must, in the absence of good cause and prejudice, or a fundamental miscarriage of justice, deny relief because of the procedural default, *see Hughes v. Dretke*, 412 F.3d 582, 592 (5ᵗʰ Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006), but the rule is not absolute; a court can look past the question of procedural default if the claims can be resolved more easily on the merits. *See Busby v. Dretke*, 359 F.3d 708, 720 (5ᵗʰ Cir.), *cert. denied*, 541 U.S. 1087 (2004).

## Analysis

Cantu's first claim is that he was denied his sixth amendment right to the effective assistance of counsel. This claim was denied on the merits by the state court, *see* State Habeas Transcript ("SHTr") p.189, Conclusion of Law 16, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

In *Wiggins v. Smith,* 539 U.S. 510 (2003), the Supreme Court stated that in order to establish that a defense lawyer's performance was constitutionally ineffective, an applicant must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. To establish deficient performance, an applicant must demonstrate that counsel's behavior fell below an objective standard of reasonableness and the proper measure of attorney performance remains simply reasonableness under prevailing professional norms. *Id.* at 521. To establish prejudice, an applicant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 534.

Cantu claims that his trial counsel's performance was deficient because they failed to investigate his mental health, and failed to prepare a social history, as a result. He contends that had they done so, they would have discovered that he suffered from bi-polar disorder, the effects of long-term drug abuse, and had a dysfunctional childhood. A psychologist, Dr. Dineen Milam, stated in an affidavit that she would have testified that because of this combination of factors Cantu committed these murders due to a mental defect, rather than because of a venal choice, and the jury would likely have shown leniency toward him.

6

Cantu's attorneys stated in affidavits that they asked Cantu to provide an account of his life prior to his arrest, including information about his childhood, including any abuse, any traumatic injuries, names of anyone who could testify on these matters, and anything else he could think of that would assist them in convincing a jury to spare his life. They also addressed these same questions to Cantu's mother. They then provided this information to a mitigation specialist, who conducted extensive interviews in an attempt to develop a detailed mitigation plan, and to a psychologist, who testified that based on the information they provided, he was of the opinion that Cantu would not be dangerous as long as he was kept in prison.

Cantu's attorneys decided that their strategy for the punishment determination phase of the trial would be based upon four themes: his dysfunctional childhood and family, his misuse of drugs and alcohol, some of which was supplied by victim Mosqueda, and his lack of future dangerousness as long as he was denied access to drugs and alcohol, and his conversion to Christianity. They testified that they decided not to have Cantu examined by a psychiatrist because they did not believe, based upon their observations of his behavior, that he suffered from any mental illness other than antisocial personality disorder, and even if they were able to obtain evidence of some other psychiatric disorder, if they attempted to introduce any evidence of that disorder the prosecution would then be allowed to examine Cantu with their own psychiatrist, and he would likely testify that Cantu was a sociopath, which would severely undercut their evidence that he would not be dangerous in the future. One of Cantu's attorneys stated that after reviewing the evidence they provided, Dr. Cunningham said to him that Cantu might be suffering from severe depression, and he suspected that Cantu might be a sociopath.

The state court found Cantu's two attorneys' affidavits more credible than Dr. Milam's affidavit. It found that the record did contain evidence of Cantu's childhood, substance abuse, and cycles of depression that the jury was able to consider. It also found that their strategic decision not to employ a psychiatric-based defense strategy was reasonable, because such a defense would have been inconsistent with their strategy of focusing on his conversion to Christianity. This finding cannot be overturned unless it is objectively unreasonable. *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) *cert denied*, 537 U.S. 1104 (2003).

The state court's finding does not meet this standard. A decision not to investigate is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation, and it must therefore be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Wiggins*, 539 U.S. at 521-22. In the present case, Cantu's attorneys based their decision on the assumption that the prosecution, if given the opportunity, would have an expert examine Cantu and opine that he was a sociopath. This assumption was based on their experience, on their understanding that under *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997), the state would have the right to examine Cantu if he attempted to introduce any mental health expert testimony, on their own observations of Cantu, and on the comments of Dr. Cunningham. Applying a heavy measure of deference to counsel's judgments, the Court finds that their decision not to investigate Cantu's mental health was not unreasonable.[1] *Compare Valle v. Quarterman*, No. 08-7005, 2008 WL 4656945 slip op. at *3 (5th Cir. Oct. 22, 2008)(unpublished)(counsel's decision not to obtain a

---

[1] Cantu contends that his trial counsel misunderstood the *Lagrone* decision, and that although the state would have been allowed to examine him if he offered expert mental health testimony on the issue of future dangerousness, they would not have been allowed to examine him if he offered such evidence only in general mitigation. Counsel's understanding does not appear unreasonable in light of *Ward v. State*, No. AP-74695, 2007 WL 1492080 slip op. at *6 (Tex. Crim. App. May 23, 2007)(unpublished) (*Lagrone* rule applies to mitigation as well as future dangerousness.)

psychological evaluation before trial because of the possibility that the state trial court would order a state-sponsored psychological examination pursuant to *Lagrone v. State* held reasonable).

Because the state court's finding that Cantu's counsel's performance was not deficient is not objectively unreasonable, it is unnecessary for the Court to analyze the prejudice element of the test. *See Amos v. Scott*, 61 F.3d 333, 348 (5th Cir.), *cert. denied*, 516 U.S. 1005 (1995).[2] Because the state court's denial of Cantu's first claim was neither contrary to nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Wiggins v. Smith*, the Court will deny this claim.

Cantu's second claim is that the evidence at his trial was legally insufficient to support his sentence of death. This claim was denied on the merits by the state court, *see Cantu v. State*, No. 74220, 2004 WL 3093156 slip op. at *2-*4, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Cantu's second claim contains two sub-claims. His first sub-claim is that the evidence presented at the punishment determination phase of his trial was insufficient to support the jury's finding that there was a probability that he would commit acts of criminal violence which would constitute a continuing threat to society. In *Jackson v. Virginia,* 443 U.S. 307, 319 (1979), the Supreme Court of the United States held that the standard for reviewing sufficiency of the evidence claims is whether, after reviewing the evidence in the record as a whole in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond

---

[2] The Court notes that the state court also found that Cantu could not establish the prejudice element of the *Wiggins* test, stating: "Applicant has not shown that any of the deficiencies he alleges caused Applicant to receive a death sentence rather than life imprisonment." This finding would not be entitled to deference, however, because it applies an incorrect legal standard. The correct standard is whether there is *a reasonable probability* that the result in the proceeding would have been different, had the attorney's performed competently.

9

a reasonable doubt.  In *Woods v. Cockrell*, 307 F.3d 353, 358 (5th Cir. 2002), the United States Court of Appeals for the Fifth Circuit held that the *Jackson* standard applies to claims of insufficiency of the evidence supporting the future dangerousness issue.

Cantu contends that "[a]lthough the nature of the crime was horrific, there was nothing in Cantu's background to indicate that he would be a future danger to society," *see* Brief in Chief at 18. There are two problems with this argument.  First, the fact that the nature of the crime was horrific is considered highly relevant to whether the defendant is likely to be dangerous in the future.  *See e.g. Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000).  Second, Cantu's background contained episodes of violence towards his mother, both of his previous wives, and Boettcher.  Previous violent conduct is considered relevant to future dangerousness.  *See e.g. Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir. 1998), *cert. denied*, 525 U.S. 1119 (1999).

Other evidence showed that Cantu expressed no remorse, which is considered relevant to future dangerousness, *see e.g., White v. Johnson*, 153 F.3d 197, 203 (5th Cir. 1998), *cert. denied*, 525 U.S. 1149 (1999), and that Cantu killed Kitchens because she was a witness, which is also considered relevant to future dangerousness.  *See e.g. Rodriguez v. Zavaras,* 42 F.Supp.2d 1059, 1134 (D. Colo. 1999),

Cantu produced evidence that he had successfully completed a term of probation, successfully completed a drug treatment program, and converted to Christianity.  He also produced evidence that inmates convicted of capital murder are less likely to commit acts of criminal violence than inmates in the general population, and that his criminal behavior was related to his drug usage and he would not have access to drugs while in prison, and his violent behavior was all family related and the family dynamics which led to his behavior would not be present in prison.

Although Cantu produced evidence under which a reasonable juror could have found that he was not likely to be dangerous to society in the future, the Court finds that the state court's determination that, after reviewing the evidence in the record as a whole, a rational fact-finder could have found beyond a reasonable doubt that there was a probability that Cantu would commit acts of criminal violence which would constitute a continuing threat to society was not unreasonable.

The second sub-claim of Cantu's second claim is that the evidence was insufficient to support the jury's failure to find that mitigating circumstances existed which warranted imposing a sentence of life imprisonment, rather than a sentence of death. This sub-claim is not cognizable in *habeas corpus. See Woods v. Cockrell*, 307 F.3d at 359-60. Because Cantu is not entitled to relief on either of the two sub-claims in his second claim, the Court will deny his second claim.

Cantu's third claim is that he was denied his right to be free from cruel and unusual punishment and his right to the due process of law when the trial court instructed the jury not to consider that he would have to serve forty-years in prison before he would be eligible for parole in determining whether there was a probability that he would be dangerous in the future.[3] The state court found this claim procedurally barred because Cantu did not raise the claim in his direct appeal, *see* SHTr p. 190, Conclusion of Law 29, and it also denied the claim on its merits, see SHTr p. 190, Conclusion of law 30. Because it is easier to decide this claim on its merits than to decide it on procedural grounds, *see Busby v. Dretke*, 359 F.3d at 720, the question for the Court is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

---

[3] The trial judge's actual instruction to the jury was:
You are instructed not to consider or discuss the possible actions of the Board of Pardons and Paroles or the Governor, nor how long a defendant would be required to serve on a sentence of life imprisonment, nor how the parole laws would be applied to this defendant. Such matters come within the exclusive jurisdiction of the Board of pardons and Paroles and are of no concern to the judge or jury.

11

In *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994), the Supreme Court of the United States held that when the defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant would not be eligible for parole.  In *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000), the Supreme Court noted that the parole ineligibility instruction is required only when the only other option besides the death penalty is life imprisonment without the possibility of parole.  Because the law in effect in Texas at the time of Cantu's sentencing provided only the alternatives of death or life imprisonment with the possibility of parole, the state court's rejection of Cantu's claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Simmons* and *Angelone*.  *See* Title 28 U.S.C. § 2254 (d)(1).  The Court will deny Cantu's third claim.

Cantu's fourth claim is that he was deprived his constitutional rights because the court's instruction concerning mitigation did not require the state to prove the absence of sufficient mitigation beyond a reasonable doubt.[4]  The state court found this claim procedurally barred because Cantu did not raise the claim in his direct appeal, *see* SHTr p. 190, Conclusion of Law 29, and it also denied the claim on its merits, *see* SHTr p. 190, Conclusion of Law 31.  Because it is easier to decide this claim on its merits than to decide it on procedural grounds, *see Busby v. Dretke*, 359 F.3d at 720, the question for the Court is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

---

[4] The mitigation special issue's actual wording is:
Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient circumstance or circumstances to warrant that a sentence of life imprisonment, rather than a death sentence be imposed?

In *Ring v. Arizona*, 536 U.S. 584, 589 (2002), the Supreme Court of the United States held that aggravating factors in statutory capital punishment schemes must be found by a jury and beyond a reasonable doubt.  The Supreme Court explicitly declined to address whether its holding extended to mitigating factors, *see* 536 U.S. at 597 n.4., and the United States Court of Appeals for the Fifth Circuit denied an identical claim in *Granados v. Quarterman*, 455 F.3d 529, 536-37 (5ᵗʰ Cir.), *cert. denied*, 549 U.S. 1081 (2006).  Based upon *Granados*, this Court finds that the state court's rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Ring*.  *See* Title 28 U.S.C. § 2254 (d)(1).  The Court  will deny Cantu's fourth claim.

Cantu's fifth claim is that he was denied his constitutional right to the due process of law and to be free from cruel and unusual punishment by the requirement under TEX CODE CRIM. PROC. art.37.071 § 2 that all twelve jurors must vote "Yes" in order to return a positive answer to the future dangerousness and mitigation special issues, and at least ten jurors must vote "No" in order for the jury to return a negative answer to those special issues.  The state court found this claim procedurally barred because Cantu did not raise the claim in his direct appeal, *see* SHTr p. 190, Conclusion of Law 29, and it also denied the claim on its merits, see SHTr p. 190, Conclusion of Law 33.  Because it is easier to decide this claim on its merits than to decide it on procedural grounds, *see Busby v. Dretke*, 359 F.3d at 720, the question for the Court is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Cantu's fifth claim contains two sub-claims.  His first sub-claim is that the Texas rule invites juror coercion, because "jurors who would otherwise hold out against voting for a death sentence

13

instead adopt a 'majority rules' approach and change their vote to conform to the will of the majority." *See* Brief in Chief at 31.  Cantu contends that this is unreasonable in light of *Brasfield v. United States,* 272 U.S. 448 (1926), and *Lowefeld v. Phelps*, 484 U.S. 231 (1988).

In *Brasfield*, the Supreme Court of the United States held that when a jury informs the trial judge that it is deadlocked, it is reversible error for the trial judge to inquire as to the numerical division of the jurors on the question of the defendant's guilt.  In *Lowenfeld*, the Supreme Court held that it was not reversible error for the trial judge to inquire about the numerical division of jurors on the question of whether they believed that further deliberations would be helpful in reaching a verdict.  In the present case, no judicial polling of the jurors occurred, so the Court finds that the state court's rejection of this sub-claim was neither contrary to nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Brasfield and Lowenfeld*.

The second sub-claim of Cantu's fifth claim is that under the Texas capital sentencing instructions  "a reasonable juror could well believe that there must be a meeting of the minds between his or her fellow jurors as to whether a mitigating factor sufficient to impose a life sentence is present."  In *Mills v. Maryland*, 486 U.S. 367, 384 (1988), the Supreme Court of the United States held that a state may not require jurors to agree unanimously on particular mitigating circumstances in order to sentence an inmate to a sentence less than death.  In *Jacobs v. Scott*, 31 F.3d 1319, 1328 (5th Cir. 1994), *cert. denied*, 513 U.S. 1067 (1995), however, the United States Court of Appeals held that because the Texas special punishment issues do not require that the jurors agree as to the particular circumstances that each considered mitigating in voting "yes" to the mitigation special issue, the rule in *Mills* was inapplicable.  Based upon *Jacobs*, the Court finds that the state court's

14

rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Mills.*

Because the state court's rejection of both sub-claims of Cantu's fifth claim was neither contrary to, nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, the Court will deny this claim.

Cantu's sixth claim is that TEXAS CODE CRIM. PROC. art. 37.071 and 44.251 violate the Eighth and Fourteenth Amendments because they fail to provide meaningful review of punishment issues. This claim was denied on the merits by the state courts, see *Cantu v. State*, No.74220, 2004 WL 3093156 slip op. at *5 (Tex. Crim. App. June 30, 2004)(unpublished), so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

In *Parker v. Dugger*, 498 U.S. 308, 321 (1991), the Supreme Court stated that appellate courts must provide meaningful appellate review of death penalty cases. TEXAS CODE CRIM. PROC. Art 44.251(a) states:

> The Court of Criminal Appeals shall reform a sentence of death to a sentence of confinement in the institutional division Texas Department of Criminal Justice for life if the court finds that there is insufficient evidence to support an affirmative answer to an issue submitted to the jury under Article 37.071 (b) of this code or a negative answer to an issue submitted to a jury under Article 37.071 (e) of this code.

The Texas Court of Criminal Appeals has admitted that by its terms, article 44.251 provides for appellate review of the jury's determination of both the future dangerousness (Article 37.071 (b)(2)(1) and mitigation (Article 37.071 (e) punishment issues. *See Mcfarland v. State*, 928 S.W.2d 482, 498-99 (Tex. Crim. App. 1996), *cert. denied*, 519 U.S. 1119 (1997). In that same case, however, the Court of Criminal Appeals held that because reviewing the sufficiency of mitigating evidence was

15

impossible, it would not attempt to comply with that part of Article 44.251(a).  *Id.*

      In *Beazley v. Johnson*, 242 F.3d 248 (5th Cir.) *cert. denied*, 534 U.S. 945 (2001), the United States Court of Appeals for the Fifth Circuit held: "regardless of whether the Texas court reviews the jury verdict under the mitigation special issue or the future dangerousness special issue, 'meaningful appellate review' has been afforded."  Based upon *Beazley,* the Court finds that the state court's denial of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Parker.*  The Court will deny Cantu's sixth claim.

      Cantu's seventh claim is that the search of his apartment violated his Fourth Amendment rights.  This claim is not cognizable in federal *habeas corpus*.  *Stone v. Powell*, 428 U.S. 465, 494 (1976).  Cantu argues that an exception to the *Stone* doctrine should be made for capital cases.  Such an exception would constitute a new rule of constitutional criminal procedure which cannot be applied to a case pending on collateral review.  *See Teague v. Lane*, 489 U.S. 288, 310 (1989).  The Court will dismiss Cantu's seventh claim.

      Cantu's eighth claim is that his trial counsel was ineffective for failing to investigate his claims of actual innocence.  Because Cantu did not raise this claim in his state proceedings, the first question for the Court is whether it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief.  If it is, the court must treat the claim as if the state court had already refused to hear it on procedural grounds.  *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).

      Cantu contends that it is not entirely clear that the state court would refuse to hear this claim if the Court stayed the case and allowed him to file a successive petition for post-conviction relief.

He relies on TEX. CODE CRIM. PROC. art. 11.071 §5 (a) (2), which provides, in relevant part:

> If a subsequent applicant for writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains specific facts establishing that by a preponderance of the evidence, but for the violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

Cantu's claim is that had his attorneys conducted a reasonable investigation, they would have uncovered enough evidence of his innocence that no rational juror could have found him guilty beyond a reasonable doubt. He contends that such investigation would have revealed that:

1. A long distance telephone call was made from Cantu's apartment at 8:37 pm on November 4, 2000, yet he and Amy Boettcher had left for Arkansas between 11 a.m. and noon;

2. Toll tag records show that James Mosqueda's Corvette was driven at 11:15 am on November 4, 2000, possibly after Cantu and Boettcher had left for Arkansas; and

3. Blood spatter expert Sutton testified that based upon her examination of photos of the crime scene that Amy Kitchen had been kicked or punched in the face with enough force to spray a large amount of blood over the wall behind the bed, but Dr. Rohr's autopsy report contains no notation of any injury to her head except the gunshot wound.

The Court finds that even with this evidence, a rational juror could have found beyond a reasonable doubt that Cantu was guilty of killing Mosqueda and Kitchen. The fact that another person had access to Cantu's house would not lead a rational person to disbelieve the evidence that he committed the murders. Similarly, a rational juror would likely conclude that it was Cantu himself who drove Mosqueda's car at 11:15 am on November 4, 2000, and that he left for Arkansas shortly thereafter. Finally, although Cantu is correct that Rohr's autopsy report does not mention that Kitchen suffered any facial trauma other than the gunshot wound, the trauma is clearly evident in the autopsy photos themselves. A rational juror would likely conclude that Dr. Rohr's autopsy report on Kitchen was less detailed than it could have been, not that Cantu did not kill her.

17

The Court finds that it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief. Accordingly, the Court will treat this claim as if the state court refused to hear it on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Federal review of such claims is prohibited unless Cantu demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law contained in the claim, or the claimant demonstrates that a fundamental miscarriage of justice would occur if the federal court did not address the defaulted claim on the merits, because he is actually innocent. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Cantu contends that the reason he failed to present this claim to the state courts was because he received ineffective assistance from his state post-conviction counsel. This does not constitute good cause for his default. *See Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). In addition, the Court has already rejected Cantu's actual innocence arguments in the context of the successive petition issue, *see* p.17 *supra*, and therefore finds that refusing to address the merits of this claim would not result in a fundamental miscarriage of justice. Because the Court treats Cantu's eighth claim as if it had been procedurally defaulted in state court, and because Cantu failed to establish either of the two exceptions to the rule prohibiting the federal courts from reviewing procedurally defaulted claims, the Court will dismiss this claim.

Cantu's ninth claim is that his appellate counsel was ineffective for failing to raise an issue on appeal related to the trial court's error in not giving a reasonable doubt instruction for extraneous offenses. Because he did not fairly present this claim to the state court, and because it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a

18

successive state petition for post-conviction relief, the court treats this claims as if the state court had already refused to hear it on procedural grounds.  *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  Review of the claim is barred unless Cantu demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law contained in the claim, or the claimant demonstrates that a fundamental miscarriage of justice would occur if the federal court did not address the defaulted claim on the merits, because he is actually innocent.  *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Cantu contends that the reason he failed to present this claim to the state courts was because he received ineffective assistance from his state post-conviction counsel.  This does not constitute good cause for his default.  *See Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).  The Court finds that Cantu's ninth claim is barred from review under the doctrine of procedural default, and it will dismiss this claim.

Cantu's tenth claim is that he was denied his constitutional right to be present at all stages of his trial.  Because he did not fairly present this claim to the state court, and because it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief, the court treats this claims as if the state court had already refused to hear it on procedural grounds.  *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  Review of the claim is barred unless Cantu demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law contained in the claim, or the claimant demonstrates that a fundamental miscarriage of justice would occur if the federal court did not address the defaulted claim on the merits, because he is actually innocent.  *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Cantu contends that the reason he failed to present this claim to the state courts was because he received ineffective assistance from his state post-conviction counsel.  This does not constitute good cause for his default.  *See Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).   The Court finds that Cantu's tenth claim is barred from review under the doctrine of procedural default, and it will dismiss this claim.

Cantu's eleventh claim is that his trial counsel was ineffective for failing to object to extraneous victim impact testimony.  Because he did not fairly present this claim to the state court, and because it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief, the court treats this claims as if the state court had already refused to hear it on procedural grounds.  *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  Review of the claim is barred unless Cantu demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law contained in the claim, or the claimant demonstrates that a fundamental miscarriage of justice would occur if the federal court did not address the defaulted claim on the merits, because he is actually innocent.  *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Cantu contends that the reason he failed to present this claim to the state courts was because he received ineffective assistance from his state post-conviction counsel.  This does not constitute good cause for his default.  *See Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).   The Court finds that Cantu's eleventh claim is barred from review under the doctrine of procedural default, and it will dismiss this claim.

Cantu's twelfth claim is that the state's use of a peremptory challenge to disqualify an Hispanic juror was improper under *Batson v. Kentucky.*  Because he did not fairly present this claim

20

to the state court, and because it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief, the court treats this claims as if the state court had already refused to hear it on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Review of the claim is barred unless Cantu demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law contained in the claim, or that a fundamental miscarriage of justice would occur if the federal court did not address the defaulted claim on the merits, because he is actually innocent. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Cantu contends that the reason he failed to present this claim to the state courts was because he received ineffective assistance from his appellate and state post-conviction counsel. While the ineffective assistance of state post-conviction counsel does not constitute  good cause for failing to fairly present a claim to the state courts, *see Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002), the ineffective assistance of appellate counsel can. *See Murray v. Carrier*, 477 U.S. 478, 492 (1986). In order to establish good cause, however, Cantu would have had to present a separate claim of ineffective assistance of appellate counsel to the state courts. *Edwards v. Carpenter,* 529 U.S. 446, 450-53 (2000). Because Cantu did not do so, the Court finds that his twelfth claim is barred from review under the doctrine of procedural default, and it will dismiss this claim.

Cantu's thirteenth and final claim is that is actually innocent of capital murder. This claim is not cognizable in *habeas corpus* in this jurisdiction*, see Foster v. Quarterman*, 466 F.3d 359, 367-68 (5th Cir. 2006), so the Court will dismiss it.

21

**Conclusion**

For the above reasons, the Court will deny Cantu's first, second, third, fourth, fifth, and sixth claims, and dismiss his seventh, eighth, ninth, tenth, eleventh and twelfth and thirteenth claims.  An Order and Judgment will be entered.

SIGNED this 17th day of March, 2009.

_T. John Ward_____

T. JOHN WARD
UNITED STATES DISTRICT JUDGE

22

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

### MARSHALL  DIVISION

| | | |
|---|---|---|
| **IVAN A. CANTU,** | § | |
| Petitioner, | § | |
| **v.** | § | No. 2:06cv166 |
| **NATHANIEL QUARTERMAN, Director,** | § | |
| **Texas Department of Criminal Justice,** | | |
| **Correctional Institutions Division,** | § | |
| Respondent. | § | |

## ORDER AND JUDGMENT

This matter came before the Court on petitioner Ivan A. Cantu's ("Cantu's") application for a writ of *habeas corpus*, which contained thirteen claims for relief.  The Court has entered a memorandum opinion of even date explaining the reasons for its decision.

It is therefore ORDERED that the seventh, eighth, ninth, tenth, eleventh, twelfth and thirteenth claims in Cantu's application are DISMISSED with prejudice, and

The Court hereby enters JUDGMENT for the Respondent on the first, second, third, fourth, fifth and sixth claims in Cantu's application.

The Clerk is directed to close this case forthwith.

SIGNED this 17th day of March, 2009.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

1

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 26, 2011

Lyle W. Cayce
Clerk

––––––––––

No. 09-70017

––––––––––

IVAN ABNER CANTU,

Petitioner-Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee

––––––––––

Appeal from the United States District Court
for the Eastern District of Texas

––––––––––

Before WIENER, STEWART, and CLEMENT, Circuit Judges.

WIENER, Circuit Judge:

Petitioner-Appellant Ivan Cantu was convicted of murder and sentenced to death. After the Texas Court of Criminal Appeals denied habeas corpus relief, Cantu filed this federal petition, which the district court dismissed. On appeal, Cantu asserts three claims: (1) ineffective assistance of counsel at the sentencing phase, which the court denied on the merits; (2) ineffective assistance of counsel at the conviction phase, which the court dismissed as procedurally defaulted; and (3) actual innocence, which the court dismissed as not cognizable in the Fifth Circuit. We affirm the district court's dismissal of all three claims.

No. 09-70017

# I. FACTS & PROCEEDINGS

## A. Facts

The relevant facts in this case pertain to the murders of which Cantu was convicted and to the tactical and strategic decisions made by Cantu's trial counsel regarding Cantu's mental health.

### 1. The Murders of James Mosqueda and Amy Kitchen

Cantu lived in an apartment with his girlfriend, Amy Boettcher, near where his cousin, James Mosqueda, lived with his fiancee, Amy Kitchen. According to Boettcher's testimony, Cantu called Mosqueda on the night of November 3, 2000 at approximately 11:30 p.m., and asked if he could come over to Mosqueda and Kitchen's house. Cantu then told Boettcher that he was going to their house to kill them, but Boettcher did not believe him. Cantu left his apartment with his gun and returned an hour later driving Kitchen's Mercedes. His face was swollen and a substance that looked like blood was on his jeans and in his hair. Cantu had Mosqueda's and Kitchen's identifications and keys. Cantu cleaned up, and Boettcher threw his bloody jeans into the trash. Cantu and Boettcher then went together to the victims' house in Kitchen's Mercedes. There, Boettcher saw both victims' bodies through the doorway to the master bedroom, while Cantu was searching the house for drugs and money. Cantu took the engagement ring that had belonged to Kitchen and gave it to Boettcher. Cantu and Boettcher left Kitchen's Mercedes parked in the garage and drove off in Mosqueda's Corvette. The couple later drove to Arkansas to visit Boettcher's parents, where they were when the bodies were discovered the following evening.

Police found no evidence of forced entry at Mosqueda and Kitchen's house. Police spoke with Cantu's mother, then searched Cantu and Boettcher's apartment. Police obtained a search warrant to search the apartment a second time and found the bloody jeans, ammunition, a key to the victims' house, and

No. 09-70017

a key to Kitchen's Mercedes. Police also found Cantu's gun at his ex-girlfriend's house where Cantu and Boettcher had stopped on the way home from Arkansas. Cantu's fingerprints were found on the gun's magazine, and Mosqueda's blood was found on the gun's barrel. Police arrested Cantu for the murders.

## 2. Cantu's Mental Health and Related Trial Decisions

As part of Cantu's state habeas corpus proceedings, Daneen Milam, Ph.D., evaluated Cantu at the request of his habeas counsel. Dr. Milam reported that there were "multiple, overlapping indicators" that suggested that Cantu "may suffer from organic brain damage or a severe mood altering disorder." Dr. Milam expressed the belief that, if a mental health professional had reviewed Cantu's family history and evaluated Cantu prior to the sentencing phase of his trial, "any reasonably competent psychiatric professional would have recognized the need to subject Ivan Cantu to a complete Neuropsychological evaluation to rule out an organic cause of his behavior pattern." In addition, Dr. Milam noted that every time Cantu used a stimulant, he became abusive in his personal relationships and that in the couple of months prior to the murders, Cantu had moved into a "manic phase" and "began to abuse Crank, Ecstasy, and Speed," which "interact with a Bi-Polar disorder to cause difficult and unpredictable behavior, irritability, agitation, and cause biological and chemical malfunctions to escalate."

Cantu's lead trial counsel, J. Matthew Goeller, testified by affidavit that he and his co-counsel, Don High, ultimately decided not to have Cantu complete a neuropsychological evaluation for three main reasons: (1) Cantu did not want to participate in psychiatric-based mitigation evidence; (2) they did not believe Cantu would receive a favorable psychiatric report, based on the fact that he had admitted to them that he killed Mosqueda and Kitchen out of revenge because Mosqueda owed him drug money; and (3) the State's evidence of Cantu's prior

3

violent acts against women,[1] coupled with "the particularly gruesome nature of the execution-style of the instant murders," led them to believe that a state-sponsored psychiatric evaluation could indicate that Cantu was a sociopath, which they believed "would substantially lower [their] already slim chance for a life sentence, considering the fact that Cantu was indicted for the murder of two people who were at home in their own bed."

Goeller rebutted Dr. Milam's report by explaining that "she fail[ed] to recognize that Cantu himself objected to any strategy that involved psychiatric-based mitigation evidence (if any such evidence did exist), and, further, failed to recognize the substantial sociopathic-type punishment evidence in possession of the State." If a psychological evaluation revealed Cantu to be a sociopath, Cantu would have been considered a future danger, which would undermine the mitigating evidence they intended to present in support of a life sentence.

Moreover, it was "[o]f great concern" to Goeller and High in deciding whether to submit Cantu to a psychological examination that "Cantu was manipulative and had lied on several occasions to his own counsel." Goeller explained that Cantu had suggested that his counsel elicit perjured testimony, and they feared that a psychological examination might lead to findings of manipulation, which is "a commonly-sought State theme in punishment phase."

Goeller also attested that after seventeen years as a practicing attorney, he was "well acquainted with [bipolar disorder's] effects and symptoms" and that he and High "had no evidence to support the theory that Mr. Cantu was suffering from any kind of mental deficiency, and in particular a bi-polar disorder." In contrast to Dr. Milam's evidence of Cantu's social history, Goeller and High interviewed many of Cantu's family members, and "none of them ever

---

[1] Cantu had a history of abusive conduct toward his two ex-wives and Boettcher, which involved him flying into a rage and firing shots at them, beating them, or raping them. There was also testimony at trial about incidents in which Cantu attempted to abuse his mother.

No. 09-70017

stated (or even remotely suggested)" that Cantu had a diminished mental capacity or bipolar disorder.

## B. Proceedings

Cantu was indicted for capital murder and pleaded not guilty. A jury convicted him of murder and sentenced him to death. Cantu appealed his conviction and sentence directly to the Texas Court of Criminal Appeals, which affirmed both.[2] Cantu did not file a petition for certiorari in the Supreme Court.

Cantu filed a state petition for post-conviction relief. The state court adopted the State's proposed findings of fact and conclusions of law and recommended denial of habeas relief. The Texas Court of Criminal Appeals adopted those findings and conclusions, and affirmed.[3]

Cantu then filed this application for a writ of habeas corpus in the Eastern District of Texas. The district court dismissed all of Cantu's claims, finding in pertinent part that: (1) "[Cantu's trial counsel's] decision not to investigate Cantu's mental health was not unreasonable"; (2) "it is entirely clear that the state court would refuse to consider the merits of [Cantu's unexhausted claim of ineffective assistance of counsel at the conviction phase] if it were presented in a successive state petition for post-conviction relief" and "Cantu failed to establish either of the two exceptions to the rule prohibiting the federal courts from reviewing procedurally defaulted claims"; and (3) Cantu's claim that he is actually innocent of capital murder "is not cognizable in habeas corpus in this jurisdiction."[4]

---

[2] *Cantu v. State*, No. 74220, 2004 WL 3093156, at *6 (Tex. Crim. App. June 30, 2004) (unpublished).

[3] *Ex parte Cantu*, No. WR-63624-01, 2006 WL 120829, at *1 (Tex. Crim. App. Jan. 18, 2006) (unpublished).

[4] *Cantu v. Quarterman*, No. 2:06-CV-166, 2009 WL 728577, at *3-13 (E.D. Tex. Mar. 17, 2009).

No. 09-70017

Cantu timely filed a notice of appeal. The district court granted a certificate of appealability (COA) on four of the thirteen claims raised in Cantu's petition. This appeal addresses the three of those claims listed at the beginning of this opinion.[5]

## II. ANALYSIS

### A. Ineffective Assistance of Counsel at the Sentencing Phase

Cantu contends that his trial counsel failed to discover and present to the sentencing jury evidence of his alleged bipolar disorder, which he claims "would have put not only the instant offense but also the State's entire punishment-phase case into the proper context."[6] We conduct a *de novo* review of this claim.[7]

Because Cantu filed his federal habeas application after 1996, the Anti-Terrorism and Effective Death Penalty Act (AEDPA) applies to his claims.[8] Pursuant to the AEDPA, a federal court may only grant habeas relief if the state court's adjudication of the claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[9]

In addressing a claim of ineffective assistance of counsel, the "clearly established

---

[5] Cantu did not advance one of the four claims on appeal. *See* Appellant's Br. at 2 n.2.

[6] *Id.* at 43.

[7] *See Ladd v. Cockrell*, 311 F.3d 349, 357 (5th Cir. 2002) ("Because an ineffective assistance claim is a mixed question of law and fact, we review *de novo*.") (citing *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999)).

[8] *See Lindh v. Murphy*, 521 U.S. 320, 324-26 (1997).

[9] 28 U.S.C. § 2254(d).

No. 09-70017

Federal law" is the Supreme Court's decision in *Strickland v. Washington*[10] and its progeny.[11] "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'"[12] Therefore, we must determine whether the state court's dismissal of Cantu's ineffective assistance of counsel claim "involved an unreasonable application (and not merely an incorrect application) of *Strickland*."[13]

Under *Strickland*, relief for ineffective assistance of counsel is appropriate only when a petitioner demonstrates that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner.[14] Counsel's performance is measured against an objective standard of "reasonableness under prevailing professional norms."[15] According to this standard, "every effort [must] be made to eliminate the distorting effects of hindsight," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[16] Strategic judgments in particular are owed a high degree of deference:

> [S]trategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable;

---

[10]  466 U.S. 668 (1984).

[11]  *See Williams v. Taylor*, 529 U.S. 362, 391 (2000) ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'").

[12]  *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (citations omitted).

[13]  *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (internal quotation marks omitted).

[14]  *See* 466 U.S. at 687.

[15]  *Wiggins*, 539 U.S. at 521.

[16]  *Strickland*, 466 U.S. at 689.

and strategic choices made after less than complete investigation
are reasonable precisely to the extent that reasonable professional
judgments support the limitations on investigation.[17]

Therefore, we must "focus on whether the investigation supporting counsel's
decision not to introduce mitigating evidence of [Cantu's mental health] *was
itself reasonable.*"[18] In addition, Cantu must establish that prejudice resulted
from his counsel's deficient performance. Specifically, "[w]hen a defendant
challenges a death sentence . . ., the question is whether there is a reasonable
probability that, absent the errors, the sentencer . . . would have concluded that
the balance of aggravating and mitigating circumstances did not warrant
death."[19]

Cantu's trial counsel, Goeller and High, agreed that their best strategy
was to home in on four salient points:

> (1) Ivan Cantu's dysfunctional childhood and family,
> (2) Ivan Cantu's misuse of drugs and alcohol, some of which was
> supplied by the decedent Mosqueda.
> (3) Ivan Cantu's lack of future dangerousness when drugs and
> alcohol were removed from his access, i.e., a plea for a life sentence.
> (4) The advent of Ivan's recent spiritual conversion experience,
> making him a "born again Christian", thereby reducing his
> likelihood for future violence, and *filling the void* brought about for
> the now-missing drugs and alcohol.

At the sentencing phase of trial, Cantu's counsel adduced the testimony of three
witnesses in support of their basic strategy. Dr. Mark Cunningham, a clinical
and forensic psychologist, had reviewed Cantu's records—including the same
documents that Dr. Milam used to support her conclusion that Cantu has bipolar
disorder—and testified that Cantu was not a future danger to society as long as

---

[17] *Id.* at 690-91.

[18] *Wiggins*, 539 U.S. at 523 (emphasis in original).

[19] *Strickland*, 466 U.S. at 695. The Supreme Court further defined a "reasonable
probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

No. 09-70017

he was in a controlled prison environment. Dr. Walter Quijano, another defense pyschologist, testified about the severity of conditions in jail and limitations that would be imposed on Cantu if he were sentenced to life in prison. Finally, Reverend Maury Davis—a former prisoner incarcerated for murder who then became a nationally recognized minister with a congregation of 5,000 persons—testified about Cantu's future leading a life with God.

The state habeas court found that the performance of Cantu's trial counsel was "zealous and competent" and that their explanations of their trial strategy were "consistent and credible." The court agreed with Cantu's counsel that pursuing a bipolar disorder diagnosis for Cantu "would not have been wholly consistent" with the focus on Cantu's "conversion to Christianity and his ability to change with self-control and discipline."

Given that the strategy that Cantu's counsel pursued and the strategy Cantu now believes should have been pursued are inconsistent, Cantu's counsel could not have pursued both—and Cantu does not attack the sufficiency of the evidence that counsel did present in support of their chosen strategy.[20] Cantu's counsel made a conscious decision not to submit Cantu to a psychological examination because, if they had done so with the intention of presenting the results to the jury, the State could have submitted Cantu to its own examination out of the presence of his defense counsel.[21] The potentially detrimental results of such an examination could have strengthened the State's position that Cantu was a sociopath and thus a future danger, thereby warranting the death penalty.

---

[20] *See, e.g., Neal*, 286 F.3d at 238 (detailing the significant amount of additional evidence that could have been presented at trial to support the trial counsel's arguments, including "forty-two pages of affidavits and reports concerning [Appellant's] background as evidence of mitigating factors").

[21] *See Lagrone v. State*, 942 S.W.2d 602, 609-12 (Tex. Crim. App. 1997).

No. 09-70017

The state habeas court's deference to Cantu's counsel's decision not to investigate Cantu's mental health—as a defensive strategy and in light of their "zealous and competent" presentation of Cantu's newfound mental and spiritual stability—was a reasonable application of *Strickland*.[22]

## B. Ineffective Assistance of Counsel at the Conviction Phase

Because Cantu did not raise this ineffective assistance of counsel claim in his state petition for post-conviction relief, the district court had to determine whether the state court would consider the merits of the claim if Cantu now raised it in a successive state petition.[23] The district court concluded that the state court would refuse to consider the merits of this claim and dismissed it as procedurally defaulted.[24] We conduct a *de novo* review of the district court's decision to treat a claim as procedurally defaulted.[25]

Cantu asserts that he may still file a successive state petition. He points to Texas Code of Criminal Procedure art. 11.071, § 5(a)(2), which provides an exception to the Texas bar on successive petitions if a petitioner can establish that "by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt."

---

[22] Because we hold that the state court reasonably determined that Cantu's counsel's performance was not deficient, we need not reach the question of prejudice. *See Amos v. Scott*, 61 F.3d 333, 348 (5th Cir.), *cert. denied*, 516 U.S. 1005 (1995) ("In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.") (citing *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir.), *cert. denied*, 513 U.S. 960 (1994)).

[23] *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).

[24] *Cantu*, 2009 WL 728577, at *10-11.

[25] *See Nixon v. Epps*, 405 F.3d 318, 322 (5th Cir. 2005).

No. 09-70017

The Texas Court of Criminal Appeals has explained that "Article 11.071, Section 5(a)(2) was enacted in response to the Supreme Court's decision in [*Schlup v. Delo*, 513 U.S. 298 (1995)]," so that "standards set forth for evaluating a gateway-actual-innocence claim announced by the Supreme Court should guide our consideration of such claims under Section 5(a)(2)."[26] The court summarized:

> [T]o mount a credible claim of innocence, an applicant must support his allegations of constitutional error with reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial. . . . To determine whether an applicant has satisfied the burden, we must make a holistic evaluation of all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. We must then decide how reasonable jurors, who were properly instructed, would react to the overall, newly supplemented record.[27]

Cantu claims that his trial counsel rendered ineffective assistance by failing to investigate evidence of his factual innocence and present it at trial. In particular, he points to three factual inconsistencies that were admitted into evidence at trial: (1) telephone records indicated that someone made a phone call from Cantu's apartment on the night after the murder when he and Boettcher were in Arkansas; (2) toll tag records indicated that someone drove Mosqueda's Corvette at 11:15 a.m. on November 4, even though Boettcher claimed the last time they drove the car was at 6:30 a.m.; and (3) the State's blood-spatter expert testified, based on photos of the crime scene, that Kitchen had been kicked or punched in the face, while the doctor who performed the autopsies found no

---

[26]   *Ex parte Reed*, 271 S.W.3d 698, 733 (Tex. Crim. App. 2008) (internal footnote omitted).

[27]   *Id.* at 733-74 (internal quotation marks and footnotes omitted).

evidence of injuries to the victims apart from the gunshot wounds.[28] Cantu does not specifically explain, however, how this evidence proves his innocence by a preponderance of evidence,[29] and the district court pointed out that there are rational explanations of these inconsistencies that reasonable jurors could accept:

> The fact that another person had access to Cantu's house would not lead a rational person to disbelieve the evidence that he committed the murders. Similarly, a rational juror would likely conclude that it was Cantu himself who drove Mosqueda's car at 11:15 am on November 4, 2000, and that he left for Arkansas shortly thereafter. Finally, although Cantu is correct that Rohr's autopsy report does not mention that Kitchen suffered any facial trauma other than the gunshot wound, the trauma is clearly evident in the autopsy photos themselves. A rational juror would likely conclude that Dr. Rohr's autopsy report on Kitchen was less detailed than it could have been, not that Cantu did not kill her.[30]

Most importantly, the inconsistencies derive from old evidence that was presented at trial and do not introduce any new information, which is a requirement under *Schlup* and thus under article 11.071, § 5(a)(2).[31]

---

[28] Appellant's Br. at 33-34.

[29] Cantu alleges that these inconsistencies "support[] the conclusion that Cantu was framed by the rival drug dealers truly responsible for James Mosqueda's murder." *Id.* at 33. This evidence does not undermine the inculpatory evidence that was admitted at trial though, and there is no reason to believe that these inconsistencies would lead a rational juror to discount the inculpatory evidence admitted at trial in favor of Cantu's alternative theory.

[30] *Cantu*, 2009 WL 728577, at *10. Furthermore, an officer testified that Cantu's mother placed a call using Cantu's phone at about that time when they were with her at the apartment.

[31] Cantu argues that "this provision does not require the claim be based on newly discovered evidence" (Appellant's Br. at 23), but he ignores the case law guiding interpretation of the provision that does require as much. *See Schlup*, 513 U.S. at 324 ("To be credible, [an actual innocence] claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.").

No. 09-70017

Cantu further contends that his counsel rendered deficient performance (1) by failing to interview Cantu's ex-girlfriend, at whose apartment police found the murder weapon; (2) by failing to question State witnesses as to whether Cantu's face was indeed swollen and Boettcher's hand was indeed injured, as she testified; and (3) by conceding Cantu's culpability for the murders during closing argument. These claims, however, do not constitute "reliable evidence," let alone new evidence, and therefore also cannot support a *Schlup* claim of actual innocence as required to file a successive petition under § 5(a)(2).

In sum, the district court was correct in its conclusion that the state court would clearly refuse to consider the merits of this claim if it were now presented in a successive state petition for post-conviction relief under § 5(a)(2).

In the alternative, Cantu argues that his procedurally defaulted claim may nevertheless be reviewed in federal court pursuant to the *Coleman v. Thompson*[32] exceptions. These exceptions allow for federal habeas review if a petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."[33] The only cause that Cantu alleges, however, is that his "state habeas counsel's ineffectiveness constitutes cause sufficient to excuse that default."[34] We have repeatedly rejected this argument and held, to the contrary, that "ineffective assistance of habeas counsel cannot provide cause for a procedural default" under these

---

[32] 501 U.S. 722 (1991).

[33] *Id.* at 750.

[34] Appellant's Br. at 26.

No. 09-70017

circumstances,[35] which Cantu conceded.[36] Cantu therefore does not satisfy the *Coleman* cause and prejudice exception.

As for the fundamental miscarriage of justice exception, we have held that "the fundamental miscarriage of justice exception is confined to cases of actual innocence, where the petitioner shows, as a factual matter, that he did not commit the crime of conviction."[37] We apply the *Schlup* standard to establish the requisite probability that the petitioner is factually innocent[38]—which Cantu does not meet, as discussed above.

Because Cantu does not qualify for either of the two *Coleman* exceptions, his claim cannot be reviewed in federal court. The district court was correct to dismiss this claim as procedurally defaulted.

## C. Actual Innocence

Cantu makes a freestanding claim of actual innocence based on the factual inconsistencies that evolved at trial. The district court dismissed this claim as legally incognizable in the Fifth Circuit. We review the district court's legal determination *de novo*.[39]

In *Herrera v. Collins*, the Supreme Court addressed the possibility of a freestanding habeas claim of factual innocence based on newly discovered evidence that had not been presented at trial.[40] The Court explained:

> We may assume, for the sake of argument in deciding this case, that
> in a capital case a truly persuasive demonstration of "actual

---

[35] *Martinez v. Johnson*, 255 F.3d 229, 240-41 (5th Cir. 2001).

[36] *See* Appellant's Br. at 26 n.4.

[37] *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999).

[38] *See id.*

[39] *See Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008).

[40] 506 U.S. 390, 416-17 (1993).

No. 09-70017

innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.[41]

We have interpreted this language narrowly as "simply assum[ing] such a premise arguendo" while "never h[olding], however, that actual innocence would entitle a petitioner to habeas relief."[42] Never having seen such a claim that was supported by anything that even approached a "truly persuasive demonstration" of actual innocence, "[t]he Fifth Circuit has rejected this possibility and held that claims of actual innocence are not cognizable on federal habeas review" in accordance with our pre-*Herrera* precedent.[43]

Neither do we see a viable claim here. Not one fact that Cantu presents to support his claim of actual innocence is new, and most importantly, none establishes—or even tends to establish—that Cantu is factually innocent of the murders.[44] Inasmuch as Cantu cannot meet even the lesser *Schlup* actual innocence standard discussed above, he surely cannot meet the "extraordinarily high" *Herrera* standard. Like the petitioner in *Herrera*, Cantu "is not innocent, in any sense of the word."[45]

---

[41] *Id.* at 417.

[42] *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998).

[43] *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (internal citation omitted).

[44] *See Herrera*, 506 U.S. at 417 (describing an actual innocence claim as "a truly persuasive demonstration of 'actual innocence' made *after trial*") (emphasis added). Presumably if the evidence was persuasive enough to meet the *Herrera* standard and *was* presented at trial, the petitioner would have been found not guilty.

[45] *Id.* at 419 (O'Connor, J., concurring).

15

000345

No. 09-70017

## CONCLUSION

For the foregoing reasons, the district court's denial of habeas relief is
AFFIRMED.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

January 26, 2011

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing or
            Rehearing En Banc

     No. 09-70017, Ivan Cantu v. Rick Thaler, Director
         USDC No. 2:06-CV-166
     -------------------------------------------------
Enclosed is a copy of the court's decision.  The court has
entered judgment under FED. R. APP. P. 36.  (However, the opinion
may yet contain typographical or printing errors which are
subject to correction.)

FED. R. APP. P. 39 through 41, and 5TH CIR. RULES 35, 39, and 41
govern costs, rehearings, and mandates.  **5TH CIR. RULES 35 and 40
require you to attach to your petition for panel rehearing or
rehearing en banc an unmarked copy of the court's opinion or
order.**  Please read carefully the Internal Operating Procedures
(IOP's) following FED. R. APP. P. 40 and 5TH CIR. R. 35 for a
discussion of when a rehearing may be appropriate, the legal
standards applied and sanctions which may be imposed if you make
a nonmeritorious petition for rehearing en banc.

Direct Criminal Appeals .  5TH CIR. R. 41 provides that a motion
for a stay of mandate under FED. R. APP. P. 41 will not be
granted simply upon request.  The petition must set forth good
cause for a stay or clearly demonstrate that a substantial
question will be presented to the Supreme Court.  Otherwise, this
court may deny the motion and issue the mandate immediately.

Pro Se Cases .  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need
to file a motion for stay of mandate under FED. R. APP. P. 41.
The issuance of the mandate does not affect the time, or your
right, to file with the Supreme Court.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    By: _Jamei R. Cheramie_____
                    James R. Cheramie, Deputy Clerk

Enclosures

Ms. Gena Blount Bunn
Mr. Thomas Merrill Jones

# Supreme Court of the United States
# Office of the Clerk
# Washington, DC  20543-0001

William K. Suter
Clerk of the Court
(202) 479-3011

March 26, 2012

Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA  70130

> Re:  Ivan Abner Cantu
>      v. Rick Thaler, Director, Texas Department of Criminal Justice,
>      Correctional Institutions Division
>      No. 10-11031
>      (Your No. 09-70017)

Dear Clerk:

The Court today entered the following order in the above-entitled case:

The motion of petitioner for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted.  The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Fifth Circuit for further consideration in light of Martinez v. Ryan, 566 U. S. ___ (2012).

The judgment or mandate of this Court will not issue for at least twenty-five days pursuant to Rule 45.  Should a petition for rehearing be filed timely, the judgment or mandate will be further stayed pending this Court's action on the petition for rehearing.

Sincerely,

*William K. Suter*

**William K. Suter**, Clerk

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

March 26, 2012

Mr. David Maland
Eastern District of Texas, Marshall
United States District Court
100 E. Houston Street
Room 125
Marshall, TX 75670-0000

    No. 09-70017, Ivan Cantu v. Rick Thaler, Director
        USDC No. 2:06-CV-166

Enclosed is a copy of the Supreme Court order granting
certiorari.

        Sincerely,

        LYLE W. CAYCE, Clerk

        *Charlene A. Vogelaar*
        By: _____
        Charlene A. Vogelaar, Deputy Clerk
        504-310-7648

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 1, 2012

No. 09-70017

Lyle W. Cayce
Clerk

IVAN ABNER CANTU,

Petitioner - Appellant,

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee,

Appeal from the United States District Court
for the Eastern District of Texas

## ON REMAND FROM THE SUPREME COURT
## OF THE UNITED STATES

Before STEWART, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM:

In our earlier consideration of this case, we affirmed the district court's
dismissal of Cantu's petition for federal habeas relief. *See Cantu v. Thaler*, 632
F.3d 157 (5th Cir. 2011). Among other grounds for relief, Cantu argued that he
had received ineffective assistance of counsel at trial. We held that this claim
was procedurally defaulted, and that Cantu's contention that his state habeas
counsel was ineffective did not constitute cause for the procedural default. The

No. 09-70017

Supreme Court has remanded the case for us to consider the effect of *Martinez v. Ryan*, 566 U.S. ___ (2012) on our holding.

IT IS ORDERED that this matter be remanded to the district court so that the district court may decide in the first instance the impact of *Martinez v. Ryan* on Cantu's contention that he had cause for his procedural default.

000351

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

June 01, 2012

Mr. David Maland
Eastern District of Texas, Marshall
United States District Court
100 E. Houston Street
Room 125
Marshall, TX 75670-0000

         No. 09-70017,  Ivan Cantu v. Rick Thaler, Director
              USDC No. 2:06-CV-166

Dear Mr. Maland:

We are enclosing a copy of an opinion-order on remand from the
United States Supreme Court.  This opinion is issued as the
mandate.

                    Sincerely,

                    LYLE W. CAYCE, Clerk


                    By:_____
                    Joseph M. Armato, Deputy Clerk
                    504-310-7651

Enclosure(s)


cc:  Ms. Gena Blount Bunn
     Mr. Thomas Merrill Jones

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

IVAN A. CANTU, #999399,                     §
                                            §
        *Petitioner*,                       §
                                            §        CIVIL ACTION No. 2:06-CV-166
v.                                          §
                                            §        JUDGE RON CLARK
DIRECTOR, TDCJ-CID,                         §
                                            §
        *Respondent*.                       §

## MEMORANDUM OPINION AND
## ORDER OF DISMISSAL

Petitioner Ivan A. Cantu, a death row inmate confined in the Texas prison system, filed

the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

He is challenging his capital murder conviction and death sentence imposed by the 380th Judicial

District Court of Collin County, Texas, in Cause Number 380-80047-01, in a case styled the

*State of Texas vs. Ivan Abner Cantu*.   The case was remanded by the Fifth Circuit for

reconsideration, in light of new case law concerning whether Mr. Cantu received ineffective

assistance of counsel at trial.

Mr. Cantu has not shown that either his state trial counsel or habeas counsel were

deficient, or that any error deprived him of a fair trial. The evidence to which Mr. Cantu points is

not new; it was presented at trial and a rational jury could still have found him guilty beyond a

reasonable doubt. The court finds that Mr. Cantu's claim for habeas relief should be denied.

## I.  PROCEDURAL HISTORY OF THE CASE

Mr. Cantu was convicted by a jury in October 2001 for the November 4, 2000 murders of

James Mosqueda and Amy Kitchen.  Based on the jury's answers to the special issues required

by the Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial court sentenced Mr. Cantu to death on October 26, 2001. Act of June 17, 1993, 73rd Leg., R.S., Ch. 781, § 1, 1993 Tex. Sess. Law Serv. 3060, 3060–61 (West) (amended 2005) (current version at TEX. CODE CRIM. PRO. ANN. art. 37.074, §§ 2(b), (e) (West 2006)). The Texas Court of Criminal Appeals affirmed the conviction. *Cantu v. State*, No. 74220, 2004 WL 3093156 (Tex. Crim. App. June 30, 2004) (not designated for publication). Mr. Cantu did not file a petition for a writ of certiorari.

Mr. Cantu filed an application for a writ of habeas corpus in the State trial court on May 24, 2004. The trial court issued findings of fact and conclusions of law recommending that relief be denied. The Texas Court of Criminal Appeals denied the application for a writ of habeas corpus "[b]ased upon the convicting court's findings and conclusions and [its] own review." *Ex parte Cantu*, No. WR-63624-01, 2006 WL 120829 (Tex. Crim. App. Jan. 18, 2006).

The present proceeding began on April 17, 2006. A petition for a writ of habeas corpus (Dkt. #9) was filed on January 18, 2007. Mr. Cantu also filed a memorandum of law in support of the petition (Dkt. #10). The Director filed a response (Dkt. #12) on June 15, 2007. Mr. Cantu filed a reply (Dkt. #13) on September 10, 2007. Mr. Cantu filed a supplemental memorandum of law (Dkt. #22) on December 22, 2008. On March 17, 2009, the Honorable T. John Ward, United States Judge for the Eastern District of Texas, denied Mr. Cantu's first, second, third, fourth, fifth and sixth claims, and dismissed his remaining claims as procedurally defaulted. *Cantu v. Quarterman*, No. 2:06cv166, 2009 WL 728577 (E.D. Tex. March 17, 2009). The ineffective assistance of counsel at trial claim that is the subject of the present opinion is claim number eight.

The Fifth Circuit affirmed the decision of this court. *Cantu v. Thaler*, 632 F.3d 157 (5th Cir. 2011). On March 26, 2012, the Supreme Court remanded the ineffective assistance of counsel at trial claim to the Fifth Circuit for further consideration in light of *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309 (2012). *Cantu v. Thaler*, 132 S. Ct. 1791 (2012). The Fifth Circuit, in turn, remanded the matter to this court in order that the court "may decide in the first instance the impact of *Martinez* on [Mr. Cantu's] contention that he had cause for his procedural default." *Cantu v. Thaler*, 682 F.3d 1053, 1054 (5th Cir. 2012). Due to the retirement of Judge Ward, the case was assigned to the Honorable Richard Schell, United States Judge for the Eastern District of Texas.

Pursuant to an order of the court, Mr. Cantu filed a brief in light of *Martinez* (Dkt. #48) on August 31, 2012. The Director, in turn, filed a brief (Dkt. #51) on September 27, 2012. Mr. Cantu filed a reply (Dkt. #52) on November 1, 2012. In the meantime, the Supreme Court issued a decision specifically finding that *Martinez* applies to Texas in *Trevino v. Thaler*, 569 U.S. ___, 133 S. Ct. 1911 (2013). Pursuant to an order of the court, Mr. Cantu filed a supplemental brief (Dkt. #56) on October 27, 2014. The Director filed a response (Dkt. #57) on November 10, 2014. Mr. Cantu filed a reply (Dkt. #58) on November 24, 2014. On May 17, 2016, after Judge Schell took senior status, this case was transferred to the undersigned.

## II. FACTUAL BACKGROUND OF THE CASE

The opinion of the Fifth Circuit summarized the factual background of the case as follows:

> Cantu lived in an apartment with his girlfriend, Amy Boettcher, near where his cousin, James Mosqueda, lived with his fiancee, Amy Kitchen. According to Boettcher's testimony, Cantu called Mosqueda on the night of November 3, 2000 at approximately 11:30 p.m., and asked if he could come over to Mosqueda and Kitchen's house. Cantu then told Boettcher that he was going to their house to kill them, but Boettcher did not believe him. Cantu left his apartment with his gun and returned an hour later driving

3

Kitchen's Mercedes. His face was swollen and a substance that looked like blood was on his jeans and in his hair. Cantu had Mosqueda's and Kitchen's identifications and keys. Cantu cleaned up, and Boettcher threw his bloody jeans into the trash. Cantu and Boettcher then went together to the victims' house in Kitchen's Mercedes. There, Boettcher saw both victims' bodies through the doorway to the master bedroom, while Cantu was searching the house for drugs and money. Cantu took the engagement ring that had belonged to Kitchen and gave it to Boettcher. Cantu and Boettcher left Kitchen's Mercedes parked in the garage and drove off in Mosqueda's Corvette. The couple later drove to Arkansas to visit Boettcher's parents, where they were when the bodies were discovered the following evening.

Police found no evidence of forced entry at Mosqueda and Kitchen's house. Police spoke with Cantu's mother, then searched Cantu and Boettcher's apartment. Police obtained a search warrant to search the apartment a second time and found the bloody jeans, ammunition, a key to the victims' house, and a key to Kitchen's Mercedes. Police also found Cantu's gun at his ex-girlfriend's house where Cantu and Boettcher had stopped on the way home from Arkansas. Cantu's fingerprints were found on the gun's magazine, and Mosqueda's blood was found on the gun's barrel. Police arrested Cantu for the murders.

*Cantu v. Thaler*, 632 F.3d at 160.[1]

## III. DISCUSSION AND ANALYSIS

### A.    PRIOR ANALYSIS

**1. In 2009, this court rejected Mr. Cantu's claim on the merits and alternatively found that it was procedurally defective.**

The analysis previously employed by this court and the Fifth Circuit in rejecting claim number eight should be considered in analyzing the claim again in light of *Martinez*. Mr. Cantu argued in the original petition that his trial counsel was ineffective for failing to investigate his claims of actual innocence. In his memorandum, he presented nothing more than a conclusory two paragraph claim. *See* Memorandum (Dkt. #10-2), page 38. He complained that trial counsel failed to retain a private investigator or interview potential witnesses who could exculpate him. He did not attach any evidence in support of the claim. Indeed, he admitted that he was seeking

---

[1] This factual summary is essentially the same as the factual summary of the Texas Court of Criminal Appeals. *Cantu v. State*, No. 74220, 2004 WL 3093156, at *1 (Tex. Crim. App. June 30, 2004) (not designated for publication).

to find such evidence and that he would submit it when such evidence became available.  At that juncture in these proceedings, the ineffective assistance of counsel claim could have been summarily rejected since Mr. Cantu offered nothing other than conclusory allegations and bald assertions, which are insufficient to support a petition for a writ of habeas corpus.  *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990); *Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983).

Although Mr. Cantu's initial Memorandum (Dkt. # 10) did not include any evidence that could prove exculpatory, it did have an affidavit from lead trial counsel, Mr. J. Matthew Goeller, which had been submitted during the State habeas corpus proceedings.[2]  Mr. Goeller began his affidavit with a four page review of all of the evidence of guilt that he uncovered during his investigation.  He then provided the following discussion as to his trial strategy:

> After I became familiar with the factual allegations against Mr. Cantu, [co-counsel] Mr. High and I discussed our initial opinions regarding our defense of the case.  We interviewed Ivan Cantu on several occasions, both together, and separately, in order to get his input regarding the facts and to apprize him of the information we had obtained.  Initially, Cantu had lied to us about the facts of the case and his involvement, taking the position that he knew nothing about the murders.  Cantu thereafter changed his recollection of his involvement in the murders. Cantu refused to participate in any psychological mitigation strategies--Cantu wished to focus on the guilt/innocence [sic] stage, despite overwhelming evidence of his guilt in the murder of Mosqueda and Kitchen.  Throughout my representation, Cantu displayed animosity toward myself and Mr. High because of strategy designed to defeat the "future dangerousness" special issue in the punishment phase of the trial.  Cantu, despite his ultimate recognition of the evidence against him, continuously advanced his demand that "we try this case to obtain a not guilty."  Cantu repeatedly questioned our punishment phase preparation, stating that our punishment phase strategy was premised on "losing" the guilt-innocence [sic] phase of the trial.

*See* Memorandum, Exhibit B (Dkt. #10-4), page 6.

In the remainder of the affidavit, Mr. Groeller provided a response to the claim that he was ineffective during the punishment phase of the trial.

---

[2] The state trial court had ordered Mr. Goeller to submit the affidavit in the state habeas proceeding and had overruled Mr. Goeller's objection to having to provide the affidavit.

Some of this information goes to both trial strategy and tactics as well as the punishment phase. Mr. Goeller describes the twenty-four motions he and Mr. High filed and obtained rulings on, their jury selection strategy of attempts to pick jurors who would be receptive to their mitigation arguments, and their presentation of a mitigation specialist, a psychologist to testify Mr. Cantu would not be dangerous in prison, and a convicted murderer who had become a minister.

In discussing his efforts to develop psychiatric-based mitigating evidence, Mr. Goeller stated that Mr. Cantu admitted to him "that he had indeed killed Mosqueda for 'ripping him off' on a drug deal, and Kitchen just happened to be at the Mosqueda home, and that '[he] didn't wish to leave any witnesses.'" *Id.* at 9.

On August 7, 2008, Judge Ward granted Mr. Cantu's motion to substitute counsel. (Dkt. # 20). Through this new counsel, Mr. Cantu subsequently filed a supplement to his memorandum of law (Dkt. #22). He claimed that had his attorneys conducted a reasonable investigation, they would have uncovered evidence of his innocence and that no rational juror could have found him guilty beyond a reasonable doubt. He contends that such investigation would have revealed the following:

1. A long distance telephone call was made from Mr. Cantu's apartment at 8:37 p.m. on November 4, 2000, yet he and Amy Boettcher had left for Arkansas between 11 a.m. and noon;

2. Toll tag records show that James Mosqueda's Corvette was driven at 11:15 a.m. on November 4, 2000, possibly after Cantu and Boettcher had left for Arkansas; and

3. Blood spatter expert Sutton testified that based upon her examination of photos of the crime scene that Amy Kitchen had been kicked or punched in the face with enough force to spray a large amount of blood over the wall behind the bed, but Dr. Rohr's report contains no notation of any injury to her head except the gunshot wound.

6

Mr. Cantu argued that this evidence was strong enough to entitle him to a stay and to file a successive application for post-conviction relief in State court.

Judge Ward's original memorandum opinion denying habeas relief initially discussed the merits of Mr. Cantu's claim number eight in order to determine whether the Texas Court of Criminal Appeals would refuse to consider the merits in a successive State application for post-conviction relief. (Dkt. # 30, pgs. 16–18). The court made the following findings:

> The Court finds that even with this evidence, a rational juror could have found beyond a reasonable doubt that Cantu was guilty of killing Mosqueda and Kitchen. The fact that another person had access to Cantu's house would not lead a rational person to disbelieve the evidence that he committed the murders. Similarly, a rational juror would likely conclude that it was Cantu himself who drove Mosqueda's car at 11:15 am on November 4, 2000, and that he left for Arkansas shortly thereafter. Finally, although Cantu is correct that Rohr's autopsy report does not mention that Kitchen suffered any facial trauma other than the gunshot wound, the trauma is clearly evident in the autopsy photos themselves. A rational juror would likely conclude that Dr. Rohr's autopsy report on Kitchen was less detailed than it could have been, not that Cantu did not kill her.

> The Court finds that it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief. Accordingly, the Court will treat this claim as if the state court refused to hear it on procedural grounds.

*Cantu v. Quarterman*, 2009 WL 728577, at *10.

Addressing Mr. Cantu's argument that the failure to present this claim at the state trial court was due to ineffective assistance of counsel, Judge Ward noted that "the Court has already rejected Cantu's actual innocence arguments in the context of the successive petition issue . . . ." *Cantu v. Quarterman*, 2009 WL 728577, at *11.

## 2. In 2011, the Fifth Circuit affirmed the denial of habeas relief on claim 8.

On appeal, the Fifth Circuit affirmed Judge Ward's decision and held that Mr. Cantu had not shown "how this evidence proves his innocence by a preponderance of the evidence." *Cantu v. Thaler*, 632 F.3d at 165.

The Court also affirmed Judge Ward's holding that the ineffective assistance of counsel claim was procedurally defaulted and that "the state court would clearly refuse to consider the merits of this claim if it were now presented in a successive state petition for post-conviction relief under § 5(a)(2)." *Id.* at 166.

## B.    ANALYSIS ON REMAND IN LIGHT OF *MARTINEZ*

### 1. *Martinez* and *Trevino* permit habeas review of some ineffective assistance of counsel claims from Texas courts.

When Judge Ward considered Mr. Cantu's Petition in 2009, there was no question that his eighth ground for relief was foreclosed as unexhausted and procedurally barred. However, in 2012 (after the Fifth Circuit had affirmed Judge Ward's ruling), the Supreme Court opened the door for a showing of cause and prejudice to excuse such a procedural default in *Martinez v. Ryan*, 566 U.S. ____, 132 S. Ct. 1309 (2012). In *Martinez*, the Supreme Court answered a question left open in *Coleman*: "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." 566 U.S. at ___, 132 S. Ct. at 1315. These proceedings were referred to as "initial-review collateral proceedings." *Id.* The Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at ___, 132 S. Ct. at 1320.

The Supreme Court extended *Martinez* to Texas in *Trevino v. Thaler*, 569 U.S. __, 133 S. Ct. 1911 (2013). Although Texas does not preclude appellants from raising ineffective assistance of trial counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas procedural system - as a matter of its structure, design, and operation - does not offer

8

most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 569 U.S. at ___, 133 S. Ct. at 1921. The Court left it to the lower courts to determine on remand whether Trevino's claim of ineffective assistance of counsel was substantial and whether his initial State habeas attorney was ineffective. *Id.*

The Fifth Circuit has summarized the application of the rule announced in *Martinez* and *Trevino* as follows:

> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013). "Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013). The Fifth Circuit subsequently reaffirmed this basic approach in *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir. 2014).

The Supreme Court specified that the *Strickland*[3] standard applies in assessing whether counsel was ineffective. *Martinez*, 566 U.S. at ___, 132 S. Ct. at 1318. In order to show that counsel was ineffective, a petitioner must demonstrate the following:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that . . . counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with

---

[3] *Stickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

9

reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688, 104 S. Ct. at 2064. The standard requires the reviewing court to give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. *Id.* at 690, 104 S. Ct. at 2066. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697, 104 S. Ct. at 2069.

## 2. Mr. Cantu has not demonstrated ineffective assistance of counsel at the guilt/innocence stage of the trial.

The first issue for the court's consideration is whether Mr. Cantu's underlying claim of ineffective assistance of trial counsel is substantial, meaning that he must demonstrate that it has some merit. Mr. Cantu argues that his trial counsel was ineffective for failing to independently investigate the State's case for guilt. As previously described, Mr. Goeller's affidavit addressed this issue in detail. Counsel reviewed the evidence of guilt and concluded that it was overwhelming. *See* Memorandum, Exhibit B (Dkt. #10-4), page 6. Moreover, Mr. Cantu admitted to counsel that he had killed Mosqueda for "ripping him off" and that he killed Kitchen because she happened to be there and he did not want to leave any witnesses. *Id.* at 9. In light of the evidence of guilt known to trial counsel Mr. Goeller and Mr. High, they chose to focus on trying to defeat the future dangerousness special issue. *Id.* at 6.

The Supreme Court has stressed that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices

10

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066. A decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S. Ct. at 2066. In *Strickland*, the Supreme Court found that the decision to forego pursuing additional evidence was reasonable in light of the evidence known to counsel. *Id.* at 699, 104 S. Ct. at 2070–71. Counsel is not required to "pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington v. Richter*, 562 U.S. 86, 108, 131 S. Ct. 770, 789–90 (2011). The Fifth Circuit has regularly approved of informed trial strategies foregoing additional investigations. *See, e.g., Ward v. Stephens*, 777 F.3d 250, 264–65 (5th Cir. 2015); *Hoffman v. Cain*, 752 F.3d 430, 446 (5th Cir. 2014); *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009); *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000).

In the present case, Mr. Goeller has set out a detailed, reasonable, and informed trial strategy of focusing on the future dangerousness special issue. He and co-counsel Mr. High conducted a thorough investigation and arrived at the rational conclusion that the evidence of guilt was overwhelming. At some point this was confirmed when Mr. Cantu admitted that he had murdered the victims. The strategic choice to forego pursuit of ephemeral evidence of actual innocence was reasonable in light of the evidence known to trial counsel.

The allegations Mr. Cantu presents concerning trial counsels' ineffectiveness are not based on any new evidence that has been, or might reasonably have been, discovered. Rather there is a litany of criticism as to how evidence on the record might have been addressed differently on cross examination or in final argument. None of these complaints implicate any

11

000363

tactical choice that is even close to being outside of the "wide range of reasonable professionally competent assistance." *See Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

Mr. Cantu also complains that counsel conceded guilt in final argument, arguing only that he was technically not guilty of capital murder. 41 RR 31 ("I didn't say he was innocent. I said he's not guilty of capital murder."). The Fifth Circuit has regularly rejected ineffective assistance of counsel claims where attorneys employed a trial strategy conceding guilt. *Haynes v. Cain*, 298 F.3d 375, 382 (5th Cir. 2002) (partial concession of guilt was a strategy that "proved effective in avoiding the death penalty for their client"); *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) ("counsel's tactic may have been the best available"); *Kitchens v. Johnson*, 190 F.3d 698, 704 (5th Cir. 1999) (conceding to murder and arguing in closing that the defendant had committed a "very brutal, a very savage murder, but [] not a capital murder . . ." was a valid strategic decision "in an effort to bolster his credibility with the jury"). In the present case, counsel's strategy was quite similar to the strategy employed in *Kitchens,* the last of these three cases. In that case, the Fifth Circuit stressed that counsel's closing argument was a strategic decision which "we will not second guess." *Kitchens*, 190 F.3d at 704.

This court will not second guess counsel's informed trial strategy. Overall, Mr. Cantu has not shown that the trial strategy employed by counsel was unreasonable. The court finds that Mr. Cantu has not demonstrated that trial counsel's performance was deficient regarding the issue of actual innocence.

Mr. Cantu likewise failed to satisfy the prejudice prong. Both this court and the Fifth Circuit analyzed the evidence presented by him that purportedly showed his innocence. The Fifth Circuit rejected the claim as follows:

> Cantu claims that his trial counsel rendered ineffective assistance by failing to investigate evidence of his factual innocence and present it at trial. In particular, he points to three

factual inconsistencies that were admitted into evidence at trial: (1) telephone records indicated that someone made a phone call from Cantu's apartment on the night after the murder when he and Boettcher were in Arkansas;  (2) toll tag records indicated that someone drove Mosqueda's Corvette at 11:15 a.m. on November 4, even though Boettcher claimed the last time they drove the car was at 6:30 a.m.; and (3) the State's blood-splatter expert testified, based on photos of the crime scene, that Kitchen had been kicked or punched in the face, while the doctor who performed the autopsies found no evidence of injuries to the victims apart from the gunshot wounds.  Cantu does not specifically explain, however, how this evidence proves his innocence by a preponderance of the evidence, and the district court pointed out that there are rational explanations of these inconsistencies that reasonable jurors could accept[.]

*Cantu v. Thaler*, 632 F.3d at 165 (internal citations omitted).  The opinion proceeded to quote Judge Ward's explanation, which was discussed at page seven of this memorandum.

The Fifth Circuit's opinion went on to reject Mr. Cantu's claim that his attorney's performance was deficient: (1) by failing to interview Mr. Cantu's ex-girlfriend, at whose apartment police found the murder weapon; (2) by failing to question State witnesses as to whether Mr. Cantu's face was indeed swollen and Boettcher's hand was indeed injured, as she testified; and (3) by conceding Mr. Cantu's culpability for the murders during closing argument. *Id.* at 166.  "These claims, however, do not constitute 'reliable evidence,' let alone new evidence, and therefore also cannot support a *Schlup*[4] claim of actual innocence . . ." *Id.*  Consequently, the issue of whether Mr. Cantu's evidence shows actual innocence has already been considered and rejected.  The actual innocence analysis employed by both this court and the Fifth Circuit is, in effect, the same analysis to employ with respect to the prejudice prong.  Mr. Cantu has not shown that any deficient representation on the part of his attorney with respect to this evidence resulted in prejudice.

In light of the foregoing, the court concludes that Mr. Cantu has not shown an underlying claim of ineffective assistance of counsel at trial that is substantial in order to establish cause to excuse the procedural default.

---

[4] *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995).

**3. Mr. Cantu has not demonstrated that State habeas corpus counsel was ineffective.**

Under *Martinez* and *Trevino*, Mr. Cantu has the additional burden of establishing that his initial State habeas corpus counsel was ineffective for failing to present the claim of ineffective assistance of counsel at trial in his State application. But "petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells*, 536 F. App'x at 492. This court's finding that Mr. Cantu has not shown an underlying claim of ineffective assistance of counsel at trial that is substantial, standing alone, precludes a finding of cause and prejudice. Nonetheless, the court shall address the issue of ineffective assistance of habeas counsel since it has been developed by Mr. Cantu.

Mr. Cantu complains that his habeas counsel filed his application for a writ of habeas corpus in State court without discussing it with him. He added that counsel met with him only once. He complains that the application only challenged the death sentence, not the conviction itself. Mr. Cantu once again alleged that trial counsel rendered ineffective assistance by failing to investigate and present evidence of his actual innocence. He argued that the omission of this claim amounted to deficient performance; and absent such omission, there is a reasonable likelihood he would have been granted relief. But, State habeas counsel had access to the record, and the record revealed that the evidence of guilt was overwhelming. State habeas counsel was not required to raise frivolous or futile arguments. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002); *Koch*, 907 F.2d at 527 (both cases concerning frivolous or futile motions during trial).

In the context of direct appeals, the Supreme Court has stressed that an indigent defendant does not have a constitutional right to require counsel to press every nonfrivolous point requested by the client if counsel, exercising professional judgment, decides not to present

that point; instead, an appellate attorney's duty is to choose among potential issues, using professional judgment as to their merits. *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 3312 (1983). Mr. Cantu has not shown actual innocence and thus has not satisfied *Strickland*'s prejudice prong. The evidence before the court does not support a finding that State habeas counsel was ineffective for failing to present this particular claim of ineffective assistance of trial counsel.

Mr. Cantu has not shown that either his trial counsel or his initial State habeas counsel were ineffective in order to excuse the procedural default.

**4. Alternatively, since this court and the Fifth Circuit previously considered and rejected Mr. Cantu's claim of actual innocence, reconsideration under *Martinez* is not warranted.**

Alternatively, the petition should be denied for yet another reason advanced by the Director. He argues that Mr. Cantu has already received the relief available to him under *Martinez*. *See* Brief (Dkt. #57), pages 10-16. "A finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 566 U.S. at ___, 132 S. Ct. at 1320. Where a federal court has addressed the merits of an otherwise defaulted claim, the petitioner has arguably received all of "the relief available to him under *Martinez* and *Trevino*." *Preyor*, 537 F. App'x at 422.

More recently, the Fifth Circuit addressed this issue as follows: "As a practical matter, we also observe that although the district court did not review Reed's ineffective assistance claims under *Martinez*, the district court did review Reed's assertions of actual innocence, which included much of the evidence Reed relies on to show that his counsel acted deficiently." *Reed*, 739 F.3d at 774 n.11.

In the present case, Mr. Cantu is bringing an ineffective assistance of trial counsel claim as a vehicle for presenting an argument that he is actually innocent of the crime. He cites *Martinez* and *Trevino* in an effort to overcome the procedural default. Nonetheless, both Judge Ward and the Fifth Circuit considered and rejected his assertions of actual innocence. Judge Ward reviewed the evidence and arguments that Mr. Cantu's claims were not properly utilized before the state trial court to establish Mr. Cantu's actual innocence. Judge Ward found "that even with this evidence, a rational juror could have found beyond a reasonable doubt that Cantu was guilty of killing Mosqueda and Kitchen." *Cantu v. Quarterman*, 2009 WL 728577, at *10. As such, Mr. Cantu was not permitted to return to the Texas Court of Criminal Appeals because it was "entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief." *Id.*

The Fifth Circuit found that the "court was correct in its conclusion." *Cantu v. Thaler*, 632 F.3d at 166. So both this court and the Fifth Circuit rejected his claims based on actual innocence. Although his ineffective assistance of trial counsel claim was not reviewed under *Martinez*, both courts reviewed his assertions of actual innocence, which includes much of the evidence he relies on to show that his trial counsel was ineffective. Mr. Cantu has already been given all of the relief made available by *Martinez* and *Trevino*- a review of his actual innocence claim on the merits. No other relief is available. Mr. Cantu is not entitled to federal habeas corpus relief on this matter, and the petition should be denied.

## IV. CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a federal habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Mr. Cantu has not yet filed a notice of appeal, the court may

address whether he would be entitled to a certificate of appealability.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court.  Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000).  In cases where a district court rejected a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003).  "When [a] district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604.

In this case, reasonable jurists could not debate the denial of Mr. Cantu's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed.  *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034 (2003) (citing *Slack*, 529 U.S. at 484).  The court thus finds that Mr. Cantu is not entitled to a certificate of appealability as to his claims.

17

000369

## V. CONCLUSION

The record establishes that Mr. Cantu's trial counsel were well experienced and had a considered and rational trial strategy for presentation of a defense to avoid the death penalty in light of the overwhelming evidence of Mr. Cantu's guilt. There is no showing of any error or omission of state counsel at the trial or habeas phases that remotely approaches the *Strickland* standard for ineffective assistance of counsel. The evidence Mr. Cantu claims was not presented to the jury is in the trial record. Even considering that evidence, a rational juror could be convinced of Mr. Cantu's guilt beyond a reasonable doubt.

Having carefully considered the claim remanded by the Fifth Circuit, this court finds that Mr. Cantu has not shown that he is entitled to federal habeas corpus relief and his petition should be denied. It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. It is further

**ORDERED** that a certificate of appealability is **DENIED**. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

So **ORDERED** and **SIGNED** this **15** day of **June, 2016.**

_____

Ron Clark, United States District Judge

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-70016

United States Court of Appeals
Fifth Circuit

**FILED**

November 7, 2016

Lyle W. Cayce
Clerk

IVAN ABNER CANTU,

      Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

      Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 2:06-CV-166

Before CLEMENT, OWEN, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

    Ivan Cantu requests a certificate of appealability ("COA") to appeal the district court's dismissal of his petition for habeas corpus relief. Cantu brought a procedurally defaulted claim that his trial counsel was ineffective for failing to investigate and present evidence of his actual innocence. The district court

---

    * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-70016

held that Cantu did not establish cause to excuse the procedural default. We deny a COA.

I.

Cantu is on death row in Texas. He was convicted and sentenced to death in Texas state court for capital murder.[1] The Texas Court of Criminal Appeals affirmed his conviction and sentence and subsequently denied post-conviction relief.

Cantu sought habeas corpus relief in federal district court, raising for the first time a claim that trial counsel was ineffective for failing to investigate and present evidence of his actual innocence. The district court dismissed Cantu's petition, holding that this claim was procedurally defaulted. *Cantu v. Quarterman*, No. 2:06cv166, 2009 WL 728577, at *3-13 (E.D. Tex. Mar. 17, 2009) (denying six claims and dismissing seven others as procedurally defaulted). This court affirmed. *Cantu v. Thaler*, 632 F.3d 157, 166-67 (5th Cir. 2011). The Supreme Court vacated and remanded for consideration of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), which was issued after this court's decision. *See Cantu v. Thaler*, 132 S. Ct. 1791 (2012). *Martinez* held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 132 S. Ct. at 1320. In *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013), the Supreme Court extended *Martinez* to Texas cases. This court remanded to the district court to decide in the first instance the effect of *Martinez* on Cantu's contention that he had cause for the procedural default. *See Cantu v. Thaler*, 682 F.3d 1053, 1054 (5th Cir. 2012).

---

[1] For a summary of the factual background, see our detailed opinion in *Cantu v. Thaler*, 632 F.3d 157 (5th Cir. 2011), *vacated*, 132 S. Ct. 1791 (2012).

2

No. 16-70016

On remand, the district court applied *Martinez* and held that Cantu failed to show cause to excuse the procedural default because he did not set forth a substantial claim of ineffective assistance of trial counsel or demonstrate that state habeas counsel was ineffective. *See Cantu v. TDCJ-CID*, No. 2:06-CV-166, 2016 WL 3277246, at *6-9 (E.D. Tex. June 15, 2016). The district court also denied a COA. *Id.* at *10. Cantu seeks a COA from this court.

## II.

"[W]hen a habeas corpus petitioner seeks to initiate an appeal of the dismissal of a habeas corpus petition . . ., the right to appeal is governed by the certificate of appealability (COA) requirements . . . ." *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). An "appeal may not be taken" from a final order in a habeas corpus proceeding without a COA. 28 U.S.C. § 2253(c)(1). A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). When a claim is dismissed as procedurally defaulted, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. At the COA stage, "we only conduct a threshold inquiry into the merits of the claims" raised in the habeas petition. *Reed v. Stephens*, 739 F.3d 753, 764 (5th Cir. 2014).

## III.

Cantu requests a COA on the following issues: "(1) [w]hether the district court erred in dismissing Cantu's claims as procedurally defaulted; and (2) [w]hether the district court erred by dismissing Cantu's claims without conducting an evidentiary hearing."

3

No. 16-70016

A.

Federal merits review of a procedurally defaulted claim is permitted when the petitioner is able to "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008). Applying *Martinez* in the COA context, we have held that "to succeed in establishing cause, the petitioner must show (1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) (citing *Martinez*, 132 S. Ct. at 1318). To establish ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

Here, the district court properly held that Cantu failed to make either required showing under *Martinez*. First, as to trial counsel, the district court reviewed the record and determined that Cantu failed to show that his claim is substantial. As the district court found, given the overwhelming evidence of Cantu's guilt, trial counsel "set out a detailed, reasonable, and informed trial strategy of focusing on the future dangerousness special issue." 2016 WL 3277246, at *7. Under *Strickland*'s deficient performance prong, Cantu cannot overcome the strong presumption that counsel's strategy fell within the "wide range of reasonable professional assistance." 466 U.S. at 689.

Second, as to state habeas counsel, the district court noted that counsel had access to the state court record—which "revealed that the evidence of guilt was overwhelming"—and determined that counsel, after exercising professional judgment, was not required to raise every frivolous or futile

4

No. 16-70016

argument requested by Cantu. 2016 WL 3277246, at *8-9. On appeal, Cantu extensively points to Texas "statutory and professional requirements" regarding investigation into state habeas claims. But on federal habeas review, the issue is whether state habeas counsel was constitutionally ineffective under an objective reasonableness standard. *See Bobby v. Van Hook*, 130 S. Ct. 13, 16-17 (2009). As the district court determined, Cantu fails to meet that standard.

Based on our threshold inquiry, we conclude that reasonable jurists would not find it debatable that the district court was correct in holding that Cantu failed to establish cause to excuse the procedural default. As such, we must deny a COA. *See Slack*, 529 U.S. at 484.

### B.

With respect to the denial of an evidentiary hearing, we have declined to hold that *Martinez* requires an opportunity for additional fact finding in support of cause and prejudice. *Segundo v. Davis*, 831 F.3d 345, 351 (5th Cir. 2016). Cantu's claims are based on the existing record, and the district court analyzed that record in reaching its decision. It is not debatable that the district court was within its discretion in declining to hold a hearing. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

### IV.

The COA is denied.

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

Scott S. Harris
Clerk of the Court
(202) 479-3011

June 19, 2017

Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA  70130

       Re:  Ivan Abner Cantu
           v. Lorie Davis, Director, Texas Department of Criminal Justice,
           Correctional Institutions Division
           No. 16-7874
           (Your No. 16-70016)

Dear Clerk:

     The Court today entered the following order in the above-entitled case:

     The petition for a writ of certiorari is denied.

Sincerely,

**Scott S. Harris**, Clerk

000376

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

June 20, 2017

Mr. David O'Toole
Eastern District of Texas, Marshall
United States District Court
100 E. Houston Street
Room 125
Marshall, TX 75670-0000

        No. 16-70016    Ivan Cantu v. Lorie Davis, Director
                        USDC No. 2:06-CV-166

Dear Mr. O'Toole,

Enclosed is a copy of the Supreme Court order denying certiorari.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    *Charlene A. Vogelaar*

                    By: _____
                    Charlene A. Vogelaar, Deputy Clerk
                    504-310-7648