İɴ ᴛʜᴇ

# United States Court of Appeals for the Fifth Circuit

In re IVAN CANTU,
*Movant.*

## RESPONSE IN OPPOSITION TO
## MOTION FOR ORDER AUTHORIZING THE DISTRICT COURT
## TO CONSIDER SECOND OR SUCCESSIVE PETITION FOR
## WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244 &
## MOTION FOR STAY OF EXECUTION

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
   for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

TRAVIS G. BRAGG
Assistant Attorney General
   *Counsel of Record*

Post Office Box 12548,
Capitol Station
Austin, Texas 78711
512.936.1400
Travis.Bragg@oag.texas.gov

*Counsel for Respondent*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Movant*
>   Ivan Cantu

*Counsel for Movant*
>   Gena Bunn
>   GENA BUNN, PLLC

*Respondent*
>   Bobby Lumpkin, Director
>   TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
>   CORRECTIONAL INSTITUTIONS DIVISION

*Counsel for Respondent*
>   Travis G. Bragg, Assistant Attorney General
>   OFFICE OF THE ATTORNEY GENERAL OF TEXAS

>>>   *s/ Travis G. Bragg*
>>>   TRAVIS G. BRAGG
>>>   Assistant Attorney General

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ i

TABLE OF CONTENTS ................................................................ ii

TABLE OF AUTHORITIES ....................................................... iv

INTRODUCTION ........................................................................ 1

STATEMENT OF THE ISSUE .................................................... 1

STATEMENT OF THE CASE ..................................................... 1

I.      Facts of Cantu's Capital Murder ..................................... 1

II.     Cantu's Postconviction Proceedings ................................. 3

SUMMARY OF THE ARGUMENT ............................................ 8

STANDARD OF REVIEW .......................................................... 8

ARGUMENT ............................................................................... 9

I.      Cantu Does Not Meet the Rigorous Standard of § 2244(b). ........... 9

        A.      Cantu could have discovered the factual predicate of his
                claims earlier (§ 2244(b)(2)(B)(i)). ............................... 9

                1.      Facts related to Amy Boettcher ................................. 10

                        a.      The "shitty Rolex" watch .................................... 11

                        b.      The engagement ring ........................................ 15

                        c.      The bloody clothes .............................................. 16

                        d.      The time of death ................................................ 19

                2.      Facts related to Jeff Boettcher .................................... 20

                3.      Facts related to Carlos Gonzalez ................................ 22

                4.      Additional new evidence .............................................. 26

B.   Moreover, Cantu is not actually innocent of capital murder (§ 2244(b)(2)(B)(ii)). ................................................ 28

II.   Cantu's Claims Are Also Barred by the Statute of Limitations of § 2244(d). ...................................................................... 33

III.   Cantu's Claims Are Also Procedurally Defaulted. ........................ 36

IV.   This Court Should Not Stay Cantu's Execution ............................ 37

CONCLUSION ........................................................................................ 40

CERTIFICATE OF SERVICE ................................................................ 41

CERTIFICATE OF COMPLIANCE ........................................................ 41

CERTIFICATE OF ELECTRONIC CASE FILING ................................ 41

# TABLE OF AUTHORITIES

CASES

*Barefoot v. Estelle*, 463 U.S. 880 (1983) .................................................. 38

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................... passim

*Busby v. Dretke*, 359 F.3d 708 (5th Cir. 2004) ........................................ 32

*Case v. Hatch*, 731 F.3d 1015 (10th Cir. 2013) ...................................... 15

*Coleman v. Thompson*, 501 U.S. 722 (1991) ........................................... 37

*Davila v. Davis*, 582 U.S. 521 (2017) ........................................................ 36

*Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009) ........................ 5

*Gage v. Chappell*, 793 F.3d 1159 (9th 2015) ........................................... 14

*Giglio v. United States*, 405 U.S. 150 (1972) ........................................... 10

*Gomez v. U.S. Dist. Ct. for N. Dist of Cal.,* 503 U.S. 653 (1992) ............. 38

*Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743 (5th Cir. 2023) ...... 35

*Halprin v. Davis*, 911 F.3d 247 (5th Cir. 2018) ...................................... 32

*Herrera v. Collins*, 506 U.S. 390 (1993) .................................................. 33

*Hill v. McDonough,* 547 U.S. 573 (2006) .......................................... 38, 39

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ............................................... 38

*In re Boshears*, 110 F.3d 1538 (11th Cir. 1997) ..................................... 14

*In re Campbell*, 750 F.3d 523 (5th Cir. 2014) ...................................... 8, 33

*In re Davila*, 888 F.3d 179 (5th Cir. 2018) .............................................. 28

*In re Jones*, 998 F.3d 187 (5th Cir. 2021) ............................................... 33

*In re Lewis*, 484 F.3d 793 (5th Cir. 2007) ............................................... 33

*Johnson v. Dretke*, 442 F.3d 901 (5th Cir. 2006) ........................ 10, 14, 28

*Martinez v. Ryan*, 466 U.S. 1 (2012) ...................................................... 3, 4

*Moore v. Dretke*, 369 F.3d 844 (5th Cir. 2004) ........................................ 10

*Napue v. Illinois*, 360 U.S. 264 (1959) ..................................................... 10

*Nelson v. Campbell*, 541 U.S. 637 (2004) ................................................. 38

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................... 38

*Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997) .............................. 36, 37

*Rocha v. Thaler*, 626 F.3d 815 (5th Cir. 2010) ........................................ 36

*Sawyer v. Whitley*, 505 U.S. 333 (1992) ................................................... 28

*United States v. Bowen*, 818 F.3d 179 (5th Cir. 2016) ............................ 36


**STATUTES**

28 U.S.C. § 2244 .......................................................................................... 10

28 U.S.C. § 2244(b) .............................................................................. 1, 8, 9

28 U.S.C. § 2244(b)(1) ................................................................................... 8

28 U.S.C. § 2244(b)(2)(A) .............................................................................. 9

28 U.S.C. § 2244(b)(2)(B) ..................................................................... 8, 9, 33

28 U.S.C. § 2244(b)(2)(B)(i) .............................................................. passim

28 U.S.C. § 2244(b)(2)(B)(ii) ....................................................................... 28

28 U.S.C. § 2244(b)(3)(C) .............................................................................. 8

28 U.S.C. § 2244(d) ................................................................................. 1, 33

28 U.S.C. § 2244(d)(1) ................................................................................. 33

28 U.S.C. § 2244(d)(1)(D)................................................................33, 34

28 U.S.C. § 2254(e)(1) ........................................................................32

Tex. Code Crim. Proc. art. 11.071, § 5(a) ..................................... 6

Tex. Code Crim. Proc. art. 64.01............................................... 4, 5

**RULES**

Tex. Crim. App. Misc. R. 11-003 ................................................ 7

**OTHER**

DUFF INVESTIGATIONS, https://duff-investigations.business.site/
(last visited on Feb. 23, 2024).............................................. 12

# INTRODUCTION

Movant Ivan Cantu murdered James Mosqueda, his cousin, and Amy Kitchens, Mosqueda's fiancée, while committing or attempting to commit a robbery. For this he was convicted of capital murder and sentenced to death in October 2001. Now, twenty-three years later, Cantu makes an eleventh-hour plea to this Court to stay his execution and file a successive petition raising claims, the facts of which he has known about for years and could have discovered even earlier. The Court should deny this motion because he cannot meet the rigorous standard of 28 U.S.C. § 2244(b), his claims are time-barred under § 2244(d), and his claims are procedurally defaulted. As such, he also cannot satisfy the requirements for a stay of his execution.

# STATEMENT OF THE ISSUE

Whether Cantu's successor petition is impermissibly successive time-barred under 28 U.S.C. § 2244(b) and (d).

# STATEMENT OF THE CASE

## I.    Facts of Cantu's Capital Murder

In a prior opinion this Court set out the facts of the crime as follows:

> Cantu lived in an apartment with his girlfriend, Amy Boettcher, near where his cousin, James Mosqueda, lived with his fiancée, Amy Kitchen. According to Boettcher's testimony,

Cantu called Mosqueda on the night of November 3, 2000, at approximately 11:30 p.m., and asked if he could come over to Mosqueda and Kitchen's house. Cantu then told Boettcher that he was going to their house to kill them, but Boettcher did not believe him. Cantu left his apartment with his gun and returned an hour later driving Kitchen's Mercedes. His face was swollen and a substance that looked like blood was on his jeans and in his hair. Cantu had Mosqueda's and Kitchen's identifications and keys. Cantu cleaned up, and Boettcher threw his bloody jeans into the trash. Cantu and Boettcher then went together to the victims' house in Kitchen's Mercedes. There, Boettcher saw both victims' bodies through the doorway to the master bedroom, while Cantu was searching the house for drugs and money. Cantu took the engagement ring that had belonged to Kitchen and gave it to Boettcher. Cantu and Boettcher left Kitchen's Mercedes parked in the garage and drove off in Mosqueda's Corvette. The couple later drove to Arkansas to visit Boettcher's parents, where they were when the bodies were discovered the following evening.

Police found no evidence of forced entry at Mosqueda and Kitchen's house. Police spoke with Cantu's mother, then searched Cantu and Boettcher's apartment. Police obtained a search warrant to search the apartment a second time and found the bloody jeans, ammunition, a key to the victims' house, and a key to Kitchen's Mercedes. Police also found Cantu's gun at his ex-girlfriend's house where Cantu and Boettcher had stopped on the way home from Arkansas. Cantu's fingerprints were found on the gun's magazine, and Mosqueda's blood was found on the gun's barrel. Police arrested Cantu for the murders.

*Cantu v. Thaler*, 632 F.3d 157, 160 (5th Cir. 2011), *vacated*, 566 U.S. 901, (2012).[1]

## II.    Cantu's Postconviction Proceedings

On October 26, 2001, the state trial court entered a judgment of conviction for capital murder and sentence of death. *State v. Cantu*, No. 380-80047-01, 2001 WL 36119208 (380th Dist. Ct., Collin County, Tex. Nov. 6, 2001). The Texas Court of Criminal Appeals (CCA) affirmed the conviction and sentence on direct review. *Cantu v. State*, No. 74,220, 2004 WL 3093156, at *5 (Tex. Crim. App. June 30, 2004). The CCA also denied relief on collateral review of Cantu's initial state habeas application, adopting the trial court's findings and conclusions. *Ex parte Cantu*, No. WR-63624-01, 2006 WL 120829, at *1 (Tex. Crim. App. Jan. 18, 2006).

The federal district court denied Cantu's initial federal habeas petition, which included an unexhausted, and thus procedurally defaulted, claim that he received ineffective assistance of trial counsel (IATC), but granted a certificate of appealability (COA) for four of the

---

[1]    The Supreme Court vacated this judgment and remanded the case for further consideration of the impact of *Martinez v. Ryan*, 466 U.S. 1 (2012). *Cantu v. Davis*, 665 F. App'x 384, 385 (5th Cir. 2016). Still, in the Court's opinion after remand, it relied on this prior "detailed opinion" for "a summary of the factual background" of the case. *Id.* at 385 n.1 (citing *Cantu*, 632 F.3d 157).

claims. *Cantu v. Quarterman*, No. 2:06-cv-166, 2009 WL 728577, at *3–13 (E.D. Tex. March 17, 2009). This Court affirmed the lower court's judgment. *Cantu*, 632 F.3d at 168. But the Supreme Court vacated the judgment and remanded the case in light of *Martinez*. *Cantu v. Thaler*, 566 U.S. 901, (2012).

This Court in turn remanded the unexhausted IATC claim back down to the district court. *Cantu v. Thaler*, 682 F.3d 1053, 1054 (5th Cir. 2012). The lower court again considered the claim and denied relief. *Cantu v. Director, TDCJ-CID*, No. 2:06-CV-166, 2016 WL 3277246, at *10 (E.D. Tex. June 15, 2016). This Court denied a COA on the claim and affirmed its prior ruling on all other claims. *Cantu v. Davis*, 665 F. App'x 384, 387 (5th Cir. 2016). The Supreme Court in turn denied a petition for certiorari. *Cantu v. Davis*, 582 U.S. 917 (2017).

While his federal habeas proceedings were ongoing, Cantu pursued DNA testing through the state courts. On October 1, 2009, Cantu filed in the trial court a motion for forensic DNA testing pursuant to Texas Code of Criminal Procedure article 64.01. *Cantu v. State*, No. 76,281, 2010 WL 4010833, at *2 (Tex. Crim. App. Oct. 13, 2010). The trial court denied the motion, and the CCA affirmed that ruling. *Id.* at *2–4.

On March 23, 2011, while Cantu was pursuing certiorari review of his federal habeas petition in the Supreme Court, the state trial court entered an order setting an execution date for August 30, 2011. On May 26, 2011, Cantu filed a subsequent motion for DNA testing under Chapter 64. Pursuant to the State's motion, the trial court withdrew the execution date on July 22, 2011. In 2017, the trial court signed an agreed order for postconviction DNA testing. The court then held hearings on February 13, 2020, and August 4, 2021, regarding the test results. On August 17, 2021, that court found that the postconviction DNA test results would not have changed the outcome of Cantu's trial.

On December 16, 2022, the trial court set another execution date for April 26, 2023. A week prior to that date, Cantu filed a subsequent state habeas application on April 18, 2023. *See generally* First Sub'q Appl. Writ Habeas Corpus, *Ex parte Cantu*, No. WR-63,624-02, 2023 WL 5425491, at *1 (Tex. Crim. App. Aug. 23, 2023). In that application he alleged that the State: (1) presented false testimony from witnesses Amy and Jeff Boettcher in violation of *Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009) and the Fourteenth Amendment's Due Process Clause; and (2) violated *Brady v. Maryland*, 373 U.S. 83 (1963), and the Due

Process Clause by suppressing evidence Cantu could have used to impeach Amy Boettcher's at trial.[2] *Id.* at 48–71. The day after he filed the application, April 19, the trial court withdrew the execution date on Cantu's motion.

On August 23, 2023, the CCA ruled that the subsequent application failed to meet the requirements of Texas Code of Criminal Procedure article 11.071, section 5(a), and thus, dismissed it as an abuse of the writ. *Ex parte Cantu*, 2023 WL 5425491, at \*1. On August 31, 2023, the trial court again set Cantu's execution date, this time for February 28, 2024. Cantu then waited *well over four months* before attempting to stun the courts into a stay by filing a flurry of litigation, including this eleventh hour motion.

On January 12, 2024, Cantu filed a motion in the trial court seeking access to the notes of the State's ballistics expert from trial and asking for funds to hire a ballistics expert himself. The court denied the motion on January 18. On January 30, Cantu filed in the same court a motion to

_____

[2] These are the majority of the claims at issue in the instant motion.

reconsider the denial of the original ballistics motion. The court denied that on February 5.

Almost *six months* after the CCA dismissed Cantu's second state habeas application, he filed a suggestion to reconsider that decision on February 19, 2024. This suggestion was based on some "new" evidence to support the claims raised in his second application.[3] Cantu filed his third state habeas application the following day, February 20—the last day to file in the CCA. *See* Tex. Crim. App. Misc. R. 11-003. In addition to an IATC claim, he again alleged the State unknowingly elicited false testimony, this time from Carlos Gonzalez.[4] Also on February 20, Cantu filed a motion to stay the execution in the CCA and a motion to withdraw the execution date in the trial court.[5]

On February 21, 2024, literally in the eleventh hour of the last day to file in this Court, Cantu filed the instant motion seeking authorization. *See generally* Mot. Order Auth. District Ct. Consider Second or Succ. Pet.

---

[3]   Cantu presented this "new" evidence to the Court in support of the instant motion.

[4]   The claim regarding Carlos Gonzales is also at issue in the instant motion.

[5]   As of the filing of this response, the suggestion for reconsideration, third state habeas application, and motion to stay the execution are pending in the CCA. The motion to withdraw the date is pending in the trial court.

Writ Habeas Corpus (Mot.). He also filed an attending motion to stay his execution. *See generally* Mot. Stay Execution (Stay). The Director's opposition to both motions follows.

## SUMMARY OF THE ARGUMENT

Cantu is not entitled to authorization under § 2244(b) because he fails to show that his proposed claims are predicated on previously unavailable facts that call into question the accuracy of his conviction for capital murder. *See* § 2244(b)(2)(B). What's more, his claims are barred by the statute of limitations and procedurally defaulted. Accordingly, this Court should deny Cantu's motion for authorization. It should likewise deny his motion for a stay.

## STANDARD OF REVIEW

To obtain authorization from this Court to file a successive federal habeas petition in the district court, a petitioner must show that his claim meets the requirements of 28 U.S.C. § 2244(b). *In re Campbell*, 750 F.3d 523, 529–30 (5th Cir. 2014). If the claim was presented in a prior habeas petition, then a motion for authorization must be denied. § 2244(b)(1). For a petitioner to proceed on a new claim, he must make a prima facie showing that one of two exceptions apply. § 2244(b)(3)(C). The first exception is that a petitioner's "claim relies on a new rule of

constitutional law, made retroactive to cases on collateral appeal by the Supreme Court, that was previously unavailable[.]" § 2244(b)(2)(A). Failing that, he must show that:

> (i)   the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; *and*

> (ii)   the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense.

§ 2244(b)(2)(B) (emphasis added). Cantu proceeds only under this latter exception.

## ARGUMENT

## I.   Cantu Does Not Meet the Rigorous Standard of § 2244(b).

### A.   Cantu could have discovered the factual predicate of his claims earlier (§ 2244(b)(2)(B)(i)).

There is no question that Cantu must proceed under the "new facts" exception contained in § 2244(b)(2)(B). First, Cantu must show that the factual predicates of his claims could not have been discovered earlier through the exercise of due diligence. § 2244(b)(2)(B)(i). This Court said that "due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record." *Johnson*

*v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006). And it is squarely Cantu's

burden to make that showing. *Id.* (citing § 2244; *Moore v. Dretke*, 369

F.3d 844, 846 (5th Cir. 2004)).

Briefly stated, Cantu submits two grounds for which he seeks

authorization.[6] First, he alleges the State proffered false testimony

through three witnesses—Amy Boettcher, Jeff Boettcher, and Carlos

Gonzalez—in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and

*Giglio v. United States*, 405 U.S. 150 (1972). Pet.59–73. Second, he claims

that the State suppressed evidence in violation of *Brady*. *Id.* at 73–81. In

support of these grounds Cantu provides a litany of "new" factual

assertions. And though they may be new to him now, he could have

discovered them by exercising reasonable diligence at the time of trial.

### 1.    Facts related to Amy Boettcher

Amy's[7] testimony was a key piece of the State's evidence at guilt.

Indeed, she testified to a multitude of incriminating facts, any one of

---

[6]    Under the heading "Claims For Relief" in the successive petition which Cantu attaches to the motion, he lists a third claim that trial counsel was ineffective. Mot.Ex.1 (Pet.) at 6. However, he never again addresses that claim in motion for authorization or successive petition.

[7]    Because of the multiple witnesses, affiants, etc. with the same last name, the Director will refer to most people by their first names to avoid confusion. The Director

which pointed to Cantu as the killer. Now, over twenty years later, and importantly, after Amy has passed and can no longer speak on these matters, Cantu attacks four pieces of her testimony. *See* Pet.60–63 (false testimony claim), 73–81 (*Brady* claim).

### a. The "shitty Rolex" watch

Cantu alleges that Amy provided false testimony during his trial regarding Mosqueda's Rolex watch and that the State suppressed evidence regarding the watch. At trial she testified that Cantu stole a "shitty Rolex," wore it for a while, and then disposed of it. 35.RR.148–50. Now Cantu alleges the watch was never stolen, rather his aunt, who was Mosqueda's mother, had it.[8]

In 2019 Abner Cantu executed an affidavit wherein he said that Gladys Mosqueda (his sister, Cantu's aunt, and Mosqueda's mother) had a Rolex that was inscribed and was considered a family heirloom. Mot.Ex.26. Abner believed that Gladys had given *that* Rolex, which used to belong to Abner and Gladys's brother Lico, to Mosqueda. Through

---

will continue to refer to the defendant as Cantu and the victims as Mosqueda and Kitchen.

[8] Cantu's father, Abner Cantu, is the brother of Mosqueda's mother, Gladys Mosqueda. *See* 34.RR.247.

multiple layers of hearsay, Abner averred that, according to Gladys, Mark Kitchen (Amy Kitchen's brother) found the watch while cleaning Mosqueda and Kitchen's house after the murders. The affidavit says that Mark Kitchen gave the watch to the police, who then gave it to Gladys. Abner took pictures of the watch and included them with his affidavit. Matt Duff, a podcast host,[9] also took pictures of the watch in 2019. Pet.23–24.

When Cantu brought these allegations to the attention of the Collin County District Attorney's Office (DAO), they conducted their own investigation. As part of that investigation, they turned over an email from Mark Kitchen, written in 2019, wherein he said that he found a watch while cleaning the room where Mosqueda and Kitchen were murdered. Mot.Ex.5. Mark said that he gave it to Dallas Police Department (DPD) Detectives Winn and Corallo believing it to be evidence.[10]

---

[9]     Matt Duff is a featured player in Cantu's successive petition. According to his website, he is a private investigator that "brings a diverse background of TV Production and investigation to the PI world." DUFF INVESTIGATIONS, https://duff-investigations.business.site/ (last visited on Feb. 23, 2024). He is also the host of a true crime podcast dedicated to this case called "Cousins by Blood."

[10]     He misspelled the names in the email.

The DAO also disclosed their investigator's notes from 2019. Mot.Ex.4. The investigator interviewed Mark Kitchen (three days prior to the email in Exhibit 4). Mark said that he believed he found the watch about one to two weeks after the murders. He again said that he gave the watch to detectives, who, based on the description, the investigator believed to be Detectives Winn and Corallo. The DAO investigator also spoke with Gladys Mosqueda who said she was given the watch by a uniformed police officer at a building on Main Street in downtown Dallas.[11] She said she still had the watch and kept it in a safe deposit box. The investigator also spoke with Abner, Sylvia (Cantu's mother), and Erik (Cantu's brother), who all said they had seen Gladys with the watch.

The DAO investigator noted that, in all the case files, there was only one mention of the watch, from a November 6, 2000, interview with Gladys where she said the watch was missing. The investigator spoke with Detective Winn who did not remember giving a watch to Gladys or anyone else. He also said that if someone turned something in from the crime scene, such as a watch, it would have been logged into evidence and

---

[11] The DAO investigator noted that the DPD headquarters was on Main Street at that time.

he would not have simply just given it to someone else. The DAO investigator spoke with the DPD Property Room clerk. The clerk reviewed the property logs for the case and did not see an entry for a watch. The clerk also did not find a notation of any property being returned to Gladys Mosqueda.

Based on this, Cantu first claims that Amy lied on the stand when she said Cantu had a "shitty Rolex" watch and then disposed of it, assuming that she was necessarily referring to the inscribed, family heirloom. Cantu also claims the State suppressed information that Detective Winn received the watch from Mark Kitchen and then gave it to Gladys Mosqueda. In fact, Cantu frames his prima facie showing under § 2244(b)(2)(B)(i) entirely around the suppression and argues that excuses any further diligence required under the statute. Mot.50–51.

But this Court has declined to take such an approach. Instead, it has held that a successive petitioner urging a *Brady* claim may not rely solely on the fact that evidence was suppressed at trial to demonstrate diligence under § 2244(b)(2)(B)(i). *Johnson*, 442 F.3d at 910; *accord In re Boshears*, 110 F.3d 1538, 1540 (11th Cir. 1997); *Gage v. Chappell*, 793 F.3d 1159, 1166 (9th 2015); *Case v. Hatch*, 731 F.3d 1015, 1027 (10th Cir.

2013). So even assuming it was the same watch and there was suppression, the question still is whether Cantu can make a prima facie showing that he could not have otherwise discovered the factual predicate using due diligence.

Cantu cannot make that showing here. Gladys Mosqueda was Cantu's aunt. Gladys testified during the trial. Indeed, the very fact that Cantu's father, mother, and brother could discover that Gladys had the family heirloom watch defeats any notion that Cantu could not have learned this fact through reasonable diligence. He simply cannot satisfy § 2244(b)(2)(B)(i) as it pertains to the Rolex watch.

### b.    The engagement ring

At trial Amy testified that on the night of the murders, after she and Cantu returned to their apartment from the murder scene, Cantu proposed with a diamond engagement ring. 35.RR.146, 150–51. She testified that Cantu told her "he got it a couple weeks ago," and she believed him. *Id.* at 151. She only later learned that the ring belonged to Kitchen. *Id.*

Cantu now proffers two affidavits from his friends at the time. Thomas Houran said that "[o]n or around Sunday, October 29, 2000," he

saw Cantu and Amy at an apartment, Amy was wearing an engagement ring, and Cantu told Houran about the engagement. Mot.Ex.9. Importantly, Houran said he had known Cantu since childhood. Likewise, Steve Oliver Mayr spoke with Cantu and Amy "[o]n or around Sunday, October 29, 2000," at a "restaurant/bar." Mot.Ex.10. Cantu told him about the engagement, and Amy was wearing a ring. Mayr says he and Cantu were friends for about six months at that time.

Clearly this falls well short of the requirements of § 2244(b)(2)(B)(i). Cantu *himself* not only knew about these encounters when preparing his initial federal habeas petition, he knew the factual predicate *before trial*. Cantu also points to an interview that Amy apparently did on Matt Duff's podcast where she said that she did not actually know where the ring came from but was told that it was Kitchen's ring. Pet.29–30. But this does not conflict with her testimony at trial; rather, it's in line with when she told the jury that she did not know that it was Kitchen's ring and only learned that at some later time.

### c. The bloody clothes

At trial Detective Winn testified that they discovered jeans and socks with a "reddish substance" on them and latex gloves in a trashcan

in Cantu's apartment. 33.RR.90; SX 61 (photo of the trashcan), 62 (photo inside the trashcan showing the jeans and socks).[12] Amy testified at trail that when Cantu returned to their apartment after he murdered Mosqueda and Kitchen, he took off his jeans and socks which appeared to have blood on them, and she placed them in the trashcan. 35.RR.131–33. She also said that she does not remember if Cantu was wearing the latex gloves when he came home nor who put them in the trashcan. *Id.*

Now Cantu proffers an affidavit from Susan Eichenberg, nee Iliff. Mot.Ex.11. She was an DPD officer at the time of the murders. She said that she responded to the murder scene. But due to concerns raised by Sylvia Cantu for her son, she and Officer Steven Junger were tasked with escorting Sylvia over to Cantu's apartment to perform a well-check. She said that while inside Cantu's apartment, she looked around the kitchen. Based on her almost twenty-year-old memory, she did not believe the bloody clothes were in the trashcan because she thought that she would have seen them at the time and reported it.

---

[12] "SX" refers to the State's exhibits from trial.

What Cantu fails to note is that Officer Junger testified about these events *at trial*. 32.RR.73. He discussed how he and Officer Iliff (now Eichenberg) escorted Sylvia to the apartment. *Id.* at 76. He explained multiple times that they were there to look for injured persons, so they were only looking where a person or body might be. *Id.* at 83–84. They were not opening cabinets or drawers or looking through bins. *Id.* at 84. And it was clearly known at that time that Officers Junger and Iliff did not see the clothes in the trashcan because they were later discovered by Officer Winn. Officer Junger also noted the bullet hole in the wall was at eye level, *id.* at 87, something that Cantu mentions to cast the well-check as something more investigatory in nature.

Even though Cantu knew Officer Junger did not discover the clothes, he did not ask questions about it. And it's because the State clearly asked several questions on direct to explain why that did not happen. So again, Cantu falls well short of the required diligence.

Cantu also briefly mentions the latex gloves in his *Brady* claim citing pretrial statements that Amy made to police that differed slightly from her trial testimony. Pet.33–35, 80. But he does not say when the statements were turned over or what investigative efforts were taken to

uncover them. Indeed, he does not even allege that he did not have these statements at the time of trial or, more relevant, during his initial federal habeas proceedings. As such, he also fails to carry his burden under § 2244(b)(2)(B)(i) regarding his *Brady* claim as it pertains to the gloves.

### d.     The time of death

Amy testified at trial that after Cantu changed out of his blood-stained clothes, he took her back over to Mosqueda's house. 35 RR 129, 139, 141. While there, she saw Mosqueda and Kitchen's bodies. 36 RR 21-22. Cantu now attacks not only this testimony, but the entire timeline of the murders.

He attached to his motion declarations from two forensic pathologists who, based only on a review of the autopsy reports and handwritten notes of the medical examiners, call into question the time of death based on their assessments of livor and rigor mortis. Mot.Ex.6, 7. Both pathologists were discovered by Cantu because they appeared on Matt Duff's podcast. Setting aside the inherent skepticism due to any assessment of livor or rigor mortis made merely by reviewing notes, the most notable part of the declarations is that neither asserts that their opinion is based on new, previously unavailable, science. So again, Cantu

fails to show that this line of attack was not available to him during his initial federal habeas proceedings, much less at trial. As with all claims relating to Amy Boettcher, Cantu fails to carry his burden by showing diligence under § 2244(b)(2)(B)(i).

## 2. Facts related to Jeff Boettcher

Jeff Boettcher was Amy's brother who lived with her and Cantu starting in August 2000. 34.RR.10. Relevant to the motion at bar, he testified that Cantu owned a gun and carried it nearly every day. *Id.* at 15–16. He also testified that, prior to the murders, Cantu told Jeff about his plans to kill Mosqueda and asked if Jeff would help clean up the murder scene afterwards. *Id.* at 25–26.

According to Cantu, Jeff contacted the DAO in 2022 and said that he wanted to discuss his testimony. Pet.44. He then gave an interview to the DAO. *See* Mot.Ex.14.[13] During the interview he said that he was a drug addict at the time. Pet.44. He ostensibly fully recanted his testimony, but Cantu only notes that he specifically said that he does not

---

[13]    Cantu provides a hyperlink, but the Director does not have an operational link or a copy of the video.

remember or does not believe that Cantu asked for his help cleaning up the murder scene. *Id.* at 44–45.

But again, Jeff's drug use was well known at the time of trial. Indeed, he testified multiple times about the extent of his drug dependency, both on direct and cross examination. *See, e.g.*, 34.RR.14–15, 42–44. Also, he was living with Cantu from August until the murders and used drugs with both Amy and Cantu. Further, Cantu fails to show why he could not have discovered this information during his initial federal habeas proceeding.

Cantu also proffers an affidavit from William Bobbitt. Mot.Ex.13. Bobbitt was roommates with Cantu when Jeff moved down to Dallas. 34.RR.10. Cantu, Amy, and Jeff lived with Bobbitt for about a month in August 2000. *Id.* Now Bobbitt says that during the two months as Cantu's roommate, he never saw him with a gun and did not know he owned one. Mot.Ex.13. Never mind that his single sentence on the matter does not actually undermine Jeff's testimony, Cantu cannot show why he could not have interviewed Bobbitt sooner, such as before trial. Just as with Amy's testimony, Cantu fails to carry his burden under § 2244(b)(2)(B)(i) by showing that, using reasonable diligence, he could not have learned

the factual assertions regarding Jeff's testimony during his initial federal

habeas proceedings.

### 3. Facts related to Carlos Gonzalez

Prior to trial Cantu was trying to convince people that the "Pizza

Man" committed the murders. As Detective Winn described it:

> [Cantu] said that there was a guy in a Domino's pizza
> uniform that knocked on his door. He said that the guy—when
> he opened the door—I'm sorry. When Mr. Cantu said he
> opened the door, the guy forced his way in, and he had a
> handgun. He said that the guy put the gun to his head and
> was telling him that he had fronted his cousin, Mr. Mosqueda,
> $300,000 in cocaine. He said that Mr. Mosqueda had only paid
> him $50,000 and he still owe him $250,000 dollars.
>
> He also stated that the guy told—assumed—no. He also
> stated that Mr. Mosqueda told this guy, whom he said his
> name was Matt, that Ivan Cantu was going to start back
> working for him in the mortgage company to help him collect
> this money. Mr. Cantu stated that he told this Matt guy that
> he was not going to be working again with Mr. Mosqueda at
> the mortgage company. That is when the—Matt got upset and
> fired one round into the wall inside his apartment.

33.RR.70–71.

On the stand Carlos Gonzalez called this story "absurd." 36.RR.251.

He testified that he started laughing when Cantu said Mosqueda owed

the Pizza Man $250,000 "because [Mosqueda] never owed anybody

anything, never ever." *Id.* at 250–51. Carlos knew that Cantu was lying

when he heard the story because of the "nonsense of it." *Id.* at 251.

Cantu now claims that "new evidence" has emerged supporting his "Pizza Man" story. First, Cantu submits an affidavit from Jason Harrelson. Mot.Ex.15. Harrelson states that he "worked for James Mosqueda off and on for approximately 3 years, from 1994 to 1997." He became "aware" of an acquaintance of Mosqueda's named "Matt," who, Harrelson was told, was from Houston. In the three-year span Harrelson said Matt came by the business "6 to 8 times." And Mosqueda and "Matt" spoke Spanish, which Harrelson does not, so Harrelson could not speak to their conversations. Harrelson said that in 2024, podcaster Matt Duff showed him a photo of photographs of a Mateo Gonzalez (seemingly from a funeral or memorial display). *See* Mot.44. Based on this photo that shows two partially obstructed photographs, Harrelson is convinced that this is the same "Matt" he saw "6 to 8 times" three decades ago.

Cantu provides a Register of Actions, Pet.Ex.16, and a background check, Pet.Ex.17, for Mateo Gonzalez to support the propositions that Mateo has a criminal record and drove a black 1989 Lincoln Town Car. Cantu also submits a declaration from his own private investigator, Stewart Fillmore. Pet.Ex.18. Fillmore stated that he spoke with June Rose who said that she was in a common law marriage with Mateo.

Fillmore also claimed that Rose said: Mateo and Mosqueda were friends; Mateo was involved in selling drugs, though she did not know any specifics; and Mateo may have sold drugs to Mosqueda, but again, she did not know specifics. Cantu also asserts that there is another witness who "describes Matt as James's 'big supplier' who brought 18 wheelers from the [Rio Grande] Valley with drugs in the tire," but who is "unwilling to appear publicly," so Cantu will only produce "materials" when he can do so under seal. Pet.52, 52 n.19.

Finally, Cantu submits the declaration of Ryan Patton. Pet.Ex.19. Patton worked at a Goodyear tire shop in 2001 (after the murders). Around the time of September 11th, Carlos talked to Patton about putting rims on the car of Carlos's friend. Patton agreed. "4 or 5 guys from the Valley" came to his shop. According to Patton, Carlos said they were "'running girls,' which [Patton] knew to mean basically pimps" and that they "were serious players, which [Patton] knew to mean some kind of high up criminals." One in particular stood out to Patton because of his long hair that "reminded [Patton] of Antonio Banderas." This person also apparently wore a trench coat. That man drove a "black box style Lincoln" from the late 1980s to early 1990s.

Patton then explained that in 2021 he was listening to the "Cousins by Blood" podcast with his then-wife. He said he was interested because he knew Ivan from school. At the prompting of his then-wife, Patton contacted podcaster Matt Duff and told him that story. Duff texted Patton a photo of a black Lincoln Town Car, which Patton said looked like the same car. Duff also texted the same photograph of photographs of Mateo Gonzalez which Patton did not recognize. But then Duff "texted [Patton] a sketch of Mateo Gonzalez, [sic] with long hair." Based on a text of a sketch, Patton was "95% certain" that was the same Antonio Banderas lookalike he saw in the Goodyear shop over two decades prior.

Cantu argues that this "evidence" could only have been discovered through a "crowd-sourced podcast investigation" that habeas counsel could not reasonably undertake. Mot.51. But this sentiment falls flat. At the very least Cantu knew Patton. And he could have learned of Harrelson by looking into Mosqueda's work history.

Cantu's argument, though, also demonstrates another fatal flaw. The investigation was not just crowd-sourced via a podcast; rather, the podcast host Duff, whose true motivations are at best questionable, is seemingly the only reason Mateo Gonzalez's name was mentioned in the

first place. Cantu provides no reason as to why Matt Duff pulled that name out of thin air. Nor does he provide the steps taken to "discover" Mateo Gonzalez as a potential stand-in for the pseudonym "Matt." As such, it is near impossible to evaluate whether an objectively diligent attorney could have conducted that investigation during the initial federal habeas proceedings. And that is Cantu's burden to carry under § 2244(b)(2)(B)(i). He fails in that endeavor.

### 4. Additional new evidence

Cantu points to additional new evidence which attacks various parts of the trial testimony. *First*, he says the jeans found in the trashcan in his apartment could not possibly have been his because they were too big. Pet.55. He claims the size was wrong based on his height, weight, and jean size he usually wore—*facts Cantu necessarily knew at the time of trial*. He also points back to Bobbitt's affidavit, Mot.Ex.13, wherein Bobbitt avers that the jeans in the trashcan would have been too big for him to wear, and he wore a bigger size than Cantu. But again, Bobbitt was a known individual to Cantu.

*Second*, Cantu condemns the testimony of Paulette Sutton, who testified that, based on a picture of blood spray, it appeared that Kitchen

was kicked or punched in the face, 37.RR.212–15. Pet.56–58. Cantu yet again points to a guest on Duff's podcast, Chris Robinson, who is a ballistics and shooting reconstruction expert and who criticized Sutton's trial testimony. Pet.57. The two pathologists who disagreed with the time of death also criticized Sutton's testimony. Mot.Ex.6, 7. Yet, just as with the time of death opinions, none of these new opinions are based in new science. Indeed, seemingly this line of attack was available to Cantu at the time of trial, much less during his initial federal habeas proceedings.

*Finally*, Cantu provides an email from Tawny Svihovec to the DAO written in 2024. Mot.Ex.20. Svihovec is Cantu's ex-girlfriend at whose house the police discovered the murder weapon. In a post-script to the email, Svihovec said that she was "99.9 percent [certain that Amy] was the one who left the murder weapon at my apartment." She provided no evidence or other reason for this assertion.[14] Again, Tawny was someone that was known to Cantu at the time of trial. If she really believed this, he could have easily discovered it well in advance of filing his federal habeas petition. For both of his claims, Cantu fails to show that the

---

[14] This is a prime example of how Cantu continues to victimize Amy Boettcher, who is now deceased, continuously calling her a liar and manipulator who is part of an alleged elaborate scheme with unknown persons to frame Cantu.

factual predicates could not have been discovered earlier through the exercise of due diligence. 28 U.S.C. § 2244(b)(2)(B)(i).

## B. Moreover, Cantu is not actually innocent of capital murder (§ 2244(b)(2)(B)(ii)).

Cantu must also show that the "new evidence" discussed above would be sufficient to demonstrate actual innocence under § 2244(b)(2)(B)(ii). This Court has "described this standard as 'a strict form of 'innocence,' . . . roughly equivalent to the Supreme Court's definition of 'innocence' or 'manifest miscarriage of justice' in *Sawyer v. Whitley*,' 505 U.S. 333[] (1992)." *In re Davila*, 888 F.3d 179, 186 (5th Cir. 2018) (quoting *Johnson*, 442 F.3d at 911). Cantu's new evidence falls well short of this standard.

As discussed above, Cantu presents new evidence regarding the family-heirloom Rolex with an inscription assuming it is the same "shitty Rolex" that Amy testified she saw with Cantu. Cantu's assertions regarding the watch are further undermined by Detective's Winn's statements that anything from the crime scene would have been logged, even if Mark Kitchen turned it in weeks after the murders. And there is no evidence that a Rolex watch was ever logged or that any piece of evidence was ever returned to Gladys Mosqueda.

As for the engagement ring, Houran and Mayr both stated that they saw Amy with it "[o]n or around Sunday, October 29, 2000." This was less than a week before the murder and does not conclusively undermine the timeline of Cantu and Amy's engagement as discussed at trial. Further, their description of the ring decades later does not match the description of Amy's stepfather from the time of trial, who said that it was too big for her finger. 36.RR.125–27. And Amy's statements supposedly to the podcaster Duff did not undermine her testimony; rather, it was in line with her testimony that she did not know from where the ring came and was only told it was Kitchen's ring at a later date.

Cantu's reliance on Eichenberg's affidavit, executed almost twenty years after the murders, to show that the bloody clothes were not in the trashcan immediately after the murder is wholly undermined by the testimony of Officer Junger, who was with Eichenberg during the initial well-check, and Detective Winn. Likewise, Bobbitt's decades old memory about the size of Cantu's pants is suspect in and of itself. But that does not matter as much when Cantu himself would have known to challenge the size of the pants. What's more, Cantu's allegation is not that the pants are too small and, thus, could not fit; it is that they are too big. And

*over*sized pants do not necessarily, or even probably, mean that a person did not wear them (belts and the rolling of cuffs easily solves this issue).

Cantu's new evidence attacking the time of death and whether Kitchen was struck in the head is not new at all. Rather it is based on science that was available to Cantu at the time of trial if he wanted to challenge those opinions then. Moreover, the opinions of the pathologists regarding livor and rigor mortis, who only had the notes from the medical examiner, pale when compared to the opinion of the medical examiner who was able to actually examine the body and whose testimony was subject to in-court cross-examination, not friendly questions from podcaster Duff (whose prime objective seems to be telling a salacious story, not seeking the truth).

Svihovec's baseless accusation that Amy planted the gun at her house, and not Cantu, clearly fails any level of evidentiary scrutiny. So do the assertions regarding the "Pizza Guy" story. Again, it is still unclear why podcaster Duff picked Mateo Gonzalez to show Harrelson and Patton (other than Mateo was a Hispanic male from the Rio Grande Valley with a criminal history). Still, Harrelson's identification of Mateo as "Matt" based on a *three-decade-old* memory of six to eight sightings and a

photograph that shows two partially-obstructed photos of Mateo is fallacious at best. And clearly a declaration from Cantu's own investigator about Rose's supposed account, which itself was wanting for details, holds no evidentiary water. Nor does a promise of a secreted witness. But even completely ignoring all of these problems and assuming arguendo that Mateo was "Matt," this is no evidence that Mateo is "Pizza Guy" *or* that he had anything to do with the murders.

And none of this touches the cornerstones of the State's case: Cantu's print on the firearm used to murder both victims, one of the victim's DNA on the firearm that has Cantu's print, the victims' DNA on bloody clothing found in Cantu's apartment, the victim's keys found in Cantu's apartment, ammunition found in Cantu's apartment, a bullet found in Cantu's wall that was fired from the murder weapon, and Mosqueda's bracelet found at Amy Boettcher's family's house in Arkansas. 31.RR.95; 32.RR.28–29, 33, 99–100, 102, 128–29, 135–37, 182–83; 33.RR.109; 34.RR.147, 150, 163, 173–74, 267; 36.RR.147–50, 37.RR.134–58, 185–87, 189–90. If anything, the case against Cantu became even stronger when postconviction DNA testing corroborated the claim that Cantu wore the bloody jeans found in his trashcan. That

testing showed that Cantu was a possible contributor of the DNA profile obtained from the sample from the waistband of the jeans, and the random match probability for this profile was 1 in 825,000.

The case for guilt is further strengthened by trial counsel's affidavit submitted during the state habeas proceedings. In addressing allegations that counsel was ineffective in their preparation and presentation of the case, lead trial counsel for Cantu averred that after Cantu initially denied any knowledge of the murders, he later told counsel his "Pizza Guy" story and then eventually admitted that "he had indeed killed Mosqueda for 'ripping him off' on a drug deal, and Kitchen just happened to be at the Mosqueda home, and that 'I didn't want to leave any witnesses' . . . ." SHCR.158–59. Cantu also became angry with counsel when they would not suborn perjured testimony. *Id.* at 159. This affidavit was credited by the state habeas court, SHCR.188, and this Court must still pay deference to that credibility determination, see 28 U.S.C. § 2254(e)(1); *see also Busby v. Dretke*, 359 F.3d 708, 721 n.14 (5th Cir. 2004); *Halprin v. Davis*, 911 F.3d 247, 258–59 (5th Cir. 2018).

The CCA said the amount of evidence supporting guilt was "substantial." *Cantu*, 2004 WL 3093156, at *2. This Court went even

further when it said that "Cantu 'is not innocent, in any sense of the word.'" *Cantu*, 632 F.3d at 168 (quoting *Herrera v. Collins*, 506 U.S. 390, 419 (1993)). Cantu has done nothing to overcome that. As such, he fails both requirements of § 2244(b)(2)(B), and this Court should deny his motion for authorization.

## II. Cantu's Claims Are Also Barred by the Statute of Limitations of § 2244(d).

This Court has "the authority to deny a motion to authorize based on timeliness." *In re Campbell*, 750 F.3d 523, 532 n.9 (5th Cir. 2014); *see also In re Jones*, 998 F.3d 187, 189 (5th Cir. 2021); *In re Lewis*, 484 F.3d 793, 795 (5th Cir. 2007). Section 2244(d)(1) applies a one-year limitations period to any federal habeas petition. Cantu would clearly proceed under § 2244(d)(1)(D), establishing the start of limitations as "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." As discussed above, this evidence was available years if not decades ago with the exercise of due diligence. But assuming arguendo for the purpose of this motion

only[15] that the relevant date is the creation of individual pieces of evidence, Cantu is still untimely for all but one claim.

Abner Cantu's affidavit, dated September 22, 2019, gave rise to Cantu's claim that Amy Boettcher provided false testimony about the Rolex watch. Further information was gathered in 2019, but, proceeding under § 2244(d)(1)(D), the limitations period began (at the latest) on September 22, 2019. Cantu did not bring these claims to any court, state or federal, until 2023. Thus, he is years untimely.

Likewise, his claim regarding the jeans in the trashcan is based on Bobbitt's affidavit from October 30, 2019, and Eichenberg's affidavit from January 29, 2020. He is years untimely for these as well. For his claim that Amy testified falsely about the engagement ring, he first points to Amy's interview on "Cousins by Blood," dated November 14, 2019. To the degree that he would point to the 2023 affidavits of Houran and Mayr, those affidavits relay pre-trial interactions *with Cantu*. So again, he is years, if not decades, late in bringing this claim.

---

[15]    That is to say, the Director will presume for the sake of argument without conceding the point for any future litigation.

His claims attacking the time of death are based on the declarations of the two pathologists, as is the attack on Sutton's testimony that Kitchen appeared to be struck in the face. Dr. Banerjee did not sign her declaration, *see* Mot.Ex.7, but Dr. Melinek signed hers on April 17, 2022. Cantu filed his subsequent state habeas application first raising this claim one year and one day later on April 18, 2023, after the expiration of the federal statute of limitations.

Likewise, Boettcher's supposed recantation is based on a March 22, 2022 interview with the DAO, and Cantu does not otherwise provide a date that he was provided with the interview. Clearly if it was March 2022, Cantu is untimely. But even if it was later, almost six months passed after the CCA denied his subsequent application and before he filed his suggestion for reconsideration: from August 23, 2023, to February 19, 2024. Further, because Cantu failed to prove that he meets all the statutory requirements, indeed failed to wholly address this issue, he has waived any further argument on it. *See Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023) ("Adequate briefing requires a party to raise an issue in its opening brief." (citing *United States v.*

*Bowen*, 818 F.3d 179, 192 n.8 (5th Cir. 2016)). The Court should not permit him to sandbag arguments and then address them in his reply.

This leaves only the assertion that Carlos Gonzalez testified falsely regarding the "Pizza Man" story. Again, leaving to the side whether Cantu could have discovered these facts earlier and even the actual worth of any of the "evidence" presented, and assuming arguendo for this response only that the dates of the declarations, affidavits, averments of secreted witnesses, controls, this claim could theoretically survive the time bar. But the rest of his claims are clearly barred by the statute of limitations.

## III. Cantu's Claims Are Also Procedurally Defaulted.

It is axiomatic that "a federal court may not review federal claims that were procedurally defaulted in state court." *Davila v. Davis*, 582 U.S. 521, 527 (2017). "A habeas claim can be procedurally defaulted in either of two ways." *Rocha v. Thaler*, 626 F.3d 815, 820 (5th Cir. 2010). The first way happens when "a state court clearly and expressly bases its dismissal of a prisoner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). The second way occurs

"when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Id.* at 420 (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). If "it is clear from state law that any future attempts at exhaustion would be futile," then the claim is defaulted. *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

All claims except for the Carlos-Gonzalez-false-testimony claim were raised in Cantu's second state habeas application and dismissed by the CCA as an abuse of the writ. Thus, they are procedurally barred from federal habeas relief. The claim regarding Carlos Gonzalez is currently pending before the CCA in Cantu's third state habeas application. If the CCA dismisses it, then the bar would likewise apply in federal court. But if the CCA allows the claim to move forward, this Court should stay any further federal court proceedings until the state courts have their say on the issue.

## IV. This Court Should Not Stay Cantu's Execution.

Cantu filed a motion requesting a stay of his execution with his motion for authorization. A stay of execution "is not available as a matter

of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough,* 547 U.S. 573, 584 (2006) (citing *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004)). Rather, the inmate must satisfy all the requirements for a stay, including a showing of a significant possibility of success on the merits. *Id.* (citing *Barefoot v. Estelle*, 463 U.S. 880, 895–96 (1983)).

When the requested relief is a stay of execution, a court must consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). A federal court must also consider "attempt[s] at manipulation." *Nelson*, 541 U.S. at 649–50 (citing *Gomez v. U.S. Dist. Ct. for N. Dist of Cal.,* 503 U.S. 653, 654 (1992)). As demonstrated above, Cantu fails to demonstrate a likelihood of success on his motion for authorization.

Further, "[b]oth the State and the victims of crimes have an important interest in the timely enforcement of a sentence." *Hill*, 547 U.S. at 584. Cantu was convicted and sentenced in 2001 for the brutal murders of two people including his cousin. He has received two stays of execution, the first in 2011 to pursue DNA testing and the second in 2023 pending the outcome of his second state habeas application.

That subsequent application was denied on August 23, 2023. Yet, Cantu waited almost six months, and until the last possible day under the CCA's rules, to file his suggestion for reconsideration and a third state habeas application. He then waited until literally the eleventh hour to file the instant motions in this Court, again, technically on the final day allowed under the rules. This was a clear attempt at gamesmanship and at stunning the courts into staying his execution, clearly having no further claims of any merit to press. His victims deserve justice for this decades-old crime. As such, the Court should deny his motion for stay.

## CONCLUSION

Given the above, this Court should deny Cantu's motion for authorization and deny his motion for a stay.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
    for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*s/ Travis G. Bragg*
TRAVIS G. BRAGG
Assistant Attorney General
State Bar No. 24076286
    *Counsel of Record*

Post Office Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
Travis.Bragg@oag.texas.gov

*Attorneys for Respondent*

**CERTIFICATE OF SERVICE**

I certify that on February 25, 2024, a copy of the forgoing pleading was filed with the Clerk of the Court using the electronic case-filing system, which will serve all registered counsel in this case.

*s/ Travis G. Bragg*
TRAVIS G. BRAGG
Assistant Attorney General

**CERTIFICATE OF COMPLIANCE**

This document complies with Federal Rule of Appellate Procedure 32(a)(5)–(7) as amended by this Court's order on May 16, 2023. It contains 8,174 words using Microsoft Word for Office 365, Century Schoolbook, 14 points.

*s/ Travis G. Bragg*
TRAVIS G. BRAGG
Assistant Attorney General

**CERTIFICATE OF ELECTRONIC CASE FILING**

I certify that: (1) all required privacy redactions have been made; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus scanning program and is free of viruses.

*s/ Travis G. Bragg*
TRAVIS G. BRAGG
Assistant Attorney General