No. 24-40110

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

IN RE IVAN ABNER CANTU,

MOVANT.

---

REPLY TO DIRECTOR'S RESPONSE IN OPPOSITION TO MOTION FOR ORDER
AUTHORIZING THE DISTRICT COURT TO CONSIDER SECOND OR SUCCESSIVE
PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244
& MOTION FOR STAY OF EXECUTION

GENA BUNN
Texas Bar No. 00790323
Gena Bunn, PLLC
P.O. Box 6150
Longview, Texas 75608
gbunn@genabunnlaw.com
(903) 804-4003

ATTORNEY FOR
MOVANT/PETITIONER

*EXECUTION DATE: FEBRUARY 28, 2024*

# TABLE OF CONTENTS

I.    Mr. Cantu has diligently pursued the claims set forth in his proposed second petition, and he has satisfied his §2244(b)(2)(B)(i) burden to plead a prima facie showing that the factual predicate of these claims was not previously available. ............................................................ 1

   A.    Evidence about the recovery of James' Rolex watch was suppressed and was not previously available to Mr. Cantu. .............. 3

      1.    Mr. Cantu's father discovered in 2019 that Amy Boettcher testified falsely at trial in conformity with the investigator's erroneous beliefs about the crime................................................ 4

      2.    New evidence divulged by the State after Mr. Cantu filed his first subsequent habeas application in state court confirms Abner Cantu's statement............................................................ 4

   B.    Jeff Boettcher recanted his testimony in a 2022 videotaped interview with the CCDAO in 2022, years after Mr. Cantu's initial federal habeas petition. ........................................................ 8

   C.    Evidence impugning Carlos Gonzalez's trial testimony has only emerged during the past weeks from public response to an independent podcast. ................................................................... 9

II.   Mr. Cantu has satisfied his § 2244(b)(2)(B)(ii) burden to plead a prima facie showing of clear and convincing evidence that, when considered in light of the evidence as a whole, that no reasonable factfinder would find him guilty. ..................................................... 11

III.  The statute of limitations does not preclude authorization for a successive habeas corpus petition in Mr. Cantu's case........................ 20

IV.   Federal review of Mr. Cantu's claims is not barred. ........................... 23

V.    Mr. Cantu's execution should be stayed........................................... 23

VI.   Conclusion.................................................................................. 24

CERTIFICATE OF COMPLIANCE ......................................................... 26

CERTIFICATE OF SERVICE ..................................................................26

In reply to the Respondent's Response in Opposition to Motion for Order Authorizing the District Court to Consider Second or Successive Petition for Writ of Habeas Corpus & Motion for Stay of Execution (hereinafter "Response"), Applicant Ivan Abner Cantu states as follows:

**I.    Mr. Cantu has diligently pursued the claims set forth in his proposed second petition, and he has satisfied his §2244(b)(2)(B)(i) burden to plead a prima facie showing that the factual predicate of these claims was not previously available.**

The Respondent accuses Mr. Cantu of sandbagging and "attempting to stun the courts into a stay" by delaying his filing. Response at 6; *see also* Response at 39. But that is simply not the case. Rather, Mr. Cantu raised his claims of prosecutorial misconduct as expeditiously as possible given the false testimony of multiple State's witnesses and the withholding of evidence and continued prevarication by State actors. Thus, contrary to the Respondent's assertions, *see* Response at 10, Mr. Cantu has made a prima facie showing that the facts supporting his claims were not previously discoverable through the exercise of reasonable diligence.

Critically, the State's pattern of belatedly dribbling out *Brady* evidence began during Mr. Cantu's 2001 trial. On October 5, 2001, the third day of trial, the prosecution revealed for the first time that on November 5, 2000—the day after the murders were discovered—the police received a tip that Mr. Mosqueda was

murdered by a drug dealer named "Mario Rojas" to whom he owed money. 33 RR 186; 197. The prosecution acknowledged that the tip sheet "appear[ed] to be covered by Brady" and "assum[ed] that's exculpatory, if it's supposed to be somebody else doing the killing," but excused their failure to turn it over by stating "we had never seen before until [sic] he got this from the officer." 33 RR 186. The pattern continued when the lead DPD detective investigating the case suppressed evidence demonstrating that State's star witness Amy Boettcher lied in her sworn statements and from the stand.

As this Court has held when assessing diligence with respect to motions for authorization, petitioners "need not assume the prosecution may be withholding information in order to exercise diligence": "The Supreme Court has stated that its 'decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed.'" *In re Will*, 970 F.3d 536, 542 (5th Cir. 2020) (quoting *Banks v. Dretke*, 540 U.S. 668, 695 (2004)). "While this Supreme Court precedent was not interpreting AEDPA, its due-diligence analysis demonstrates that trial counsel may rely, absent notice to the contrary, on representations by the prosecutor, as [Mr. Cantu's] counsel reasonably did here." *Id*. at 543.

**A. Evidence about the recovery of James' Rolex watch was suppressed and was not previously available to Mr. Cantu.**

Days after the police failed to find Mr. Mosqueda's watch—erroneously believed to be stolen—among items seized at Mr. Cantu's apartment, Amy Boettcher gave a statement reporting that "On the way to 7, Ivan [sic] through out ***a Rolex watch that belonged to James***." Exhibit 22 (Amy Boettcher's November 10, 2000, statement) (emphasis added).[1] Ms. Boettcher repeated her claim that Mr. Cantu threw away the watch in multiple sworn statements. *See* Mr. Cantu's MFA at 17-19. In opening arguments to Mr. Cantu's jury, the Collin County District Attorney's Office ("CCDAO") stated that Mr. Cantu had stolen Mr. Mosqueda's Rolex watch and then put it on back at his apartment. 31 RR 13 ("the Defendant put on … ***James's watch***") (emphasis added). The CCDAO then elicited testimony from Amy Boettcher that Mr. Cantu threw the allegedly stolen Rolex watch out of the window while driving down the freeway. 35 RR 149–50. As lead Detective Winn already knew at trial, none of this actually happened, Ms. Boettcher was lying under oath.

---

[1] All exhibits referenced in this pleading are exhibits to Mr. Cantu's proposed successive petition, filed as an appendix to his Motion for Order Authorizing the District Court to Consider Second or Successive Petition for Writ of Habeas Corpus (hereinafter referred to as "MFA").

1.  **Mr. Cantu's father discovered in 2019 that Amy Boettcher testified falsely at trial in conformity with the investigator's erroneous beliefs about the crime.**

In 2019, Mr. Cantu's father, Abner Cantu, discovered that the Mosqueda family had had the Rolex watch all along. According to Abner Cantu, Amy Kitchen's brother had taken the watch from the scene after the bodies were discovered then returned it to police; the police later returned the watch to James Mosqueda's mother. *See* Exhibit 26 (Affidavit of Abner Cantu). Mr. Cantu relied upon the affidavit of his father to argue in his first subsequent state habeas corpus application that Ms. Boettcher testified falsely at his trial and that the State had suppressed this material evidence prior to trial.

2.  **New evidence divulged by the State after Mr. Cantu filed his first subsequent habeas application in state court confirms Abner Cantu's statement.**

The Respondent misstates the record with respect to the claims related to Ms. Boettcher. The Respondent suggests that, in 2019, when the CCDAO conducted an independent investigation into Ms. Boettcher's lies about the Rolex watch—and Detective Winn's subsequent suppression of it— the CCDAO disclosed the fruits of its investigation to Mr. Cantu:

> When Cantu brought these allegations to the attention of the Collin County District Attorney's Office (DAO), they conducted their own investigation. *As part of that investigation, they turned over an email from Mark Kitchen, written in 2019*, wherein he said that he found a watch while cleaning the room where Mosqueda and Kitchen were murdered.

Response at 12 (emphasis added).

The Respondent's recitation obscures the fact that while the CCDAO conducted its investigation in 2019, it did not turn over its notes and evidence to undersigned counsel until almost four years later, in May of 2023, after the withdrawal of Mr. Cantu's 2023 execution date. *See* MFA Appendix at 17 ("Mr. Cantu filed his first subsequent application for habeas corpus relief on April 18, 2023," and "[b]ased on evidence supporting the claims in his first subsequent application first disclosed by the Collin County District Attorney's Office ("CCDAO") *after* the application was filed, Mr. Cantu filed a suggestion to reconsider the dismissal on the Court's own motion.") (emphasis added).

During its own internal investigation concerning the Rolex watch in October 2019, the CCDAO received statements from both victims' families confirming Mr. Cantu's claim that the DPD returned Mr. Mosqueda's watch to his family shortly after the murders and before Mr. Cantu's 2001 trial. *See* Exhibit 4 (Investigative Notes of CCDAO Investigator Dale Lundberg).

Mark Kitchen, Amy Kitchen's brother, reported to CCDAO Investigator Dale Lundberg that he found the watch at the victims' home one or two weeks after the murders. Exhibit 4. He also told Lundberg that he turned the watch over to the lead detective, Anthony Winn. *See* Exhibit 5 (Electronic Mail Message from Mark Kitchen to Dale Lundberg); Exhibit 4. Mr. Kitchen's timeline aligns with an offense

report dated November 25, 2000, when Detective Winn met Mr. Kitchen at the victims' home. Critically, however, Detective Winn failed to report Mr. Kitchen's surrender of the Rolex watch. *Id*.

Gladys Mosqueda, Mr. Mosqueda's mother, told CCDAO investigator Lundberg in 2019 that a DPD officer gave her the family's Rolex watch shortly after the murders. Exhibit 4. She told Lundberg that she was given the watch at a building on Main Street in downtown Dallas, which was at that time the location of Dallas Police headquarters. *Id*. However, Lundberg was unable to locate any reference to the Rolex watch in Dallas Police Property Room records. *Id*. Ms. Mosqueda also told Lundberg that her son only had one Rolex watch. *Id*.

CCDAO investigator Lundberg also questioned Detective Winn about the Rolex watch in October 2019. *See* Exhibit 4. Winn claimed that he did not recall giving the watch to Mr. Mosqueda's mother or anyone else. *Id*. He further speculated that if the watch had been found, he would never have given it to anyone because he would have considered it evidence. *Id.* But according to Mr. Kitchen, Detective Winn was aware *before Mr. Cantu's trial* that Mr. Mosqueda's Rolex watch had been located.

The victims' family members thus confirm Mr. Cantu's claim that Mr. Mosqueda's Rolex watch has been in their possession since shortly after the murders and through the time of Mr. Cantu's 2001 trial. Notably, neither Mark Kitchen nor

Gladys Mosqueda testified at the guilt-innocence phase of Mr. Cantu's trial.[2] But these statements are obviously in conflict with Detective Winn's account. The victims' families have no reason to collude in a false account of the evidence to assist Mr. Cantu, an account that is confirmed by the Mosquedas' possession of the Rolex watch allegedly discarded by Mr. Cantu on a Dallas freeway. Detective Winn, on the other hand, repeatedly testified to his lack of memory and, significantly, also testified "I don't know what *Brady* is." 33 RR 189.

The evidence supporting Mr. Cantu's claims regarding the Rolex watch (both the State's reliance on false testimony and suppression of evidence that the watch had been recovered before trial) was not previously discoverable by Mr. Cantu. First, as described above and in Mr. Cantu's MFA, the lead DPD detective investigating this case suppressed evidence demonstrating that Ms. Boettcher lied in her sworn statements and from the stand. Mr. Kitchen discovered Mr. Mosqueda's watch shortly after the murders and gave it to Detective Winn. By then, Mr. Boettcher had already repeatedly sworn she saw Mr. Cantu wear and then discard Mr. Mosqueda's watch. Instead of logging the watch into evidence, Winn returned it to Mr. Mosqueda's mother. Though his report documented the meeting with Mr.

---

[2] Gladys Mosqueda testified at the punishment phase as a victim impact witness after the defense rested its punishment-phase case. She testified through a Spanish language interpreter. Her testimony comprised less than five pages. 47 RR 11-15. Mark Kitchen did not testify in either phase of trial.

Kitchen, he failed to document recovering the watch and thus Mr. Cantu had no way of knowing it had been recovered. He only discovered the deceits of Detective Winn and Ms. Boettcher many years later.

The Respondent asserts nonetheless that, because "Gladys Mosqueda was Cantu's aunt" and because his father Abner was able to discover in 2019 that Gladys had the Rolex watch, this "defeats any notion that Cantu could not have learned this fact through reasonable diligence." Response at 15. But the Respondent ignores the reality that Gladys Mosqueda was the mother of the victim, James Mosqueda. The record reveals that Mr. Cantu and his mother Sylvia had lost contact with the Mosqueda family after Sylvia and Abner divorced when Mr. Cantu was seven or eight years old; only James Mosqueda had any regular interactions with them. 34 RR 279-283. Their estrangement from the Mosqueda family must have only intensified after Mr. Cantu was charged with and ultimately convicted of murdering James. *See* 47 RR 9-10. Even in 2019, Gladys Mosqueda only cooperated regarding the Rolex watch when she was approached by representatives of the State.

### B. Jeff Boettcher recanted his testimony in a 2022 videotaped interview with the CCDAO in 2022, years after Mr. Cantu's initial federal habeas petition.

The other indisputably new evidence was a 2022 videotaped recantation by the State's other star witness, Jeff Boetcher, in which he admits to lying about a damning pre-crime conversation with Mr. Cantu and states that it "never happened."

Mr. Boettcher recanted his testimony in an interview by a CCDAO assistant district attorney and investigator; Mr. Cantu first learned of the interview and recantation on April 5, 2022, when the CCDAO disclosed the video. Thus, Mr. Boettcher's recantation came to light years after Mr. Cantu's prior federal habeas proceedings.

### C. Evidence impugning Carlos Gonzalez's trial testimony has only emerged during the past weeks from public response to an independent podcast.

Mr. Cantu asserts that the factual basis for his claim regarding Carlos Gonzalez's false testimony emerged from public response to a podcast by a citizen-journalist podcaster named Matt Duff. *See* MFA at 51. Mr. Cantu's allegations are supported by evidence submitted with his MFA.

Ryan Patton connected Carlos Gonzalez to a friend from the Valley who drove a Lincoln after listening to the podcast with his wife in 2021. Exhibit 19. Mr. Patton was interviewed by the podcaster in 2021 and learned that his recollection of one of Carlos's friends who visited his shop in 2001 matched the drug dealer who threatened Mr. Cantu. *Id.* But, at that time, nobody knew the actual identity of "Matt from the Valley."

It was not until very recently that the podcaster thought he had identified Mateo "Matt" Gonzalez—a drug dealer from Mission, Texas who drove a Lincoln Town Car—as Matt from the Valley.[3] Mr. Patton viewed a picture of Mr. Gonzalez

---

[3] Undersigned counsel learned of this development for the first time on February 14, 2024.

taken towards the end of his life (he died in 2022). Mr. Patton was not sure if he was the same man he saw with Carlos over 20 years ago. *Id*. On February 18, 2024, Mr. Patton viewed a sketch of Matt Gonzalez with longer hair and declared that he was 95% certain that Matt Gonzalez was the man he saw with Carlos Gonzalez in September of 2001. Mr. Patton signed a declaration the next day, on February 19, 2024.

Additionally, Mr. Cantu's investigator, Stewart Fillmore, acting on the podcaster's information that Matt Gonzalez was "Matt from the Valley," spoke with Matt Gonzalez's ex-wife, June Rose, on February 19, 2024. Exhibit 18. She confirmed that she had known Matt Gonzalez since the late 1980s or early 1990s and was in a common law marriage with him from approximately 1996 to until he went to prison for selling drugs in 2006 or 2007. *Id*. She also confirmed that Matt Gonzalez knew and supplied drugs to James Mosqueda, but she denied knowing the details. *Id*.

Jason Harrelson worked for Mr. Mosqueda in the 1990s. Exhibit 15. After seeing a picture of Matt Gonzalez on February 14, 2024, he identified him as one of Mr. Mosqueda's acquaintances who would occasionally show up where they worked. *Id*. Mr. Harrelson signed his declaration on February 17, 2024.

Prior to this month, Mr. Cantu did know the identity of Matt from the Valley. As soon as this information was discovered through the podcaster's crowd-sourced

investigation and passed on to undersigned counsel, Mr. Cantu acted as quickly as he could and filed his second successive state application in less than a week's time, and his MFA in this Court the following day.

The Respondent claims that Mr. Cantu "knew Patton" and "could have learned of Harrelson by looking into Mosqueda's work history." Response at 25. Mr. Cantu has alleged that the evidence was unavailable to him before this month. He supported this allegation with statements from witnesses who—until seeing a photo or sketch less than two weeks ago—likewise did not know that the person that they knew was associated with both Mr. Mosqueda and Carlos Gonzalez was in fact Mateo "Matt" Gonzalez. Mr. Cantu's allegations and evidence satisfy the threshold showing of unavailability required at this stage.

## II. Mr. Cantu has satisfied his § 2244(b)(2)(B)(ii) burden to plead a prima facie showing of clear and convincing evidence that, when considered in light of the evidence as a whole, that no reasonable factfinder would find him guilty.

The Respondent argues that courts—without the benefit of the new evidence before this Court—have described the evidence of Mr. Cantu's guilt as "substantial" or concluded that Mr. Cantu is "not innocent." Response at 32–33. Every conviction, hopefully, rests on proof of guilt beyond a reasonable doubt. However, innocent people are convicted and, not surprisingly, their undiscovered claim of innocence is often not apparent from the record. A study of DNA exoneration cases

found that in 10% of cases, reviewing "courts were [initially] so sure of guilt that they called the evidence of guilt '*overwhelming*.'" Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 109 (2008) (emphasis added).

The question under § 2244(b)(2)(B)(ii) is not whether there was sufficient evidence of guilt at trial to convict Mr. Cantu. The appropriate inquiry here is whether Mr. Cantu "has made a prima facie showing, by clear and convincing evidence" that "after hearing the new evidence alongside the old evidence, every reasonable juror would have some level of reasonable doubt." *In re Will*, 970 F.3d 536, 547 (5th Cir. 2020). The Respondent suggests that Mr. "Cantu's new evidence falls well short of this standard," Response at 28, but the new evidence undercuts every pillar of the State's case and validates Mr. Cantu's account leading up to the murders.

First, "Amy Boettcher's testimony about the offense wholly incriminated appellant in the murders and robbery" and "both Amy and Jeff Boettcher testified about appellant's express desire to kill the victims." *Cantu v. State*, 2004 WL 3093156, at *4 (Tex. Crim. App. June 30, 2004). The Boettchers were indisputably the prosecution's star witnesses, Amy all the more so because she provided critical testimony linking Mr. Cantu to physical evidence, such as clothing stained with the victims' blood and a bullet recovered from the wall of their apartment. Amy testified

12

to facts that the lead detective, Anthony Winn, knew to be false, which raises questions about his credibility as well.

This Court can, and should, reassess the Boettchers' and Winn's credibility in light of the new evidence:

- **Amy Boettcher**

Ms. Boettcher lied about seeing Mr. Cantu throw away a valuable Rolex watch because the police erroneously believed it was stolen but had not recovered it. MFA at 17–22. She testified that Mr. Cantu gave her the victim's engagement ring because the police told her it was stolen. *Id*. at 22–24. She testified to seeing the victims after they were killed at a time when forensic pathologists (and the victim's roommate) confirm they were still alive. *Id*. at 30–33. In short, Ms. Boettcher lied extensively in the service of the State, which is not surprising considering she was facing a probation revocation which never came. This Court can and should reassess her credibility and discount anything she said based on her demonstrable willingness to lie for the police. Without Ms. Boettcher, most of the prosecution's case evaporates.

- **Jeff Boettcher**

Mr. Boettcher recanted his testimony in 2022 and said he "lied," plain and simple. MFA 33–36. This Court can assess Mr. Boettcher's credibility for itself;

the State's 2022 videotaped interview leaves no doubt that his trial testimony was not credible.[4]

- **Anthony Winn**

The true fate of the Rolex watch not only discredits Ms. Boettcher, it discredits Anthony Winn, the lead the lead detective who testified about the police investigation into the case. The evidence demonstrates that Detective Winn suppressed evidence inconsistent with his theory that Mr. Cantu was guilty or that would impeach his star witness. When Detective Winn discovered two weeks after the murders that Amy Boettcher was lying about Mr. Mosqueda's Rolex, he suppressed the evidence and omitted it from his report. MFA at 21–22.

The Respondent argues that "Cantu's assertions regarding the watch are further undermined by Detective's Winn's statements that anything from the crime scene would have been logged" and "there is no evidence that a Rolex watch was ever logged." Response at 28. But Detective Winn claimed no memory of what

---

[4] Counsel for Respondent suggests that he did not watch Mr. Boettcher's videotaped recantation because "Cantu provides a hyperlink, but the Director does not have an operational link or a copy of the video." Response at 20 n.13. The hyperlink is active in both the e-filed version of the motion and a copy of the pleading Mr. Cantu downloaded from PACER after it was filed. Counsel for the Respondent represents the State in these proceedings: in federal habeas cases "against [the] Director…, the real party in interest is the State of Texas." *Saldano v. Roach*, 363 F.3d 545, 551 (5th Cir. 2004); *see also id*. ("the Attorney General is properly representing the State in this case"). Mr. Cantu obtained the video from the State. MFA at 35. Mr. Cantu is thus unsure how the State lacks access to materials created by the State that are in the State's file. Nevertheless, counsel for Respondent never notified undersigned counsel that he could not work the hyperlink before filing his Response. Undersigned counsel has now sent him the hyperlink by email.

happened,[5] and only speculated that he would have logged it into evidence. MFA Appendix at 102.

The CCDAO's own investigation confirmed that James Mosqueda had only one Rolex watch and the Mosqueda family has it. Thus, based on the evidence developed by the State's own investigator, there are just two possible explanations. The first is that Amy Boettcher testified truthfully, the families of both victims lied to the CCDAO investigator about Detective Winn receiving the watch and returning it to the Mosqueda family, and Mr. Mosqueda's mother bought an identical Rolex watch and had it engraved in the same manner as Mr. Mosqueda's. The second is that the victims' families are telling the truth, the watch currently in the possession of the Mosqueda family (which matches the description of the allegedly stolen watch in all particulars) is in fact Mr. Mosqueda's watch, and Amy Boettcher lied. The first explanation is facially implausible. Only Detective Winn knows whether he truly forgot facilitating the return of the watch, but there is no doubt that he did so.

The conclusion that Detective Winn suppressed evidence revealing that Amy Boettcher was lying is consistent with record evidence of similar conduct. Though Detective Winn was aware of information connecting the murders to Mr.

---

[5] Even during Mr. Cantu's trial 2001, Detective Winn professed his inability to recall the details of his investigation in this case. His memory lapses were particularly acute when being cross-examined by the defense, so much so that the trial court's joke about Winn's bad memory drew laughter from the courtroom. 33 RR 168.

Mosqueda's drug dealing—which corroborates Mr. Cantu's account, Winn failed to disclose it to the prosecutors before trial, meaning that even diligent prosecutors could not comply with their *Brady* obligations in a timely manner. MFA at 7. Detective Winn's suppression of the watch was also consistent with his astonishing failure to attempt any investigation into leads regarding suspects other than Mr. Cantu. *Id*. at 7–9. This Court can and should assess Detective Winn's credibility in light of all available evidence because the integrity of the State's investigation rests on his shoulders. The totality of the evidence reveals Detective Winn led a blinkered investigation focused exclusively on Mr. Cantu and he was more concerned with the consistency of the evidence than the truth.

New evidence also requires reassessment of the State's physical evidence, including:

- **The clothing stained with the victim's blood discovered in plain view, and other crime-relevant items, in Mr. Cantu's apartment.**

Dallas Police Officer Iliff (now Ms. Eichenberg) has sworn under oath that the clothes were not in Mr. Cantu's apartment on the evening of November 4, 2000, well after the time Ms. Boettcher testified to seeing Mr. Cantu with the clothes, and after they both departed for Arkansas. MFA Appendix at 125. Either the Dallas Police Officer or Ms. Boettcher lied under oath, and other evidence confirms Ms. Boettcher repeatedly lied under oath. This credible evidence is supported by other new evidence proving that the blood-stained pants were far too large for Mr. Cantu,

*Id*. at 129, and that someone made a call from Mr. Cantu's apartment on the night of November 4, 2000, after the police wellness check had concluded and everyone present had left the apartment. *Id*. at 12.

Respondent contends this evidence is "wholly undermined by the testimony of Officer Junger, who was with Officer Iliff during the initial well-check, and Detective Winn." Response at 29. But Officer Junger testified that he *could not remember if he checked the kitchen* or Officer Iliff checked the kitchen: "Once again, I don't know if I did or Officer Iliff did, but it wouldn't take very long, sir." 32 RR 104. Officer Iliff affirmatively remembers that she "entered the small kitchen" and "did not observe any clothing or later discovered evidence in the garbage can," "leading [her] to believe the evidence in the trash can was not there at the time of the search." MFA Appendix at 125. She described the search as "thorough" and is "positive this evidence would have been seen." *Id*. Between the two, Ms. Eichenberg has the better recall of events, but the State called only Officer Junger to the stand.

- **The bullet found in Mr. Cantu's apartment wall.**

The Respondent points to the bullet found in the wall of Mr. Cantu's apartment that was fired from the murder weapon. Response at 31. Respondent fails to acknowledge that the only evidence connecting that bullet to Mr. Cantu comes from the State's thoroughly discredited witness, Amy Boettcher (who testified that

Mr. Cantu shot at her on November 2, 2000, and then she accepted his marriage proposal and took him to meet her parents in the ensuing days).

The Respondent also fails to acknowledge the new evidence confirming that Mr. Mosqueda's drug supplier truly was Matt from the Valley, and that Mr. Cantu's account contained details he could not have known unless he was telling the truth: "Again, it is still unclear why podcaster Duff picked Mateo Gonzalez to show Harrelson and Patton (other than Mateo was a Hispanic male from the Rio Grande Valley with a criminal history)." Response at 30.

To discount this evidence, one must assume that the details of Mr. Cantu's allegedly fictional account given immediately after the crime just coincidentally hit on the name, "Matt," Mr. Mosqueda's supplier of large quantities of drugs. *And*, coincidentally, Mr. Cantu's fictional "Matt" who supplied Mr. Mosqueda's drugs was—like the real Matt—also from the Valley. *And*, coincidentally, Mr. Cantu's fictional "Matt from the Valley" who supplied Mr. Mosqueda's drugs—like the real Matt from the Valley—drove a Lincoln town car. *And*, coincidentally, Mr. Cantu's fictional "Matt from the Valley" who supplied Mr. Mosqueda's drugs and drove a Lincoln town car—like the real Matt from the Valley—wore his hair in a ponytail. Matt Gonzalez was not just a random "Hispanic male from the Rio Grande Valley with a criminal history," Response at 30, he was Mr. Mosqueda's large-scale drug supplier. The significance of this evidence is that Mr. Cantu has told the truth from

day one.  Respondent quibbles with whether Mr. Cantu has sufficient "evidentiary water" to float this proposition, Response at 31, but the question before the Court is only whether Mr. Cantu has made a prima facie showing to warrant further exploration of his proposed petition.

- **The murder weapon containing a cartridge bearing Mr. Cantu's fingerprint.**

The Respondent points to the murder weapon discovered in the apartment of Tawny Svihovec, where Mr. Cantu and Ms. Boettcher went upon returning from Arkansas.  Response at 31.  But there is evidence that Mr. Cantu was not responsible for placing the gun there.  First, Ms. Boettcher testified that she looked under the couch cushions and found only drugs and money.  She did not testify to seeing a gun there after Mr. Cantu had left the apartment for good.  35 RR 183–84. Second, Ms. Svihovec states that she is "99.9 percent" sure that Amy Boettcher—who was alone in the apartment most of the day, 35 RR 18—left the gun in her apartment. MFA Appendix at 148.  Respondent urges this Court to doubt Ms. Svihovec's credibility, Response at 27, 30, but offers no basis for doing so.

"[T]he controlling standard is not whether the newly discovered evidence proves innocence beyond all doubt," the "standard is one of reasonable doubt—whether [the petitioner] has made a prima facie showing, by clear and convincing evidence, that no reasonable factfinder would find him guilty." *In re Will*, 970 F.3d at 547. Mr. Cantu submits that he has.

**III.  The statute of limitations does not preclude authorization for a successive habeas corpus petition in Mr. Cantu's case.**

The Respondent argues that Mr. Cantu's motion for authorization should be denied because his claims are time-barred under 28 U.S.C. §2244(d).  *See* Response at 33–36.  The Respondent further asserts that because Mr. Cantu "failed to wholly address [the statute of limitations issue in his motion for authorization], he has waived any further argument on it."  Response at 35.

The statute of limitations is an affirmative defense pled by the Respondent when answering a petition for habeas corpus relief. *See, e.g.,* Rule 5(b), Rules Governing Section 2254 Cases in the United States District Courts.  Responding to the invocation of a procedural defense is the very stuff of a reply brief.  Mr. Cantu was required to plead the elements contained in § 2244(b): "The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements *of this subsection*."  28 U.S.C. § 2244(b)(3)(C) (emphasis added).  The statute of limitations is contained in § 2244(d), a different subsection of § 2244.  Assuming the Court has "the authority to deny a motion to authorize based on timeliness," Respondent's Opposition at 33, Mr. Cantu was not bound to preemptively plead or address the issue in his motion for authorization before the Respondent had even asserted it.

Mr. Cantu's claims are not time-barred for multiple independent reasons. First, in *McQuiggin v. Perkins*, the Supreme Court held that satisfying the *Schlup v. Delo*, 513 U.S. 298 (1995), standard for overcoming a procedural bar, serves as a gateway through which a petitioner may pass to overcome a time bar. 569 U.S. 383, 398 (2013). Mr. Cantu, *supra*, has "made a prima facie showing, by clear and convincing evidence" that "after hearing the new evidence alongside the old evidence, every reasonable juror would have some level of reasonable doubt." *In re Will*, 970 F.3d at 547. Satisfying the § 2244(b)(2)(B)(ii) standard is more demanding than satisfying the *Schlup* standard. *McQuiggin*, 569 U.S. at 396 ("Congress thus required second-or-successive habeas petitioners attempting to benefit from the miscarriage of justice exception to meet a higher level of proof…."). To overcome a time-bar, Mr. Cantu must show that "it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Floyd v. Vannoy*, 894 F.3d 143, 155 (5th Cir. 2018) (quoting *Schlup*, 513 U.S. at 329) (internal quotation marks omitted). Because his greater § 2244(b)(B)(ii) showing necessarily includes the lesser *McQuiggin* showing, Mr. Cantu has "opened the 'actual innocence' gateway." *Id*. at 160.

Second, the Respondent concedes that Mr. Cantu's claim regarding Carlos Gonzalez' false testimony "theoretically" survives the time bar. Response at 36.

This is true because Mr. Cantu was not on notice of the facts necessary to plead the claim until earlier this month.

Third, as set forth in Section I.A.2., *supra*, while the CCDAO conducted its investigation regarding the Rolex watch in 2019, it did not turn over its notes and evidence to Mr. Cantu's counsel until almost four years later, in May of 2023.

The materials first disclosed in May of 2023 significantly strengthen Mr. Cantu's claims regarding Ms. Boettcher's false testimony and Detective Winn's suppression of evidence. First, the State secured an unsworn written statement from Mark Kitchen confirming that he found the watch and gave it to Detective Winn two weeks after the murders, well before the trial in this case. Second, throughout this litigation, the State has attempted to deflect attention from these issues by asserting some variation of an argument that perhaps Ms. Boettcher saw Mr. Cantu throw away a different Rolex watch because Mr. Mosqueda may have had more than one. No evidence supported such speculations, but the CCDAO's own investigation sealed off any remaining rabbit holes by documenting that Mr. Mosqueda owned just one Rolex. MFA Appendix at 102. The evidence the State withheld for almost four years—until after Mr. Cantu filed his first subsequent state habeas application— removed any doubt that the Mosqueda family's possession of the heirloom watch proved that Ms. Boettcher lied at trial and, that Detective Winn suppressed the watch. The limitations period has yet to run on this disclosure.

In any event, the statute of limitations does not preclude this Court from authorizing Mr. Cantu's successive petition.

## IV. Federal review of Mr. Cantu's claims is not barred.

The Respondent also argues that Mr. Cantu's motion for authorization should be denied because his claims are procedurally defaulted. *See* Response at 36–37. However, Mr. Cantu can overcome any procedural bar based on his showing, *supra*, "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 326–27.

Additionally, as described in his proposed petition, that factual predicate for Mr. Cantu's claims—including Jeff Boettcher's recantation, the new evidence demonstrating that Carlos Gonzalez lied at trial, the suppression of Mr. Mosqueda's Rolex watch which proved that Amy Boettcher lied at trial—was not available when Mr. Cantu filed his initial federal habeas. *See* MFA Appendix at 23–26 (addressing the Rolex); 44–45 (addressing Jeff Boettcher's recantation); 49–54 (addressing Carlos Gonzalez). Thus, Mr. Cantu can likewise show cause for any default and prejudice based on the potential merit of his claims.

## V. Mr. Cantu's execution should be stayed.

Contrary to the Respondent's assertions, Mr. Cantu had no intention of "stunning the courts into staying his execution." *See* Respondent's Opposition at 39. Rather, Mr. Cantu raised his claims of prosecutorial misconduct as expeditiously

as possible and—as the Respondent notes, Response at 39—in compliance with this Court's rules governing timely filings in cases with an active execution date.

This situation was in part created by the State's piecemeal disclosure of suppressed material, exculpatory evidence. State actors cannot now claim substantial harm for a situation created by their failure to comply with their constitutional obligations. To date, the State of Texas has succeeded in thwarting all judicial review of evidence that completely undermines the judgment against Mr. Cantu. No party will be injured if Mr. Cantu is not executed tomorrow, but he will be irreparably injured. When all of the evidence, old and new, creates a reasonable doubt in the mind of every reasonable juror, the public interest lies in allowing one airing of the claims.

## VI.    Conclusion

For all the above and foregoing reasons, Mr. Cantu asks this Court to grant his motions for authorization to file a successive habeas corpus application and for stay of his impending execution date.

Respectfully submitted,

 */s/* Gena Bunn
GENA BUNN
Texas Bar No. 00790323

Gena Bunn, PLLC
P.O. Box 6150

Longview, Texas 75608
gbunn@genabunnlaw.com
(903) 804-4003

ATTORNEY FOR MOVANT,
IVAN ABNER CANTU

**CERTIFICATE OF COMPLIANCE**

I certify that (1) this pleading was prepared in 14-point Times New Roman font using Microsoft Word software, (2) this Motion is 5835 words, excluding the parts of the pleading exempted by the rules of court, and (3) this pleading has been scanned for viruses and the pleading is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

*/s/ Gena Bunn*
Gena Bunn

**CERTIFICATE OF SERVICE**

I certify that on February 27, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. I have also sent a copy via email to counsel for the Director, Travis Bragg.

*/s/ Gena Bunn*
Gena Bunn