# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
February 27, 2024
Lyle W. Cayce
Clerk

No. 24-40110

In re Ivan Abner Cantu,

*Movant.*

Motion for an Order Authorizing
The United States District Court
For the Eastern District of Texas
To Consider a Successive Petition for
A Writ of Habeas Corpus Pursuant to
28 U.S.C. § 2244

Before Jones, Wilson, and Douglas, *Circuit Judges.*

Edith H. Jones, *Circuit Judge*:

Ivan Cantu was convicted of capital murder and sentenced to death in October 2001. His conviction and sentence were affirmed on direct appeal, and he was subsequently denied state and federal habeas relief. On the eve of his execution, Cantu moved again to stay his execution and authorize the district court to consider a successive writ of habeas corpus under 28 U.S.C. § 2254. But first, he must meet the requirements of 28 U.S.C. § 2244. Because Cantu has failed to satisfy the requirements of 28 U.S.C. § 2244(b)(2)(B), we DENY relief.

## Background

The relevant facts, as presented at trial, were well summarized by this court in 2011:

Cantu lived in an apartment with his girlfriend, Amy Boettcher, near where his cousin, James Mosqueda, lived with his fiancée, Amy Kitchen. According to Boettcher's testimony, Cantu called Mosqueda on the night of November 3, 2000 at approximately 11:30 p.m., and asked if he could come over to Mosqueda and Kitchen's house. Cantu then told Boettcher that he was going to their house to kill them, but Boettcher did not believe him. Cantu left his apartment with his gun and returned an hour later driving Kitchen's Mercedes. His face was swollen and a substance that looked like blood was on his jeans and in his hair. Cantu had Mosqueda's and Kitchen's identifications and keys. Cantu cleaned up, and Boettcher threw his bloody jeans into the trash. Cantu and Boettcher then went together to the victims' house in Kitchen's Mercedes. There, Boettcher saw both victims' bodies through the doorway to the master bedroom, while Cantu was searching the house for drugs and money. Cantu took the engagement ring that had belonged to Kitchen and gave it to Boettcher. Cantu and Boettcher left Kitchen's Mercedes parked in the garage and drove off in Mosqueda's Corvette. The couple later drove to Arkansas to visit Boettcher's parents, where they were when the bodies were discovered the following evening.

Police found no evidence of forced entry at Mosqueda and Kitchen's house. Police spoke with Cantu's mother, then searched Cantu and Boettcher's apartment. Police obtained a search warrant to search the apartment a second time and found the bloody jeans, ammunition, a key to the victims' house, and a key to Kitchen's Mercedes. Police also found Cantu's gun at his ex-girlfriend's house where Cantu and Boettcher had stopped on the way home from Arkansas. Cantu's fingerprints were found on the gun's magazine, and Mosqueda's blood was found on the gun's barrel. Police arrested Cantu for the murders.

No. 24-40110

*Cantu v. Thaler*, 632 F.3d 157, 160 (5th Cir. 2011), *cert. granted, judgment vacated*, 566 U.S. 901, 132 S. Ct. 1791, 182 L. Ed. 2d 612 (2012). After his arrest and indictment for murder, Cantu pleaded not guilty. *Id.* at 161. "A jury convicted him of murder and sentenced him to death." *Id.*

Cantu's conviction and sentence were affirmed on direct appeal. *Cantu v. State*, No. AP-74,220, 2004 WL 3093156 (Tex. Crim. App. Jun. 30, 2004) (not designated for publication). State habeas corpus relief was denied in 2006. *Ex parte Cantu*, No. WR-63624-01, 2006 WL 120829 (Tex. Crim. App. Jan. 18, 2006) (not designated for publication). A federal district court denied federal habeas corpus relief, *Cantu v. Quarterman*, No. 2:06-CV-166, 2009 WL 728577 (E.D. Tex. Mar. 17, 2009), and this court affirmed. *Cantu v. Thaler*, 632 F.3d 157 (5th Cir. 2011). However, the United States Supreme Court granted certiorari review, vacated, and remanded for reconsideration in light of *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309 (2012). *Cantu v. Thaler*, 566 U.S. 901 (2012). On remand, the federal district court again denied relief and denied a certificate of appealability. *Cantu v. TDCJ-CID*, No. 2:06-CV-166, 2016 WL 3277246 (E.D. Tex. Jun. 15, 2016). The Fifth Circuit also denied a certificate of appealability. *Cantu v. Davis*, 665 F. App'x 384 (5th Cir. 2016). The United States Supreme Court denied certiorari review. *Cantu v. Davis*, 582 U.S. 917, 137 S. Ct. 228 (2017).

Cantu and the prosecution team agreed to additional DNA testing while Cantu's federal habeas proceedings were still pending. Following additional hearings in 2020 and 2021, the convicting court concluded that the new DNA evidence would not have made a difference at Cantu's trial.

In December 2022, the convicting court scheduled Cantu's execution for April 26, 2023. Cantu then filed his first subsequent application for habeas corpus relief on April 18, raising the same issue he now raises at the last minute in this court. The trial court withdrew Cantu's execution date, but

3

the Texas Court of Criminal Appeals (TCCA) dismissed Cantu's first subsequent application without considering the merits of his claims. *Ex parte Cantu*, No. WR-63,624-02, 2023 WL 5425491 (Tex. Crim. App. Aug. 23, 2023).

Cantu's execution was then rescheduled for February 28, 2024. On January 12, Cantu filed a motion in the trial court seeking access to the notes of the State's ballistics expert from trial and asking for funds to hire a ballistics expert. The court denied the motion on January 18. On January 30, Cantu filed in the same court a motion to reconsider the denial of the original ballistics motion. The court denied that on February 5. On February 20—the day before our court received the instant motion from Cantu—he filed a suggestion to the TCCA to reconsider the August 23 dismissal on the court's own motion. Earlier today, on February 27, the TCCA denied habeas relief and Cantu's motion to stay the execution.

At midnight on February 21, this court "received" Cantu's e-filed motion seeking authorization to file a second habeas petition and an attendant motion to stay his execution. Cantu raises the same claims that the TCCA rejected in August 2023. Principally, Cantu argues that the testimony of the State's "star witnesses," Amy Boettcher, her brother Jeff Boettcher, and Carlos Gonzalez (an acquaintance of Cantu and drug dealer with James Mosqueda), was materially false in violation of the Due Process Clause of the Fourteenth Amendment. He also claims that the State suppressed evidence impeaching Amy Boettcher, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the Due Process Clause. These claims were not raised during his direct appeal and post-conviction proceedings.

## Standard of Review

To obtain authorization from this court to file a successive federal habeas petition in the district court, a petitioner must show that his claim

meets the requirements of 28 U.S.C. § 2244(b). *In re Campbell*, 750 F.3d 523, 529–30 (5th Cir. 2014). For a petitioner to proceed on a claim not previously raised, he must make a prima facie showing that one of two exceptions apply. § 2244(b)(3)(C). Pertinent here, Cantu asserts that:

> (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense.

§ 2244(b)(2)(B). Otherwise, the successive habeas petition "'shall be dismissed.'" 28 U.S.C. § 2244(b).

## Analysis

Having carefully evaluated Cantu's claims in light of the evidence from trial, post-conviction opinions of the courts, and Cantu's multiple exhibits, we conclude that he cannot succeed in proving either prong of the test for newly discovered evidence. In short, his claims could have been discovered years or even decades ago with the exercise of due diligence. And even if some of his claims had merit (though they do not), he has not made a prima facie case that by clear and convincing evidence, no reasonable factfinder would have found him guilty of the two murders.

### I. Cantu Failed to Exercise Due Diligence

This court has held that "the plain text of § 2244(b)(2)(B) suggests that due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record. The burden to make such a showing, of course, remains the petitioner's." *Johnson v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006). It is "not sufficient under

§ 2244(b) merely to show that evidence muddies the waters." *In re Swearingen*, 935 F.3d 415, 420 (5th Cir. 2019) (quoting *In re Raby*, 925 F.3d 749, 759. (5th Cir. 2019)) (quotation marks omitted). Rather, the evidence must be "clear and convincing." *Id*. (quoting § 2244(b)(2)(B)(ii)).

Cantu seeks authorization on two different grounds. First, he alleges that the State proffered false testimony through three witnesses: Amy Boettcher, her brother Jeff Boettcher, and Carlos Gonzalez, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972). Second, he claims that the State suppressed evidence in violation of *Brady*. In support of these grounds, Cantu cites numerous factual allegations that he could have discovered by exercising due diligence at the time of trial or no less than several years ago. He had ample opportunity to bring these alleged new facts to the court's attention earlier than a week before his execution.

### *A. Facts Related to Amy Boettcher*

The State concedes that Amy Boettcher was the State's key witness against Cantu. But nearly two decades after her testimony, and curiously, only after Amy passed away in February 2021, Cantu claims that four elements of Amy's testimony were false.

First, Cantu claims that Amy testified falsely about James Mosqueda's Rolex watch, and the State suppressed evidence regarding the watch. At trial, she testified that Cantu stole a "shitty Rolex" from Mosqueda after his murder, wore it for a short time, and then threw it out a car window on their way to a club in downtown Dallas on the night of the murders. Cantu now claims that it was known to the State at the time of trial that the watch was never stolen, and that James's mother Gladys—Cantu's aunt—has possessed the watch for years. Cantu also claims that the State suppressed information that Detective Winn—one of the police officers who

worked on the case and who allegedly received the watch from victim Amy Kitchen's brother—gave it to James's mother. This is in spite of the fact, noted by Cantu, that Detective Winn, when questioned by a Collin County District Attorney's Office investigator in 2019, said he did not remember giving the watch to Mosqueda's mother. Detective Winn further stated that if someone had turned in evidence from the crime scene, such as a watch, it would have been logged into evidence rather than given to a third party. Further investigation revealed that Dallas Police Department Property Room logs did not include an entry for a watch nor an entry for any property returned to Gladys Mosqueda.

Cantu argues that the above suggests that Amy Boettcher lied on the stand and that the State suppressed evidence that Detective Winn gave the watch to Gladys Mosqueda. According to Cantu, this satisfies his requirement of a prima facie showing under § 2244(b)(2)(B)(i), such that any further diligence is not required under the statute. We disagree.[1] This court, like other circuits, has held that a successive petitioner urging a *Brady* claim may not rely solely on the fact that evidence was suppressed at trial to demonstrate diligence under § 2244(b)(2)(B)(i). *Johnson*, 442 F.3d at 910; *accord In re Boshears*, 110 F.3d 1538, 1540 (11th Cir. 1997); *Gage v. Chappell*, 793 F.3d 1159, 1166 (9th Cir. 2015); *Case v. Hatch*, 731 F.3d 1015, 1027 (10th Cir. 2013). Mosqueda's mother Gladys, who was also Cantu's aunt, testified at trial. It was amply possible for Cantu, as well as his father, mother, or brother to discover that Gladys had her murdered son's heirloom watch at the time of the trial, and long before 2019, when Cantu's father first signed an affidavit stating that Gladys had possessed the Rolex. Cantu would have

---

[1] As the above recitation demonstrates, Cantu has had the information for his claim that Mosqueda's mother had the watch since at least 2019, but he chose not to bring this before even the state courts until the eve of his execution date in 2023.

Case: 24-40110   Document: 34-1   Page: 8   Date Filed: 02/27/2024

No. 24-40110

known if Amy was lying about his having allegedly thrown the watch away and would have had every incentive to locate the watch. Cantu could have learned the watch's location through reasonable diligence. He failed to do so, and thus cannot satisfy § 2244(b)(2)(B)(i) as it pertains to the Rolex.

Second, Cantu claims that Amy Boettcher lied when she testified that Cantu proposed to her with Amy Kitchen's engagement ring on the night of the murders. Now, with the help of two affidavits from his friends at the time of the murders, Cantu claims that he and Amy Boettcher had announced their engagement a week before the murders and that that Amy Boettcher was wearing a ring at that time. This allegation also cannot satisfy the requirements of § 2244(b)(2)(B)(i). Surely, Cantu knew at the outset of the murder case when and to whom he had announced his engagement to Amy Boettcher and when he had presented her with an engagement ring.[2] But "not one of [Cantu's] attorneys inquired as to the existence of [this evidence]" until years after the trial. As in the *Johnson* case, they plainly failed to meet the due diligence requirement for at least this aspect of [Cantu's] claims." *Blackman v. Davis*, 909 F.3d 772, 779 (5th Cir. 2018), *as revised* (Dec. 26, 2018).

Third, Cantu offers an affidavit from Susan Eichenberg, née Iliff, a Dallas Police Department officer who responded to the murder scene and subsequently escorted Sylvia Cantu to her son's apartment for a welfare check. This check occurred the day after the murders when Cantu's mother, having been informed of her nephew's death, worried that Cantu and Amy Boettcher might also be unsafe. Eichenberg avers that the bloodied jeans and socks and latex gloves that were subsequently found, during a warranted

---

[2] Also undermining this claim is that the prosecution presented witnesses who partied with Cantu and Amy Boettcher the night of the murders and also saw her ring.

search, in the kitchen trash basket at Cantu and Boettcher's apartment were not there the day after the murders. Eichenberg's affidavit, executed nearly two decades after the relevant events, states that while inside Cantu's apartment, she looked around the kitchen, and that she did not believe that the bloody clothes were in the trash basket because she would have seen them and reported it. Based on this affidavit, Cantu claims that after Amy Boettcher and Cantu left for Arkansas, but before they returned, someone else must have entered the apartment, deposited the jeans and socks in the trash basket, and left them in plain view for the police to recover. But Cantu ignores that Officer Steven Junger, who accompanied Eichenberg to the apartment for the welfare check, testified at trial about this event. Officer Junger testified that because they were there to look for injured persons, they searched only where a person or body might be secreted. Thus, they were not opening cabinets or drawers or looking through bins. Obviously, Cantu knew at trial that Officers Junger and Eichenberg did not discover the bloody clothing, but he did not question the officers on this point nor did he investigate further. "[W]here a defendant has actual knowledge that exculpatory evidence exists . . . the due diligence requirement cannot be satisfied if that evidence was not pursued." *In re Will*, 970 F.3d 536, 542 n.23 (5th Cir. 2020). Cantu has failed to meet his burden on this evidence as well.

Last, Cantu claims that Amy Boettcher testified implausibly that Cantu committed the murders around midnight on November 3rd. In support of this attack on the timeline of the murders, Cantu relies primarily on declarations from two forensic pathologists who reviewed the autopsy reports and the handwritten notes of the medical examiners. According to these declarations, the victims were killed on the morning of Saturday, November 4, based on the onset and progression of rigor mortis and livor mortis. Separate and apart from the dubiousness of relying on assessments of rigor mortis and livor mortis based on reviewing notes alone, neither

declaration asserts that it relies on new or previously unavailable science. Yet again, Cantu fails to show why this line of attack was unavailable to him even before trial, much less in the ensuing decades, as required by § 2244(b)(2)(B)(i).

### B. Facts Related to Jeff Boettcher

Jeff Boettcher, Amy's brother, lived with her and Cantu starting in August 2000. At trial, he testified that Cantu owned a gun and carried it nearly every day. Jeff also testified that Cantu told him about his plans to kill Mosqueda prior to the murders and asked if he would help clean up the murder scene afterward. In 2022, after Amy Boettcher died, Jeff Boettcher at least partly recanted his testimony, emphasizing his drug use at the time of the murders and at the time of trial. In the instant motion, Cantu relies on Jeff's assertion that the conversation in which Cantu supposedly asked for help cleaning up the murder scene never happened. But, as the State notes, Jeff's drug use was no secret at the time of trial. Rather, he testified about it both on direct and cross-examination. Jeff also testified that he would do anything to protect his sister. Cantu was well aware of any unreliability in Jeff's testimony at the time of trial. Why he never secured Jeff's attempted recantation before 2022 cannot be the product of due diligence.

In addition, Jeff's testimony is not contradicted by the affidavit from William Bobbitt, who was a roommate of Cantu, Amy, and Jeff in August 2000. Bobbitt now claims that during the two months as Cantu's roommate in August 2000, he never saw him with a gun. That does not mean that Cantu was not carrying a gun nearly every day around the time of the murders in November 2000.

Cantu has failed to carry his burden under § 2244(b)(2)(B)(i) to show that, using reasonable diligence, he could not have previously undermined Jeff's testimony. He thus "fails to make a prima facie showing that the

10

factual predicate for his new habeas claim could not have been discovered through the exercise of due diligence and thus could not have been included in his first federal petition." *In re Davila*, 888 F.3d 179, 186 (5th Cir. 2018).

### C. Facts Related to Carlos Gonzalez

Cantu also attacks the testimony of prosecution witness Carlos Gonzalez, a friend of James Mosqueda. Gonzalez testified to refute Cantu's account that Cantu had been threatened by a man named Matt shortly before the murders because Mosqueda had become deeply indebted to "Matt" in his drug-dealing business. Because "Matt" had been wearing a Domino's Pizza t-shirt when he allegedly threatened Cantu, this became known as the "Pizza Man" story, and Cantu claimed that the Pizza Man had actually killed Mosqueda. In his current motion, Cantu claims that, in the course of a "crowd-sourced investigation" led by "Cousins by Blood" podcast host Matt Duff, he has uncovered new evidence showing that Matt was a real person: Mateo "Matt" Gonzalez from South Texas, who was one of Mosqueda's drug suppliers.

Cantu supports this theory by relying on disparate evidence, including a declaration from one of James Mosqueda's former employees, Jason Harrelson, stating that a man Harrelson has recently identified as Mateo Gonzalez came to Mosqueda's business "6 to 8 times" between 1994 and 1997. Cantu also relies on an affidavit from Mateo Gonzalez's common-law wife, stating that he was a drug seller and was a friend of Mosqueda. Last, Cantu also relies on a declaration of Cantu's former classmate, Ryan Patton, who claims that in 2001, Carlos Gonzalez and one of Carlos's friends, who matched the description of Mateo Gonzalez and drove a similar car, came to the Goodyear tire shop where he worked.

None of this is sufficient to satisfy Cantu's burden under § 2244(b)(2)(B)(i). First, Cantu's focus on "Matt" the Pizza Man is

puzzling because even if such an individual existed, that would not in itself undermine Carlos Gonzalez's testimony that he thought Cantu's story was preposterous. Likewise, the existence of a "Matt" who lived in South Texas and drove a boxy black Lincoln does not support the underlying truth of Cantu's story. Second, Cantu could have discovered Harrelson by looking into Mosqueda's business activities. Finally, the investigation's reliance on Duff, whose motivations are unclear, overshadows Cantu's claims. Duff appears to be the only reason Mateo Gonzalez's name was mentioned in the first place, and Cantu does not shed light on why Duff started focusing on the now-deceased Mateo Gonzalez years after the trial and Cantu's first habeas petition. Nor does Cantu clarify the steps taken to "discover" Mateo Gonzalez as a potential stand-in for "Matt" the Pizza Man. Hence, it is impossible to evaluate whether an objectively diligent attorney could have conducted such an investigation during the initial habeas proceeding.

### D. Additional New Evidence

None of the other "new" evidence Cantu points to in his motion as having been suppressed by the prosecution satisfies the due diligence requirement, either. First, Cantu was "obviously aware at trial," or could have become aware, that the jeans found in the trashcan were too big for him. *In re Swearingen*, 935 F.3d at 421. That is true regardless of Bobbitt's newly offered affidavit, which claims that the jeans were too big for Bobbitt, and he wore a bigger size than Cantu. Bobbitt was an individual known to Cantu at the time of trial.

Second, Cantu also claims that Paulette Sutton testified falsely, based on her analysis of blood splatter from the scene, that Kitchen was kicked or punched in the face. Cantu bases this attack on the analysis of a ballistics and a shooting reconstruction expert who appeared on Duff's podcast and the analyses of two pathologists who disagreed with the time of death opinions.

But this line of attack was available to Cantu at the time of trial and during his initial federal habeas proceedings.

Last, Cantu also provides an email from Tawny Svihovec dated in 2024. Svihovec is Cantu's ex-girlfriend. Cantu and Amy Boettcher stayed at her apartment on their way back from Arkansas. There, the police discovered the murder weapon hidden in a sofa. In the email, Svihovec stated that she is now "99.9 percent [certain that Amy] was the one who left the murder weapon at my apartment." But Svihovec provided no evidence for this assertion. And in any case, Svihovec was known to Cantu at the time of the trial. If Svihovec really believed that the murder weapon had been left by Amy Boettcher, Cantu could have easily discovered this evidence many years ago and prior to filing his initial habeas petition.

## II. Cantu Failed to Provide Clear and Convincing Evidence That No Reasonable Factfinder Would Have Found Him Guilty

Even if Cantu satisfied the diligence requirement, he cannot overcome the requirements of the second prong of § 2244(b)(2)(B). Specifically, "he does not have a reasonable likelihood of showing, by clear and convincing evidence, that but for the alleged *Brady* violation [and allegedly false testimony], not a single reasonable juror would have found him guilty of murder. . . . Consequently, we cannot permit him to proceed with this claim." *In re Raby*, 925 F.3d at 761 (citations omitted). "We have previously described this standard as 'a strict form of 'innocence,' . . . roughly equivalent to the Supreme Court's definition of 'innocence' or 'manifest miscarriage of justice." *In re Davila*, 888 F.3d at 186 (quoting *Johnson*, 442 F.3d at 911 (quoting *Sawyer v. Whitley*, 505 U.S. 333 (1992)).

Beside the fact that much of the new evidence described above is either not credible or not necessarily inconsistent with the evidence presented at trial as part of the State's case, *none* of it undermines the critical

incriminating evidence against Cantu. This includes: Cantu's fingerprint on the clip of the firearm used to murder both victims, which was the firearm found at Svihovec's apartment.

- One victim's DNA on the firearm that has Cantu's print.
- The victims' DNA on the bloody clothing found in Cantu's apartment.
- The victim's keys found in Cantu's apartment.
- Ammunition, the same caliber as the bullets involved in the murders, found in Cantu's apartment.
- A bullet found in Cantu's apartment wall that was fired from the murder weapon.
- James Mosqueda's bracelet found at Amy Boettcher's family home in Arkansas.

Indeed, post-conviction DNA made the case against Cantu even stronger, as it showed that Cantu was a possible contributor to the DNA profile obtained from the sample of the jeans' waistband—with the probability of a random match for this profile measuring 1 in 825,000.

Moreover, according to the affidavit submitted during his state habeas proceedings, Cantu's trial counsel stated that Cantu confessed to the murders and became angry with counsel when they would not suborn perjured testimony. Because this affidavit was credited by the state habeas court, we are obliged under 28 U.S.C. § 2254(e)(1) to pay deference to that

factual determination, as Cantu has failed to rebut such presumption of correctness by clear and convincing evidence as required under the statute.[3]

### III. Cantu Is Not Entitled to A Stay of Execution

When evaluating whether to grant a stay of execution, we must consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009). Cantu cannot satisfy this test because he cannot demonstrate a likelihood of success on his motion for authorization.

In evaluating motions for a stay of execution, we also consider "attempts at manipulation," *Nelson v. Campbell*, 541 U.S. 637, 649, 124 S. Ct. 2117, 2126 (2004), and weigh the interest of the State and victims of crimes "in the timely enforcement of a sentence," *Hill v. McDonough*, 547 U.S. 573, 584, 126 S. Ct. 2096, 2104 (2006).

Cantu was convicted more than two decades ago for two murders. He has since received two stays of execution, been provided with post-conviction

---

[3] Even if Cantu could make a prima facie showing under § 2244(b)(2), we note that most if not all his claims are brought outside the one-year period of limitations under § 2244(d). As discussed above, this evidence was available years if not decades ago with the exercise of due diligence. Though equitable tolling is permitted in situations like these, *Holland v. Florida*, 560 U.S. 631, 649 (2010), Cantu does not argue that tolling is appropriate here. On this basis, we also conclude that Cantu's claims falling outside the one-year period are time-barred. *See* 28 U.S.C. § 2244(d); *see also In re Campbell*, 750 F.3d at 533 ("We have the authority to deny a motion to authorize based on timeliness.").

No. 24-40110

DNA testing, and been represented in multiple state and federal habeas proceedings. His current attorney has represented him for fifteen years during which he has proclaimed his innocence. But Cantu waited almost six months from when the TCCA rejected his subsequent state habeas application to seek any relief in this court and again delayed until barely a week before the scheduled execution. We are unpersuaded by this last-minute strategy.

****

Consistent with the above, we DENY Cantu's motion for authorization to file a successive habeas corpus petition. We also DENY the motion for stay of execution.

No. 24-40110

Edith H. Jones, *Circuit Judge*, concurring:

This last minute-attempt to secure a stay of execution is an abuse. If Mr. Cantu did not murder James Mosqueda and Amy Kitchen execution-style in 2000, he's had two decades to secure proof of his innocence. His present attorney has represented him for 15 years, and he has enjoyed competent counsel at every step of multiple state and federal proceedings. But not until April 2023, one week before a previously scheduled execution date, did he contend that three major prosecution witnesses, his fiancé and two others close to him, all lied on the witness stand. As the panel opinion demonstrates, these claims, and his claims about other evidence offered at trial, are deeply flawed. A reasonable person must conclude that the primary reason for raising these claims at the eleventh hour is to beleaguer the courts and cause some jurist somewhere to blink and grant a stay of execution.

In several decades on this court, I have seen this gamesmanship play out over and over. Today's case, however, is a throwback to the 1980s, when capital trial counsel were not as carefully selected as today and when there were no meaningful limits imposed by AEDPA and state law on the filing of repeated habeas petitions. Here, can it be a coincidence that Cantu accuses Amy Boettcher of lying on the witness stand only after she died, and that her brother recants his testimony incriminating Cantu only after his sister's death? Can it be a coincidence that Cantu now claims to identify the "Pizza Man" as the real murderer, when that fellow is also conveniently deceased (unable to defend himself or to be incriminated by prosecuting authorities)? Finally, does it make no difference that according to his original trial counsel, who was deemed credible, zealous and effective by the state habeas court, Cantu *confessed* that he killed Mosqueda and Kitchen in anger over a drug debt?

No. 24-40110

The law of capital punishment contains multiple layers of protection against conviction of the actually innocent and for protection of those saddled with "mitigating circumstances." Cantu exhausted all these avenues. Yet his counsel, and a podcaster whose role in his representation remains unclear, have pursued frivolous last-minute filings. Their maneuver does nothing to advance their client's cause, but it encourages gamesmanship in the future, reduces their professional credibility in the eyes of the courts, prolongs the agony of the victims' families, and perverts legal procedures.